UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JOHN STEVEN GARDNER | ) | |
| Petitioner | ) | |
| | ) | 1:10-CV-610 |
| v. | ) | |
| | ) | |
| RICK THALER, Director | ) | |
| Texas Department of Criminal Justice, | ) | (Death Penalty Case) |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

### *PETITION FOR WRIT OF HABEAS CORPUS*
&
### *Motion for Evidentiary Hearing*
### *Motion To Expand the Record*
(separately filed pleadings)

&
### *Exhibits*
in Support Thereof

_____

### **DEATH-PENALTY CASE**

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR GARDNER

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................... ii

TABLE OF ABBREVIATIONS............................................. viii
    INTRODUCTION..................................................... 2

PROCEDURAL HISTORY................................................. 7
    A.    Basis of Confinement.......................................... 7
    B.    Overview of Procedural History................................. 7
        1.    Indictment........................................... 7
        2.    Jury Trial............................................ 7
        3.    Direct Appeal......................................... 9
        4.    State Habeas......................................... 11
        5.    Federal Habeas....................................... 12

STANDARD OF REVIEW................................................ 13
    A.    Adjudication on the Merits.................................... 13
        1.    Contrary to federal law  −  § 2254(d)(1)................... 14
        2.    Unreasonable application of federal law  −  § 2254(d)(1)...... 14
        3.    Unreasonable determination of facts  −  §2254(d)(2)......... 14
        4.    Presumption of correctness of fact issue  −  § 2254(e)(1)..... 15
        5.    *Richter* (summary disposition), and *Pinholster* (facts presented for first time in federal habeas).......................................... 15
    B.    No Adjudication on the Merits................................. 17
    C.    Evidentiary Hearing.......................................... 17

REASONS TO ISSUE THE WRIT OF HABEAS CORPUS......................... 19
    As to all Grounds: Clear and convincing evidence shows the Fact Findings are not entitled to a presumption of correctness.  They are not entitled to any deference by the federal court........................................... 20
        A.    The fact finding procedures are "not adequate for reaching reasonably correct results" or, at a minimum, resulted in a process that appeared to be "seriously inadequate for the ascertainment of the truth"...................... 20
        B.    The credibility of trial counsel is not at issue; their constitutional effectiveness is................................................ 22
        C.    The state court denied Mr. Gardner his substantive and procedural due process rights in striking the juror affidavits, but using the same evidence to support the State's position that Collin County juries would not have responded to the abandonment rage theory..................... 23
    Ground One  (Killing in Retaliation− 6th & 14 Amendment Violations).  Mr. Gardner was denied his Sixth Amendment right to effective assistance of counsel, who failed to provide a fair defense and negate an essential element of capital murder − "retaliation for status as a prospective witness"........................ 27

A.     Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B.     No Presumption of Correctness for Fact Findings. . . . . . . . . . . . . . . . . 33

     1.    Because the mitigation investigation was not adequate, defense counsel failed to challenge the retaliation element, and instead reinforced the prosecution's theory that Petitioner killed Tammy because she was divorcing him . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     2.    The inadequate mitigation investigation prevented any defense expert from identifying a mental health theme. . . . . . . . . . . . . . . . . . . . 36

     3.    The inadequate mitigation investigation lead the defense to misperceive and characterized Petitioner's conduct as "random violence". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

C.     Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     1.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     2.    Defense counsel was constitutionally ineffective . . . . . . . . . . . . 40

          a.    Defense counsel's performance was deficient . . . . . . . . 40

              (1)    Even absent divorce proceedings, uxoricide occurs as a result of real or threatened termination of the relationship by men who have experienced significant attachments disorders in early childhood . . . . . . . 40

              (2)    The state habeas record evidence reflects the killing was an "estrangement killing," refuting capital murder based on retaliation for testifying. . . . . . . 41

              (3)    Defense counsel failed to object when the prosecution conflated estrangement with retaliation for testifying, and themselves compounded the legal error. . . . . 43

          b.    The constitutionally deficient performance of defense counsel raised the reasonable probability that the outcome would have been different. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

              (1)    The *Strickland* prejudice prong. . . . . . . . . . . . . . 44

              (2)    The prosecution's theory of the case and its trial evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

                  (a)    Burglary: A Non-Consensual Entry. . . . . . 45

                  (b)    Retaliation for Testifying. . . . . . . . . . . . . 45

           c.    State habeas evidence revealed a reasonable probability the outcome would have been different. . . . . . . . . . . . . . . . . 48

              (1)    The Abandonment Rage Theory made a *prima facie* showing that the act of leaving – and not testifying in the formal divorce proceeding – is what triggered the domestic killing. . . . . . . . . . . . . . . . . . . . . . . . . . . 48

              (2)    The defense attorneys attestations about their "beliefs" are not evidence of "strategy". . . . . . . . 50

D.     The Conclusions of Law Nos. 97-102 are contrary to, and an unreasonable application of federal law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

GROUND TWO (IAC & FAILURE TO TIMELY INVESTIGATE AND DEVELOP CRUCIAL EVIDENCE
& NO EFFECTIVE THEORY  –  6TH & 14TH AMENDMENT VIOLATIONS).  Trial counsel
presented multiple, inconsistent and implausible theories because they failed to
timely investigate and develop crucial information. . . . . . . . . . . . . . . . . . . . . . . . 56

A.      Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

B.      No Presumption of Correctness for Fact Findings. . . . . . . . . . . . . . . . . . 56

        1.      Because mitigation is linked to issues relating to guilt/innocence, and
                because the mitigation investigation was not adequate, defense
                counsel could not have developed any effective theory of the case
                whatsoever. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

        2.      Unlike the defense presentation, an adequate mitigation investigation
                would have revealed Petitioner's attachment disorder, that refutes and
                explains the prosecution's future dangerousness presentation.  . . 59

        3.      Jurors' affidavits refute trial counsel's attestations and the fact
                findings that Collin County juries would not have responded to the
                abandonment rage theory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

C.      Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        1.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        2.      Trial counsel was constitutionally ineffective. . . . . . . . . . . . . . . . 64

                a.      Counsel's performance was deficient. . . . . . . . . . . . . . . . 64

                        (1)     An effective theory of the case for life is a national
                                standard in capital cases. . . . . . . . . . . . . . . . . . . . . 65

                        (2)     There was an absence of a consistent, unified and
                                effective theme in any phase of the trial . . . . . . . . 66

                                (a)     Voir Dire: selecting jurors who could vote for
                                        other than death. . . . . . . . . . . . . . . . . . . . . 66

                                (b)     Guilt/Innocence: Petitioner was not at the
                                        scene, but if he was, there was no burglary
                                        and the divorce was uncontested. . . . . . . . 66

                                (c)     Punishment: Petitioner's leaving one woman
                                        for another, is the type of thing that "happens
                                        everyday". . . . . . . . . . . . . . . . . . . . . . . . . . 68

                        (3)     An adequate pre-trial investigation would have
                                revealed the theme of abandonment rage, which made
                                use of the undisputed facts of domestic abuse, while
                                leading to the conclusion that Petitioner was not
                                deserving of death. . . . . . . . . . . . . . . . . . . . . . . . 68

                b.      Prejudice is presumed. . . . . . . . . . . . . . . . . . . . . . . . . . . 72

                c.      Alternatively, but for the deficient performance of counsel,
                        there is a reasonable probability the outcome would have
                        been different. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

                        (1)     The Strickland prejudice prong. . . . . . . . . . . . . . . 72

                        (2)     The trial evidence. . . . . . . . . . . . . . . . . . . . . . . . . 73

                                (a)     The aggravating evidence. . . . . . . . . . . . . 75

(b)     The mitigating evidence. . . . . . . . . . . . . . 78
d.     State habeas evidence revealed a reasonable probability the
outcome would have been different. . . . . . . . . . . . . . . . . 79
(1)     Adequate lay witness testimony would have provided
personal knowledge about the rigid religious
environment and childhood abuse experienced by Mr.
Gardner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
(2)     Expert witness testimony would have explained
Petitioner's domestic violence, with its origins in
Petitioner's psycho-social history. . . . . . . . . . . . . 80
(3)     At the psychological level, Dr. Dutton's work could
have explained how Petitioner's family origin resulted
in a depraved lifestyle. . . . . . . . . . . . . . . . . . . . . 82
(4)     At the neurobiological level, Dr. Dutton's work could
have shown the link between abandonment and
homicidal rage. . . . . . . . . . . . . . . . . . . . . . . . . . . 82
(5)     Jurors' affidavits refute that they would not have
responded to the abandonment rage theory. . . . . . 83
D.     The Conclusions of Law Nos. 97-102 are contrary to, and an unreasonable
application of federal law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
GROUND THREE  (FAILURE TO ADEQUATELY INVESTIGATE AND DEVELOP MITIGATING
EVIDENCE – IAC):  Mr. Gardner was denied his Sixth, Eighth and Fourteenth
amendment rights to individualized sentencing because trial counsel failed to
adequately *investigate and develop* crucial mitigating evidence. . . . . . . . . . . . . . 88
GROUND FOUR (FAILURE TO ADEQUATELY PRESENT MITIGATING EVIDENCE – IAC):  Mr.
Gardner was denied his Sixth, Eighth and Fourteenth amendment rights to
individualized sentencing because trial counsel failed to adequately *present* crucial
mitigating evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
A.     Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
1.     The aggravating evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 88
2.     The mitigating evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
B.     No Presumption of Correctness for Fact Findings. . . . . . . . . . . . . . . 93
1.     There is clear and convincing evidence that refutes that the mitigation
investigation was thorough. . . . . . . . . . . . . . . . . . . . . . . . . . . 93
2.     The TCCA's September 15, 2010 order implicitly ruled that the
mitigation investigation *was* impaired. . . . . . . . . . . . . . . . . . . 94
3.     At the time of trial, trial experts Kate Allen and Gilda Kessner,
Psy.D., put trial counsel on notice of the inadequate mitigation
investigation, and both refused to testify about mitigation because of
the lack of information.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
4.     The affidavit of state habeas expert, Toni Knox LCSW, corroborates
the trial experts opinions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
5.     The billing records of Ms. Schade, the trial mitigation specialist, was
inadequate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

6. The attorneys sought to impermissibly shift blame to the parents of Mr. Gardner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

7. The evidence clearly and convincingly refutes that any one on the defense team or their consultants could have made one or more "strategic" decisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

C. Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

 1. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

  a. Counsel has an obligation to conduct a thorough and independent investigation. . . . . . . . . . . . . . . . . . . . . . . . 102

  b. Counsel bears ultimate responsibility for the performance of the defense team. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

 2. Counsel's performance was constitutionally ineffective. . . . . . . 103

  a. The performance of counsel was deficient. . . . . . . . . . . . 105

   (1) Absent an adequate psycho-social history, the defense team was unable to formulate a viable defense theme based on documented trends, patterns of behavior and causal factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

   (2) The mitigation investigation was restricted to the immediate family with no corroborating information from other available sources. . . . . . . . . . . . . . . . 107

   (3) Corroborating testimony from the Reeves would have revealed the manipulation of first wife, Rhoda, detailed Steve's remorse, and revealed the use of codeine in cold medication that Steve had taken prior to the shooting. . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

   (4) Testimony from Louise Lillis corroborates that of Petitioner's sister, Elaine: Petitioner's father physically abused him. . . . . . . . . . . . . . . . . . . . . . 111

   (5) Testimony from Dr. Kessner would have explained the killings as an "estrangement killing," refuting capital murder based on retaliation. . . . . . . . . . . 111

   (6) In summary, the performance was deficient. The known evidence would have lead a reasonable attorney to investigate further. . . . . . . . . . . . . . . 113

  b. There is a reasonable probability the outcome would have been different. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

   (1) The *Strickland* prejudice prong. . . . . . . . . . . . . . 114

   (2) The trial evidence. . . . . . . . . . . . . . . . . . . . . . . . . 114

    (a) The aggravating evidence. . . . . . . . . . . . 116

    (b) The mitigating evidence. . . . . . . . . . . . . . 119

  c. State habeas evidence revealed a reasonable probability the outcome would have been different. . . . . . . . . . . . . . . . . 120

   (1) Adequate lay witness testimony would have provided personal knowledge about the rigid religious

environment and childhood abuse experienced by Mr. Gardner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

(2)    Expert witness testimony would have explained Petitioner's domestic violence, with its origins in Petitioner's psycho-social history. . . . . . . . . . . 121

(3)    At the psychological level, Dr. Dutton's work could have explained how Petitioner's family origin resulted in a depraved lifestyle. . . . . . . . . . . . . . . . . . . . . . 123

(4)    At the neurobiological level, Dr. Dutton's work could have shown the link between abandonment and homicidal rage. . . . . . . . . . . . . . . . . . . . . . . . . . 123

(5)    Jurors' affidavits refute that they would not have responded to the abandonment rage theory. . . . . 124

D.    The Conclusions of Law Nos. 97-102 are contrary to, and an unreasonable application of federal law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

GROUND FIVE  (THE ADMISSION OF THE TESTIMONY CONCERNING THE 911 CALL TO THE DISPATCHER VIOLATED CRAWFORD AND ITS PROGENY): Mr. Gardner was denied his Sixth amendment right to confrontation because the trial court admitted testimony about the 911 call to the dispatcher. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

A.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

B.    Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

1.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

2.    The state court findings are not entitled to a presumption of correctness because the trial record contradicts that Tammy "believed her death was imminent". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

3.    The state court conclusion that the admission of the 911 call did not violate the Confrontation Clause is contrary to and an unreasonable application of federal law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

FEDERAL HABEAS EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Exhibit 1:        Shelli Schade Billing Records. . . . . . . . . . . . . . . . . . . . . . 139

Exhibit 2:        Defense Team Billing Records. . . . . . . . . . . . . . . . . . . . 139

Exhibit 3A&B:    Findings of Fact & Conclusions of Law (3A) and TCCA Sept 15, 2010 Order Denying Habeas Relief (3B). . . . . . . . . 139

Exhibit 4:        Joint Affidavit of House and Hultkrantz. . . . . . . . . . . . 139

## TABLE OF ABBREVIATIONS

The following are a list of abbreviations used within the pleading:

CR __:__               CR is the abbreviation for Clerk's Record, as required by TEX. R. APP. PROC. 34.1.  It is followed by the volume number before the colon, and the page numbers after the colon.

RR __:__               RR is the abbreviation for Reporter's Record, pursuant to TEX. R. APP. PROC. 34.1,which is the trial transcript testimony recorded by the court reporter. The abbreviation RR is followed by the volume number before the colon, and the page numbers after the colon.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JOHN STEVEN GARDNER | ) | |
| Petitioner | ) | |
| | ) | 1:10-CV-610 |
| v. | ) | |
| | ) | |
| RICK THALER, Director | ) | |
| Texas Department of Criminal Justice, | ) | (Death Penalty Case) |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

---

## *PETITION FOR WRIT OF HABEAS CORPUS*

JOHN STEVEN GARDNER (hereinafter also referred to as Petitioner, Applicant, or GARDNER) petitions pursuant to 28 U.S.C. § 2241 & 28 U.S.C.§ 2254 for a writ of habeas corpus because he is confined by the State of Texas under a sentence of death, in violation of the laws and Constitution of the United States.

JOHN STEVEN GARDNER has never sought federal habeas corpus relief for this conviction and sentence before.  This is his first appearance in federal district court for any purpose.

---

## <u>INTRODUCTION</u>

Estrangement killings, which are named "uxoricide" when the wife is killed,  take place when one spouse leaves or attempts to leave the other.  This phenomena was well established and published in the research literature at least six years prior to Petitioner's trial.  The leading researcher is Donald G. Dutton, Ph.D.  *See*  Donald G. Dutton and Greg Kerry, *Modus Operandi and Personality Disorder in Incarcerated Spousal Killers*, 22 International Journal of Law & Psychiatry 287, 287 (1999).  Testifying at a divorce proceeding is irrelevant.   Uxoricide occurs even absent a divorce proceeding.

Dutton and Kerry explain that men, who kill their female companions with excessive force when faced with recent or imminent abandonment, are men who experience  abandonment rage ("abandonment rage theory").   Abandonment rage has its origins in early development and is predicated on attachment disorder.  Real or threatened termination of the relationship – as in the case at bar  –  are the most typical scenarios that result in uxoricide.  *See*  Exhibit C: Affidavit of Gilda Kessner, Psy.D., para. 26.

The claims raised in this (and in the state) habeas petition pivot on – and prove by clear and convincing evidence that the mitigation investigation was not adequate.  These claims – contrary to the prosecution's assertions  –  are not about whether the abandonment rage theory was or was not an efficacious theory.  Set aside the abandonment rage theory altogether.  What remains is the glaring fact that the mitigation investigation was <u>in</u>adequate, and that no one on the defense team, or their consultants, had adequate information about Mr. Gardner's psycho-social history throughout <u>any</u> phase of the trial.  As a result, the defense was completely unable to identify, develop and present <u>any</u> coherent theme or theory that was effective in all phases of the trial to explain the

behavior of Mr. Gardner  –   such as the abandonment rage theory with its genesis in attachment disorder.

Trial counsel themselves made an admission-against-interest in state habeas by attesting that their trial expert, Dr. Allen,  "decided she didn't want to testify [to attachment disorder] because of lack of information...."   Affidavit of House and Hultkrantz, p. 9. Contrast this admission-against-interest by the defense lawyers against FFCL No. 68 d., which conveniently omits this crucial fact. Drafted by the prosecutors, and signed verbatim by the state judge, FFCL No. 68 d. recites that Dr. Allen did not want to testify solely because Dr. Allen "concluded that Applicant was psychotic...." *Compare* FFCL No. 68, d. *with* Affidavit of House and Hultkrantz, p. 9.

Dr. Kessner, another trial expert, attested in state habeas that she had "had a telephone conference and in-person conferences with the defense attorneys and various members of the defense team.  I voiced my concern that there were important corroborating witnesses who were not being located and interviewed for mitigation."State Habeas Exhibit C:  Affidavit of Gilda Kessner, Psy.D.

And in its September 15, 2010 order, the Texas Court of Criminal Appeals, explicitly refused to adopt FF No. 67 that defense counsel "did not believe that their investigation was impaired...."[1] Put another way, the TCCA implicitly ruled that the mitigation investigation was impaired.

---

[1]    FF No. 67 recited that ***defense counsel "did not believe that their investigation was impaired***," because "their mitigation expert, Shelli Schade, was 'overly close' with Applicant and his family." (Emphasis supplied)

The capital guidelines instruct that mitigation is not separate from issues relating to guilt or innocence.[2]  The trial attorneys could not defend against the enhancement elements of retaliation or burglary, because they did not have sufficient information about their client's psycho-social history.  Absent this information, they lack any "strategic" choice by which to challenge the burglary/retaliation elements in the guilt/innocence phase.  *Compare* FF No. 46.  Had the mitigation investigation been adequate, the defense could have shown that the killing of Tammy Gardner was the result of abandonment rage and trauma (which at best, was a non-capital offense resulting in a term of years, instead of a sentence of death)  –  and ***not*** because Tammy was going to testify, or because Petitioner entered Tammy house without consent.

Similarly, in the punishment phase, it was impossible for the defense "to humanize Steve." *Compare*  FF No. 48.  They did not have the crucial information to do so. To the contrary, the "defense" of Mr. Gardner, such as it was, left unanswered the state's case-in-chief.  The State had contrasted Mr. Gardner, as a child, raised by a "mother and father [who] made him pray on his knees every morning," and whose "parents are still together," and who visit the grandchildren, (Vol. 23:114-115), against Mr. Gardner, as an adult male, who made repeated choices to perpetrate violence on women, sexually molest and/or physically assault the daughters of his former wives, and commit acts of sexual indecency in public. (Vol. 23:28).

Although the state court labeled the state habeas mitigation evidence and theory as "significantly harmful information," "not compelling," and "not [making] a difference," there is

---

[2]   The capital guidelines instruct that "it is important to dispel any motion that mitigation is separate from issues relating to the guilt or innocence of the accused.  They are intricately linked." al ABA GUIDELINE 10.4 (2008) located in O'BRIEN, 36 HOFSTRA L. REV. 693, 703 (6/15/2008).

clear and convincing evidence that proves otherwise. The mitigation evidence discovered in state habeas revealed that the repeated instances of domestic violence, and a depraved lifestyle, engaged in by Petitioner, had its origins in attachment disorder – a concept well-recognized in the mental health field. Not novel, the abandonment rage theory is itself predicated on attachment disorder. The abandonment rage theory is the product of years of research by Dr. Dutton into domestic abuse and spousal killing, and was long established in the research literature prior to trial. *See* State Habeas Exhibit C: Affidavit of Gilda Kessner, Psy.D., paras. 13, 24; Donald G. Dutton and Greg Kerry, *Modus Operandi and Personality Disorder in Incarcerated Spousal Killers*, 22 International Journal of Law & Psychiatry 287, 287 (1999).

The state-habeas mitigation-investigation revealed that there were lay witnesses whose testimony would have provided first-hand accounts about the rigid religious environment and childhood abuse experienced by Mr. Gardner.  Expert witness testimony would have explained Petitioner's domestic violence, with its origins in Petitioner's psycho-social history.  At the psychological level, Dr. Dutton's work would have explained how the violent-Gardner-household, with rigid enforcement of strict rules by a remote, depressed, angry, former alcoholic father, resulted in Petitioner's depraved lifestyle.  At the neurobiological level, Dr. Dutton's work provides an explanation and context for domestic abuse and spousal killings by demonstrating a neurobiological link between abandonment and homicidal rage.  And the jurors' affidavits obtained in state habeas – which contradict  trial counsel's attestations in state habeas  –  affirm that Collin County juries would have responded to the abandonment rage theory.

Accordingly, Mr. Gardner had made a *prima facie* showing in each of his claims in state court, so *Panetti v. Quarterman,* 551 U.S. 930, 953 (2007) requires that this court conduct a full *de*

*novo* review without deference to the state court fact findings.  *See also Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007). ("[i]f the state court's decision runs afoul of [AEDPA's] limits [in determining if a state court decision is "contrary to" or "unreasonable application of" federal law], then federal court review 'is unencumbered by the deference AEDPA normally requires.'").

Thereafter, habeas relief should be granted because without an adequate investigation into, and development of, Mr. Gardner's psycho-social history, defense counsel was constitutionally ineffective in all phases of the trial.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984);  *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins v. Smith*, 539 U.S. 510 (2003); U.S. CONST. Amend. VI.

## PROCEDURAL HISTORY

#### A.     BASIS OF CONFINEMENT.

John Steven Gardner, inmate number #999-516, is confined by the Texas Department of Criminal Justice, Institutional Division, by Rick Thaler, Director, Texas Department of Criminal Justice.  Petitioner is being denied his liberty and also faces execution under an unconstitutional conviction for capital murder and the concomitant sentence of death.

#### B.     OVERVIEW OF PROCEDURAL HISTORY.

**1.     Indictment.**  By re-indictment filed on May 23, 2006, Gardner was charged in trial court cause number 219-81121-06 with capital murder, because on or about January 23, 2005, he did then and there

> intentionally and knowingly cause the death of Tammy Dawn Gardner, an individual, hereinafter called deceased, by shooting deceased with a firearm, a deadly weapon, while the defendant was in the course of committing or attempting to commit the offense of burglary by then and there intentionally and knowingly entering a habitation without the effective consent of deceased, the owner thereof, and committing the felony offense of murder; and while the defendant was in the course of committing or attempting to commit the offense of retaliation by then and there intentionally and knowingly harming or threatening to harm deceased by an unlawful act, to wit: causing the death of deceased in retaliation for or on account of deceased's service or status as a prospective witness.

(CR 1:6).  This was a re-indictment from Cause Nos. 219-80411-05 and 219-81637-05.  (Cause No. 219-81121-06, CR 1:6; Cause No. 219-80411-05, CR 2:637;  Cause No. 219-81637-05, CR 2:491).

**2.     Jury Trial.**  On February 3, 2005, W.B. House, SBOT 10044000,  was appointed as first chair to represent Mr. Gardner in his capital trial.  (Cause No. 219-80411-05, CR 1:10).

On February 16, 2005, the court granted the defense motion for a fact investigator, Randi Ray.  (Cause No. 219-80411-05, CR 1:4).

January, 2006 was scheduled for the hearing on pre-trial motions. (Cause No. 219-81637-05, CR 2:445). The pre-trial motions hearing was rescheduled because lead counsel, House, had been admitted to Presbyterian Hospital for a medical emergency on 1-17-06. (Cause No. 219-80411-05, CR 2:597).

In October and November, 2006, individual voir dire took place, with both sides announcing ready to proceed on November 7, 2006. (Cause No. 219-81121-06, Docket Sheet).

On November 7, 2006, the jury was sworn in and the trial began. (Cause No. 219-81121-06, Docket Sheet). On November 7, 2006 and November 8, 2006, the State presented its case. (Cause No. 219-81121-06, Docket Sheet). On November 8, 2006, the defense rested. (Cause No. 219-81121-06, Docket Sheet).

On November 9, 2006, following a two day trial on the merits, and only 4.5 hours of deliberation (10:30 am jury out; returned 3:00 pm), the jury returned a verdict of guilty of capital murder. (Cause No. 219-81121-06, Docket Sheet; CR 2:608).

On November 13, 2006, the State presents its case-in-chief in the punishment phase. On November 14, 2006, the defense presents its case. The defense did not call any expert witnesses. Instead, it called William Miles to testify that he believed that Petitioner had "full confidence in the finished work of Christ on the cross" in his heart. (RR 2311). The defense called Kelly Dowdy to testify that Petitioner was "a good worker," when she worked with him at Wal-Mart. (RR 23:17).

The defense also called Juan Sewell, the victim's former husband, who testified that Tammy Gardner could be manipulative. (RR 23:23). And finally, the defense called Elaine Holified, Petitioner's sister, who testified that their father (a preacher) forced her and Petitioner to have daily

devotionals, that their parents were violent with one another, and that she and Petitioner suffered physical abuse at the hands of their parents. (RR 23:29,32-33, 35).

The State put on rebuttal witnesses, and both sides closed.   In closing argument, the prosecutor argued:   "the evidence shows, after looking at all of it, there is nothing sufficiently mitigating to warrant a life sentence for this defendant."  (Cause No. 219-81121-06, Docket Sheet; RR 23: 85).  The jury deliberated a mere 2 hours.  (Cause No. 219-81121-06, Docket Sheet).  The jury answers special issue 1, future dangerousness, "yes."  The jury answers special issue 2, mitigation, no.  (Cause No. 219-81121-06, Docket Sheet; CR 2:616-617, 619-620).

On November 14, 2006, Mr. Gardner was sentenced to death for the 1-23-05 capital murder of Tammy Gardner, with a deadly weapon finding. (Cause No. 219-81121-06, Docket Sheet; CR 2:618).


3.      **Direct Appeal.**   On November 21, 2006, Manuel Gonzalez was appointed as direct appeal counsel.  (Cause No. 219-81121-06, CR 2:624).  Because he was not on the "approved list," he was replaced by Steven Miears, as direct appeal counsel.  (Trial Court Order, dated April 11, 2008).

On December 14, 2006, direct appeal counsel filed a Motion for New Trial, arguing the verdict was contrary to the law and weight of the evidence because of an impermissible comment by the trial judge on the weight of the evidence prior to jury deliberations. (Cause No. 219-81121-06, CR 2:625).

Mr. Gardner filed his direct appeal brief, which contained eleven (11) issues:

1.      The Evidence is Legally Insufficient to Sustain the Jury's Determination of Guilt.

2.      The Evidence is Factually Insufficient to Sustain the Jury's Determination of Guilt.

3.      The Trial Court Improperly Denied Defense Challenges to Veniremembers, Donna Kay Williams, Donna Crabtree, William Chambers, David Sanford, and Susan McMillan.

4.      The Trial Court Improperly Disqualified Veniremember Charles Perry.

5.      The Trial Court Erred in Permitting a State's Witness to Testify About and Describe the Contents of a 9-1-1- Call.

6.      The Trial Court Erred in Admitting State's Exhibit 36.

7.      The Trial Court Erred in Admitting State's Exhibit 61.

8.      The Trial Court Erred in Refusing to Submit A Court's Charge Requiring a Unanimous Verdict on Guilt Innocence.

9.      The Trial Court Erred in Overruling Appellant's Written Objections to the Court's Charge on Punishment.

10.     The Trial Court Erred in Failing to Sustain Defense Counsel's Objection to Improper Jury Argument by Counsel for the State.

11.     The Trial Court Erred in Failing to Provide Appellant the Opportunity to Prove His Allegations in a Hearing on Appellant's Motion for New Trial.

In a published opinion, *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2010), the Texas Court of Criminal Appeals affirmed the conviction and sentence of death holding that 1) the evidence was legally and factually sufficient to support murder conviction;  (2) the evidence was legally and factually sufficient, as to underlying felony of burglary, to prove that defendant did not have wife's consent to enter her home; (3) the wife's statement during 911 call that defendant had shot her was admissible as dying declaration; (4) the red robe was sufficiently authenticated as

wife's; (5) the defendant was not "in custody" at time of phone conversation with detective; (6) the trial court did not abuse its discretion in denying defendant's for-cause challenges to prospective jurors; (7) the jury did not need to be unanimous concerning which felony defendant was in the course of committing at time of killing;  (8) there was no presumption in favor of a life sentence in capital murder case; (9) any impropriety in punishment-phase closing argument was not so manifestly improper as to constitute reversible error; and (10) the trial court did not abuse its discretion in failing to conduct a hearing on motion for new trial.

On October 04, 2010, the U.S. Supreme Court denied the petition for writ of certiorari. *Gardner v. Texas*, 131 S.Ct. 103 (2010).


**4.**     **State Habeas.**  On December 29, 2006, undersigned counsel, Lydia Brandt, was appointed to represent Mr. Gardner in this state habeas.  (CR 5:1876; Order of Texas Court of Criminal Appeal, dated Dec. 29, 2006).  The State of Texas filed its direct appeal brief on May 11, 2009.  Under TEX. CODE CRIM. PROC. 11.071 § 4(a), the application for writ of habeas corpus is due "not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals...."  However, TEX. CODE CRIM. PROC. 11.071 § 4(b) permits the trial judge to grant one, ninety (90) day extension for good cause.  Mr. Gardner requested that ninety (90) day extension, and the trial court granted it, making the application for writ of habeas corpus due on or before September 23, 2009.  The Application was timely filed.

On May 12, 2010, the state district judge denied the request for an evidentiary and signed verbatim the Findings of Fact and Conclusions of Law drafted by the State of Texas.  On September 15, 2010, the Texas Court of Criminal Appeals entered an order, which reads in pertinent part:

Applicant presented five allegations in his application in which he challenges the validity of his conviction and sentence.  The trial court did not hold a live evidentiary hearing.  As to all of these allegations, the trial judge entered findings of fact and conclusions of law and recommended that relief be denied.

This court has reviewed the record with respect to the allegations made by applicant. We agree with the trial judge's recommendation and adopt the trial judge's findings and conclusions, except for findings paragraphs 67, 85, and 86.  In addition, we do not adopt the phrase, "at China Blue's direction," in findings paragraph 81.  We also observe that the work, "first," in findings paragraph 94 ( c) should be changed to the word, "second."  Based upon the trial court's findings and conclusions and our own review of the record, relief is denied.

*Ex parte John Steven Gardner*, Order, Texas Court of Criminal Appeals (Sept 15, 2010).

    **5.**    **Federal Habeas.**  Pursuant to 18 U.S.C. § 3599(a), and within the fifteen (15) day time period required by Tex. Code Crim. Proc. 11.071, sec. 2(e), undersigned counsel, Lydia Brandt, was appointed to represent Mr. Gardner in this federal habeas proceeding.

## STANDARD OF REVIEW

Title 28, section 2254(d) of the United States Code provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits* in State court proceedings unless the adjudication of the claim –

      (1)     resulted in a decision that was *contrary to, or involved an unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or

      (2)     resulted in a decision that was based on an *unreasonable determination of the facts* in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis supplied).

The threshold question the court must answer under 28 U.S.C. § 2254(d) is whether the claim "was adjudicated on the merits in State court proceedings."  "An 'adjudication on the merits' occurs when the state court resolves the case on substantive grounds, rather than procedural grounds." *Valdez v. Cockrell*, 274 F.3d 941, 946-947 (5th Cir. 2001), *citing Mercadel v. Cain,* 179 F.3d 271, 273 (5th Cir.1999) (holding that whether an adjudication on the merits has occurred is whether the state court disposed of the case on substantive or procedural grounds).

### A.      Adjudication on the Merits

When the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under the contrary to, or unreasonable application prong of § 2254(d)(1), *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001); *Martin v. Cain*, 246 F.3d 471, 475 (5th cir. 2001).

1.      **Contrary to federal law – § 2254(d)(1).** "[A] state-court decision is contrary to [U.S. Supreme] Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.   Second, a state-court decision is also contrary to [U.S. Supreme] Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the U.S. Supreme Court]...." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

2.      **Unreasonable application of federal law – § 2254(d)(1).** "[A] state-court decision involves an unreasonable application of [U.S. Supreme] Court's precedent if the state court identifies the correct governing legal rule from  [U.S. Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.   Second, a state-court decision also involves an unreasonable application of  [U.S. Supreme] Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000).   "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410.   "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly.   Rather, that application must also be unreasonable."   *Williams*, 529 U.S. at 411.

3.      **Unreasonable determination of facts – §2254(d)(2).** When the state court adjudicated the claim on the merits, questions of fact are reviewed under § 2254(d)(2).   *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).   "Under [28 U.S.C. § 2254](d)(2), a state court decision

may be overturned on factual grounds if its determinations of fact are "objectively unreasonable in the light of the evidence presented in the state-court proceeding". *Guidry v. Dretke*,  397 F.3d 306, 316-317 (5th Cir. 2005) *citing  Miller-El,* 537 U.S. 322, 340 (2003).

      **4.**      **Presumption of correctness of fact issue  –  § 2254(e)(1).**  A determination of a factual issue made by a State court shall be presumed to be correct.  *Gardner v. Johnson*, 247 F.3d 551, 557 (5th Cir. 2001).  The "presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).  The presumption of correctness can be rebutted by clear and convincing evidence.  *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998), *quoting* 28 U.S.C. § 2254(e)(1).

      **5.**      ***Richter* (summary disposition), and *Pinholster* (facts presented for first time in federal habeas).**   In *Harrington v. Richter*, 131 S.Ct. 770 (2011), the Supreme Court addressed the issue of whether the limitation on relief found in § 2254(d) applied when the denial of the claim on the merits took the form of a "summary disposition."  The Court held: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [in *Richter*], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."

      In *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011) at issue was whether facts presented for the first time during federal habeas proceedings could be considered by a federal court when deciding if a state court denial of relief was contrary to, or involved an unreasonable application of, clearly

established federal law under § 2254(d)(1).[3]  The Supreme Court observed: "Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did." *Pinholster*, 131 S.Ct. at 1399.  The Court held: "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 131 S.Ct. at 1400.

*Pinholster* did not allege that the state court in any way prevented or impeded his development of facts in support his claims.  At least since *Williams v. Taylor*, 529 U.S. 410 (2000), it has been settled law that a prisoner who diligently attempted to develop the facts, but was prevented from doing so by the state court, will not be barred by 28 U.S.C. § 2254(e)(2) from fact development in federal habeas.  "Comity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent efforts." *Williams v. Taylor*, 529 U.S. at 437.  *Pinholster* did nothing to change this holding.

A petitioner can still develop and present his evidence in federal court, even when the factual basis of a claim previously adjudicated on the merits of an underdeveloped record that was before the state court, provided he can overcome the limitation of  § 2254(d).  In making a showing to overcome the limitation of  § 2254(d), the federal court asks if, assuming the truth of all of the

---

[3]     It is to be noted that *Pinholster* did not allege that the state court in any way prevented or impeded his development of facts in support his claims.  At least since *Williams v. Taylor*, 529 U.S. 410 (2000), it has been settled law that a prison who diligently attempted to develop the facts, but was prevented from doing so by the state court, will not be barred by 28 U.S.C. § 2254(e)(2) from fact development in federal habeas.  "Comity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent efforts." *Williams v. Taylor*, 529 U.S. at 437.  *Pinholster* did nothing to change this holding.

allegations and evidence that the petitioner put before the state court, that state court's determination that the petitioner failed to state a claim for relief was "contrary to" or "involved an unreasonable application of" clear established federal law, or "was based on an unreasonable determination of the facts." Put another way, the federal court asks if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts" with clearly established federal law, or with the evidence taken in the light most favorable to the petitioner. *Richter*, 131 S.Ct. at 786.

Indeed, the lower federal courts did just that in *Skipwith v. McNeil*, 2011 WL 1598829 (S.D. Fla. 2011), and *Hale v. Davis*, 2011 WL 3163375 (E.D. Michigan 2011). The federal courts granted an evidentiary hearing in accord with Justice Breyer's concurrence in *Pinholster*:

> if the state-court rejection assumed the habeas petitioner's facts (deciding that, *even if* those facts were true, federal law was not violated), then (after finding the state court wrong on a(d) ground) an (e) hearing might be needed to determine whether the facts alleged were indeed true.

Pinholster, 131 S.Ct. at 1412 (emphasis in original).

### B.      No Adjudication on the Merits

***De Novo Review***:   Where there is <u>no</u> adjudication on the merits, the court is to review the claim *de novo.  See  Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir.1999) (finding that where a state habeas court decided the habeas Petitioner's claim on procedural grounds, there had not been an "adjudication on the merits").

### C.      Evidentiary Hearing

Section 2254(e)(2), Title 28, U.S.C., prescribes the circumstances under which a district court can conduct a hearing.    "Not withstanding AEDPA's requiring substantial deference for state

court determinations . . . "deference does not imply abandonment or abdication of judicial review."

*Guidry* at 326 (quoting *Miller El* at 540 (2005).  So long as a hearing is not barred under 28 U.S.C.

§ 2254(e)(2), a district court may conduct a hearing on whether the presumption of correctness is

rebutted by clear and convincing evidence and to aid its determination under 2254(d)(2).  *Guidry.*

 Under § 2254(e)(2), the district court may not conduct a hearing if the petitioner "failed to develop

the factual basis" for his claim in state court.  28 U.S.C. § 2254(e)(2). However,

> a failure to develop the factual basis of a claim is not established unless there is a
> lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's
> counsel. *Michael Williams,* 529 U.S. at 432, 120 S.Ct. 1479; *see also Dowthitt v.*
> *Johnson,* 230 F.3d 733, 758 (5th Cir.2000). Restated, if a petitioner develops a
> factual basis for a claim in state court (or sufficiently attempts to do so), subpart
> (e)(2) does *not* bar an evidentiary hearing in district court.

*Guidry* at 323.

**REASONS TO ISSUE THE WRIT OF HABEAS CORPUS**

Petitioner's conviction and death sentence were obtained in violation of his rights under the Sixth, Eighth, and Fourteenth amendments to the United States Constitution. V U.S. CONST. amend. VI; U.S. CONST. amend. VIII; U.S. CONST. amend. XIV.

Set out below are the grounds that warrant the issuance of the writ of habeas corpus. All factual and legal allegations presented in any claim in this petition are fully incorporated into each and every other claim in this petition.

**AS TO ALL GROUNDS: Clear and convincing evidence shows the Fact Findings are not entitled to a presumption of correctness.  They are not entitled to any deference by the federal court**.

Because there are Findings of Fact that are common to all claims, rather than repeat the objection in each claim, Mr. Gardner sets out his objections below, and incorporates those objections as to each and every claim in this petition.

**A.    The fact finding procedures are "not adequate for reaching reasonably correct results" or, at a minimum, resulted in a process that appeared to be "seriously inadequate for the ascertainment of the truth"**

In *Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007), which involved a *Ford* execution-competency-claim, the Supreme Court held:

> Under AEDPA, a federal court may grant habeas relief, as relevant, only if the state court's "adjudication of [a claim on the merits] . . . resulted in a decision that . . . involved an unreasonable application" of the relevant law.  When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied.  A federal court must then resolve the claim without the deference AEDPA otherwise requires. . . .  Here, due to the state court's unreasonable application of Ford, ***the factfinding procedures upon which the court relied were "not adequate for reaching reasonably correct results" or, at a minimum, resulted in a process that appeared to be "seriously inadequate for the ascertainment of the truth."***  477 U.S., at 423-424, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (Powell, J., concurring in part and concurring in judgment) (internal quotation marks omitted).  We therefore consider petitioner's claim on the merits and without deferring to the state court's finding of competency.

(Emphasis supplied).

In the specific context of developing evidence of incompetency for execution, *Panetti* found that "these basic requirements include an opportunity to submit evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination."  *Id.* at 2856  (internal quotation marks omitted).  After making the

requisite threshold showing of incompetency, Panetti filed motions for appointment of counsel and

funds to hire a mental health expert, along with a request for an evidentiary hearing in an attempt

to develop the facts of his Ford claim.  *Id*. at 2857.  Because the state court denied these motions,

and refused Panetti even the "rudimentary process" of "an opportunity to submit psychiatric

evidence as a counterweight to the report filed by the court-appointed experts," the Supreme Court

concluded that Texas deprived Panetti of "a constitutionally adequate opportunity to be heard." *Id*.

at 2858.  *See also Jefferson v. Upton*, 130 S.Ct. 2217 (2010) (in which the U.S. Supreme Court

criticized the practice where findings of fact are "adopted verbatim by the [state] court." *Jefferson*,

130. S.Ct. at 2219-2220, *quoting Anderson v. Bessemer* City, 470 U.S. 564, 572 (1985)).

Citing  *Panetti*, the Fifth Circuit in *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) held:

> when a petitioner makes a *prima facie* showing of [his federal constitutional law claim], a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA.

As in *Panetti* and in *Wiley*, the fact finding procedures in Mr. Gardner's case are "not

adequate for reaching reasonably correct results" or, at a minimum, resulted in a process that

appeared to be "seriously inadequate for the ascertainment of the truth."  This is because the

Findings of Fact were drafted by the State of Texas, and signed verbatim by the trial judge, who

denied Petitioner's request for discovery and/or evidentiary hearing.

Thus, Mr. Gardner was denied federal procedural due process in state habeas court because

the state factual determination is not fairly supported by the record as a whole; nor was the fact-

finding procedure employed by the state court adequate to afford a full and fair hearing.  The Fact

Findings are not entitled to a presumption of correctness.  1 R.HERTZ & J. LIEBMAN, FEDERAL

HABEAS CORPUS PRACTICE AND PROCEDURE §20.2c, pp. 915–918 (5th ed. 2005).  *See Jefferson v.*

*Upton*, __ S.Ct. __, 2010 WL 2025209 (May 24, 2010) ("Although we have stated that a court's "verbatim adoption of findings of fact prepared by prevailing parties" should be treated as findings of the court, we have also criticized that practice.") *citing Anderson v. City of Bessemer City, N.C.*, 470 U. S., 564, 572 (1985) ("We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record. [citations omitted]  ....  We are also aware of the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor.")

### B.   The credibility of trial counsel is not at issue; their constitutional effectiveness is

In particular, Mr. Gardner objects to Findings of Fact (FF) Nos. 11-16.  Among other things, these fact findings recite:  "In the court's experience with these attorneys in this trial and other appearances before this Court, House and Hultkrantz have proven themselves to be at all time forthright and credible."  Such superfluous statements are irrelevant.  The issue(s) in this federal habeas petition pertain(s) to claims of ineffective assistance of counsel  – not allegations of deception or fraud.  An attorney, who is "forthright and credible," *see* FF No. 14, may nonetheless be ineffective because of an act or omission in the representation of his/her client, which does not rise to the level of constitutionally effective representation as recited in the ABA and Texas capital guidelines.  Such is the case at bar.

Mr. Gardner objects to each Finding of Fact, whose sum and substance pivots on testimony or affidavit from his own defense counsel concerning their acts and omissions that give rise of each of the ineffective assistance of counsel claims.  *See e.g.,* Ground One FF 17-43; Ground Two FF 44-

62; Ground Three FF 63-83; Ground Five FF 84-96.  The objection is predicated on TEX. CODE CRIM. PROC. 26.052, which provides that if counsel are found to be ineffective, they are not eligible for appointment in the trial or direct appeal of a capital case.    To make his showing of ineffectiveness, and to circumvent trial counsel's inherent conflict of interest in voluntarily providing proof of their own constitutionally deficient representation, Mr. Gardner had requested discovery and an evidentiary hearing, which were denied.  Accordingly, without the power of the court, and given the conflict-of-interest-defense counsel would find itself in addressing the IAC claims, there were – and continue to be  –  obstacles external to Mr. Gardner, which prevented him from offering the proof that the fact findings recite he allegedly failed to make.  For these reasons, Mr. Gardner once again requests discovery and an evidentiary hearing to make the requisite showing.

C.     **The state court denied Mr. Gardner his substantive and procedural due process rights in striking the juror affidavits, but using the same evidence to support the State's position that Collin County juries would not have responded to the abandonment rage theory**

The FFCL Nos. 8-10, recite that the affidavits are inadmissible, and purport to "strike" them, because they violate TEX. R. EVID. 606(b)  –  which they do not.  TEX. R. EVID. 606(b) provides:

(b)     Inquiry into Validity of Verdict or Indictment.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any jurors mind or emotions or mental processes, as influencing any juror';s assessment to or dissent from the verdict or indictment.  Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes.

Remarkably, the Fact Findings strike the juror affidavits on the basis that state statute makes them inadmissible because they concern the jurors' deliberation of the effect certain evidence had or might have had ..." on the verdict.  *See*  Fact Finding Nos. 8-10.  Yet at the same time, the fact findings as drafted by the prosecutors  and signed verbatim by the judge, use this same evidence to support "the effect [this] evidence had or might have had" on the verdict.  For example, they refer to it as proof that juries would be distrustful of such evidence, characterize the abandonment rage theory as a "novel" theory, FF No. 53; "would not have affected the jury's decision on future dangerousness,"  FF No. 58, 82; and "would not have affected the jury's decision on mitigation," FF No. 59, 81.  This inconsistent application of the statute arising from Fact Finding Nos. 8-10 violates Mr. Gardner's due process, substantive and procedural rights.

Putting aside this aside, the juror affidavits go above and beyond any inquiry into the validity of a verdict.  Instead, the juror affidavits refute FF No. 53.  The theory of abandonment rage is not a "novel" theory.  At least as early as 1999, there were published studies as to it.  Donald G. Dutton and Greg Kerry, *Modus Operandi and Personality Disorder in Incarcerated Spousal Killers*, 22 International Journal of Law & Psychiatry 287, 287 (1999).   The affidavits prove  by clear and convincing evidence that the unsubstantiated, conclusory and self-serving assertions of defense counsel that "local juries'[in Collin County] distrust ... 'novel' defensive theories" were incorrect. *Compare* Affidavit of House and Hultkrantz, p.3 *with* State Habeas Exhibit B4: Declaration of Gail Stafford:  "I believe that had I seen the reports of Toni Knox and Gilda Kessner, I would have seriously considered that testimony ...." *and with* State Habeas Exhibit B3: Declaration of Paul Reichenbach: "The mitigation evidence investigated by Toni Knox and Gilda Kessner may have [made me] ... more willing to consider a life sentence;" *and with* State Habeas Exhibit B2: Affidavit

of Wendy Duerr: "The declaration of Gardner's friends and his psychological evaluation would have affected my deliberations."

Accordingly, these affidavits refute that "counsel's reasons for not pursuing such a defense were reasonable," and refute that a Collin County jury would have been distrustful of such a defense theory. FF No. 53.

In sum, and although the Texas Court of Criminal Appeals adopted the FFCL and denied relief, the aforementioned findings are not entitled to a presumption of correctness. They are "'objectively unreasonable in the light of the evidence presented in the state-court proceeding,'" *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2). They also were not the product of a full and fair hearing in state court. *Jefferson v. Upton*, __ S.Ct. __, 2010 WL 2025209 (May 24, 2010); 1 R.Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure §20.2c, pp. 915–918 (5th ed. 2005).

Justice Breyer's concurrence in *Pinholster* is instructive:

if the state-court rejection assumed the habeas petitioner's facts (deciding that, *even if* those facts were true, federal law was not violated), then (after finding the state court wrong on a(d) ground) an (e) hearing might be needed to determine whether the facts alleged were indeed true.

*Pinholster*, 131 S.Ct. at 1412 (emphasis in original).

The conflict in the evidence, coupled with the objectively unreasonable determination by the state courts, gives rise to the need for an evidentiary hearing. 28 U.S.C. § 2254(e); *Pinholster*, 131 S.Ct. at 1412 . Further, habeas relief should be granted because the state court adjudication

resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2).

**G**ROUND **O**NE (**K**ILLING IN **R**ETALIATION– 6TH & 14 **A**MENDMENT **V**IOLATIONS). **Mr. Gardner was denied his Sixth Amendment right to effective assistance of counsel, who failed to provide a fair defense and negate an essential element of capital murder – "retaliation for status as a prospective witness"**

**A.      Statement of Facts.**

On January 11, 2005, Tammy Gardner had initiated divorce proceedings, styled: *In the Matter of the Marriage of Tammy Dawn Gardner and John Steen Gardner*, Cause No. 401-50106-05, in the District Court, Collin County, Texas.  State's Trial Exhibit 39 and State Hab. Exhibit A: Divorce Papers (hereinafter Divorce Papers).  The original petition for divorce reflects that the couple had ceased living together as husband and wife on or about 12-25-04, that there were no children under the age of 18 years of age and Tammy was not expecting a child.  It also reflects that there was no community property to divide.

The Divorce Papers also contain a Waiver of Citation, signed by Petitioner.  In it, he agreed "that the cause may be taken up and considered by the court without further notice to [him], that he "waive[d] the making of a record of testimony in this cause, and that he "agree[d] and consent[ed] to the entry of a decree in this case.  Exhibit A: Divorce Papers.

The divorce proceedings were dismissed with a record notation by the judge that "Pet [Tammy Gardner] died 01/11/05."  Exhibit A: Divorce Papers.

On January 23, 2005, Petitioner was indicted for the capital murder of Tammy Gardner.  The indictment reads that:

> John Steven Gardner hereinafter called defendant on or about the 23rd day of January in the year of our Lord Two Thousand Five, in said county and State, did then and there intentionally and knowingly cause the death of Tammy Dawn Gardner, an individual, hereinafter called deceased, by shooting deceased with a firearm, a deadly weapon, while the defendant was in the course of committing or attempting to commit the offense of burglary by then and there intentionally and knowingly entering a habitation without the effective consent of deceased, the owner thereof,

and committing the felony offense of murder; and while the defendant was *in the course of committing or attempting to commit the offense of retaliation* by then and there intentionally and knowingly harming or threatening to harm deceased ... by an unlawful act, to wit: *causing the death of deceased ... in retaliation for or on account of deceased's service or status as a prospective witness*.

(Cause No. 219-81121-06 – CR 1:6).[4]

On November 7, 2006, the jury was sworn in and the trial began.  (Cause No. 219-81121-06,

Docket Sheet).  The guilt/innocence phase of the trial last lasted two (2) days, November 7 and 8,

2006.  On November 7, 2006 and November 8, 2006, the State presented its case.  (Cause No. 219-

81121-06, Docket Sheet).  On November 8, 2006, the defense rested. (Cause No. 219-81121-06,

Docket Sheet).   November 9, 2006 was a day dedicated to closing argument by both sides.  After

---

[4]   The jury charge read in pertinent part:

A person commits capital murder when he intentionally causes the death of an individual in the course of committing or attempting to commit the offense of burglary or the offense of retaliation.
....
Our law provides that *a person commits the offense of retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as a witness or prospective witness*.
....
Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that on or about January 23, 2005, the defendant, John Steven Gardner, did intentionally cause the death of Tammy Gardner, an individual, hereinafter called deceased, by shooting deceased with a firearm, a deadly weapon, and the defendant intentionally did cause the death of deceased while the defendant was in the course of committing or attempting to commit the offense of burglary or offense of retaliation, you will find the defendant guilty of capital murder as charged in the indictment.

(Cause No. 219-81121-06 – CR 1:598, 599, 603).

---

only 4.5 hours of deliberation (10:30 am jury out; returned 3:00 pm), the jury returned a verdict of guilty of capital murder. (Cause No. 219-81121-06, Docket Sheet; CR 2:608).

The prosecution's theory of the case was that Petitioner shot and killed Tammy Gardner, his wife,"in retaliation for or on account of the service or status of another as a witness or prospective witness." TEX. PENAL CODE 36.36(a)(1).  The alternative theory was that Petitioner shot Tammy Gardner in the course of committing or attempting to commit the offense of burglary by intentionally and knowingly entering her house, without her effective consent, and committed the felony offense of murder. (CR 1:6).

To advance its theories of the case, on November 7 and 8, 2006, the prosecution presented testimony from twenty-two (22) witnesses, the salient points of which were as follows:

(a)      **Burglary: A Non-Consensual Entry**

The evidence presented by the prosecution on the burglary enhancement came from Diane Stubbs and Robert Yeager, both criminal investigators, from John White, Tammy's son by a previous marriage, and from Kay Tate, who had raised Tammy Gardner.  Ms. Tate testified that she had owned a house, that she allowed Tammy to live in rent free, provided Tammy paid the utilities. Ms. Tate testified that Tammy could treat the house as her home, and Tammy could admit or exclude whomever Tammy wanted.  (RR 20:109, 112-114, 116).  This was the house in which Tammy was shot and ultimately died from the gunshot wounds.

Investigators Stubbs and Yeager testified that the doors to the house had been locked, as were the windows.  Both investigators testified that except for the forced entry by the first responders following the 911 call by Tammy, there were no other signs of forced entry into the

home.  (RR 19:102, 125; RR 20:14).  Both law enforcement officers testified that a burglary can

occur when a person enters even through an open door.  The issue is whether the owner gave

consent.  (RR 19:128; RR 20:17).  Neither officer had any personal knowledge as to whether

Tammy gave consent to Petitioner's entry into the house.  (RR 19:128; RR 20:17).

John White, Tammy's son by another marriage, testified that both Tammy and Petitioner had

told Mr. White that they were divorcing.  (RR 19:259).  Mr. White testified that his mother had told

him that there were two sets of keys to her house and to the shed.  (RR 19:261).  Mr. White testified

that Petitioner told him that because of the divorce, Petitioner was going to live with his parents in

Mississippi.  At that time, Petitioner gave Mr. White one set of keys to the house and the shed.  (RR

19:261).

In closing argument, the prosecutor argued:

"you basically heard him [defense attorney] in closing argument, and it didn't sound
like the defense is he didn't kill her, but that if he was there, that somehow she
consented to allow him in the house." (RR 21:52).[5]

"***there's no way Tammy could have effectively consented to allow him to come in
the home to kill her***.  Consent was not effective."  (Emphasis supplied) (RR 21:24).


**(b)      Retaliation for Testifying**

To prove retaliation for her service or status as a witness, the prosecution called Erin

Whitefield, the dispatcher who spoke with Tammy on the 9-1-1- call.  Ms. Whitefield testified that

during the question and answer form of their conversation, she learned the victim's address and that

---

[5]      The defense had argued a negative: "no evidence exists that consent was not given."  (RR
21:35).

her blue Ford pickup truck was parked outside, that the victim had been shot by her husband, and that the victim's husband had left in a white Ford pickup truck with Mississippi license plates.  (RR 19:24-26).

The prosecution also called three witnesses who had been associated with Tammy's employer:  Jacquie West, a former co-worker of the victim; Candace Akins, Tammy's manager; and David Young, the VP for the company that employed Tammy.  Ms. West testified that Tammy had told her that Tammy would not get out of the relationship alive, and that she had filed for divorce. (RR 19:201, 205).  Tammy had told West that the divorce would never be final because Petitioner would kill her.  (RR 19:209).  Tammy's former manager, Candace Akins testified that Tammy had told West that she would never get to the date when her divorce would become final, because Petitioner would kill her before then.  (RR 19:240-241).  David Young, the VP for the company that employed Tammy, testified that they were trying to help Tammy disappear for her safety.  (RR 19:312).   The last time he saw her, was the day that she was shot.  (RR 19:309).

The prosecution called family members Jessie Mangum, the daughter of Tammy by another marriage, and Elaine and David Holifield, the sister and brother-in-law of Petitioner. Jessie Mangum, the daughter of Tammy, testified that Tammy and Petitioner were divorcing, that she was afraid for her mother's safety, and that her mother told her that she did not think she would make it out of the divorce.  (RR 19:292).  Mangum also testified to text messages from Petitioner asking if Tammy were going through with the divorce.  (RR 19:294).

Elaine Holifield, Petitioner's sister, testified that in December 2004, Petitioner came to live with her and her husband, David, who also testified for the prosecution.  (RR 20:30).  David allowed Petitioner to drive his white Ford pickup truck.  (RR 20:22).  The Holifield's testified that Petitioner

left in the truck, but did not know where he had gone the day Tammy had been shot. (RR 20:22). The police retrieved a gun that belonged to David Holifield, which had one spent round. David had not fired the gun. (RR 20:25-26). Elaine told Petitioner to turn himself in, and he went to his parents home to wait for law enforcement, who arrested him. (RR 20:38-41).

And finally, the prosecution called Eric Higgins, a family law attorney. Mr. Higgins testified that before a divorce can be finalized, a petition must be filed, and the filing is followed by a 60 day waiting period. (RR 20:99). After the waiting period, there is a "prove up." In the prove up, a petitioner is sworn in like any witness to swear to the facts alleged in the petition, and provides some testimony to support the divorce decree. (RR 20:100). Mr. Higgins testified that in the Gardner divorce case, the petition was filed January 11, 2005, so that the prove-up would have occurred some time in the second week of March, at the earliest. (RR 20:101-103). Mr. Higgins also testified that there was a Waiver of Citation that had been signed by Petitioner on January 13, 2005, which means that the person giving the waiver would not have to be served with the lawsuit, so the divorce proceeding could go forward without further notice to him. (RR 20:101, 105).

In closing, the prosecutor argued:

"We have many of her friends who came in to testify about her fears of the defendant killing her... She told them he is going to kill me. I will not get out of this relationship alive..." (RR 21:17)

"Eric Higgins, the family law lawyer, talked about the process of getting the divorce in Collin County. ... After that 60-day waiting period that person must come to court, must take an oath, must testify to prove up the petition... [Tammy] was a prospective witness. But Tammy's words came back to haunt her as she told her friends, ... He will not let me out of this relationship...." (RR 21:25)

And later in the argument, the prosecutor asserted: "the reason he [Petitioner] drove to Texas is because of the divorce. The reason *he drove to Texas and shot Tammy Gardner in the head was because she was divorcing him; and that's retaliation*." (RR 21:63).

The defense theory was that the prosecution failed to prove its case beyond a reasonable doubt. (RR 21:31). There was no evidence that Petitioner was there at the residence at all, but if he was there, there was no evidence that consent was not given. (RR 21:34-36). There was no burglary because there was no forced entry. (RR 21:32). The defense argued that there was no retaliation because the divorce papers did not reflect any request for a protective order, which would have shown that Tammy was afraid of the Petitioner. (RR 21:37). The prosecution witnesses testified about a "perceived" fear; but none of them, testified they were afraid of Petitioner, and none of them took any action to help her. (RR 21:38). There is no evidence that Petitioner fired the gun. (RR 21:45). The thrust of the defense was that "there's very little forensic or physical evidence that links Steve Gardner to this case, very little." (RR 21:49).


**B.      No Presumption of Correctness for Fact Findings**

Findings of Fact Nos. 17-43, labeled: Presentation of Defense to Murder in Course of Retaliation, are not entitled to a presumption of correctness, as will be more fully discussed below. *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2). Further, habeas relief should be granted because the state court adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2).

1.    **Because the mitigation investigation was not adequate, defense counsel failed to challenge the retaliation element, and instead reinforced the prosecution's theory that Petitioner killed Tammy because she was divorcing him**

FF Nos. 17-20 recite that it was defense counsel's "strategy" to challenge the retaliation element that raise the offense to capital murder. There is clear and convincing evidence in the record that shows that defense did not do this. Defense counsel failed to distinguish between a killing arising from estrangement, and capital murder arising from retaliation. The prosecution continuously asserted, contrary to state law, that shooting an individual in the head because the couple is divorcing proved capital murder under Texas law. (RR 21:63). It does not. The killing of Tammy Gardner was the result of abandonment rage predicated on attachment disorder (which at best, was a non-capital offense resulting in a term of years, instead of a sentence of death) – and _**not**_ because of the status of Tammy Gardner as a prospective witness who would testify against him, as was required by TEX. PENAL CODE 36.36(a)(1). *See Giles v. California*, 554 U.S. 353 (2008).[6]

The prosecutor had argued to the jury in closing: "the reason he [Petitioner] drove to Texas is because of the divorce. The reason he drove to Texas and shot Tammy Gardner in the head was because she was divorcing him; and that's retaliation." (RR 21:63). Not only did the defense

---

[6]    In Giles, at issue was an exception to the right to confrontation when a spouse is "absent" from proceedings because of domestic abuse and violence. The United States Supreme Court held that in the typical domestic homicide case, the issue does not pivot on a defendant merely causing the absence of the witness. Rather, there had to be a

> *"showing that the defendant intended to prevent a witness from testifying. In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying – as in the typical murder case involving accusatorial statements by the victim – the testimony was excluded* unless it was confronted or fell within the dying-declaration exception."

*Giles*, 554 U.S. at 361.

counsel fail to object, they themselves mislead the jury into conflating divorce and retaliation because they failed to distinguish a non-capital offense based on an estrangement killing, from capital murder based on retaliation to prevent Tammy from testifying.

The defense was not capable of making this distinction in fact or law because the mitigation investigation was not adequate.  Trial counsel themselves attested in state habeas that their trial expert, Dr. Allen,  "decided she didn't want to testify [to attachment disorder] because of lack of information...."  Affidavit of House and Hultkrantz, p. 9.  Dr. Kessner, another trial expert, attested in state habeas that she had "had a telephone conference and in person conferences with the defense attorneys and various members of the defense team.  I voiced my concern that there were important corroborating witnesses who were not being located and interviewed for mitigation."State Habeas Exhibit C:  Affidavit of Gilda Kessner, Psy.D.  And in its September 15, 2010 order, the Texas Court of Criminal Appeals, explicitly refused to adopt FF No. 67 that defense counsel "did not believe that their investigation was impaired...."[7]  Put another way, the TCCA implicitly ruled that the mitigation investigation was impaired.  Accordingly, there is clear and convincing evidence that refutes FF No. 22 that defense counsel made a "strategic decision not to seek a complex psychological defense..."

---

[7]     FF No. 67 recited that *defense counsel "did not believe that their investigation was impaired*," because "their mitigation expert, Shelli Schade, was 'overly close' with Petitioner and his family." (Emphasis supplied)

## 2.    The inadequate mitigation investigation prevented any defense expert from identifying a mental health theme

FFCL Nos. 23, 24, and 30 are not entitled to a presumption of correctness.[8]   First, the defense experts placed defense counsel on notice prior to  trial that there was a lack of adequate information concerning Petitioner's psychosocial history.  Second, the TCCA's September 15, 2010 order implicitly ruled that the mitigation investigation *was* impaired.

Until the mitigation investigation is adequately performed, no mental health expert is in a position to identify a mental health theme.    And unless and until there is an adequate mitigation investigation into the life history of the client, no theory can be developed or implemented.  Hence, there is clear and convincing evidence that trial attorneys House and Hultkrantz were incapable of "strategically" deciding on a theory to present.  *See* ABA GUIDELINE 10.4 (2008) located in O'BRIEN, 36 HOFSTRA L. REV. 693, 703 (6/15/2008) ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client.  It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.")

## 3.    The inadequate mitigation investigation lead the defense to misperceive and characterized Petitioner's conduct as "random violence"

There is clear and convincing evidence that proves that the fact findings Nos. 32-36 are not entitled to a presumption of correctness.  Contrary to trial counsel's misperception, Petitioner's behavior was not "random violence."  No. 34.  Nor was the "impending divorce [the] impetus for

---

[8]    These FFCL recite that Dr. Kessner "never informed counsel of the abandonment rage theory prior to trial or suggested that it could be applicable to Applicant," or that "Dr. Kessner did not claim on habeas that the abandonment rage theory had any application to the guilt phase of the trial."

Tammy's murder." No. 35. Rather, the adequate mitigation investigation done in state habeas

confirmed that Petitioner's conduct was predictable behavior arising from attachment disorder:

> Steve Gardner's history of violence with his wives.... [t]he shooting of his second
> wife Rhoda, leading to her death six weeks later, the threats to his third wife
> Margaret and the assault of her daughter Rebecca and the details of the abuse toward
> Tammy and her eventual death tell the story of man who uses violence to manage his
> relationships and who has a chronic inability to maintain a mutually satisfying
> marital relationship. ....

Exhibit C: Affidavit of Gilda Kessner, Psy.D.

Contrary to the fact findings, not only was this defensive theory supported by the evidence,

it also negated the enhancement elements (both burglary and retaliation, as will be more fully

discussed in the prejudice section below) that made the killing of Tammy "capital murder."

*Compare* FF Nos. 36, 38, 41-43.


**C.      Argument and Authorities**

**1.      Standard of Review**

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of

ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*

*v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims

of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were
> outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact
> finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 695.

The *Wiggins* Court wrote that "[i]n assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

### The ABA Guidelines

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 2466 (2005), *citing Wiggins v. Smith*, 539 U.S. 510, 522 (2003) ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'").

In the case at bar, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, specifically ABA GUIDELINE 10.7 – INVESTIGATION (rev. ed. Feb. 2003), and GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL, specifically TEXAS GUIDELINE 11.1 – TRIAL INVESTIGATION  (adopted April, 2006)  are applicable.


**a.     Counsel has an obligation to conduct a thorough and independent investigation**

ABA GUIDELINE 10.7 – INVESTIGATION specifically provides:

A.     Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty....

      2.     The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

The ABA Guidelines were supplemented in 2008.  Supplemental ABA GUIDELINE 10.11 – The Defense Case: Requisite Mitigation Functions of the Defense Team to impose an obligation on the defense team to "conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. [followed by an enumeration of the kind and type of sources]."

The commentary to the capital guidelines explain:

A second potential danger identified by seasoned practitioners is that articulating standards specifically directed to the mitigation function could create the false impression that mitigation is separate from issues related to the guilt or innocence of the accused  – that the mitigation effort only comes into play at the penalty stage of trial.  ...  ***The Supplementary Guidelines build on the requirement of the ABA Guidelines that counsel harmonize the defense presentation of both guilt-innocence and punishment issues by recognizing counsel's duty to address the mitigation function from the very beginning and throughout the representation***:

[T]he responsibility for the development and presentation of mitigation evidence must be incorporated into the defense case at all stages of the proceedings from the moment the client is taken into custody, and extending to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, ....

(Emphasis supplied)   *Commentary, B. Integrating the Defense Theory*,   Supplemental ABA GUIDELINE 10.4 (2008) located in O'BRIEN, 36 HOFSTRA L. REV. 693, 705-707 (6/15/2008).

2.      **Defense counsel was constitutionally ineffective**

    a.      **Defense counsel's performance was deficient**

        (1)      **Even absent divorce proceedings, uxoricide occurs as a result of real or threatened termination of the relationship by men who have experienced significant attachments disorders in early childhood**

Estrangement killings, which are named "uxoricide" when the wife is killed, take place when one spouse leaves or attempts to leave the other, as described by Donald G. Dutton and Greg Kerry, *Modus Operandi and Personality Disorder in Incarcerated Spousal Killers*, 22 International Journal of Law & Psychiatry 287, 287 (1999). Divorce proceedings are irrelevant, except to the extent that they are an overt signal of a wife's attempt to leave the relationship.

Dutton and Kerry explain that men, who kill their female companions with excessive force when faced with recent or imminent abandonment, are men who experience abandonment rage, which has its origins in early development. Real or threatened termination of the relationship – as in the case at bar – are the most typical scenarios for uxoricide. *See* Exhibit C: Affidavit of Gilda Kessner, Psy.D., para. 26. Thus, the status of Tammy Gardner as a prospective witness who would testify against him in the divorce proceedings, pursuant to TEX. PENAL CODE 36.36(a)(1), was both superfluous and irrelevant. Yet, defense counsel allowed the prosecution to conflate divorce (estrangement) with _retaliation for testifying_ in the divorce proceeding. *See e.g.* (Prosecutor: "the reason he [Petitioner] drove to Texas is because of the divorce. The reason he drove to Texas and shot Tammy Gardner in the head was because she was divorcing him; and that's retaliation." (RR 21:63)).

(2)     **The state habeas record evidence reflects the killing was an "estrangement killing," refuting capital murder based on retaliation for testifying**

In *Giles v. California*, 554 U.S. 353 (2008), at issue was an exception to  the right to confrontation when a spouse is "absent" from proceedings because of domestic abuse and violence. In *Giles*, the United States Supreme Court held that in the typical domestic homicide case, the issue does not pivot on a defendant merely causing the absence of the witness.  Rather, there had to be a ***"showing that <u>the defendant intended to prevent a witness from testifying</u>.  In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying  – as in the typical murder case involving accusatorial statements by the victim  – the testimony was excluded*** unless it was confronted or fell within the dying-declaration exception."  *Giles*, 554 U.S. at 361.

The rationale of *Giles* is equally applicable in the case at bar.  The Divorce Papers reflect that even if Petitioner killed Tammy Gardner, he had not done so to prevent her from testifying. Instead, the real or threatened termination of the relationship by Tammy Gardner, triggered abandonment rage in Petitioner as a result of his severe and significant attachment disorder, and the concomitant uxoricide of Tammy Gardner.  In her affidavit, Dr. Kessner attests to the abandonment rage and trauma experienced by Petitioner, which arose from childhood environmental factors, and which resulted in his history of domestic abuse, and in particular in spousal killing (uxoricide), when the spouse attempts to leave the relationship (estrangement killings).  Dr. Kesser states:

> I have concluded based on the records and literature review, that had I been allowed to testify in the 2006 Case about the impact of the developmental trauma cited by family members, that I could have provided a context for the jury to understand the etiology of Mr. Gardner's personality and behavior.  ***At the time of trial, there was a large and growing body of literature addressing the issue of perpetrators of domestic violence***.

> ***Briefly, John Steven Gardner was born into a chaotic and dysfunctional family and events in his infancy and early childhood had a profound effect on his early and life long psychosocial development***.  Events taking place at critical developmental periods for trust, interpersonal relationships and self-concept had a damaging effect on his ability to relate to others in an intimate and sexual way.  The modeling of violence and jealousy between his parents in their marital relationship served as a template for behavior in his future romantic relationships.  ***These factors would have provided an explanation to the jurors, as to why John Steven Gardner perpetrated violence and threats of violence against his domestic partners***, ....

Exhibit C: Affidavit of Gilda Kessner, Psy.D.  *See also* Donald G. Dutton & Greg  Kerry, (1999a),

Modus Operandi and Personality Disorder in Incarcerated Spousal Killers, *International Journal*

*of Law & Psychiatry, 22*(3-4), 287-299; DonaldG. Dutton,(1999b),Traumatic  Origins of Intimate

Rage,  *Aggression and Violent Behavior, 4*(4), 431-447.

Indeed, Petitioner's violent domestic history further supports the fact that he abused or killed

his spouses,  ***not*** because of their status as prospective witnesses who would testify against him, as

was required by Tex. Penal Code 36.36(a)(1), but because they were leaving him.   Dr. Kessner

attests:

> 11.    ***The trial transcript details Steve Gardner's history of violence with his wives***.  The shooting of his second wife Rhoda, leading to her death six weeks later, the threats to his third wife Margaret and the assault of her daughter Rebecca and the details of the abuse toward Tammy and her eventual death ***tell the story of man who uses violence to manage his relationships and who has a chronic inability to maintain a mutually satisfying marital relationship***. ....

Exhibit C: Affidavit of Gilda Kessner, Psy.D.

**(3)** **Defense counsel failed to object when the prosecution conflated estrangement with retaliation for testifying, and themselves compounded the legal error**

During closing argument, the prosecutor argued that the evidence showed that Petitioner was guilty of capital murder because "the reason he [Petitioner] drove to Texas is because of the divorce. The reason *he drove to Texas and shot Tammy Gardner in the head was because she was divorcing him; and that's retaliation*." (RR 21:63).  Shooting an individual in the head because the couple is divorcing is not capital murder under Texas law.  Yet, defense counsel failed to object.

Worse, defense counsel himself, compounded the mistake of law by arguing to the jury in closing:

> *To make it a capital murder, then they have to prove* beyond all reasonable doubt, and we talked about that, there's two separate things going on, that Steve either committed retaliation, and that must be proven beyond all reasonable doubt, and *in this case the State's theory is because of the divorce*;....."

(RR 21:31).

In summary, the performance of defense counsel was deficient because they failed to object to the misleading statement of the prosecutor.  They themselves conflated retaliation for testifying estrangement overtly manifested by divorce.  More importantly, the defense theory altogether failed to explore, explain and clarify how and why an estrangement killing is not the same as murder committed to prevent a person from testifying.

**b.     The constitutionally deficient performance of defense counsel raised the reasonable probability that the outcome would have been different**

**(1)     The *Strickland* prejudice prong**

In *Strickland v. Washington*, 466 U.S. 668, 695-696 (1984), the Court held:

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. ***Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.***

**(2)     The prosecution's theory of the case and its trial evidence**

The prosecution's theory of the case was that Petitioner shot and killed Tammy Gardner, his wife, "in retaliation for or on account of the service or status of another as a witness or prospective witness." TEX. PENAL CODE 36.36(a)(1).  The alternative theory was that Petitioner shot Tammy Gardner in the course of committing or attempting to commit the offense of burglary by intentionally and knowingly entering her house, without her effective consent, and committed the felony offense of murder. (CR 1:6).

To advance its theories of the case, on November 7 and 8, 2006, the prosecution presented testimony from twenty-two (22) witnesses, the salient points of which were as follows:

#### (a)    Burglary: A Non-Consensual Entry

The evidence presented by the prosecution on the burglary enhancement neither directly proved or disproved that Petitioner entered the house without consent.  Investigators Stubbs and Yeager testified that the doors to the house had been locked, as were the windows.  Both investigators testified that except for the forced entry by the first responders following the 911 call by Tammy, there were no other signs of forced entry into the home.  (RR 19:102, 125; RR 20:14). No witness had any personal knowledge as to whether Tammy gave consent to Petitioner's entry into the house.  (RR 19:128; RR 20:17).

John White, Tammy's son by another marriage, testified that his mother had told him that there were two sets of keys to her house and to the shed.  (RR 19:261).   Mr. White testified that Petitioner told him that because of the divorce, Petitioner was going to live with his parents in Mississippi.  At that time, Petitioner gave Mr. White one set of keys to the house and the shed.  (RR 19:261).

In closing argument, the prosecutor argued by inference that "***there's no way Tammy could have effectively consented to allow him to come in the home to kill her***.  Consent was not effective." (Emphasis supplied) (RR 21:24).

#### (b)    Retaliation for Testifying

To prove retaliation for her service or status as a witness, the prosecution called Erin Whitefield, the dispatcher who spoke with Tammy on the 9-1-1- call.  Ms. Whitefield testified that during the question and answer form of their conversation, she learned the victim's address and that her blue Ford pickup truck was parked outside, that the victim had been shot by her husband, and

that the victim's husband had left in a white Ford pickup truck with Mississippi license plates.  (RR 19:24-26).

The prosecution also called three witnesses who had been associated with Tammy's employer: Jacquie West, a former co-worker of the victim; Candace Akins, Tammy's manager; and David Young, the VP for the company that employed Tammy.  All of them testified that Tammy had told them of the fear she had for Petitioner and that Tammy believed that the divorce would never be final because Petitioner would kill her.  (RR 19:209).   Jessie Mangum, the daughter of Tammy by another marriage, testified that she was afraid for her mother's safety, and that her mother told her that she did not think she would make it out of the divorce.  (RR 19:292).

Elaine Holifield, Petitioner's sister, testified that in December 2004, Petitioner came to live with her and her husband, David, who also testified for the prosecution.  (RR 20:30).  David allowed Petitioner to drive his white Ford pickup truck.  (RR 20:22).  The Holifield's testified that Petitioner left in the truck, but did not know where he had gone the day Tammy had been shot.  (RR 20:22). The police retrieved a gun that belonged to David Holifield, which had one spent round.  David had not fired the gun.  (RR 20:25-26).   Elaine told Petitioner to turn himself in, and he went to his parents home to wait for law enforcement, who arrested him.  (RR 20:38-41).

And finally, the prosecution called Eric Higgins, a family law attorney.  Mr. Higgins testified that before a divorce can be finalized, there is a "prove up," in which a petitioner is sworn in like any witness to swear to the facts alleged in the petition, and provides some testimony to support the divorce decree.  (RR 20:100).

In closing, the prosecutor argued, among other things that "the reason he [Petitioner] drove to Texas is because of the divorce.  The reason *he drove to Texas and shot Tammy Gardner in the head was because she was divorcing him; and that's retaliation*." (RR 21:63).

     **c.**    **State habeas evidence revealed a reasonable probability the outcome would have been different**

     **(1)**    **The Abandonment Rage Theory made a *prima facie* showing that the act of leaving  – and not testifying in the formal divorce proceeding  – is what triggered the domestic killing**

The prosecution assertions concerning the enhancements  – burglary based on "no effective consent to allow him to come in the home to kill her," (RR 21:24), and retaliation when Petitioner "shot Tammy Gardner in the head was because she was divorcing him; and that's retaliation," (RR 21:63)  – were errors of law and fact, and would have been refuted and clarified had there been an adequate mitigation investigation.

The abandonment rage evidence demonstrates that it was the act of leaving the relationship that culminated in Tammy's death by Petitioner.  Indeed, none of the witnesses referred to above, spoke about Tammy telling them that she would be killed because she was going to testify against Petitioner.  Nor did any of them relate any incident about Tammy changing the locks to the house, or otherwise prevent Petitioner from entering.  Rather, all the prosecution witnesses testified that Tammy told them that it was the "divorce" – that is, the estrangement –  that would get her killed. To use the language of the Supreme Court in *Giles*, the Petitioner had caused Tammy to be absent, but he had not done so to prevent her from testifying.  *Giles*, 554 U.S. at 361.

The presence of a serious and significant mental health impairment (abandonment rage originating in attachment disorder), would have explained at the outset why Petitioner, if guilty, was guilty of a lesser offense than capital murder.  Abandonment rage was also consistent with the evidence presented by the prosecution, making maximum use of undisputed facts.  (*See e.g.,* the prosecutor argued:  "whatever communication [the text messages] was going on, causes this

defendant to make the decision.  Because whatever communication, either by not communicating with him or by telling him it's going through, this defendant loses control."  (RR 21:61)).

It had internal logical force and was easy to believe. (*See  e.g.,* Dr. Kessner attested to the consistency of Petitioner's domestic violence.  "The shooting of his second wife Rhoda, leading to her death six weeks later, the threats to his third wife Margaret and the assault of her daughter Rebecca and the details of the abuse toward Tammy and her eventual death tell the story of man who uses violence to manage his relationships and who has a chronic inability to maintain a mutually satisfying marital relationship.).  Exhibit C: Affidavit of Gilda Kessner, Psy.D.   Abandonment rage would have satisfied the national standard of practice.[9]

---

[9]    Having an effective theory of the case for life is a national standard of practice when representing persons accused of capital crimes. NATIONAL LEGAL AID AND DEFENDER ASSOCIATION, *Guidelines for Criminal Defense Representation* (1995).  ABA GUIDELINE 11.7.1 (1989).  An effective theory of the case satisfies the following essential elements:

- It is logical.  A winning theory has internal logical force.  It is based upon a foundation of undisputed or otherwise provable facts, all of which lead in a single direction.  The facts upon which your theory is based should reinforce (and never contradict) each other.  Indeed, they should lead to each other, each fact or premise implying the next in an orderly and inevitable fashion.

- It speaks to the legal elements of your case.  All of your trial persuasion must be in aid of a 'legal' conclusion.  Your theory must not only establish that your client is good or worthy (or that the other side is bad and unworthy), but also that the law entitles you to relief.  Your theory therefore must be directed to prove every legal element that is necessary to both justify a verdict on your behalf and to preserve it on appeal.

- It is simple.  A good theory makes maximum use of undisputed facts.  It relies as little as possible on evidence that may be hotly controverted, implausible, inadmissible, or otherwise difficult to prove.

---

Evidence of abandonment rage in guilt/innocence would have refuted burglary, and/or retaliation for testifying, and shown that those enhancements were both irrelevant and superfluous. Yet, without insight into abandonment rage based on Petitioner's attachment disorder whose genesis lay in early childhood, the only response by the defense was that the prosecutor failed in its burden of proof beyond a reasonable doubt. As a result of the absence of an effective theory of the case for life, Petitioner was denied his Sixth and Fourteenth amendment rights to effective assistance of counsel who failed to provide him with a fair defense.

> **(2)    The defense attorneys attestations about their "beliefs" are not evidence of "strategy"**

The defense attested in state habeas that an abandonment rage theory would present two problems, and these problems were based on their "beliefs":

> First, by raising the issue it is our belief that the State would have been able to bring in the shooting of his second wife Rhonda and all of the other bad acts entered through testimony during the punishment phase of trial. We can only image the small amount of evidence that the jury would need to convict Steve of shooting Tammy after listening to everything the State had to present about him from incidents prior to Tammy.

---

> •    It is easy to believe. Even "true" theories may be difficult to believe because they contradict everyday experience, or because they require harsh judgments. You must strive to eliminate all implausible elements from your theory. Similarly, you should attempt to avoid arguments that depend upon proof of deception, falsification, ill motive, or personal attack. An airtight theory is able to encompass the entirety of the other side's case and still result in your victory by sheer logical force.

Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8-9 (NITA 2nd ed. 1999).

---

Secondly, this type of defense, specifically in Collin County, more than likely would not be an effective trial strategy. ... This is a very conservative county that tend to believe the State more often than not and who don't respond to "novel" defense theories. If given the option again, neither attorney believes that abandonment rage as a defense in guilt innocence would be effective nor benefit their client Mr. Gardner."

Affidavit of House and Hultkrantz, p. 3.  These "beliefs" are not trial strategy.  Moreover, these beliefs are not predicated on any objective and reliable evidence.

The first "belief" of the defense attorneys was that the State would be allowed to bring in and "all of the other bad acts entered through testimony during the punishment phase of trial."  This attestation overlooks the capital guidelines instruction that "it is important to dispel any motion that mitigation is separate from issues relating to the guilt or innocence of the accused.  They are intricately linked."  ABA GUIDELINE 10.4 (2008) located in O'BRIEN, 36 HOFSTRA L. REV. 693, 703 (6/15/2008).

The extra offenses concerning domestic abuse and violence were going to come into evidence regardless, because the best the defense had to offer was that the "prosecution-failed-to-prove-it."  An abandonment rage theory could have been used by the defense at the outset to explain why Petitioner, if guilty, was guilty of a lesser offense than capital murder.  And even if the jury returned a capital murder verdict, it would have been a consistent theory that in the punishment phase would have reflected why Petitioner was less morally culpable.

The commentary to the capital guidelines explain:

A second potential danger identified by seasoned practitioners is that articulating standards specifically directed to the mitigation function could create the false impression that mitigation is separate from issues related to the guilt or innocence of the accused  – that the mitigation effort only comes into play at the penalty stage of trial.  ...  The Supplementary Guidelines build on the requirement of the ABA Guidelines that counsel harmonize the defense presentation of both guilt-innocence

and punishment issues by recognizing counsel's duty to address the mitigation function from the very beginning and throughout the representation:

> [T]he responsibility for the development and presentation of mitigation evidence must be incorporated into the defense case at all stages of the proceedings from the moment the client is taken into custody, and extending to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, ....

*Commentary, B. Integrating the Defense Theory*,  Supplemental ABA Guideline 10.4 (2008)

located in O'Brien, 36 Hofstra L. Rev. 693, 705-707 (6/15/2008).

With respect to the second "belief," the theory of abandonment rage is not a "novel" theory. At least as early as 1999, there were published studies as to it.  Donald G. Dutton and Greg Kerry, *Modus Operandi and Personality Disorder in Incarcerated Spousal Killers*, 22 International Journal of Law & Psychiatry 287, 287 (1999).   The juror affidavits prove  by clear and convincing evidence that the unsubstantiated, conclusory and self-serving assertions of defense counsel that "local juries'[in Collin County] distrust ... 'novel' defensive theories" were incorrect. *Compare* Affidavit of House and Hultkrantz, p.3 *with* State Habeas Exhibit B4: Declaration of Gail Stafford:  "I believe that had I seen the reports of Toni Knox and Gilda Kessner, I would have seriously considered that testimony ...." *and with* State Habeas Exhibit B3: Declaration of Paul Reichenbach: "The mitigation evidence investigated by Toni Knox and Gilda Kessner may have [made me] ... more willing to consider a life sentence;" *and with* State Habeas Exhibit B2: Affidavit of Wendy Duerr: "The declaration of Gardner's friends and his psychological evaluation would have affected my deliberations."

The jurors affidavits refute that "counsel's reasons for not pursuing such a defense were reasonable," and refute that a Collin County jury would have been distrustful of such a defense theory.  FF No. 53.

---

Taking the unaffected findings in the guilt/innocence phase of the trial as a given, and taking due account of the effect of the errors on the remaining findings, Mr. Gardner satisfied his burden of showing that there is a reasonable probability that the outcome would have been different, but for the deficient performance of defense counsel. The "prosecution-failed-to-prove-it" theory in guilt/innocence, ensured a verdict of capital murder. This theory increased the likelihood of Petitioner's execution when the prosecution just served up even more unexplained acts of Petitioner's repeated domestic violence in the punishment phase of the trial. The deficient performance of defense counsel resulted in a directed verdict for the State of Texas. *See Miller v. Dretke*, 420 F.3d 356, 364 (5th Cir. 2005) ("While not presenting a potential bar to prosecution, Miller's claim that she was suffering from mental and emotional injuries, ... was significant in that it constituted a basis for minimizing her culpability"). For all of the aforementioned reasons, habeas relief should be granted.

**D.    The Conclusions of Law Nos. 97-102 are contrary to, and an unreasonable application of federal law**

The State court decision denying relief on the basis that trial counsel was not ineffective, and specifically Conclusions of Law Nos. 97-102 are contrary to, and an unreasonable application of, *Strickland* and its progeny.  28 U.S.C. § 2254(d)(1)(2).

Had there been a thorough mitigation investigation, coupled with an adequate time line, a unified theme of abandonment rage and trauma could have emerged. This theme would have made maximum use of the undisputed fact of Petitioner's history of domestic abuse and violence, and

would have given rise to the distinction between a non-capital killing arising from estrangement, and capital murder arising from retaliation or burglary.

For all the aforementioned reasons, the state court decision to deny relief on the merits is not entitled to the deference ordinarily due under the AEDPA. Mr. Gardner had made a *prima facie* showing that he was denied his Sixth Amendment right to both effective assistance of counsel and to a fair defense, by refuting and explaining the enhancement elements of capital murder (*e.g.,* burglary and retaliation for testifying). *Strickland,* 466 U.S. at 695; U.S. CONST. Amend. VI. Yet, the state court denied him an opportunity to develop his claim in an evidentiary hearing, particularly as to the retaliation enhancement. At such a hearing, Petitioner would have show by a preponderance of the evidence that the killing was the result of attachment disorder, a long-standing mental impairment, whose origins were in Petitioner's early childhood, and not because Tammy was to testify in the divorce proceeding. Instead, the state court proceeded to a merits-based determination of the factual questions and essentially required Petitioner to prove his claim at the *prima facie* stage, pretermitting the opportunity for the hearing and the fuller development of the evidence that Petitioner contemplated. *Compare Wiley v. Epps*, 625 F.3d 199, 211 (5th Cir. 2010).

In cases such as Petitioner's, when the state court pretermits the opportunity for a hearing and the fuller development of the evidence, no deference is due the state court decision on the merits. Indeed, in *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010), the Fifth Circuit made clear that when a mental impairment is at issue (mental retardation in *Atkins*; incompetency to be executed in *Ford*) federal "due process jurisprudence ... required a hearing in accord with fundamental fairness and procedural due process ..." *citing Atkins v. Virginia*, 536 U.S. 304 (2002) and *Ford v. Wainwright*, 477 U.S. 399, 424 (1986). *See Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007),

*Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) ("[W]hen a petitioner makes a *prima facie* showing of [his federal constitutional law claim], a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA.").

Following therefrom, a *de novo* review of the state court decision reflects that the state court decision on the merits is both contrary to, and an objectively unreasonable application of, *Strickland* and its progeny.  In light of the aforementioned arguments and authorities, habeas relief is in order.

**GROUND TWO (IAC & FAILURE TO TIMELY INVESTIGATE AND DEVELOP CRUCIAL EVIDENCE & NO EFFECTIVE THEORY – 6TH & 14TH AMENDMENT VIOLATIONS). Trial counsel presented multiple, inconsistent and implausible theories because they failed to timely investigate and develop crucial information**

## A.     Statement of Facts.

Grounds One and Two involve a common set of facts.   Accordingly, all factual and legal allegations are fully incorporated into each and every other ground.

## B.     No Presumption of Correctness for Fact Findings

Findings of Fact Nos. 44-62, labeled: Ground Two: Presentation of a Consistent Theory of the Case  are not entitled to a presumption of correctness, as will be more fully discussed below. *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).   Further, habeas relief should be granted because the state court adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2).

The findings of fact recite, among other things, that "counsel elected to pursue separate strategies during the guilt and punishment phase of trial," FF No. 45; that counsel engaged in making "choices" of "strategies" for the guilt/innocence and punishment phases, that were the result of "reasoned decisions," FF No. 47-50;

1.      **Because mitigation is linked to issues relating to guilt/innocence, and because the mitigation investigation was not adequate, defense counsel could not have developed any effective theory of the case whatsoever**

There is clear and convincing evidence that proves the mitigation investigation was inadequate.  Trial counsel themselves attested in state habeas that their trial expert, Dr. Allen, "decided she didn't want to testify [to attachment disorder] because of lack of information...." Affidavit of House and Hultkrantz, p. 9. Dr. Kessner, another trial expert, attested in state habeas that she had "had a telephone conference and in person conferences with the defense attorneys and various members of the defense team.  I voiced my concern that there were important corroborating witnesses who were not being located and interviewed for mitigation."State Habeas Exhibit C: Affidavit of Gilda Kessner, Psy.D. And in its September 15, 2010 order, the Texas Court of Criminal Appeals, explicitly refused to adopt FF No. 67 that defense counsel "did not believe that their investigation was impaired...."[10]  Put another way, the TCCA implicitly ruled that the mitigation investigation was impaired.

Setting aside whether the abandonment rage theory was an appropriate theory to present, and focusing solely on the work product of trial counsel in the Gardner trial, it is apparent that defense counsel could not have developed _any_ an effective theory of the case whatsoever – contrary to FF Nos. 44-52.  This is because no one on the defense team, or their consultants, had adequate information about Mr. Gardner's psycho-social history  The capital guidelines instruct that

---

[10]     FF No. 67 recited that ***defense counsel "did not believe that their investigation was impaired,"*** because "their mitigation expert, Shelli Schade, was 'overly close' with Applicant and his family." (Emphasis supplied)

mitigation is not separate from issues relating to guilt or innocence.[11]   Hence, because the defense

did not have sufficient information about their client, they could not make a "strategic" choice to

challenge the enhancement element of burglary or retaliation as the theory in the guilt/innocence

phase.  *Compare* FF No. 46. Had the mitigation investigation been adequate, the defense could have

shown that the killing of Tammy Gardner was the result of abandonment rage and trauma (which

at best, was a non-capital offense resulting in a term of years, instead of a sentence of death)  –  and

**_not_** because of the status of Tammy Gardner as a prospective witness who would testify against him,

as was required by Tex. Penal Code 36.36(a)(1).  *See Giles v. California*, 554 U.S. 353 (2008).[12]

Similarly, in the punishment phase, it was impossible for them "to humanize Steve."

*Compare*  FF No. 48.  They did not have the crucial information to do so. To the contrary, the

"defense" of Mr. Gardner, such as it was, left unanswered the state's case-in-chief.  The State had

contrasted Mr. Gardner as a child raised by a "mother and father [who] made him pray on his knees

every morning," and whose "parents are still together," and who visit the grandchildren, (Vol.

---

[11]     The capital guidelines instruct that "it is important to dispel any motion that mitigation is separate from issues relating to the guilt or innocence of the accused.  They are intricately linked." al ABA Guideline 10.4 (2008) located in O'Brien, 36 Hofstra L. Rev. 693, 703 (6/15/2008).

[12]     In *Giles*, at issue was an exception to  the right to confrontation when a spouse is "absent" from proceedings because of domestic abuse and violence.  The United States Supreme Court held that in the typical domestic homicide case, the issue does not pivot on a defendant merely causing the absence of the witness.  Rather, there had to be a

> **"showing that _the defendant intended to prevent a witness from testifying_. In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying  – as in the typical murder case involving accusatorial statements by the victim  – the testimony was excluded** unless it was confronted or fell within the dying-declaration exception."

*Giles*, 554 U.S. at 361.

---

23:114-115), against Mr. Gardner, the adult male, who made repeated choices to perpetrate violence on women, sexually molest and/or physically assault the daughters of his former wives, and commit acts of sexual indecency in public. (Vol. 23:28).

>      **2.    Unlike the defense presentation, an adequate mitigation investigation would have revealed Petitioner's attachment disorder, that refutes and explains the prosecution's future dangerousness presentation**

FF Nos. 56-61, recite that trial counsel "subjected the prosecution's evidence to meaningful adversarial testing," and that the abandonment rage theory "would have reinforced" that Petitioner was a future danger, thus, it would not have caused a different result in the punishment phase.  The evidence proves otherwise.  Because of an inadequate mitigation investigation, left uncontested was the prosecution's assertion that even if there was evidence of child abuse:

> 1.    there was "nothing in his [Petitioner's] background [that] explain[s] or justifies his behavior;"
>
> 2.    his sister grew up in the same household and was able to lead a normal life; and
>
> 3.    the parents have remained together, visiting "grandkids and greatgrand children on a regular basis."

(Vol. 23:85, 86, 92, 115).

Dr. Allen "decided she didn't want to testify [to attachment disorder] because of lack of information...."  Affidavit of House and Hultkrantz, p. 9.  And Dr. Kessner, another trial expert, attested in state habeas that she had "had a telephone conference and in person conferences with the defense attorneys and various members of the defense team.  I voiced my concern that there were important corroborating witnesses who were not being located and interviewed for mitigation." State Habeas Exhibit C:  Affidavit of Gilda Kessner, Psy.D.

Although FFCL Nos. 23, 30-25-36 were drafted to address Ground 1, they are important to include in this Ground 2 because they touch and concern the development of a consistent and effective theory of the case.  FFCL Nos. 23, 30-25-36  recite in part that Dr. Kessner "never informed counsel of the abandonment rage theory prior to trial or suggested that it could be applicable to Applicant," and that "Dr. Kessner did not claim on habeas that the abandonment rage theory had any application to the guilt phase of the trial." FF No. 70 recites that "Applicant has identified no evidence or themes that counsel failed to recognize...."  These fact findings border on the frivolous.   Until the mitigation investigation is adequately performed, no mental health expert can suggest a theme or theory.  And given that Dr. Kessner herself placed defense counsel on notice prior to the inception of trial that the mitigation investigation was deficient, she was not in a position to advise defense counsel about possible mental health theories.  *See* State Habeas Exhibit C: Affidavit of Gilda Kessner, Psy.D.

Likewise, no defense expert was willing to testify in the punishment phase about mitigation for the same reason: the mitigation investigation was inadequate.  As a result, Mr. Gardner was left without any defense, to refute and explain the  prosecution's picture of Mr. Gardner's "pattern in his life that has repeated over and over," of being "violent and abusive toward women and children." (Vol. 23:85, 86).

The Supplemental Guidelines make clear "it is important to dispel any notion that mitigation is separate from issues relating to the guilt or innocence of the accused.  They are intricately linked." O'BRIEN, 36 HOFSTRA L. REV. 693, 703 (6/15/2008).

 The abandonment rage theory, which is predicated in attachment disorder, would not have "reinforced the jury's conclusion that Applcant was a future danger," or "reinforced the State's

theory that applicant murdered Tammy because he 'lost that control' and emphasized his violent nature. FF 58, 61. Likewise, there was nothing "internally contradictory" about it. *See* FF No. 58, 59.

An adequate mitigation investigation would have provided the necessary foundation that would have revealed that Petitioner had attachment disorder – a concept well-recognized in the mental health field, and a mental health impairment that was continuous and pervasive throughout Petitioner's life and relationships. Attachment disorder would have been the springboard from which, an expert would have explained Petitioner's depraved lifestyle as well as domestic violence, using the work of Dr. Dutton on domestic violence and killings. This theory would have given a defense expert the foundation on which to testify about "the critical phase of development for attachment insecurity that leads to abandonment rage." (Vol. 23:28); State Habeas Exhibit C: Affidavit of Gilda Kessner, Psy.D., paras. 13, 24. Instead, the trial defense left future dangerousness unexplained. The outcome was inevitable – a vote for yes to special issue, and it concomitant sentence of death.

### 3. Jurors' affidavits refute trial counsel's attestations and the fact findings that Collin County juries would not have responded to the abandonment rage theory

The FFCL Nos. 8-10, recite that the affidavits are inadmissible, and purport to "strike" them, because they violate TEX. R. EVID. 606(b) – which they do not. TEX. R. EVID. 606(b) provides:

(b)     Inquiry into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any jurors mind or emotions or mental processes, as influencing any juror';s assessment to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about

which the juror would be precluded from testifying be admitted in evidence for any of these purposes.

Remarkably, the Fact Findings strike the juror affidavits on the basis that state statute makes them inadmissible because they concern the jurors' deliberation of the effect certain evidence had or might have had ..." on the verdict.  Fact Finding Nos. 8-10.  Yet at the same time, the fact findings as drafted by the prosecutors  and signed verbatim by the judge, use this same evidence to support "the effect [this] evidence had or might have had" on the verdict.  For example, they refer to it as proof that juries would be distrustful of such evidence, FF No. 53; "would not have affected the jury's decision on future dangerousness,"  FF No. 58, 82; and "would not have affected the jury's decision on mitigation," FF No. 59, 81.  This inconsistent application of the statute arising from Fact Finding Nos. 8-10 violates Mr. Gardner's due process, substantive and procedural rights.

Putting aside this aside, the juror affidavits go above and beyond any inquiry into the validity of a verdict.  Instead, the juror affidavits refute FF No. 53.  They prove  by clear and convincing evidence that the unsubstantiated, conclusory and self-serving assertions of defense counsel that "local juries'[in Collin County] distrust ... 'novel' defensive theories...."   *Compare* Affidavit of House and Hultkrantz, p.3 *with* State Habeas Exhibit B4: Declaration of Gail Stafford:  "I believe that had I seen the reports of Toni Knox and Gilda Kessner, I would have seriously considered that testimony ...." *and with* State Habeas Exhibit B3: Declaration of Paul Reichenbach: "The mitigation evidence investigated by Toni Knox and Gilda Kessner may have [made me] ... more willing to consider a life sentence;" *and with* State Habeas Exhibit B2: Affidavit of Wendy Duerr: "The declaration of Gardner's friends and his psychological evaluation would have affected my deliberations."

Accordingly, these affidavits refute that "counsel's reasons for not pursuing such a defense were reasonable," and refute that a Collin County jury would have been distrustful of such a defense theory.  FF No. 53.

## C.     Argument and Authorities.

### 1.     Standard of Review

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

ABA GUIDELINE 10.7 Investigation (rev. ed. Feb. 2003) provides:

A.     ***Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty***.

> 1.     The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

*See also* GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL, Guideline 11.1 – Trial Investigation.

Additionally, the Commentary to ABA GUIDELINE 10.11 – The Defense Case Concerning Penalty (rev. ed. Feb. 2003) provides:

The Importance of an Integrated Defense

> ***During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial***.  Ideally, "the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation."  Consistency is crucial because, as discussed in the commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime.

**2.      Trial counsel was constitutionally ineffective**

**a.      Counsel's performance was deficient**

Trial counsel's performance was deficient because they failed to adequately and thoroughly investigate and develop crucial information about Mr. Gardner's life history.  As attested to by Toni Knox, because the dates in the abbreviated time line that the mitigation investigator had provided defense counsel "were vague and the time line did not document what records the information was obtained from, .... the trial team did not have this basic organizing tool ... [which] can frequently reveal trends, patterns of behavior and causal factors."  Exhibit D: Affidavit of Toni Knox, LCSW at p. 4.  Following therefrom, defense counsel was unable to formulate and present an effective theory of the case in all phases of the trial.

Specifically, absent an adequate mitigation investigation, the defense was unable to advance the any theme or theory that would have been effective throughout the trial.

> **(1)     An effective theory of the case for life is a national standard in capital cases**

Having an effective theory of the case for life is a national standard of practice when representing persons accused of capital crimes.  NATIONAL LEGAL AID AND DEFENDER ASSOCIATION, *Guidelines for Criminal Defense Representation* (1995).  ABA GUIDELINE 11.7.1 (1989).  An effective theory of the case satisfies the following essential elements:

- It is logical.  A winning theory has internal logical force.  It is based upon a foundation of undisputed or otherwise provable facts, all of which lead in a single direction.  The facts upon which your theory is based should reinforce (and never contradict) each other.  Indeed, they should lead to each other, each fact or premise implying the next in an orderly and inevitable fashion.

- It speaks to the legal elements of your case.  All of your trial persuasion must be in aid of a 'legal' conclusion.  Your theory must not only establish that your client is good or worthy (or that the other side is bad and unworthy), but also that the law entitles you to relief.  Your theory therefore must be directed to prove every legal element that is necessary to both justify a verdict on your behalf and to preserve it on appeal.

- It is simple.  A good theory makes maximum use of undisputed facts.  It relies as little as possible on evidence that may be hotly controverted, implausible, inadmissible, or otherwise difficult to prove.

- It is easy to believe.  Even "true" theories may be difficult to believe because they contradict everyday experience, or because they require harsh judgments.  You must strive to eliminate all implausible elements from your theory.  Similarly, you should attempt to avoid arguments that depend upon proof of deception, falsification, ill

> motive, or personal attack.  An airtight theory is able to encompass the entirety of the other side's case and still result in your victory by sheer logical force.[13]

Steven Lubet, MODERN TRIAL ADVOCACY: ANALYSIS & PRACTICE 8-9  (NITA 2nd ed. 1999).

Despite this national standard, there was no effective unifying theme at trial.  See Exhibit D: Affidavit of Toni Knox, LCSW at p. 17 ("By the choice of mitigation witnesses, I could not identify the mitigation themes the defense was attempting to present").

**(2)      There was an absence of a consistent, unified and effective theme in any phase of the trial**

**(a)      Voir Dire: selecting jurors who could vote for other than death**

Other than seeking potential jurors who were capable of voting for other than death, there was a glaring absence of a consistent unified theme.

**(b)      Guilt/Innocence: Petitioner was not at the scene, but if he was, there was no burglary and the divorce was uncontested**

To the extent that there was a defense theory in the guilt/innocence phase, it was limited to the assertion that "the evidence will not show any forensic link to Mr. Steven Gardner, no physical link ..., nothing that places that gun in his hand."   (RR 19:18).  This theory failed to account for the role of circumstantial evidence, and inferences that jurors could draw.

---

[13]  *See also* STEPHEN C. RENCH, *Building the Powerfully Persuasive Criminal Defense*, 42 MERCER L. REV. 569, 570 (1991) ("The story allows the jury to understand and organize the myriad of facts and to judge plausibility. Studies show that in order to be plausible, a story or case must be: 1) consistent; 2) complete; 3) in context; 4) organized; 5) believable; and 6) positive and persuasive.").

Worse, the closing argument of the defense aided the prosecution's theory when he told the jury:

> ***To make it a capital murder, then they have to prove*** beyond all reasonable doubt, and we talked about that, there's two separate things going on, ***that Steve*** either ***committed retaliation***, and that must be proven beyond all reasonable doubt, and in this case the State's theory is ***because of the divorce***;....."

(RR 21:31).

The prosecution had introduced the divorce petition into evidence.  Then it called Eric Higgins, a family-law practitioner who testified that even in an uncontested divorce proceeding, a petitioner, such as Tammy Gardner, would come to court for a "prove up."  That is, "the petitioner typically would come to court and provide some testimony to the court to support the judgment or the divorce decree." (RR 20:100).

The closing argument of the defense pointed the jury in the direction of a verdict of capital murder based on two facts: First, the prosecutor had introduced evidence, that even in an uncontested divorce, there must be a "prove-up."  Second, Tammy Gardner was dead.  Hence, a reasonable juror could infer that because Tammy Gardner was going to testify in the "prove up," that Petitioner killed her.  But testifying in a prove-up is irrelevant in a uxoricide.  All that is relevant in an estrangement killing is that one spouse leaves or attempts to leave the other.

**(c)    Punishment: Petitioner's leaving one woman for another, is the type of thing that "happens everyday"**

In the punishment phase, there was no defense theory whatsoever as reflected in the disjointed opening statement of defense counsel.  He first told the jury that after assaulting Margaret and being imprisoned, Margaret and Petitioner continued to have a conjugal relationship.  Then defense counsel told the jury that Petitioner later divorced Sandra, to marry Tammy.  And finally, defense argued in opening statement, that this sort of thing "happens everyday."  (RR 22:11-13).

**(3)    An adequate pre-trial investigation would have revealed the theme of abandonment rage, which made use of the undisputed facts of domestic abuse, while leading to the conclusion that Petitioner was not deserving of death**

Had an adequate and thorough pre-trial investigation been performed, the defense could have developed a unified them that the killing was not in "retaliation for testifying" at the prove-up. Rather, the killing of Tammy Gardner was an *estrangement* killing  – which is not a capital murder offense.

An effective theory of the case, would have begun by testing each potential juror's  views concerning "abandonment rage."   These views would have allowed the defense to cull those persons whose view on the topic were within their "latitude of rejection," from those who views on the topic were within their "latitude of non-commitment."[14]

---

[14]    Social Judgment Theory posits three possible perspectives by a potential juror:  latitude of acceptance; latitude of non-commitment; and  latitude of rejection.  "The latitude of acceptance" are those positions which are acceptable. The "latitude of non-commitment" are those positions which are neither accepted nor rejected. The "latitude of rejection" are positions which will be actively opposed.

Having at least identified those jurors who were capable of listening to the theme, the defense could then have segued into guilt/innocence where the defense would have sponsored forensic evidence that showed that men who kill their female companions with excessive force, are men who are faced with recent or imminent abandonment and that this abandonment rage has its origins in early development." Exhibit C: Affidavit of Gilda Kessner, Psy.D., para. 26.   *See also* Donald G. Dutton and Greg Kerry, *Modus Operandi and Personality Disorder in Incarcerated Spousal Killers*, 22 International Journal of Law & Psychiatry 287, 287 (1999a).

In particular, the testimony would have revealed that Petitioner experienced abandonment rage and trauma originating in his early childhood trauma,[15] which consisted of three meaningful childhood environmental factors.   Specifically, the Petitioner

1.      witnessed/experienced violence, which was the first source of trauma,

2.      was shamed, which was a second source of trauma, and

3.      had an insecure attachment, which was a third source of trauma.

Accordingly, the theme of abandonment rage was consistent with the prosecution's assertion that Petitioner had a history of domestic abuse and violence, while at the same time refuting that the killing of Tammy Gardner was done in retaliation for potential testimony at a prove-up.

And finally, the theme of abandonment rage and trauma would have naturally segued into the punishment phase to explain how and why Petitioner was less morally culpable and not

---

[15]      There was evidence of trauma, despite the self-serving statements of the trial counsel that there was none:

"There was no – we checked on whether there was any mental health treatment that would aid in mitigation in this case and also to the cohesiveness of the family."  RR 23:77.

deserving of death.  The research literature reflects that abandonment rage has a neurobiological component.[16]

As a result, the theme  of abandonment rage, with its concomitant neurobiological effects, would have embraced the prosecutor's admonishment:

 "all of this defendant's adult life, he has been violent and abusive toward women and children.  It's been a behavior, a pattern in his life that has repeated over and over,...."

(RR 23: 85), while at the same time providing an explanation to the jurors that these very facts of a "pattern of domestic violence" were ***not*** the product of volitional, evil intent, but instead a product of brain impairment.[17]

----

[16]    *See*  Donald G. Dutton. (2002). *The Neurobiology of Abandonment  Homicide, Aggression and Violent Behavior, 7,* 407-421.

"A review is made of the typical modus operandi and psychological profile of uxoricide (wife murder) perpetrators.  Typically, most had traumatic childhood and have current personality disorders (PD; typically Dependent, Passive–Aggressive, or Borderline PD). ***The uxoricide occurred during attempted abandonment of the relationship by the female and was characterized by extreme violence and elements of disorganized behavior by the perpetrator***.   A review is also made of the neuroanatomy and neurobiology of aggression.  ***It is found that the orbitofrontal cortex (OFC) is implicated in control of aggressive impulses***.  This cortical area matures during the critical ''rapprochement subphase'' of early development (1.5–2 years). Attachment dysfunction during this period may interfere with critical development. It is found that low levels of serotonin (5-HT) and high levels of norepinephrine (NE) are implicated in aggression. It is also found that low levels of 5-HT and high levels of NE are long-term neurobiological sequelae of trauma. Attachment trauma can occur during the rapprochement subphase.  ***It is suggested that a biological basis may serve to connect early trauma experience with a specific rage response to abandonment and spousal homicide. Neural networks containing malignant memories may be the neural mechanism by which perceived abandonment generates such symbolic terror and rage.***"

[17]    *See*  Donald G. Dutton. (2002). *The Neurobiology of Abandonment  Homicide, Aggression and Violent Behavior, 7,* 407-421.

"....  ***It is found that the orbitofrontal cortex (OFC) is implicated in control of***

----

In summary, had the pre-trial investigation been adequate, an effective theory of the case would have been available to the defense in the guilt/innocence phase to the capital-murder-enhancements. Further, evidence of abandonment rage and trauma could have naturally segued into the punishment phase. It would have allowed defense counsel to urge the jurors that Mr. Gardner was not as morally culpable as someone who did not suffer from his impairments, and thus did not deserve death.

---

*aggressive impulses*. This cortical area matures during the critical ''rapprochement subphase'' of early development (1.5–2 years). Attachment dysfunction during this period may interfere with critical development. It is found that low levels of serotonin (5-HT) and high levels of norepinephrine (NE) are implicated in aggression. It is also found that low levels of 5-HT and high levels of NE are long-term neurobiological sequelae of trauma. Attachment trauma can occur during the rapprochement subphase. ***It is suggested that a biological basis may serve to connect early trauma experience with a specific rage response to abandonment and spousal homicide. Neural networks containing malignant memories may be the neural mechanism by which perceived abandonment generates such symbolic terror and rage.***"

### b.      Prejudice is presumed

Trial counsel's deficient performance was complete; prejudiced is presumed.  This is because in the case at bar, the absence of a theory that was effective in all phases of the trial made it improbable –  if not impossible – for counsel to have been effective at any stage of the trial proceedings.  Without an effective theory, counsel had no roadmap to guide them in their efforts to persuade the jury to sentence to life.

The United States Supreme Court has made clear that "[i]f no actual 'Assistance' 'for' the accused's 'defense' is provided, then the constitutional guarantee [to effective counsel] has been violated." *United States v. Cronic*, 466 U.S. 648, 654 (1984).  Echoing *Cronic*, the Fifth Circuit held: "The right to the assistance of counsel for one's defense . . . encompasses the right to have an advocate for one's cause." *Childress v. Johnson*, 103 F.3d 1221, 1226, 1228 (5th Cir.1997).  The lack of an effective theory of the case for life deprived Mr. Stroman of a fair trial and resulted in a complete failure to subject the prosecution's case to meaningful adversarial testing. *Bell v. Cone*, 535 U.S. 685, 697 (2002) . . .   *Bell v. Cone*, 535 U.S. 685, 697 (2002).  Hence, prejudice is presumed.  Habeas relief must be granted.


### c.      Alternatively, but for the deficient performance of counsel, there is a reasonable probability the outcome would have been different


### (1)      The *Strickland* prejudice prong

In *Strickland v. Washington*, 466 U.S. 668, 695-696 (1984), the Court held:

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have

been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. ***Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.***

### (2)    The trial evidence

The punishment phase of the trial last lasted two days: on November 13, 2006, the state's case-in-chief consisted of testimony from seven (7) witnesses as to the future dangerousness issue, and then the state rested; on November 14, 2006, the defense called four (4) witnesses to refute the state's future dangerousness issue and then it rested; immediately followed by two prosecution witnesses in rebuttal, again as to the future dangerousness issue only.

No mitigation was presented by the defense team.[18]   The affidavit of the defense attorneys recited, among other things, that they did not present any evidence in mitigation  because:

- the State had not proven future dangerousness beyond a reasonable doubt. Affidavit of Attorneys House and Hultkrantz, p. 5.

- "The fact of the matter there wasn't much [mitigation] available given the life style Steve had lived including his past homosexual relationships, his past history of violence in many if not all of the relationships and the limited testimony available from his family;" Affidavit of Attorneys House and Hultkrantz, p. 5.

- "our mitigation expert had discovered little or nothing that was deemed useful for trial," and although they had hired Dr. Allen to "examine and address about abandonment issues concerning Steve... [Dr. Allen] decided she didn't want to testify because of lack of information...."  Id. at 9;

- the mitigation expert "had developed an overly close relationship with the defendant," and had "refused to share notes from her mitigation investigation and refused to summarize her findings in a report to the attorneys;" Affidavit of Attorneys House and Hultkrantz, pp. 4, 6, 7.

- testimony about Mr. Gardner's "womanizing," "his constant focus on sex," and "his life style ... including homosexual relationships, his past history of

---

[18]   According to defense counsel, the mitigation investigation consisted of (Vol 23:77-78):

- Mr. Gardner's prior childhood accidents and injuries, which did not reveal anything significant,
- there was no serious illnesses at any time;
- There was physical abuse to Mr. Gardner and Elaine Holifield, his sister, but no sexual abuse of any kind;
- The size of the immediate family "was four  –  plus grandchildren;"
- there was no drug or alcohol abuse by Mr. Gardner or any members of the family;
- there was no mental health treatment, issues as to family cohesiveness, or family standard of living and living conditions, that would aid in mitigation;
- "the social relationships with members of, basically, the opposite sex, marriage, divorces, etc; and that's all come into evidence,"(as reflected in the state's case-in-chief on the future dangerousness issue)
- all awards and honors shown by his military records

violence in many if not all of the relationships and the limited testimony available from his family," would have been harmful because they were "well aware of what the feelings and reactions jurors [in conservative Collin County] are when it comes to presentation of evidence regarding transvestites and other alternative lifestyles." Affidavit of Attorneys House and Hultkrantz, pp. 7, 8.

Additionally, the prosecutor stated on the record in response to the defense attorneys assertion at trial that it was their "trial strategy not to put [experts] on," that "at approximately 11:15 a.m. that morning, we were summoned to the Chambers, and defense counsel was present.  It was our understanding at that point the defense team had consulted with their client and that he was of the opinion that he did not want to put on a mitigation case."[19] Defense counsel did not respond. (Vol 23:76).

### (a)    The aggravating evidence

As result, the only story of Mr. Gardner was the one told by the prosecution during the punishment phase on the issue of future dangerousness.  The prosecution introduced evidence that despite having been raised by a "mother and father [who] made him pray on his knees every morning," and whose "parents are still together," and visit the grandchildren, (Vol. 23:114-115), Mr. Gardner was a man who perpetrated violence on women, sexually molested and/or physically assaulted the daughters of his former wives, and committed acts of sexual indecency in public.

Specially, the evidence in aggravation included the testimony of:

---

[19]    In *Rompilla v. Beard*, 545 U.S. 374, 377 (2005), the Supreme Court made clear that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."  And in *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000), the U.S. Supreme Court stated that "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable."

- Dr. Rohr, the medical examiner for Collin County, who testified from the Mississippi medical records of Rhoda Gardner. Rhoda was Mr. Gardner's former spouse, who was pregnant at the time he ambushed and shot her three times, resulting in paraplegia.  (Vol. 22:17).  As a result of complications from having lost the fetus, she was required to undergo subsequent surgery and died as a result of cardiac arrhythmia.  The medical records recited that the manner of death was homicide, and listed four reasons for her death: massive pulmonary embolism; paraplegia; gunshot wounds; homicide. (Vol 22:21, 25).

- Margaret Westmoreland (Vol. 22:27) testified that during the marriage, although Mr. Gardner was work-capable, he was unemployed, (Vol. 22:39), that he was controlling, threatened to "hunt [her] down" and kill her and her children if she left him, (Vol. 22:54), and isolated her from her family.

- Rebecca Fethiere, the daughter of Ms. Westmoreland, testified Mr. Gardner had hit her in the head three times with his fist, causing injury, which required 78 stitches. (Vol. 22:74).  Ms. Fethiere also testified to the inappropriate, "boyfriendish" approach of Mr. Gardner, who wanted to put her makeup on her, and suggested that if she had "sex with the devil," meaning himself, she would get devil-like powers.  (Vol. 22:65, 68).

- Several law enforcement officers testified to an incident by Mr. Gardner of indecent exposure and unlawful carrying of a weapon, (Vol. 22: 103); specifically for masturbating in his vehicle in the parking lot at the Irving Mall at Christmas time in December, 1992, where there were women and children. (Vol. 22:91, 96, 100).

- Jessie Mangum, the daughter of capital murder victim Tammy Gardner, testified that when she was in second grade and living with her mom and Mr. Gardner, Mr. Gardner acted sexually inappropriate with her by kissing her and touching her, and having her touch him.  (Vol. 22:124-126).

- Both Ms. Mangum and Ms. Fethiere had testified that Mr. Gardner showed no remorse when he told each of them about his ambushing and shooting his former wife, Rhoda Gardner.  (Vol. 22:77; Vol. 22:132-133).  Ms. Mangum also testified that when a former wife of Mr. Gardner, Sandra, would dropped off Nicholas (biological son of Mr. Gardner and Sandra), Sandra appeared "frantic" around Mr. Gardner and wanted to "get out of there."  (Vol. 22:128-129).

In an attempt to refute the future dangerousness presentation, the defense called:

- two former co-workers (William Campbell Miles and Kelly Dowdy), who testified that Mr. Gardner was a diligent, responsible employee, (Vol.23:7-8; Vol 23: 17-18).  Mr. Miles testified that based on his conversations with Mr. Gardner during his incarceration awaiting trial, that Mr. Gardner would have eternal security in God because he was a born-again Christian.  (Vol. 23: 10-11).

- They called a former spouse of the victim, Juan Russel Sewell, who testified that he and Tammy were divorced after a year of marriage because they "couldn't make it,"  (Vol. 23:22), and that Tammy could be manipulative, and had a weakness for men.  (Vol. 23:23).

- Only Elaine Hollifield, the older sister of Mr. Gardner, testified about repeated incidents of abuse of Mr. Gardner at the hands of his parents.  (Vol. 23:24).

Elaine Holifield testified to the death of a sister who died in first grade of heart failure, and how her illness and death caused financial stress in the family.  (Vol. 23:26).  Ms. Holifield also testified to the violent temper of her father, the unhappy marriage and violent interaction of their parents, (Vol. 23:30).  The violence in her parents' marriage was reflected in the  presence of knives, broom handles, and a gun. (Vol. 23:32).

Ms. Holified also testified that their father was a Baptist preacher, who continuously moved from church to church because the congregation would ask him to resign, (Vol. 23:26), and how he would have them up at 5:30 am to do daily devotionals, only after their mother left for work at a sewing factory at 4:00 am. Because playmates would have been forced to participate in this morning ritual, Elaine and Steve did not invite friends to their home.  (Vol. 23:28).

Ms. Holified testified that their father would physically abuse her and, Steve Gardner. Their father would interrupt a church service to take Steve to the fellowship hall to beat him with a belt

while the congregants listened.  The wails were heard by the parishioners, and the beating caused welts on Steve's body.  (Vol 23: 35-36).

Ms. Holifield testified to other physical and verbal abuse of Mr. Gardner, by his father and mother.  His father would beat Steve at least once a week for no apparent reason, not with his hand but with a limb from a bush or with his belt.  (Vol. 23:31-32, 34).  Steve's mother, who was a screamer, would use her hand to slap the children, and Steve in particular.  Ms. Holified could not provide any particular reason for the beatings, and testified that their father would later take them to the beach. (Vol. 23:40-41).


        (b)        **The mitigating evidence**

As reflected above, there was no expert testimony to provide context and both refute and explain the  prosecution's picture of Mr. Gardner's "pattern in his life that has repeated over and over," of being "violent and abusive toward women and children."  (Vol. 23:85, 86).  Such expert testimony would have provided an explanation to the jury about "the critical phase of development for attachment insecurity that leads to abandonment rage."

Also left uncontested was the prosecution's assertion that even if there was evidence of child abuse:

1.      there was "nothing in his background [that] explain[s] or justifies his behavior;"

2.      his sister grew up in the same household and was able to lead a normal life; and

3.      the parents have remained together, visiting "grandkids and greatgrand children on a regular basis."

(Vol. 23:85, 86, 92, 115).

###### d.   State habeas evidence revealed a reasonable probability the outcome would have been different

The evidence in state habeas sought to address the *Strickland* prejudice prong from the psychological and the neurobiological perspective.[20]  Each perspective illustrates how and why Mr. Gardner is less morally culpable for the death of his wife, Tammy Gardner, than someone who did not experience the trauma he experienced at the hands of his parents, and the increased risk in all aspects of his life as a result of the attachment disorder.  These different perspectives seek to appeal to those jurors who are inclined toward hard-data by presenting a neurobiological approach, and also to appeal to those jurors who are receptive to the soft sciences, using the psychological-study approach.

###### (1)   Adequate lay witness testimony would have provided personal knowledge about the rigid religious environment and childhood abuse experienced by Mr. Gardner

The mitigation investigator, Toni Knox, LCSW, for this state habeas proceeding, attested to the constitutional ineffectiveness of counsel as a result of the failure to adequately present lay witness testimony in the penalty phase of the trial, such as Sylvia and Donald Reeves; Steve's third wife, Margaret; Steve's son, Randall Reeves.  Ms. Knox attests that the failure of trial counsel to present this additional lay witness testimony resulted in a "disjointed" mitigation "with no unifying theme."

---

[20]   Social Judgment Theory posits three perspectives from which a juror views the evidence: latitude of acceptance; latitude of non-commitment; and  latitude of rejection.  "The latitude of acceptance are those positions which are acceptable. The latitude of non-commitment are those positions which are neither accepted nor rejected. The latitude of rejection are positions which will be actively opposed."  *Social Judgment Theory*, http://changingminds.org/explanations/theories/social_judgment.htm

Had these additional lay witnesses been called, they would have provided additional information at the punishment phase, which would have given credence to testimony about the rigid religious environment and abuse and violence in Steve's family home.  It would have refuted the prosecutor's suggestion that the testimony of Steve's sister, Elaine, was a biased effort to save her brother from a sentence of death.  And it would have bolstered expert testimony concerning Steve's life history.  *See* Exhibit D: Affidavit of Toni Knox, LCSW at pp. 10-13.

> **(2)    Expert witness testimony would have explained Petitioner's domestic violence, with its origins in Petitioner's psycho-social history**

The mitigation investigator, Toni Knox, LCSW, for this state habeas proceeding, attested to the constitutional ineffectiveness of counsel as a result of the failure to adequately present expert witness testimony in the penalty phase of the trial to address the issue of domestic violence.    Ms. Knox attests:

> Rather than allow their expert witnesses to come in to present Steve's life history and attempt to possibly explain his behavior in the abusive relationships, Mr. House announced in his closing statement:
>
>> *But here is my question to you: This abuse by itself, how does that work?  How many people do you know that are in abusive relationships?  How many people do you know that are in those relationships, stay in those relationships when they shouldn't?  They do.  And you know why?  Because they still love them.*
>
> ***The reason for remaining in an abusive relationship is not this simple as there are a myriad of reasons for people remaining in abusive relationships, other than they still love the person***.  This is not the testimony that would have been presented by a mental health expert to the jury.

Exhibit D: Affidavit of Toni Knox, LCSW at p.17 (emphasis supplied).

Ms. Knox further attests:

Two expert witnesses were retained by the defense to testify and present Steve's life history and provide some research data concerning Steve's behavior when he believed he was being abandoned.

Dr. Gilda Kessner, a psychologist, spent hours interviewing Steve and his sister. Additionally, she reviewed numerous records and researched the literature in preparation of her testimony. [*See* exhibit 10, to Knox affidavit] If ***Dr. Kessner had been allowed to testify, she would have provided information to the jury concerning the neurobiology of abandonment homicide. Additional rather than the simplistic explanation given by Mr. House concerning domestic violence, she would have provided research based information about domestic violence***. ....

Dr. Kate Allen, a social worker, was also retained to provide life history testimony at the trial. As with Dr. Kessner, she was not called to testify, although she was present and ready to testify.

Exhibit D: Affidavit of Toni Knox, LCSW at pp.15-16 (emphasis supplied).

Dr. Kessner attests in this state habeas proceeding:

I have concluded based on the records and literature review, that had I been allowed to testify in the 2006 Case about the impact of the developmental trauma cited by family members, that ***I could have provided a context for the jury to understand the etiology of Mr. Gardner's personality and behavior***. At the time of trial, there was a large and growing body of literature addressing the issue of perpetrators of domestic violence.

Briefly, John Steven Gardner was born into a chaotic and dysfunctional family and events in his infancy and early childhood had a profound effect on his early and life long psychosocial development. ***Events taking place at critical developmental periods for trust, interpersonal relationships and self-concept had a damaging effect on his ability to relate to others in an intimate and sexual way***. The modeling of violence and jealousy between his parents in their marital relationship served as a template for behavior in his future romantic relationships. ***These factors would have provided an explanation to the jurors, as to why John Steven Gardner perpetrated violence and threats of violence against his domestic partners, and therefore, would have given them a basis to find that he was less morally culpable and not worthy of death***.

Exhibit C: Affidavit of Gilda Kessner, Psy.D, para. 12 (emphasis supplied).  Thereafter, Dr. Kessner

explains the concept of abandonment rage and its neurobiological effects.

As the aforementioned state habeas evidence revealed, the psycho-social history of Mr.

Gardner reflects his insecurity, possessiveness, jealousy, and probable sex addiction, as well as

abandonment rage that had its genesis in early childhood.

> **(3)     At the psychological level, Dr. Dutton's work could have explained how Petitioner's family origin resulted in a depraved lifestyle**

At the psychological level, Dutton's work could have explained how the violent Gardner

household, with rigid enforcement of strict rules by a remote, depressed, angry, former alcoholic

father, may have affected Mr. Gardner's development and behavior, and resulted in a depraved

lifestyle.  (Vol. 23:28). Relying on the work of Dutton, Dr. Kessner attests:  "[T]he critical phase

of development for attachment insecurity that leads to abandonment rage ... is seen in all of Steve

Gardner's relationships and especially in his relationship with Tammy."  State Habeas Application,

Exhibit C: Affidavit of Kessner, Psy.D., p. 8, para. 21.

> **(4)     At the neurobiological level, Dr. Dutton's work could have shown the link between abandonment and homicidal rage**

At the neurobiological level, Dutton's work on domestic abuse and spousal killings reflects

a neurobiological link between abandonment and homicidal rage.  Once again, relying on the work

of Dutton, Dr. Kessner attests: "... Gardner's early childhood history of exposure to extreme trauma

provided the basis for his insecurity, dependence and over-controlled hostility in intimate

relationships."  State Habeas Application, Exhibit C: Affidavit of Kessner, Psy.D., p. 10, para. 25.

**(5)     Jurors' affidavits refute that they would not have responded to the abandonment rage theory**

The FFCL Nos. 8-10, recite that the affidavits are inadmissible, and purport to "strike" them, because they violate TEX. R. EVID. 606(b)  –  which they do not.  TEX. R. EVID. 606(b) provides:

> (b)     Inquiry into Validity of Verdict or Indictment.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any jurors mind or emotions or mental processes, as influencing any juror';s assessment to or dissent from the verdict or indictment.  Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes.

Remarkably, the Fact Findings strike the juror affidavits on the basis that state statute makes them inadmissible because they concern the jurors' deliberation of the effect certain evidence had or might have had ..." on the verdict.  Fact Finding Nos. 8-10.  Yet at the same time, the fact findings as drafted by the prosecutors  and signed verbatim by the judge, use this same evidence to support "the effect [this] evidence had or might have had" on the verdict.  For example, they refer to it as proof that juries would be distrustful of such evidence, characterize abandonment rage theory as a "novel" theory FF No. 53; which "would not have affected the jury's decision on future dangerousness,"  FF No. 58, 82; and which "would not have affected the jury's decision on mitigation," FF No. 59, 81.  This inconsistent application of the statute arising from Fact Finding Nos. 8-10 violates Mr. Gardner's due process, substantive and procedural rights.

Putting aside this aside, the juror affidavits go above and beyond any inquiry into the validity of a verdict.  Instead, the juror affidavits refute FF No. 53.  The theory of abandonment rage is not a "novel" theory.  At least as early as 1999, there were published studies as to it.  Donald G. Dutton

and Greg Kerry, *Modus Operandi and Personality Disorder in Incarcerated Spousal Killers*, 22 International Journal of Law & Psychiatry 287, 287 (1999).   Further, the juror affidavits refute, by clear and convincing evidence, that the unsubstantiated, conclusory and self-serving assertions of defense counsel that "local juries'[in Collin County] distrust ... 'novel' defensive theories" were not correct.  *Compare* Affidavit of House and Hultkrantz, p.3 *with* State Habeas Exhibit B4: Declaration of Gail Stafford:  "I believe that had I seen the reports of Toni Knox and Gilda Kessner, I would have seriously considered that testimony ...." *and with* State Habeas Exhibit B3: Declaration of Paul Reichenbach: "The mitigation evidence investigated by Toni Knox and Gilda Kessner may have [made me] ... more willing to consider a life sentence;" *and with* State Habeas Exhibit B2: Affidavit of Wendy Duerr: "The declaration of Gardner's friends and his psychological evaluation would have affected my deliberations."

Accordingly, these affidavits refute that "counsel's reasons for not pursuing such a defense were reasonable."  FF No. 53.In the case at bar, there was no strategic reason for the failure of trial counsel to adequately present lay and expert witness testimony to explain Mr. Gardner's actions.[21]

---

[21]   ABA GUIDELINE 10.11 – THE DEFENSE CASE CONCERNING PENALTY specifically provides:

> F.   In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:
>
> > 1.   Witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death;
> >
> > 2.   Expert and lay witnesses along with supporting documentation (*e.g.,*

The deficient performance resulted in a failure to "integrate all of the facts and circumstances of the defendant's life and the crime and present a persuasive narrative of the events that encourages values of accountability over retribution, grace over vengeance, and life over death." RICHARD G. DUDLEY, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, Vol. 36, No. 3 HOFSTRA L. REV. at 963, 965 (Spring 2008). Following therefrom, the one-sided story of the prosecution, in the absence of a thoroughly investigated and developed mitigation presentation were "errors [of trial counsel] ... which had a pervasive effect on the inference to be drawn from the evidence, altering the entire evidentiary picture ...." *Strickland*, 466 U.S. at 695-696.

## D.    The Conclusions of Law Nos. 97-102 are contrary to, and an unreasonable application of federal law

The State court decision denying relief on the basis that trial counsel was not ineffective, and specifically Conclusions of Law Nos. 97-102 are contrary to, and an unreasonable application of, *Strickland* and its progeny.  28 U.S.C. § 2254(d)(1)(2).

Had there been a thorough mitigation investigation, coupled with an adequate time line, a unified theme of abandonment rage and trauma could have emerged.  This theme would have made maximum use of the undisputed fact of Petitioner's history of domestic abuse and violence, while

---

school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); ... [to] support a sentence less than death; ....

at the same time providing a viable explanation of the shooting of Rhoda and the subsequent shooting of Tammy.

In the guilt/innocence phase, an adequate mitigation investigation would have given rise to the distinction between a non-capital killing arising from estrangement, and capital murder arising from retaliation for testifying.  Because of an inadequate mitigation investigation, the defense failed to object to the prosecution's focus on the "divorce."  The defense too mislead the jury into finding retaliation by eliciting testimony about the "divorce," and conflating it with retaliation for testifying.  (RR 19:37, 143, 164, 166, 209, 292, 294, 259, 260, 266),  Thrust of TEX. PENAL CODE 36.36(a)(1) is not about whether a couple is divorcing.  It is about whether a defendant intends to prevent a witness from testifying.  The defense was not capable of making this distinction in fact or law because the mitigation investigation was not adequate.

In the punishment phase, an adequate mitigation investigation would have demonstrated why Petitioner was not as morally culpable as someone who did not experience such childhood trauma, and supported a verdict other than death.  *Strickland,* 466 U.S. at 695.

For all the aforementioned reasons, the state court decision to deny relief on the merits is not entitled to the deference ordinarily due under the AEDPA.  Mr. Gardner had made a *prima facie* showing that trial counsel were constitutionally ineffective in failing to fulfill their obligation to conduct an adequate, thorough and independent investigation, and therefore, presented multiple, inconsistent and implausible theories of the case.  U.S. CONST. Amend. VI. Yet, the state court denied him an opportunity to develop his claim in an evidentiary hearing.  *See Panetti v. Quarterman,* 551 U.S. 930, 953-54 (2007), *Wiley v. Epps,* 625 F.3d 199, 207 (5th Cir. 2010) ("[W]hen a petitioner makes a *prima facie* showing of [his federal constitutional law claim], a state

court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA.").   Hence, the state court decision is both contrary to, and an objectively unreasonable application of, *Strickland* and its progeny.  In light of the aforementioned arguments and authorities, habeas relief is in order.

**GROUND THREE** **(FAILURE TO ADEQUATELY INVESTIGATE AND DEVELOP MITIGATING EVIDENCE – IAC):** **Mr. Gardner was denied his Sixth, Eighth and Fourteenth amendment rights to individualized sentencing because trial counsel failed to adequately *investigate and develop* crucial mitigating evidence**

**GROUND FOUR** **(FAILURE TO ADEQUATELY PRESENT MITIGATING EVIDENCE – IAC):** **Mr. Gardner was denied his Sixth, Eighth and Fourteenth amendment rights to individualized sentencing because trial counsel failed to adequately *present* crucial mitigating evidence**

Because FFCL Nos.63-83 treat Grounds Three and Four together, they are addressed together here.  Further, all factual and legal allegations presented in Grounds Three and Four as they pertain to mitigation, are fully incorporated into each and every other ground.

## A.      Statement of Facts.

The punishment phase of the trial last lasted two days: on November 13, 2006, the state's case-in-chief consisted of testimony from seven (7) witnesses as to the future dangerousness issue, and then the state rested; on November 14, 2006, the defense called four (4) witnesses to refute the state's future dangerousness issue and then it rested; immediately followed by two prosecution witnesses in rebuttal, again as to the future dangerousness issue only.

### 1.      The aggravating evidence

The only story of Mr. Gardner was the one told by the prosecution during the punishment phase on the issue of future dangerousness.  The prosecution introduced evidence that despite having been raised by a "mother and father [who] made him pray on his knees every morning," and whose "parents are still together," and visit the grandchildren, (Vol. 23:114-115), Mr. Gardner was a man

who perpetrated violence on women, sexually molested and/or physically assaulted the daughters

of his former wives, and committed acts of sexual indecency in public.

Specially, the evidence in aggravation included the testimony of:

- Dr. Rohr, the medical examiner for Collin County, who testified from the Mississippi medical records of Rhoda Gardner. Rhoda was Mr. Gardner's former spouse, who was pregnant at the time he ambushed and shot her three times, resulting in paraplegia. (Vol. 22:17). As a result of complications from having lost the fetus, she was required to undergo subsequent surgery and died as a result of cardiac arrhythmia. The medical records recited that the manner of death was homicide, and listed four reasons for her death: massive pulmonary embolism; paraplegia; gunshot wounds; homicide. (Vol 22:21, 25).

- Margaret Westmoreland (Vol. 22:27) testified that during the marriage, although Mr. Gardner was work-capable, he was unemployed, (Vol. 22:39), that he was controlling, threatened to "hunt [her] down" and kill her and her children if she left him, (Vol. 22:54), and isolated her from her family.

- Rebecca Fethiere, the daughter of Ms. Westmoreland, testified Mr. Gardner had hit her in the head three times with his fist, causing injury, which required 78 stitches. (Vol. 22:74). Ms. Fethiere also testified to the inappropriate, "boyfriendish" approach of Mr. Gardner, who wanted to put her makeup on her, and suggested that if she had "sex with the devil," meaning himself, she would get devil-like powers. (Vol. 22:65, 68).

- Several law enforcement officers testified to an incident by Mr. Gardner of indecent exposure and unlawful carrying of a weapon, (Vol. 22: 103); specifically for masturbating in his vehicle in the parking lot at the Irving Mall at Christmas time in December, 1992, where there were women and children. (Vol. 22:91, 96, 100).

- Jessie Mangum, the daughter of capital murder victim Tammy Gardner, testified that when she was in second grade and living with her mom and Mr. Gardner, Mr. Gardner acted sexually inappropriate with her by kissing her and touching her, and having her touch him. (Vol. 22:124-126).

- Both Ms. Mangum and Ms. Fethiere had testified that Mr. Gardner showed no remorse when he told each of them about his ambushing and shooting his former wife, Rhoda Gardner. (Vol. 22:77; Vol. 22:132-133). Ms. Mangum also testified that when a former wife of Mr. Gardner, Sandra, would dropped off Nicholas (biological son of Mr. Gardner and Sandra), Sandra appeared

"frantic" around Mr. Gardner and wanted to "get out of there." (Vol. 22:128-129).

In an attempt to refute the future dangerousness presentation, the defense called:

- two former co-workers (William Campbell Miles and Kelly Dowdy), who testified that Mr. Gardner was a diligent, responsible employee, (Vol.23:7-8; Vol 23: 17-18).  Mr. Miles testified that based on his conversations with Mr. Gardner during his incarceration awaiting trial, that Mr. Gardner would have eternal security in God because he was a born-again Christian.  (Vol. 23: 10-11).

- They called a former spouse of the victim, Juan Russel Sewell, who testified that he and Tammy were divorced after a year of marriage because they "couldn't make it,"  (Vol. 23:22), and that Tammy could be manipulative, and had a weakness for men.  (Vol. 23:23).

- Only Elaine Hollifield, the older sister of Mr. Gardner, testified about repeated incidents of abuse of Mr. Gardner at the hands of his parents. (Vol. 23:24).

Elaine Holifield testified to the death of a sister who died in first grade of heart failure, and how her illness and death caused financial stress in the family.  (Vol. 23:26).  Ms. Holifield also testified to the violent temper of her father, the unhappy marriage and violent interaction of their parents, (Vol. 23:30).  The violence in her parents' marriage was reflected in the  presence of knives, broom handles, and a gun. (Vol. 23:32).

Ms. Holified also testified that their father was a Baptist preacher, who continuously moved from church to church because the congregation would ask him to resign, (Vol. 23:26), and how he would have them up at 5:30 am to do daily devotionals, only after their mother left for work at a sewing factory at 4:00 am. Because playmates would have been forced to participate in this morning ritual, Elaine and Steve did not invite friends to their home.  (Vol. 23:28).

Ms. Holified testified that their father would physically abuse her and, Steve Gardner. Their father would interrupt a church service to take Steve to the fellowship hall to beat him with a belt while the congregants listened.  The wails were heard by the parishioners, and the beating caused welts on Steve's body.  (Vol 23: 35-36).

Ms. Holifield testified to other physical and verbal abuse of Mr. Gardner, by his father and mother.  His father would beat Steve at least once a week for no apparent reason, not with his hand but with a limb from a bush or with his belt.  (Vol. 23:31-32, 34).  Steve's mother, who was a screamer, would use her hand to slap the children, and Steve in particular.  Ms. Holified could not provide any particular reason for the beatings, and testified that their father would later take them to the beach. (Vol. 23:40-41).

### 2.      The mitigating evidence

No mitigation was presented by the defense team.    According to defense counsel, the mitigation investigation consisted of (Vol 23:77-78):

- Mr. Gardner's prior childhood accidents and injuries, which did not reveal anything significant,
- there was no serious illnesses at any time;
- There was physical abuse to Mr. Gardner and Elaine Holifield, his sister, but no sexual abuse of any kind;
- The size of the immediate family "was four  –  plus grandchildren;"
- there was no drug or alcohol abuse by Mr. Gardner or any members of the family;
- there was no mental health treatment, issues as to family cohesiveness, or family standard of living and living conditions, that would aid in mitigation;
- "the social relationships with members of, basically, the opposite sex, marriage, divorces, etc; and that's all come into evidence,"(as reflected in the state's case-in-chief on the future dangerousness issue)
- all awards and honors shown by his military records

The affidavit of the defense attorneys recited, among other things, that they did not present any evidence in mitigation because:

- the State had not proven future dangerousness beyond a reasonable doubt. Affidavit of Attorneys House and Hultkrantz, p. 5.

- "The fact of the matter there wasn't much [mitigation] available given the life style Steve had lived including his past homosexual relationships, his past history of violence in many if not all of the relationships and the limited testimony available from his family;" Affidavit of Attorneys House and Hultkrantz, p. 5.

- "our mitigation expert had discovered little or nothing that was deemed useful for trial," and although they had hired Dr. Allen to "examine and address about abandonment issues concerning Steve... [Dr. Allen] decided she didn't want to testify because of lack of information...." Id. at 9;

- the mitigation expert "had developed an overly close relationship with the defendant," and had "refused to share notes from her mitigation investigation and refused to summarize her findings in a report to the attorneys;" Affidavit of Attorneys House and Hultkrantz, pp. 4, 6, 7.

- testimony about Mr. Gardner's "womanizing," "his constant focus on sex," and "his life style ... including homosexual relationships, his past history of violence in many if not all of the relationships and the limited testimony available from his family," would have been harmful because they were "well aware of what the feelings and reactions jurors [in conservative Collin County] are when it comes to presentation of evidence regarding transvestites and other alternative lifestyles." Affidavit of Attorneys House and Hultkrantz, pp. 7, 8.

Additionally, the prosecutor stated on the record in response to the defense attorneys assertion at trial that it was their "trial strategy not to put [experts] on," that "at approximately 11:15 a.m. that morning, we were summoned to the Chambers, and defense counsel was present. It was our understanding at that point the defense team had consulted with their client and that he was of

the opinion that he did not want to put on a mitigation case."[22] Defense counsel did not respond.

(Vol 23:76).


B.      **No Presumption of Correctness for Fact Findings**

Findings of Fact Nos. 11-16 (Credibility of Counsel) and Findings of Fact Nos. 63-83

(Grounds Three & Four: Investigation and Development of Mitigating Evidence) – as modified by

the September 15, 2010 order of the Texas Court of Criminal Appeals rejecting Finding of Fact No.

67, which recites that defense counsel "did not believe that their investigation was impaired,"

because "their mitigation expert, Shelli Schade, was 'overly close' with Applicant and his family"),

are not entitled to a presumption of correctness, as discussed *supra*, and as will be more fully

discussed below. *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), *citing Miller-El v. Cockrell,*

537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).  Further, habeas relief should be granted because

the state court adjudication resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2).


1.      **There is clear and convincing evidence that refutes that the mitigation
        investigation was thorough**

In particular, there is clear and convincing evidence that contradicts that "counsel thoroughly

investigated and prepared for Applicant's trial, ...."  FFCC No. 64.  Setting aside the abandonment

---

[22]    In  *Rompilla v. Beard*, 545 U.S. 374, 377 (2005), the Supreme Court made clear that
"even when a capital defendant's family members and the defendant himself have suggested that
no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and
review material that counsel knows the prosecution will probably rely on as evidence of
aggravation at the sentencing phase of trial."  And in *Roe v. Flores-Ortega*, 528 U.S. 470, 481
(2000), the U.S. Supreme Court stated that "[t]he relevant question is not whether counsel's
choices were strategic, but whether they were reasonable."

rage theory, and looking at the acts and omissions of trial counsel in the Gardner matter, the affidavit of trial counsel themselves, the statements and attestations of the trial experts and that of the state habeas expert, as well as the billing records, all prove that trial counsel did *not* adequately investigate, develop or present mitigating evidence.

2.     **The TCCA's September 15, 2010 order implicitly ruled that the mitigation investigation *was* impaired**

In state habeas, the joint Affidavit of Counsel at 6-7, FFCL No. 67 recited that "Counsel believed that their mitigation expert, Shelli Schade, was 'overly close' with Applicant and his family, but they did not believe that their investigation was impaired."   As modified by the September 15, 2010 order, the Texas Court of Criminal Appeals rejected Finding of Fact No. 67. The Texas Court of Criminal Appeals implicitly ruled that the mitigation investigation *was* impaired.   Thus, it is not entitled to a presumption of correctness.

Hence, it does not follow that the trial attorneys were able to "humanize Steve as much as possible ...." when their "mitigation expert had discovered little or nothing that was deemed useful for trial."   *See*  Affidavit of House and Hultkrantz, p. 4, last para.

3.      **At the time of trial, trial experts Kate Allen and Gilda Kessner, Psy.D., put trial counsel on notice of the inadequate mitigation investigation, and both refused to testify about mitigation because of the lack of information**

At the trial, Mr. Gardner's attorneys put on the record that it was "part of our trial strategy ... not to put them [experts as regards mitigation] on...." (RR 23:74).   This self-serving, conclusory assertion of counsel at trial, is likewise not entitled to a presumption of correctness.   Because the September 15, 2010 order of the Texas Court of Criminal Appeals rejected Finding of Fact No. 67, it recognized that the mitigation investigation *was impaired*.

Therefore, setting aside the abandonment rage theory, and looking at the acts and omissions of trial counsel in the Gardner case, the attorneys could not have made a "strategic" decision to refrain from calling the experts to testify as to mitigation.   The experts did not testify in punishment because of the inadequate mitigation investigation.

Not only did the experts put defense counsel on notice, Mssrs. House and Hultkrantz admitted as much when they attested:

> "Dr. Kate Allen was retained to examine and address about abandonment issues concerning Steve.  However, at the conclusion of watching some of the testimony, specially when the step-daughter stated Steve had been very abusive to her  – she ***[Dr. Allen] decided she didn't want to testify [to attachment disorder] because of lack of information*** ...."

Affidavit of House and Hultkrantz, p. 9.  It is to be noted that the FFCL No. 68 d. conveniently omitted this crucial part of the attorney affidavit and recast it that Dr. Allen did not want to testify solely because Dr. Allen "concluded that Applicant was psychotic...."  *Compare* FFCL No. 68, d. *with* Affidavit of House and Hultkrantz, p. 9.

Likewise, the attestation of trial expert, Gilda Kessner, Psy.D., contradicts by clear and convincing evidence the FFCL that recite that the mitigation investigation was "thorough,"  see FFCL Nos. 64, 63-83.  Dr. Kessner attested:

---

10.     I also had a telephone conference and in person conferences with the defense attorneys and various members of the defense team.  ***I voiced my concern that there were important corroborating witnesses who were not being located and interviewed for mitigation***.  Ms. Shelli Schade the social worker hired by the attorneys for the mitigation investigation indicated that people in small towns would not be willing to reveal information and therefore corroborating information could not be obtained from them. ....  Ms. Schade did not provide me with notes from any interviews she conducted.  It was my impression that she did not provide summary notes to the attorneys either.

....

12.     It is my recollection that at the time of trial the attorneys had settled that I would testify on risk assessment and Dr. Allen was going to testify on attachment.  ***I believe I had scant information for the development of a coherent mitigation theme due to the absence of detailed and corroborated information about Mr. Gardner's background.  There was an abundance of information from Mr. Gardner but without corroborating witnesses my ability to present mitigation information to the jury was necessarily very limited***.

State Habeas Exhibit C:  Affidavit of Gilda Kessner, Psy.D.

In light of the experts notice to counsel at the trial stage that there was a lack information, couple with the TCCA's September 15, 2010 order that recognized that the mitigation investigation _was_ impaired, no theory could be developed or implemented.  Hence, the trial attorneys House and Hultkrantz were incapable of "strategically" deciding on a theory to present.  *See* ABA GUIDELINE 10.4 (2008) located in O'BRIEN, 36 HOFSTRA L. REV. 693, 703 (6/15/2008) ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.").

4.      **The affidavit of state habeas expert, Toni Knox LCSW, corroborates the trial experts opinions**

The attestation of the mitigation investigator, Toni Knox, LCSW, in state habeas corroborates Dr. Kessner's professional observation.  Ms. Knox attested:

> Although the defense team formed appropriate members for the defense team as described in the ABA Guidelines, the follow through of the presentation of the mitigation at trial did not follow.
>
> The mitigation specialist, while maintaining very good rapport with the client and frequently visiting him, ***other mitigation tasks were neglected.  There was not a thorough mitigation investigation as there were quite a few friends and family that were not contacted to corroborate Steve's information***.

State Habeas Exhibit D:   Affidavit of Toni Knox, LCSW, and exhibits 1 - 12 appended thereto.

5.      **The billing records of Ms. Schade, the trial mitigation specialist, was inadequate**

A review of the billing records of defense team, and Shelli Schade in particular, reflects an absence of a thorough mitigation investigation.  The May 8, 2006 Account Summary submitted by Schade reflects that at most 23.25 hours were dedicated to a  "visit with parents, sister, attorney, investigator, notes – 13.5 hr; and a "visit with witnesses, parents, and sister" – 9.75 hr).  Exhibit 1: May 8, 2006 Account Summary.

On the one hand, the trial attorneys seek to shift blame to Ms. Schade wanting to make it appear that they were helpless in the face of her refusal to cooperate or undertake her assigned role:

> Shelli Schade refused to share notes from her mitigation investigation and refused to summarize her findings in a report to the attorneys.  She was overly concerned with waht could be discoverable by the State and despite the attorneys reassurance that it wold not be discoverable, she refused to put together a report of any form for use by the investigator and the trial team.

Affidavit of House and Hultkrantz, p. 7.  However, the commentary to the ABA guidelines for capital defense make clear that "'ultimate responsibility' for the investigation of such [mitigation] issues rests irrevocably with counsel.  O'Brien, 36 Hofstra L. Rev. 693, 703 (6/15/2008).

Curiously, defense counsel at the same time were quick to assert that the decision on who to call was theirs alone:

> We realize that our mitigation specialist has complained that she was not consulted regarding the decision not to present our two consulting experts.  However, it must be remembered that she was a part of the defense team and not the trial team.  Her work, or lack thereof, was meant to assist us in our trial strategy but the trial team was not a democracy where we sought out the opinions of all involved and took a votes as what we should present or not present.

Affidavit of House and Hultkrantz, p. 9.

The aforementioned clear and convincing evidence reflect that trial counsel's performance was constitutionally ineffective because they failed to closely supervise and monitor the work of Ms. Schade, for whose work they were responsible.   O'Brien, 36 Hofstra L. Rev. at 704.


6.    **The attorneys sought to impermissibly shift blame to the parents of Mr. Gardner**

The joint affidavit of House and Hultkrantz blames the parents of Mr. Gardner for the inadequate mitigation investigation, because:

> [b]oth were adamant that Steve wasn't abused by the father although admitting that he was punished on occasion.  Their refusal to acknowledge even the least bit of problems with Steve growing up, their denying any physical or emotional abuse and their inability to identify potential individuals that could possibly provide useful information for trial led to very little of importance being developed through the time spent with them.

Affidavit of House and Hultkrantz, p. 7.

This position is unsupportable in the law.  *Rompilla v. Beard*, 545 U.S. 374, 377, 381 (2005) made clear that even where a client is "actively obstructive by sending counsel off on false leads," and "when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."

7.      **The evidence clearly and convincingly refutes that any one on the defense team or their consultants could have made one or more "strategic" decisions**

Trial counsel made the following unsupported "strategy" assertions:

•       In their joint affidavit, Mssrs. House and Hultkrantz attest that part of the "strategy for the punishment phase ...  was to humanize Steve as much as possible ...  Affidavit of House and Hultkrantz, p. 4.

•       During the trial, these same attorneys put self-serving, conclusory assertions on the record:  "part of our trial strategy ... not to put them [experts as regards mitigation] on...."  (RR 23:74).

•       The FFCL Nos. 21, 51, 71 recite that "counsel consulted with other experienced local attorneys [John Niland of the Texas Defender Service, and Bill Schultz][23]  prior to trial, who agreed that counsel's trial strategy was reasonable."

•       The FFCL Nos. 68, 76 recites that counsel's investigation uncovered significant harmful information, which they reasonably concluded did not merit further investigation."

---

[23]     Joint Affidavit of House and Hultkrantz, p. 5 ("The trial team consulted with John Niland, with the Texas Defender Service and Bill Schultz, a local attorney, about our trial strategy and both agreed that it ***seemed*** sound.") (emphasize supplied).

These fact findings are not presumed correct because of the clear and convincing evidence, *see supra*,[24] that proves that their so-called "strategy" was neither "strategic" nor "reasonable." Setting aside the abandonment rage theory, and looking at the work product of trial counsel in the Gardner trial, it is apparent that no one – neither the trial attorneys, nor the "local attorneys" with whom they consulted prior to trial  – could have made any strategic decision "to humanize Steve," or develop any an effective theory of the case whatsoever, or select witnesses to call or refrain from calling, for a very simple and obvious reason:  the mitigation investigation was woefully inadequate. This is because no one on the defense team, and no one of the "local attorneys," had the facts on which to make rationale, strategic choices.  "[T]he known evidence would [have] lead a reasonable attorney to investigate further."  *Wiggins*, 539 U.S. at 527.

The reason the so-called "significantly harmful information" to which the FFCL Nos. 68, 76, 81-82 and other FFCL Nos. 74-80, which the findings label as "not compelling," and would "not have made a difference," was such only because the experts did not have the necessary information to provide context and explanation for this behavior (*e.g.,* "[Dr. Allen] decided she didn't want to testify [to attachment disorder] because of lack of information." Affidavit of House and Hultkrantz, p. 9).  An adequate mitigation investigation would have provided the necessary foundation that would have revealed that Petitioner had attachment disorder –  a concept well-recognized in the

---

[24]    In light of the experts notice to counsel at the trial stage that there was a lack information, couple with the TCCA's September 15, 2010 order that recognized that the mitigation investigation *was* impaired. Unless and until there is an adequate mitigation investigation into the life history of the client, no theory can be developed or implemented.  Hence, the trial attorneys House and Hultkrantz were incapable of "strategically" deciding on a theory to present.  *See*  ABA GUIDELINE 10.4 (2008) located in O'BRIEN, 36 HOFSTRA L. REV. 693, 703 (6/15/2008) ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client.  It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.")

mental health field.  Attachment disorder would have been the springboard from which, an expert would have explained Petitioner's depraved lifestyle as well as domestic violence.  (Vol. 23:28); State Habeas Exhibit C: Affidavit of Gilda Kessner, Psy.D., paras. 13, 24.

## C.    Argument and Authorities.

### 1.    Standard of Review.

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 695.

The *Wiggins* Court wrote that "[i]n assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

### The ABA Guidelines

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel

in Death Penalty Cases. *Rompilla v. Beard*, 545 U.S. 374 (2005), *citing Wiggins v. Smith*, 539 U.S. 510, 522 (2003) ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'").

In the case at bar, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, specifically ABA GUIDELINE 10.7 – INVESTIGATION (rev. ed. Feb. 2003), and GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL, specifically TEXAS GUIDELINE 11.1 – TRIAL INVESTIGATION  (adopted April, 2006)  are applicable.

**a.      Counsel has an obligation to conduct a thorough and independent investigation**

ABA GUIDELINE 10.7 – INVESTIGATION specifically provides:

A.      Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty....

2.      The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

The ABA GUIDELINES were ed in 2008.  They impose an obligation on the defense team to "conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. [followed by an enumeration of the kind and type of sources]." al ABA GUIDELINE 10.11  –  *The Defense Case: Requisite Mitigation Functions of the Defense Team*.

### b.    Counsel bears ultimate responsibility for the performance of the defense team

ABA GUIDELINE 10.11 (2008) also imposes an obligation on the team members to "*provide counsel with documentary evidence of the investigation through the use of such methods as genealogies, social history reports, chronologies and reports on relevant subjects including, but not limited to, cultural, socioeconomic, environmental, racial, and religious issues in the client's life. ....*" (emphasis supplied).

Notwithstanding that the team is obligated to provide various types of data, the guidelines make clear that "*counsel bears ultimate responsibility for the performance of the defense team and for decisions affecting the client and the case.*" (emphasis supplied).

> *It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client.  It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.*

ABA GUIDELINE 10.11 (2008) (emphasis supplied).

### 2.    Counsel's performance was constitutionally ineffective

In self-serving statements at the inception of the punishment phase, defense counsel claimed that the dearth of mitigation presentation was because of "trial strategy."  Mr. Hultkrantz asserted "that we have as part of our preparation for this trial used a number of experts, both testifying and consulting experts as regards mitigation....  The defense team has made a decision not to put those individuals on, although they were all ready to testify, and we prepared them to testify, and we had contacted witnesses and everything else.  But it is part of our trial strategy ... not to put them on, and so I ... want the record to reflect that we, in fact, had done what is required of us by the ABA and by this Court as far as preparing for trial; but that the reason that we didn't go forth with that was

because of trial strategy." (RR 23:74). As will be amply demonstrated below, it was impossible for trial counsel to have made one or more "strategic decisions," because the investigation that had been done was inadequate, and because "the known evidence would [have] lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

### Toni Knox, LCSW

The mitigation investigator, Toni Knox, LCSW, for this state habeas proceeding, attested to the constitutional ineffectiveness of counsel as a result of the lack of an adequate and thorough investigation, development and presentation of mitigation evidence in the penalty phase of the trial. Ms. Knox attests:

> Although the defense team formed appropriate members for the defense team as described in the ABA Guidelines, the follow through of the presentation of the mitigation at trial did not follow.

> The mitigation specialist, while maintaining very good rapport with the client and frequently visiting him, *other mitigation tasks were neglected. There was not a thorough mitigation investigation as there were quite a few friends and family that were not contacted to corroborate Steve's information*. Steve identified in several interviews his close relationship with Sylvia and Donald Reeves in Laurel. Steve's third wife, Margaret, was Sylvia's sister. There was no attempt to contact the Reeves and they live in the same home as when Steve lived with them. Dr. Kessner also had questions about Steve's reported relationship with "China Blue" (Don Ware). Don Ware was contacted and he provided a brief interview corroborating his relationship with Steve, although he was hesitant to provide detailed information and did not want further contact. Mr. Ware was not contacted in the original mitigation investigation.

> A consulting psychologist, Dr. Kristi Compton, was also retained to help the defense attorneys identify mental health issues and possible mitigation themes for Steve's trial.

> The defense team retained two testifying experts, Dr. Gilda Kessner, a psychologist and Dr. Kate Allen, a social worker. The testifying experts were scheduled to testify to provide information to the jury concerning factors in Steve's

life that might have contributed to his abandonment rage issues.  Additionally, Dr. Kessner was to testify concerning future dangerousness.

After identifying the mitigation themes for the case, the prevailing standard in presenting mitigation evidence includes records, lay witnesses and expert testimony.  *By the choice of mitigation witnesses, I could not identify the mitigation themes the defense was attempting to present.  Although the defense attorneys recognized the need for expert testimony to help explain Steve's actions, it was decided at the last minute to not have the experts testify.  If there was a decision to forego the future dangerousness testimony by Dr. Kessner, that should not have prevented her other testimony and the testimony of Dr. Allen.*

*After reading trial transcript for the punishment phase of Steve's trial, it is understandable how the jury was able to reach a death verdict as Steve's life history was not presented and little explanation (not excuse) was furnished for his actions.*

Exhibit D: Affidavit of Toni Knox, LCSW at p.17.

### a.    The performance of counsel was deficient

In light of all the circumstances, trial counsel's acts and omissions were outside the wide range of professional competent assistance in the following areas:

a.    a complete psycho-social history was not compiled and documented, and

b.    there was a lack of a thorough mitigation investigation and presentation.[25]

*Strickland,* 466 U.S. at 695.

Indeed, the jurors were astonished by the deficient performance as reflected by the statement of Arthur Wheaton, who declared that "when the defense rested early ... [m]y reaction was, 'Is that it?'" Exhibit B5: Declaration of Arthur Wheaton.  Likewise, another juror, Wendy Duerr attested

---

[25]    The lack of expert testimony is plead in the next ground, incorporated by reference herein.

that she "was shocked when the defense rested without putting on much of a mitigation case."

Exhibit B2: Affidavit of Wendy Duerr.

And the absence of an adequate mitigation investigation and presentation provided the

foundation supporting the prosecutor's request for a sentence of death:

> "the evidence shows, after looking at all of it, there is nothing sufficiently mitigating to warrant a life sentence for this defendant.   Because what you heard in the punishment phase and the guilt/innocence phase is that ***all of this defendant's adult life, he has been violent and abusive toward women and children.  It's been a behavior, a pattern in his life that has repeated over and over.***    And the best indicator of future behavior is past behavior."

(RR 23: 85).

### (1)   Absent an adequate psycho-social history, the defense team was unable to formulate a viable defense theme based on documented trends, patterns of behavior and causal factors

Ms. Knox, the mitigation investigator in state habeas, attests that the "trial attorneys failed

to ensure that a thorough social history was compiled and documented....  Consequently, when

experts were retained, the trial attorneys failed to provide the experts with a documented social

history, ... [and instead] were just provided with various records with no context. ...."  Exhibit D:

Affidavit of Toni Knox, LCSW at p. 4.

The dates in the abbreviated time line "were vague and the time line did not document what

records the information was obtained from. .... [Thus,] without the chronological time line, the trial

team did not have this basic organizing tool ... [which] can frequently reveal trends, patterns of

behavior and causal factors."  Exhibit D: Affidavit of Toni Knox, LCSW at p. 4.

### (2)   The mitigation investigation was restricted to the immediate family with no corroborating information from other available sources

Dr. Gilda Kessner was hired by the defense team as a forensic testifying expert in the case

at bar  – who trial counsel did not call to testify.  Dr. Kessner attests:

10.     I also had a telephone conference and in person conferences with the defense attorneys and various members of the defense team.  ***I voiced my concern that there were important corroborating witnesses who were not being located and interviewed for mitigation***.  Ms. Shelli Schade the social worker hired by the attorneys for the mitigation investigation indicated that people in small towns would not be willing to reveal information and therefore corroborating information could not be obtained from them.  The meeting with the defense team and Ms. Holifield proved to be difficult.  Ms. Holifield kept looking to Ms. Schade before she would answer questions, at one point she became very tearful, and asked if she could just speak with Ms. Schade. I instructed Ms. Holifield that she was going to have to answer my questions without coaching by Ms. Schade.  She stated that she was concerned if she spoke with anyone but Ms. Schade that the information could come out at trial.  ***Ms. Schade appeared to have developed an overly close relationship with the defendant and his family members, such that she seemed to take on the role of counselor to them instead of mitigation investigator.***  Ms. Schade did not provide me with notes from any interviews she conducted. It was my impression that she did not provide summary notes to the attorneys either.

11.     The attorneys also retained Kate Allen, Ph.D. (social worker) to address the concept of attachment and its relationship to Mr. Gardner's psychological development.

12.     It is my recollection that at the time of trial the attorneys had settled that I would testify on risk assessment and Dr. Allen was going to testify on attachment.  ***I believe I had scant information for the development of a coherent mitigation theme due to the absence of detailed and corroborated information about Mr. Gardner's background.  There was an abundance of information from Mr. Gardner but without corroborating witnesses my ability to present mitigation information to the jury was necessarily very limited***.

Exhibit D: Affidavit of Gilda Kessner, Psy.D. appended as Exhibit 10 to Affidavit of Toni Knox,

LCSW, (emphasis supplied).

---

Ms. Knox confirms the impressions of Dr. Kessner.  Ms. Knox attests that "although a great deal of time was spent by the mitigation specialist, Ms. Schade, with Steve and he furnished a considerable amount of information concerning his social history through interviews and writings to the mitigation specialist, she failed to do a diverse investigation and interviews of corroborating witnesses.  Ms. Schade's investigation was limited primarily to Steve's mother, father and sister.  There was contact with one of Steve's former wives, but Ms. Schade documented little from that interview to incorporate into the social history.  Ms. Schade did not appear to have adequately investigated into Steve's former friends, and other life history informants...."  Exhibit D: Affidavit of Toni Knox, LCSW at pp. 4-5.

"In the habeas mitigation investigation to Mississippi, I located friends and a church member that could have provided corroborating information to some of Steve's history.  ....  These friends were able to provide information that revealed Steve's state of mind prior to the assault of his first wife.  The furnished information about the manipulation and aggravation of Steve's first wife and her immaturity, ... how remorseful Steve was about the shooting, ... how Steve had been taking cold medication [with codeine] prior to the shooting, which could have affected him ...."   Exhibit D: Affidavit of Toni Knox, LCSW at p. 5, and Declaration of Sylvia Reeves, Exhibit 5, and Declaration of Donald Reeves, Exhibit 6; Declaration of Randall Reeves, Exhibit 7, attached as exhibits to the Knox affidavit.

      **(3)**      **Corroborating testimony from the Reeves would have revealed the manipulation of first wife, Rhoda, detailed Steve's remorse, and revealed the use of codeine in cold medication that Steve had taken prior to the shooting**

Sylvia Reeves stated:

7.      ... During the time that Rhoda had stayed with us previously, her ex-husband would call and she would tell me to tell him that she was not there.  During tat time period we would go shopping and Rhoda's ex-husband would be at the same place we were shopping.  Rhoda told me she thought he was probably following her and acted as though she did not want to see him.  Later I found out she would call her ex-husband and tell him where we were going and that was why he was there.  Rhoda's behavior was gamey.  After Rohda and Steve got married, Rhoda continued to play these types of games, but with Steve....

....

9.      ....  In the days prior to the shooting, Steve had some type of cold or something and was taking cough syrup with codeine.  At the time of the shooting, I was concerned the drugs in the cough syrup might have contributed to Steve's state of mind.

10.      On the morning that Steve shot Rhoda, he took my husband's gun.  After Steve shot Rhoda, he called me at work.  He called me and was crying and upset and state that he had shot Rhoda. .....  Steve seemed very remorseful and wanted to confess to the shooting and turn himself in.

11.      ... We continued to be supportive of Steve and although, we certainly did not accept Steve shooting Rhoda, we could understand how Rhoda had "played" him....

Declaration of Sylvia Reeves, appended to Exhibit D: Affidavit of Toni Knox, LCSW at p. 5, and

16.

Sylvia Reeves provides further insight into Petitioner's lack of control, providing her perspective that Petitioner was mentally ill, and that he had been sent to a psychiatric facility after one incidence of violence.  Sylvia attests:

16.      ....  Steve seemed stable when we initially met him and had a stable job, but as time went on, we began to see Steve's impulse control and anger

problems.  It became more common for Steve to go off in an angry fit over small things.....

17.     When Steve and Margaret were living in Tennessee, Steve, my husband, and me along with a few others, went to play golf at a three par golf course. Steve became increasing angry because he did not like the way he was playing.  He left the group and just got further and further ahead.  When we finally caught up with him, I asked him to stay with the group.  He because so angry that my husband was fearful that he might attach me.....

18.     After Steve hit my niece Becky in the head and all the problems Margaret told me about, I began to believe more and more that Steve was mentally ill. I know he was sent to a psychiatric facility for a time after he hit my niece.

22.     I never talked with anyone associated with Steve's defense team during the time of his trial in 2006.  I have lived at this same address for many years.

Declaration of Sylvia Reeves, appended to Exhibit D: Affidavit of Toni Knox, LCSW.


Donald Reeves also details Petitioner's inability to control his anger over the smallest of

things:

5.      Steve seemed like a nice guy and we would do various things together.  I did notice that Steve had these anger episodes.  We called them "flash-overs" and "spasms."  He would get incredibly angry over some insignificant thing and just go out of control for a few minutes.  Then he would just calm down and it would be as thought it had never happened.

Declaration of Donald Reeves, appended to Exhibit D: Affidavit of Toni Knox, LCSW.


Like his wife, Donald Reeves, too discussed the manipulative of Rhoda and the remorse of

Petitioner in her shooting:

6.      Steve met Rhoda Slaughter at our house and eventually they were married. Rhoda had been married previously and was still in communication with her ex-husband when she and Steve married.  I considered Rhoda to be manipulative.  I did not agree with the way she treated Steve by keeping in contact with her ex-husband.  Her actions did not justify any violence by

Steve, but knowing Rhoda helped me to understand better how it might have happened.

7.       When I talked with Steve after he shot Rhoda, he was very remorseful and stated he did not know why he had done it.  Steve kept repeating, "Lord, I wish I hadn't done this."

Declaration of Donald Reeves, appended to Exhibit D: Affidavit of Toni Knox, LCSW.

### (4)     Testimony from Louise Lillis  corroborates that of Petitioner's sister, Elaine: Petitioner's father physically abused him

Louise Lillis stated:

3.       I was friends with Ollie and John Gardner and they had two children, Elaine and Steve Gardner.  Steve Gardner and my son, Rickie Lillis, were very good friends during the time the Gardner's lived near here.  Steve was frequently over at my house and he was a likeable boy and I did not have any problems with him.....

4.       John Gardner was very strict with Steve, much more so than with Elaine.  I remember one instance during the church services that John gave Steve a particularly harsh whipping or so it sounded. ...  He was whipping Steve so loudly that everyone in the church could hear them.  It was awkward as everyone inside the church could hear and no one knew what to think or do. ..... Shortly after that incident John Gardner left the church and the Gardner's moved to Eillisville.

### (5)     Testimony from Dr. Kessner would have explained the killings as an "estrangement killing," refuting capital murder based on retaliation

As reflected above, an adequate mitigation investigation would have uncovered the crucial information known to the Reeves and to Lillis.  The testimony of the Reeves, and that of Lillis, would have provided the fact-basis, supporting expert testimony about uxoricide.  Thereafter, the

defense could have sponsored Dr. Kessner to testify about the childhood environmental factors experienced by Petitioner:

1.      witnessing/experiencing violence as a source of trauma,

2.      shaming as a source of trauma, and

3.      insecure attachment as a source of trauma.

Had the mitigation been adequate, Dr. Kessner could then have explained to the jurors how these environmental factors triggered the estrangement killing of Tammy Gardner (uxoricide), when she attempted to terminate the relationship.  Dr. Kesser attests:

> I have concluded based on the records and literature review, that had I been allowed to testify in the 2006 Case about the impact of the developmental trauma cited by family members, that I could have provided a context for the jury to understand the etiology of Mr. Gardner's personality and behavior.  *At the time of trial, there was a large and growing body of literature addressing the issue of perpetrators of domestic violence*.
>
> *Briefly, John Steven Gardner was born into a chaotic and dysfunctional family and events in his infancy and early childhood had a profound effect on his early and life long psychosocial development*.  Events taking place at critical developmental periods for trust, interpersonal relationships and self-concept had a damaging effect on his ability to relate to others in an intimate and sexual way.  The modeling of violence and jealousy between his parents in their marital relationship served as a template for behavior in his future romantic relationships.  *These factors would have provided an explanation to the jurors, as to why John Steven Gardner perpetrated violence and threats of violence against his domestic partners*, ....

Exhibit C: Affidavit of Gilda Kessner, Psy.D.  *See also* Donald G. Dutton & Greg Kerry, (1999a).

Modus Operandi and Personality Disorder in Incarcerated Spousal Killers, *International Journal of Law & Psychiatry, 22*(3-4), 287-299; Donald G. Dutton, (1999b)  Traumatic Origins of Intimate Rage,  *Aggression and Violent Behavior, 4*(4), 431-447.

### (6) In summary, the performance was deficient. The known evidence would have lead a reasonable attorney to investigate further

In the case at bar, "[b]ecause the underlying investigation was not adequate, the presentation of mitigation at the punishment phase appeared ... disjointed, ... [and these] witnesses provided very limited testimony with no unifying theme that explained why Steve was less morally culpable and not deserving of death."   Exhibit D: Affidavit of Toni Knox, LCSW at p. 11.   Thus, trial counsel's performance was constitutionally deficient because "the known evidence would [have]  lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003), U.S. Const. Amend VI.

Accordingly, the decisions of trial counsel are owed no deference because they were made after less than complete investigation.  *Wiggins,* 539 U.S. at 536 (finding that counsel is not in a position to "make a reasonable strategic choice" when his "investigation supporting [that] choice was unreasonable").  *See also Miller v. Dretke,* 420 F.3d 356, n.30 (5th Cir. 2005), *citing Bouchillon v. Collins,* 907 F.2d 589, 597 (5th Cir.1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *Profitt v. Waldron,* 831 F.2d 1245, 1249 (5th Cir.1987) (finding that "our usual deference to tactical decisions is not relevant" when the decisions are based on "information that was faulty because of [ ] ineffective investigatory steps"); *Adams v. Quarterman,* 2009 WL 1069330, *6 (5th Cir. April 22, 2009) (not designated for publication) ("When, as here, counsel does not conduct an investigation sufficient to enable him to reach an *informed decision,* we must reject the assertion that counsel made a strategic choice not to emphasize the defendant's background").

### b.       There is a reasonable probability the outcome would have been different

#### (1)       The *Strickland* prejudice prong

In *Strickland v. Washington*, 466 U.S. 668, 695-696 (1984), the Court held:

In making this determination, a court hearing an ineffectiveness claim must consider
the totality of the evidence before the judge or jury. Some of the factual findings will
have been unaffected by the errors, and factual findings that were affected will have
been affected in different ways. Some errors will have had a pervasive effect on the
inferences to be drawn from the evidence, altering the entire evidentiary picture, and
some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only
weakly supported by the record is more likely to have been affected by errors than
one with overwhelming record support. ***Taking the unaffected findings as a given,
and taking due account of the effect of the errors on the remaining findings, a
court making the prejudice inquiry must ask if the defendant has met the burden
of showing that the decision reached would reasonably likely have been different
absent the errors.***

#### (2)       The trial evidence

The punishment phase of the trial last lasted two days: on November 13, 2006, the state's

case-in-chief consisted of testimony from seven (7) witnesses as to the future dangerousness issue,

and then the state rested; on November 14, 2006, the defense called four (4) witnesses to refute the

state's future dangerousness issue and then it rested; immediately followed by two prosecution

witnesses in rebuttal, again as to the future dangerousness issue only.

No mitigation was presented by the defense team.[26]   The affidavit of the defense attorneys recited, among other things, that they did not present any evidence in mitigation  because:

- the State had not proven future dangerousness beyond a reasonable doubt. Affidavit of Attorneys House and Hultkrantz, p. 5.

- "The fact of the matter there wasn't much [mitigation] available given the life style Steve had lived including his past homosexual relationships, his past history of violence in many if not all of the relationships and the limited testimony available from his family;" Affidavit of Attorneys House and Hultkrantz, p. 5.

- "our mitigation expert had discovered little or nothing that was deemed useful for trial," and although they had hired Dr. Allen to "examine and address about abandonment issues concerning Steve... [Dr. Allen] decided she didn't want to testify because of lack of information...."  Id. at 9;

- the mitigation expert "had developed an overly close relationship with the defendant," and had "refused to share notes from her mitigation investigation and refused to summarize her findings in a report to the attorneys;" Affidavit of Attorneys House and Hultkrantz, pp. 4, 6, 7.

- testimony about Mr. Gardner's "womanizing," "his constant focus on sex," and "his life style ... including homosexual relationships, his past history of violence in many if not all of the relationships and the limited testimony

---

[26]   According to defense counsel, the mitigation investigation consisted of (Vol 23:77-78):

- Mr. Gardner's prior childhood accidents and injuries, which did not reveal anything significant,
- there was no serious illnesses at any time;
- There was physical abuse to Mr. Gardner and Elaine Holifield, his sister, but no sexual abuse of any kind;
- The size of the immediate family "was four  –  plus grandchildren;"
- there was no drug or alcohol abuse by Mr. Gardner or any members of the family;
- there was no mental health treatment, issues as to family cohesiveness, or family standard of living and living conditions, that would aid in mitigation;
- "the social relationships with members of, basically, the opposite sex, marriage, divorces, etc; and that's all come into evidence,"(as reflected in the state's case-in-chief on the future dangerousness issue)
- all awards and honors shown by his military records

available from his family," would have been harmful because they were "well aware of what the feelings and reactions jurors [in conservative Collin County] are when it comes to presentation of evidence regarding transvestites and other alternative lifestyles." Affidavit of Attorneys House and Hultkrantz, pp. 7, 8.

Additionally, the prosecutor stated on the record in response to the defense attorneys assertion at trial that it was their "trial strategy not to put [experts] on," that "at approximately 11:15 a.m. that morning, we were summoned to the Chambers, and defense counsel was present.  It was our understanding at that point the defense team had consulted with their client and that he was of the opinion that he did not want to put on a mitigation case."[27] Defense counsel did not respond. (Vol 23:76).

### (a)    The aggravating evidence

As result, the only story of Mr. Gardner was the one told by the prosecution during the punishment phase on the issue of future dangerousness.  The prosecution introduced evidence that despite having been raised by a "mother and father [who] made him pray on his knees every morning," and whose "parents are still together," and visit the grandchildren, (Vol. 23:114-115), Mr. Gardner was a man who perpetrated violence on women, sexually molested and/or physically assaulted the daughters of his former wives, and committed acts of sexual indecency in public.

---

[27]    In *Rompilla v. Beard*, 545 U.S. 374, 377 (2005), the Supreme Court made clear that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."  And in *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000), the U.S. Supreme Court stated that "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable."

Specially, the evidence in aggravation included the testimony of:

- Dr. Rohr, the medical examiner for Collin County, who testified from the Mississippi medical records of Rhoda Gardner. Rhoda was Mr. Gardner's former spouse, who was pregnant at the time he ambushed and shot her three times, resulting in paraplegia.  (Vol. 22:17).  As a result of complications from having lost the fetus, she was required to undergo subsequent surgery and died as a result of cardiac arrhythmia.  The medical records recited that the manner of death was homicide, and listed four reasons for her death: massive pulmonary embolism; paraplegia; gunshot wounds; homicide. (Vol 22:21, 25).

- Margaret Westmoreland (Vol. 22:27) testified that during the marriage, although Mr. Gardner was work-capable, he was unemployed, (Vol. 22:39), that he was controlling, threatened to "hunt [her] down" and kill her and her children if she left him, (Vol. 22:54), and isolated her from her family.

- Rebecca Fethiere, the daughter of Ms. Westmoreland, testified Mr. Gardner had hit her in the head three times with his fist, causing injury, which required 78 stitches. (Vol. 22:74).  Ms. Fethiere also testified to the inappropriate, "boyfriendish" approach of Mr. Gardner, who wanted to put her makeup on her, and suggested that if she had "sex with the devil," meaning himself, she would get devil-like powers.  (Vol. 22:65, 68).

- Several law enforcement officers testified to an incident by Mr. Gardner of indecent exposure and unlawful carrying of a weapon, (Vol. 22: 103); specifically for masturbating in his vehicle in the parking lot at the Irving Mall at Christmas time in December, 1992, where there were women and children. (Vol. 22:91, 96, 100).

- Jessie Mangum, the daughter of capital murder victim Tammy Gardner, testified that when she was in second grade and living with her mom and Mr. Gardner, Mr. Gardner acted sexually inappropriate with her by kissing her and touching her, and having her touch him.  (Vol. 22:124-126).

- Both Ms. Mangum and Ms. Fethiere had testified that Mr. Gardner showed no remorse when he told each of them about his ambushing and shooting his former wife, Rhoda Gardner.  (Vol. 22:77; Vol. 22:132-133).  Ms. Mangum also testified that when a former wife of Mr. Gardner, Sandra, would dropped off Nicholas (biological son of Mr. Gardner and Sandra), Sandra appeared "frantic" around Mr. Gardner and wanted to "get out of there." (Vol. 22:128-129).

In an attempt to refute the future dangerousness presentation, the defense called:

- two former co-workers (William Campbell Miles and Kelly Dowdy), who testified that Mr. Gardner was a diligent, responsible employee, (Vol.23:7-8; Vol 23: 17-18). Mr. Miles testified that based on his conversations with Mr. Gardner during his incarceration awaiting trial, that Mr. Gardner would have eternal security in God because he was a born-again Christian. (Vol. 23: 10-11).

- They called a former spouse of the victim, Juan Russel Sewell, who testified that he and Tammy were divorced after a year of marriage because they "couldn't make it," (Vol. 23:22), and that Tammy could be manipulative, and had a weakness for men. (Vol. 23:23).

- Only Elaine Hollifield, the older sister of Mr. Gardner, testified about repeated incidents of abuse of Mr. Gardner at the hands of his parents. (Vol. 23:24).

Elaine Holifield testified to the death of a sister who died in first grade of heart failure, and how her illness and death caused financial stress in the family. (Vol. 23:26). Ms. Holifield also testified to the violent temper of her father, the unhappy marriage and violent interaction of their parents, (Vol. 23:30). The violence in her parents' marriage was reflected in the presence of knives, broom handles, and a gun. (Vol. 23:32).

Ms. Holified also testified that their father was a Baptist preacher, who continuously moved from church to church because the congregation would ask him to resign, (Vol. 23:26), and how he would have them up at 5:30 am to do daily devotionals, only after their mother left for work at a sewing factory at 4:00 am. Because playmates would have been forced to participate in this morning ritual, Elaine and Steve did not invite friends to their home. (Vol. 23:28).

Ms. Holified testified that their father would physically abuse her and, Steve Gardner. Their father would interrupt a church service to take Steve to the fellowship hall to beat him with a belt while the congregants listened. The wails were heard by the parishioners, and the beating caused welts on Steve's body. (Vol 23: 35-36).

Ms. Holifield testified to other physical and verbal abuse of Mr. Gardner, by his father and mother.  His father would beat Steve at least once a week for no apparent reason, not with his hand but with a limb from a bush or with his belt.  (Vol. 23:31-32, 34).  Steve's mother, who was a screamer, would use her hand to slap the children, and Steve in particular.  Ms. Holified could not provide any particular reason for the beatings, and testified that their father would later take them to the beach. (Vol. 23:40-41).

### (b)    The mitigating evidence

As reflected above, there was no expert testimony to provide context and both refute and explain the  prosecution's picture of Mr. Gardner's "pattern in his life that has repeated over and over," of being "violent and abusive toward women and children."  (Vol. 23:85, 86).  Such expert testimony would have provided an explanation to the jury about "the critical phase of development for attachment insecurity that leads to abandonment rage."

Also left uncontested was the prosecution's assertion that even if there was evidence of child abuse:

1.    there was "nothing in his background [that] explain[s] or justifies his behavior;"

2.    his sister grew up in the same household and was able to lead a normal life; and

3.    the parents have remained together, visiting "grandkids and greatgrand children on a regular basis."

(Vol. 23:85, 86, 92, 115).

### c.      State habeas evidence revealed a reasonable probability the outcome would have been different

The evidence in state habeas sought to address the *Strickland* prejudice prong from the psychological and the neurobiological perspective.[28]  Each perspective illustrates how and why Mr. Gardner is less morally culpable for the death of his wife, Tammy Gardner, than someone who did not experience the trauma he experienced at the hands of his parents, and the increased risk in all aspects of his life as a result of the attachment disorder.  These different perspectives seek to appeal to those jurors who are inclined toward hard-data by presenting a neurobiological approach, and also to appeal to those jurors who are receptive to the soft sciences, using the psychological-study approach.

### (1)      Adequate lay witness testimony would have provided personal knowledge about the rigid religious environment and childhood abuse experienced by Mr. Gardner

The mitigation investigator, Toni Knox, LCSW, for this state habeas proceeding, attested to the constitutional ineffectiveness of counsel as a result of the failure to adequately present lay witness testimony in the penalty phase of the trial, such as Sylvia and Donald Reeves; Steve's third wife, Margaret; Steve's son, Randall Reeves.  Ms. Knox attests that the failure of trial counsel to present this additional lay witness testimony resulted in a "disjointed" mitigation "with no unifying theme."

---

[28]     Social Judgment Theory posits three perspectives from which a juror views the evidence: latitude of acceptance; latitude of non-commitment; and  latitude of rejection.  "The latitude of acceptance are those positions which are acceptable. The latitude of non-commitment are those positions which are neither accepted nor rejected. The latitude of rejection are positions which will be actively opposed."  *Social Judgment Theory*,
http://changingminds.org/explanations/theories/social_judgment.htm

Had these additional lay witnesses been called, they would have provided additional information at the punishment phase, which would have given credence to testimony about the rigid religious environment and abuse and violence in Steve's family home.  It would have refuted the prosecutor's suggestion that the testimony of Steve's sister, Elaine, was a biased effort to save her brother from a sentence of death.  And it would have bolstered expert testimony concerning Steve's life history.  *See* Exhibit D: Affidavit of Toni Knox, LCSW at pp. 10-13.

> **(2)     Expert witness testimony would have explained Petitioner's domestic violence, with its origins in Petitioner's psycho-social history**

The mitigation investigator, Toni Knox, LCSW, for this state habeas proceeding, attested to the constitutional ineffectiveness of counsel as a result of the failure to adequately present expert witness testimony in the penalty phase of the trial to address the issue of domestic violence.    Ms. Knox attests:

> Rather than allow their expert witnesses to come in to present Steve's life history and attempt to possibly explain his behavior in the abusive relationships, Mr. House announced in his closing statement:
>
> > *But here is my question to you: This abuse by itself, how does that work?  How many people do you know that are in abusive relationships?  How many people do you know that are in those relationships, stay in those relationships when they shouldn't?  They do.  And you know why?  Because they still love them.*
>
> ***The reason for remaining in an abusive relationship is not this simple as there are a myriad of reasons for people remaining in abusive relationships, other than they still love the person***.  This is not the testimony that would have been presented by a mental health expert to the jury.

Exhibit D: Affidavit of Toni Knox, LCSW at p.17 (emphasis supplied).

Ms. Knox further attests:

> Two expert witnesses were retained by the defense to testify and present Steve's life history and provide some research data concerning Steve's behavior when he believed he was being abandoned.

> Dr. Gilda Kessner, a psychologist, spent hours interviewing Steve and his sister.  Additionally, she reviewed numerous records and researched the literature in preparation of her testimony. [*See* exhibit 10, to Knox affidavit] If ***Dr. Kessner had been allowed to testify, she would have provided information to the jury concerning the neurobiology of abandonment homicide.  Additional rather than the simplistic explanation given by Mr. House concerning domestic violence, she would have provided research based information about domestic violence***.  ....

> Dr. Kate Allen, a social worker, was also retained to provide life history testimony at the trial.  As with Dr. Kessner, she was not called to testify, although she was present and ready to testify.

Exhibit D: Affidavit of Toni Knox, LCSW at pp.15-16 (emphasis supplied).

Dr. Kessner attests in this state habeas proceeding:

> I have concluded based on the records and literature review, that had I been allowed to testify in the 2006 Case about the impact of the developmental trauma cited by family members, that ***I could have provided a context for the jury to understand the etiology of Mr. Gardner's personality and behavior***.  At the time of trial, there was a large and growing body of literature addressing the issue of perpetrators of domestic violence.

> Briefly, John Steven Gardner was born into a chaotic and dysfunctional family and events in his infancy and early childhood had a profound effect on his early and life long psychosocial development.  ***Events taking place at critical developmental periods for trust, interpersonal relationships and self-concept had a damaging effect on his ability to relate to others in an intimate and sexual way***.  The modeling of violence and jealousy between his parents in their marital relationship served as a template for behavior in his future romantic relationships.  ***These factors would have provided an explanation to the jurors, as to why John Steven Gardner perpetrated violence and threats of violence against his domestic partners, and therefore, would have given them a basis to find that he was less morally culpable and not worthy of death***.

Exhibit C: Affidavit of Gilda Kessner, Psy.D, para. 12 (emphasis supplied).  Thereafter, Dr. Kessner

explains the concept of abandonment rage and its neurobiological effects.

As the aforementioned state habeas evidence revealed, the psycho-social history of Mr.

Gardner reflects his insecurity, possessiveness, jealousy, and probable sex addiction, as well as

abandonment rage that had its genesis in early childhood.

> **(3)     At the psychological level, Dr. Dutton's work could have explained how Petitioner's family origin resulted in a depraved lifestyle**

At the psychological level, Dutton's work could have explained how the violent Gardner

household, with rigid enforcement of strict rules by a remote, depressed, angry, former alcoholic

father, may have affected Mr. Gardner's development and behavior, and resulted in a depraved

lifestyle.  (Vol. 23:28). Relying on the work of Dutton, Dr. Kessner attests:  "[T]he critical phase

of development for attachment insecurity that leads to abandonment rage ... is seen in all of Steve

Gardner's relationships and especially in his relationship with Tammy."  State Habeas Application,

Exhibit C: Affidavit of Kessner, Psy.D., p. 8, para. 21.

> **(4)     At the neurobiological level, Dr. Dutton's work could have shown the link between abandonment and homicidal rage**

At the neurobiological level, Dutton's work on domestic abuse and spousal killings reflects

a neurobiological link between abandonment and homicidal rage.  Once again, relying on the work

of Dutton, Dr. Kessner attests: "... Gardner's early childhood history of exposure to extreme trauma

provided the basis for his insecurity, dependence and over-controlled hostility in intimate

relationships."  State Habeas Application, Exhibit C: Affidavit of Kessner, Psy.D., p. 10, para. 25.

### (5)     Jurors' affidavits refute that they would not have responded to the abandonment rage theory

The FFCL Nos. 8-10, recite that the affidavits are inadmissible, and purport to "strike" them, because they violate TEX. R. EVID. 606(b)  –  which they do not.  TEX. R. EVID. 606(b) provides:

(b)     Inquiry into Validity of Verdict or Indictment.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any jurors mind or emotions or mental processes, as influencing any juror';s assessment to or dissent from the verdict or indictment.  Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes.

Remarkably, the Fact Findings strike the juror affidavits on the basis that state statute makes them inadmissible because they concern the jurors' deliberation of the effect certain evidence had or might have had ..." on the verdict.  Fact Finding Nos. 8-10.  Yet at the same time, the fact findings as drafted by the prosecutors  and signed verbatim by the judge, use this same evidence to support "the effect [this] evidence had or might have had" on the verdict.  For example, they refer to it as proof that juries would be distrustful of such evidence, characterize abandonment rage theory as a "novel" theory FF No. 53; which "would not have affected the jury's decision on future dangerousness,"  FF No. 58, 82; and which "would not have affected the jury's decision on mitigation," FF No. 59, 81.  This inconsistent application of the statute arising from Fact Finding Nos. 8-10 violates Mr. Gardner's due process, substantive and procedural rights.

Putting aside this aside, the juror affidavits go above and beyond any inquiry into the validity of a verdict.  Instead, the juror affidavits refute FF No. 53.  The theory of abandonment rage is not a "novel" theory.  At least as early as 1999, there were published studies as to it.  Donald G. Dutton and Greg Kerry, *Modus Operandi and Personality Disorder in Incarcerated Spousal Killers*, 22 International Journal of Law & Psychiatry 287, 287 (1999).  Further, the juror affidavits refute, by

clear and convincing evidence, the unsubstantiated, conclusory and self-serving assertions of defense counsel that "local juries'[in Collin County] distrust .... 'novel' defensive theories...."

*Compare* Affidavit of House and Hultkrantz, p.3 *with* State Habeas Exhibit B4: Declaration of Gail Stafford:  "I believe that had I seen the reports of Toni Knox and Gilda Kessner, I would have seriously considered that testimony ...." *and with* State Habeas Exhibit B3: Declaration of Paul Reichenbach: "The mitigation evidence investigated by Toni Knox and Gilda Kessner may have [made me] ... more willing to consider a life sentence;" *and with* State Habeas Exhibit B2: Affidavit of Wendy Duerr: "The declaration of Gardner's friends and his psychological evaluation would have affected my deliberations."

Accordingly, these affidavits refute that "counsel's reasons for not pursuing such a defense were reasonable."  FF No. 53.In the case at bar, there was no strategic reason for the failure of trial counsel to adequately present lay and expert witness testimony to explain Mr. Gardner's actions.[29]

---

[29]   ABA GUIDELINE 10.11 – THE DEFENSE CASE CONCERNING PENALTY specifically provides:

> F.     In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:
>
>   1.     Witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death;
>
>   2.     Expert and lay witnesses along with supporting documentation (*e.g.,* school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); ... [to] support a sentence less than death; ....

The deficient performance resulted in a failure to "integrate all of the facts and circumstances of the defendant's life and the crime and present a persuasive narrative of the events that encourages values of accountability over retribution, grace over vengeance, and life over death." RICHARD G. DUDLEY, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, Vol. 36, No. 3 HOFSTRA L. REV. at 963, 965 (Spring 2008). Following therefrom, the one-sided story of the prosecution, in the absence of a thoroughly investigated and developed mitigation presentation were "errors [of trial counsel] ... which had a pervasive effect on the inference to be drawn from the evidence, altering the entire evidentiary picture ...." *Strickland*, 466 U.S. at 695-696.

**D.    The Conclusions of Law Nos. 97-102 are contrary to, and an unreasonable application of federal law**

The State court decision denying relief on the basis that trial counsel was not ineffective, and specifically Conclusions of Law Nos. 97-102 are contrary to, and an unreasonable application of, *Strickland* and its progeny.  28 U.S.C. § 2254(d)(1)(2).

Had there been a thorough mitigation investigation, coupled with an adequate time line, a unified theme of abandonment rage and trauma could have emerged.  This theme would have made maximum use of the undisputed fact of Petitioner's history of domestic abuse and violence, while at the same time providing a viable explanation of the shooting of Rhoda and the subsequent shooting of Tammy.

In the guilt/innocence phase, an adequate mitigation investigation would have given rise to the distinction between a non-capital killing arising from estrangement, and capital murder arising from retaliation.  Because of an inadequate mitigation investigation, the defense fail to object to the

prosecution's focus on the "divorce."  The defense too mislead the jury into finding retaliation by eliciting testimony about the "divorce."  (RR 19:37, 143, 164, 166, 209, 292, 294, 259, 260, 266), Thrust of Tex. Penal Code 36.36(a)(1) is not about whether a couple is divorcing.  It is about whether a defendant intends to prevent a witness from testifying.  The defense was not capable of making this distinction in fact or law because the mitigation investigation was not adequate.

In the punishment phase, an adequate mitigation investigation would have demonstrated why Petitioner was not as morally culpable as someone who did not experience such childhood trauma, and supported a verdict other than death.  *Strickland,* 466 U.S. at 695.

Mr. Gardner had a Sixth Amendment right to effective assistance counsel. *Strickland,* 466 U.S. at 695; U.S. Const. Amend. VI.  However trial counsel failed to fulfill their obligation to conduct an adequate, thorough and independent investigation.  Mssrs. House and Hultkrantz bear ultimate responsibility for the performance of the defense team, and Ms. Schade's acts and omissions in particular.   al ABA Guidelines 10.4 and 10.11 (2008) located in O'Brien, 36 Hofstra L. Rev. 693, 703 (6/15/2008).  As a result of the constitutionally ineffective assistance of his trial counsel, Mr. Gardner was also denied his right to individualized sentencing under the Eighth amendment.  U.S. Const. Amend. VIII.

Taking the unaffected findings in the punishment phase of the trial as a given, and taking due account of the effect of the errors on the remaining findings, Mr. Gardner satisfied his burden of showing that the decision reached would reasonably likely have been different absent the errors.  Even the jurors attested that they would have listened and considered the mitigating evidence of attachment disorder, and its concomitant abandonment rage theory, thereby refuting the attestations of defense counsel.

For all the aforementioned reasons, the state court decision to deny relief on the merits is not entitled to the deference ordinarily due under the AEDPA.  Mr. Gardner had made a *prima facie* showing that trial counsel were constitutionally ineffective in failing to fulfill their obligation to adequately investigate and develop, and thereafter present mitigating evidence in the punishment phase of the trial.  U.S. CONST. Amend. VI. Yet, the state court denied him an opportunity to develop his claim in an evidentiary hearing.  *See  Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007), *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) ("[W]hen a petitioner makes a *prima facie* showing of [his federal constitutional law claim], a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA.").   Hence, the state court decision is both contrary to, and an objectively unreasonable application of, *Strickland* and its progeny.  In light of the aforementioned arguments and authorities, habeas relief is in order.

GROUND FIVE (THE ADMISSION OF THE TESTIMONY CONCERNING THE 911 CALL TO THE DISPATCHER VIOLATED CRAWFORD AND ITS PROGENY): **Mr. Gardner was denied his Sixth amendment right to confrontation because the trial court admitted testimony about the 911 call to the dispatcher**

The admission of the 911 call, which contained un-redacted, testimonial statements, violated the Confrontation Clause, therefore, this court should grant habeas relief. U.S. CONST. amend. VI, *Crawford v. Washington,* 541 U.S. 36 (2004); *Davis v. Washington*, 547 U.S. 813 (2006).

A.   **Statement of Facts.**

During the testimony of Erin Whitfield, a "9-1-1" dispatcher, the State developed the facts surrounding a 9-1-1 call received on January 23, 2005. Mr. Howard asked her, "Could you please tell us about that call?" At this point, Mr. Hultkrantz objected, arguing "I'm going to object as to hearsay. Object based on hearsay, based on confrontation clause in Article 1, Section 10 of the Tex – Texas Constitution. And object based on the confrontation in the Sixth Amendment of the U.S. Constitution." In response, Mr. Howard stated:

> Your Honor, as far as the confrontation clause goes, this is a dying declara -- first of all, I'm going to address somebody uttering a dying declaration; also excited utterance, present sense impression. There's no confrontation issue here because it was coming in during an emergency situation, not a -- not a testimonial aspect because there's not a gathering of information for prosecution later.

The trial court overruled the defense objection but granted Mr. Hultkrantz's request for a running objection (RR Vol. 19, P. 24-25).

Referring to the caller, Whitfield then testified, "She advised that her husband had either slapped or shot her. It was -- it was difficult to understand exactly what -- what she had said" (RR Vol. 19, P. 25). She subsequently testified that the caller had stated,

> She told me that, as I said, her head -- her head hurt. There was -- there was blood everywhere. She said that -- I asked her if the person who shot her was still there,

> and she said, No, he left in a white Ford pickup truck with Mississippi plates.  And
> I asked her her husband's name.  And it sounded -- the first name sounded like
> Steven, and she said Gardner"

(RR Vol. 19, PP. 26-27).

Whitfield then testified that the call lasted about 20 minutes then they got disconnected.

When Whitfield attempted to call back she got the caller's voicemail.

**B.**    **Argument and Authorities.**

**1.**    **Standard of Review.**

In *Crawford v. Washington*, 541 U.S. 36, 62 (2011), the U.S. Supreme Court held:

> Where testimonial statements are involved, we do not think the Framers meant to
> leave the Sixth Amendment's protection to the vagaries of the rules of evidence,
> much less to amorphous notions of "reliability." Certainly none of the authorities
> discussed above acknowledges any general reliability exception to the common-law
> rule. Admitting statements deemed reliable by a judge is fundamentally at odds with
> the right of confrontation. To be sure, the Clause's ultimate goal is to ensure
> reliability of evidence, but it is a procedural rather than a substantive guarantee. It
> commands, not that evidence be reliable, but that reliability be assessed in a
> particular manner: by testing in the crucible of cross-examination.

**2.      The state court findings are not entitled to a presumption of correctness because the trial record contradicts that Tammy "believed her death was imminent"**

In the direct appeal opinion, the Texas Court of Criminal Appeals held

In his fifth point of error, appellant claims that the trial judge erred in permitting Erin Whitfield to testify to the contents of the 911 call Tammy made after she was shot. Appellant objected to Ms. Whitfield's testimony at trial, [footnote omitted] arguing that this testimony was hearsay and that it violated the Confrontation Clause of both the federal and Texas constitutions. The State argued that it was a nontestimonial statement and admissible as (1) a dying declaration, (2) an excited utterance, and (3) a present sense impression. Because ***we find that the 911 call was admissible as a dying declaration,*** [footnote omitted] we need not address its admissibility as a nontestimonial excited utterance or present-sense impression. *Gardner*, 306 S.W.3d at 289-290.

...

***All that the rule requires is sufficient evidence, direct or circumstantial, that demonstrates that the declarant must have realized that he was at death's door at the time that he spoke***. It is both (1) the solemnity of the occasion  –  the speaker peering over the abyss into the eternal  –  which substitutes for the witness oath, [footnote omitted] and (2) the necessity principle  –  since the witness had died, there was a necessity for taking his only available trustworthy statements [footnote omitted]  – that provide the underpinning for the doctrine. *Gardner*, 306 S.W.3d at 291-292.

...

In determining that sufficient evidence supported a finding that Tammy believed that her death was imminent, the trial judge could have relied upon the following facts:

(1)      The single bullet entered her right temple, went through her brain, and exited below her left ear. This was a mortal wound;

(2)      Ms. Whitfield testified that Tammy's voice was very slurred and hard to understand;

(3)      Tammy kept repeating that her head hurt and that she could not hear very well "because her ears were ringing from the gunshots";

(4)      She said that her husband had shot her, there was blood everywhere, and she needed an ambulance;

(5)     Before the phone disconnected, Ms. Whitfield heard what sounded like Tammy choking and vomiting;

(6)     When the first deputy arrived, he found Tammy on the blood-soaked bed, trying to sit up; she appeared to be in shock and was bleeding badly from both the back and top right of her head;

(7)     There was a trail of blood leading into the bathroom, around the toilet, and in the trash can;

(8)     When the paramedics finally arrived, Tammy was "spitting up a lot of blood" and mumbling incomprehensibly;

(9)     She was in a vegetative state and died at the hospital two days later.

To satisfy the dying declaration exception, Tammy's sense of impending death may be established in any satisfactory mode, including her express words, her conduct, the severity of her wounds, the opinions of others stated to her, or any other relevant circumstances. [footnote omitted].  The totality of the circumstances set out in this record support the trial judge's conclusion that Tammy believed that her death was imminent at the time she made the 911 call, even though she did not expressly state that belief and no one explicitly told her that she was dying [footnote omitted].

*Gardner*, 306 S.W.3d at 289-290, 291-292.


The aforementioned nine (9) state court findings  are not entitled to a presumption of correctness.  Further, the conclusion that there was "sufficient evidence, direct or circumstantial, that demonstrate[d] that the declarant [Tammy] must have realized that [s]he was at death's door at the time that [s]he spoke," is contrary to federal law.

The state court relied on *Mattox v. United States*, 146 U.S. 140, 151-152 (1892) for the proposition:

This may be made to appear from what the injured person said; or from the ***nature and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive***; as well as from his conduct at the time and the communications, if any, made to him by his medical advisers, if assented to or understandingly acquiesced in by him.  (Emphasis supplied).

While the aforementioned nine (9) recitals by the state court are not entitled to a presumption of correctness for several reasons.  First, the state court is retrospectively making a fact finding to support its outcome that Tammy "felt or knew that she could not survive."  The state court's fact finding that "Tammy believed that her death was imminent," is speculative.  No one can read the mind of another, or intuit a subjective belief.  Third,  –  and as argued on direct appeal  –  nothing in the call between Tammy and the dispatcher  demonstrated that Tammy believed her death was imminent.  *Gardner*, 306 S.W.3d at 289-290, 291-292.

Fourth, the testimony of William Armstrong an officer for Collin County contradicts the state court's outcome determinative fact finding.  Officer Armstrong testified that Tammy wanted to get out of bed and walk around:

> She way laying – when I first went in, she was laying down and she sat up and she kept wanting to get out of bed, ....  She was trying to make words just wanted to get up and try to walk.

(RR 19:49-50).  The state court relied on *Mattox* for the proposition that the declarant made a dying declaration based on the "*nature and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive....*" However, the state court ignored the applicable portion of Mattox, which instructs that in making the determination, the court is to look to the "conduct at the time and the communications...."  The trial record of Tammy's conduct at the time contradicts that any statement made by Tammy was a dying declaration.  Officer Armstrong testified that Tammy "sat up ... kept wanting to get out of bed, .... [trying] to get up and try[ing] to walk."  This conduct is not indicative of an individual who believed her death was imminent.  Hence, any statement made to the dispatcher was not a dying declaration.

3.     **The state court conclusion that the admission of the 911 call did not violate the Confrontation Clause is contrary to and an unreasonable application of federal law**

As the aforementioned reflects, the statements made by Tammy in the 911 was not a dying declaration.  Hence, the state court's reliance on dicta in *Crawford*, and *Giles* is unavailing.[30]

Further, the statements made by Tammy about Petitioner were testimonial in nature:

> I asked her if the person who shot her was still there, and she said, No, he left in a white Ford pickup truck with Mississippi plates.  And I asked her her husband's name.  And it sounded ... she said Gardner..

(RR 19:49-50).

The statements made in the 911 call in response to questioning by the dispatcher were not necessary to address an on-going emergency.  Rather, the primary purpose of the questioning of the dispatcher was to establish or prove past events potentially relevant to later criminal prosecution.  Hence, they were testimonial as *Davis v. Washington*, 547 U.S. 813 (2006) makes clear.

In *Davis*, the Supreme Court held:

> The question before us in *Davis,* then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements. When we said in Crawford, 124 S.Ct. 1354, that "interrogations by law

---

[30]  *Gardner*, 306 S.W.3d at 289, n. 20:

> Appellant concedes that if Tammy's 911 call qualified as a dying declaration, "neither the Confrontation Clause nor *Crawford* [*v. Washington,* 541 U.S. 36 (2004)] or *Davis* [*v. Washington,* 547 U.S. 813 (2006)] would bar its admission." Appellant's Brief at 44. Although this question was not explicitly addressed by the Supreme Court, appellant's concession seems well taken. *See Crawford,* 541 U.S. at 56 n. 6 ("We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis.*"); *Giles v. California,* 554 U.S. 353, 361-362 (2008) ("We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying....

enforcement officers fall squarely within [the] class" of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator.  The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial.  ....  A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.  *Davis*, 547 U.S. at 826.

....

In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford,* 541 U.S. at 53, n. 4

*Davis*, 547 U.S. at 828-829.

Accordingly, the state trial court was required to "redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." *Davis*, 547 U.S. at 829.  The trial court failed to do so.

Given that the fact findings of the state court in its direct appeal opinion were rebutted by clear and convincing evidence in the trial record, and that the state court incorrectly held that the 911 call did not violate the Confrontation Clause, this court should grant habeas relief.   U.S. Const. amend. VI, *Crawford v. Washington,* 541 U.S. 36 (2004); *Davis v. Washington*, 547 U.S. 813 (2006).

## CONCLUSION

For the reasons set forth above, Mr. Gardner is entitled to relief from his unconstitutional conviction and sentence.

WHEREFORE, Mr. Gardner prays that this federal court:

1.     Issue a writ of habeas corpus to him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.     Grant him one or more hearings (*see* separately filed motion accompanying this petition) at which he may present any evidence in support of his claims, and allow him a reasonable period of time subsequent to any hearing this court determines to brief the issues of fact and of law raised by this Petition or such hearing.

3.     Direct that under Habeas Corpus Rule 7, the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in exhibits filed with this Petition.

Respectfully submitted,

_____
Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

JOHN STEVEN GARDNER                   )
               Petitioner       )
                                    )
                                    )       1:10-CV-610
v.                                    )
                                    )
RICK THALER, Director                 )
Texas Department of Criminal Justice, )       (Death Penalty Case)
Correctional Institutions Division,   )
               Respondent     )

## VERIFICATION

     I, Lydia M.V. Brandt, pursuant to 28 U.S.C. § 2242, acting on behalf of Petitioner, certify

under penalty of perjury that the foregoing Petition for Writ of Habeas Corpus is true and correct

to the best of my belief.

     DATE: September 7, 2011


_____
                  Lydia M.V. Brandt
               Texas Bar No. 00795262
             THE BRANDT LAW FIRM, P.C.
                 P.O. Box 850843
            Richardson, Texas   75085-0843
     (972) 699-7020 Voice; (972) 699-7030 Fax

## CERTIFICATE OF SERVICE

This certifies that on September 7, 2011, I electronically filed the foregoing document with the clerk of court for the US District Court Northern District Texas using the electronic case filing system of the court.  The electronic case filing system sent a notice of electronic filing to the following attorney of record, who has consented in writing to accept this notice as service of this document by electronic means:

      Matthew Ottoway,  Assistant Attorney General
      Attorney General's Office
      Post Conviction Division
      P.O. Box 12548
      Austin, TX 78711

                                                 _____
                                                      Lydia M.V. Brandt


cc:   Mr. John Steven Gardner
      #999-516
      Polunsky Unit, TDCJ
      3872 FM 350 South
      Livingston, TX 77351-8580

**EXHIBITS**

FEDERAL HABEAS EXHIBITS

Exhibit 1:          Shelli Schade Billing Records

Exhibit 2:          Defense Team Billing Records

Exhibit 3A&B:       Findings of Fact & Conclusions of Law (3A) and TCCA Sept 15,
                    2010 Order Denying Habeas Relief (3B)

Exhibit 4:          Joint Affidavit of House and Hultkrantz