NO. 219-80411-05

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 219th JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| JOHN STEVEN GARDNER | § | COLLIN COUNTY, TEXAS |

## AFFIDAVIT OF WILLIAM B. HOUSE, JR & ROBERT HULTKRANTZ

BEFORE ME, the undersigned authority, personally appeared February 7th, 2007, who, after being by me duly sworn stated the following under oath:

"My name is William B. House, Jr. and I am a duly licensed attorney in the State of Texas, SBN 10044000. I am over 18 years old and I am competent to make this affidavit. The statements contained herein are true and correct.

Mr. House had been practicing law for over 35 years at the time he was appointed as lead counsel to represent Mr. Gardner. He was board certified in criminal law for over 30 years at the time of appointment and still remains certified. He had previously been part of a trial team for eight (8) Capitol Murder cases -- seven (7) as lead counsel and one (1) as second chair. He have never been held "ineffective" in his entire career and his law practice has been at least 95 % criminal law; both state and federal, since his swearing in on September 18, 1970.

"My name is Robert O. Hultkrantz and I am a duly licensed attorney in the State of Texas, SBN 50511610. I am over 18 years old and I am competent to make this affidavit. The statements contained herein are true and correct.

Mr. Hultkrantz had been practicing law for six one-half (6 ½) years when he was

1

appointed as second chair in the Gardner capital murder trial. Previously he had been a sworn police officer for 24 years (1974-1998) and had served in different capacities in the public safety profession from police officer to Deputy Director of Public Safety and Fire Chief.

At the time of appointment to Mr. Gardner's case Mr. Hultkrantz had represented numerous clients, beginning in May 1999, in jury trial and trials before the court for cases ranging including Aggravated Sexual Assault of a Child, Aggravated Robbery, Arson, Aggravated Assault, Burglary of a Habitation, Indecency with a Child plus sundry other felonies and misdemeanors. Additionally, he had participated in 34 hours of capital trial specific CLE through the Center for American and International Law (CAIL) and sought specific permission from the trial judge to be appointed to this case.

## Issue #1:  Response to  issue of failure to develop abandonment rage (AR) as an issue during guilt-innocence:

The issue of an abandonment rage (AR) defense was never brought up by any of member of the defense team and, therefore, was not a part of our trial strategy. The first time we have seen it discussed is in the Post Conviction Writ of Habeas Corpus now being presented. Dr. Kessner was a risk assessment witness for the punishment phase of the trial alone. She never raised abandonment rage as an issue or potential trial strategy at any time during trial preparation. Based on her research - people who commit violent acts in the real world are very unlikely to commit acts of violence in prison. That was going to be part of punishment – nothing in guilt innocence. She was going to present

2

research that specifically showed those convicted of capital murder are less likely to commit violence in a prison setting than are inmates convicted of other offenses.

Even if the issue had been raised prior to the trial, it's our belief that in an abandonment rage defense in this case could present a number of potential problems. First, by raising the issue it is our belief that the State would have been able to bring in the shooting of his second wife Rhonda and all of the other bad acts entered through testimony during the punishment phase of the trial. We can only imagine the small amount of evidence that the jury would need to convict Steve of shooting Tammy after listening to everything the State had to present about him from incidents prior to Tammy.

Secondly, this type of defense, specifically in Collin County, more than likely would not be an effective trial strategy. Both Hultkrantz & House practice almost exclusively in Collin County and have conducted many criminal jury trials in the County. This is a very conservative county that tend to believe the State more often than not and who don't respond to "novel" defensive theories. If given the option again, neither attorney believes that abandonment rage as a defense in guilt innocence would be effective nor benefit their client Mr. Gardner.

**<u>Issue #2 - Failure to present a cohesive theory at trial:</u>**

We did believe that there would have to be two separate trial theories – one for guilt/innocence and the other for the punishment phase. The theory during the trial's simple in that we wanted to minimize any exposure of Steve to the death penalty, if the trial got to punishment, and we thoroughly believed that the State could not prove either

of their of the underlying acts which raised the incident to capital murder: burglary and retaliation.

If Steve had in fact committed this offense, first - there had been no burglary committed and there was no evidence that he entered the building with the intent to commit an assault or any other crime. In fact, the evidence at trial raised the inference that Steve entered the residence by invitation and nothing else. All of the states witnesses testified to the fact that the doors were all secure, no sign of entry and it required forced entrance to kick open the door to the house to gain access. The only thing that the jury could do was speculate that he entered the building with the intent to commit another crime, specifically shoot Tammy, but there was no evidence by which they could make that decision.

Second, if Steve did commit this act it was not in retaliation for the pending divorce The divorce was filed by Tammy and Steve signed the waiver which meant that he did not have to be served and he did not have to be notified of any pending hearings. In other words, Tammy could get her divorce 60 days after the filing date and Steve would have had nothing to do with the finality of the divorce. Although Steve didn't want the divorce he signed the waiver and wasn't going to contest it by appearing at trial. By signing the waiver, Tammy was able to go forward with the divorce with no interference from Steve.

The strategy for the punishment phase was two pronged. First, was to humanize Steve as much as possible given the limited resources available to the team and given the past historical background. Specifically, our mitigation expert had discovered little or

nothing that was deemed useful for trial. We were limited to his sister Elaine testifying as his father chose not to come up for the trial and his mother was in such an emotionally unstable state that she remained across the street at the attorney's law office for the trial and was not able to testify on her son's behalf.

The second prong was to focus on a point that was made during voir dire by both the State and the defense. That is, simply, that Steve's "future dangerousness" to society had to be proven beyond all reasonable doubt before a death penalty could be an option and the State had the burden in meeting that burden. The State made a point of emphasizing the fact, during voir dire, that future dangerousness could be measured in terms of the society that existed in prison.

During the punishment phase the State put on absolutely no evidence or testimony concerning Steve's future dangerousness should he be given a life sentence. The only evidence they had put on concerned extraneous bad acts which took place between himself and women and never with men while he was incarcerated. There was nothing put on by the State that proved beyond all reasonable doubt that Steve would be a future danger to "prison society" if he was given a life sentence.

When the State failed to put on any evidence in this regard the trial team knew that, if they put on evidence from experts or other testimony as to future dangerousness of Steve in prison, the State would call at least one expert to rebut our testimony giving the jury an out. Without any evidence from the State at all, and given the burden of beyond all reasonable doubt, it seemed obvious that the jury would have to return a verdict of life in prison. The trial team consulted with John Niland, with the Texas Defender Service and Bill Schultz, a local attorney, about our trial strategy and both agreed that it seemed

sound. However, as seen by the affidavit's of some of the jurors it seems obvious that they were requiring the defendant to put on evidence that he wasn't a future danger rather than holding the State to their burden of proving beyond all reasonable doubt that Steve would be a future danger. Had they truly reviewed the evidence presented and made the State meet their burden they would have returned a life sentence for Steve.

## Issue #3: Investigating and development of mitigating evidence:

Bennie House began a fact investigation into the case upon appointment and developed witnesses that were potential fact and mitigation witnesses. The witness list was turned over to the mitigiation expert for her own independent investigation and to our private investigator that had been appointed by the Court to assist as part of the defense team.

Bob Hultkrantz, Randi Ray (private investigator) and Shelly Schade (mitigation specialist) traveled to Mississippi to develop specific mitigation witnesses. The witnesses names were gleaned through family contacts, interviews with Steve and interviews with childhood friends. Our mitigation expert spent most of the time with the sister of Mr. Gardner (Elaine). Both attorneys agree with Dr. Gilda Kessners's assessment of Shelli Schade's work that she "developed anoverly close relationship with the defendant and his family members, specifically his sister Elaine, and took on the role of counselor to them rather than an mitigation investigator.

All three spent a long period of time interviewing Steve's parents about his childhood, adulthood and his allegations of physical and mental abuse by his parents. Both parents denied any abuse and in fact said that their son was a normal kid but had

6

few friends that he hung around with. Both were adamant that Steve wasn't abused by the father although admitting that he was punished on occasion. Their refusal to acknowledge even the least bit of problems with Steve growing up, their denying any physical or emotional abuse and their inability to identify potential individuals that could possibly provide useful information for trial led to very little of importance being developed through the time spent with them.

Shelli Schade refused to share notes from her mitigation investigation and refused to summarize her findings in a report to the attorneys. She was overly concerned with what could be discoverable by the State and despite the attorneys reassurance that it would not be discoverable, she refused to put together a report of any form for use by the investigator and the trial team.

Regarding the mitigation evidence developed by Toni Knox, we would like it known that had we been able to locate Don Ware (China Blue) in the Dallas area we would not have called him as a mitigation witness. We did attempt to locate witnesses in Dallas and Irving in the gay and transgender community, through our investigator Randi Ray, but weren't able to do so.

As practicing attorneys in Collin County we are well aware of what the feelings and reactions jurors are when it comes to presentation of evidence regarding transvestites and other alternate lifestyles. There is no question in our mind that testimony by Don "China Blue" Ware during any phase of the trial would have hurt, more than helped, Mr. Gardner.

Ms. Knox also contacted William "Billy" Stone a close friend of Steve's during his time in the service and in Laurel, Mississippi. Again, Mr. Stone's testimony of

womanizing and his constant focus on sex would not have a positive effect on any jury and especially a Collin County jury. Steve eventually became a brother-in-law of Mr. Stone through marrying Mr. Stone's sister-in-law Margaret. Steve was sent back to prison after hitting Margaret's daughter as part of a parole violation. Margaret and her daughter came and testified against Steve during the punishment phase of the trial. Nothing Billy Stone, nor his wife, would have been able to testify about would have benefited Mr. Gardner in a trial in Collin County, Texas.

## Issue #4: Failure to present mitigating evidence

One of the keys that led to the trial strategy not to present mitigating evidence went back to the voir dire process. During general voir dire and during individual voir dire both the Defense and the State emphasized the fact that, as related to future dangerousness, the State had to prove beyond a reasonable doubt that Steve was going to be a future danger in the "community" in prison to warrant the death penalty. By us not presenting any evidence on future dangerousness it precluded the state from presenting any rebuttal evidence. Specifically, we did not want to call our expert in this area nor even admit his records of behavior from his time in Collin County jail as it would open up for the State to put on their witness. We felt by limiting what the State put on we were affectively attacking the "reasonable doubt" standard they had to meet regarding future dangerousness.

In a strategic decision the trial team came to the conclusion that present the mitigating evidence we had could cause more harm than good. First, the fact of the matter that wasn't much available given the life style Steve had lived including his past

homosexual relationships, his past history of violence in many if not all of the relationships and the limited testimony available from his family. Specifically, his sister Elaine spoke of the unbearable abuse Steve received from his parents but, in interviewing his parents on different occasions, it was clear that they would not, or refused to, admit to any abusive behavior on their part.

Part of our consideration in determining what we presented was what the we believed the Court would allow the State put before the jury. Judge – we felt like he would let that testimony of the State in, at the time even though we believe the evidence from their Huntsville prison statistics expert may have been inadmissible we felt as a matter of trial strategy we didn't want to risk allowing such testimony opening the door at putting Steve at greater risk. do to our practicing in front of him before.

Dr. Kate Allen was retained to examine and address about abandonment issues concerning Steve. However, at the conclusion of watching some of the testimony, specifically when the step-daughter stated Steve had been very abusive to her – she decided she didn't want to testify because of lack of information and felt that he was psychotic.

We realize that our mitigation specialist has complained that she was not consulted regarding the decision not to present our two consulting experts. However, it must be remembered that she was a part of the defense team and not the trial team. Her work, or lack thereof, was meant to assist us in our trial strategy but the trial team was not a democracy where we sought out the opinions of all involved and took a vote as what we should present or not present.

The fact of the matter is that the trial team consulted with the two experts that we had hired, Dr. Kessler and Dr. Allen before letting them know of our decision not to present their testimony. Bob Hultkrantz personally spoke to John Niland and a local attorney and former ADA Bill Schultz about our strategy and, after discussing what existed for presentation and what didn't as regarded mitigation. They both concluded that our decision was a sound trial strategy.

# AFFIDAVIT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF COLLIN | § |

BEFORE ME, the undersigned authority, on this day personally appeared W. B. "Bennie" House, Jr., who being by me duly sworn, upon oath deposes and says,

"I am W. B. "Bennie" House, Jr., the Attorney of record for Defendant in this cause; I have read the above and it is true and correct."

_____
W. B. House, Jr.

SUBSCRIBED AND SWORN TO BEFORE me on March 8, 2010, to certify which witness my hand and seal of office.

Maria C. Hinojosa   9-8-13
Notary Public, State of Texas

MARIA C. HINOJOSA
Notary Public
STATE OF TEXAS
My Comm. Exp. 09/08/2013

## AFFIDAVIT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF COLLIN | § |

BEFORE ME, the undersigned authority, on this day personally appeared Robert

O. Hultkrantz, who being by me duly sworn, upon oath deposes and says,

"I am Robert O. Hultkrantz, the Attorney of record for Defendant in this

cause; I have read the above and it is true and correct."

Robert O. Hultkrantz

SUBSCRIBED AND SWORN TO BEFORE me on March 8, 2010, to certify

which witness my hand and seal of office.

Notary Public, State of Texas

MARIA C. HINOJOSA
Notary Public
STATE OF TEXAS
My Comm. Exp. 09/08/2013

12