IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JOHN STEVEN GARDNER,<br>Petitioner, | §<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. 1:10-CV-610 |
| RICK THALER,<br>Director, Texas Department of<br>Criminal Justice, Correctional<br>Institutions Division,<br>Respondent. | §<br>§<br>§<br>§<br>§ | (Death Penalty Case) |

**RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT**

Petitioner John Steven Gardner was convicted of capital murder and sentenced to death for killing his estranged wife, Tammy Gardner, during the course of a committing a burglary or in retaliation for her status as a prospective witness.  Gardner seeks relief in this Court, which possesses both personal and subject matter jurisdiction, pursuant to 28 U.S.C. § 2254. Respondent Rick Thaler (the Director) denies all of Gardner's assertions of fact except those supported by the record or specifically admitted herein. Although Gardner seeks habeas relief he has failed to show that any of his claims have merit or that he is entitled to further factual development. Accordingly, the Director respectfully requests that Gardner's petition for a writ of habeas corpus be denied with prejudice.

## PETITIONER'S ALLEGATIONS

The Director understands Gardner to allege the following grounds for relief:

1.  Counsel were ineffective during the guilt-innocence phase of trial because they did not present an "abandonment rage" defense;

2.  Counsel were ineffective during both the guilt-innocence and punishment phases of trial for presenting "multiple, inconsistent and implausible" defensive theories;

3.  Counsel were ineffective during the punishment phase of trial because they did not adequately investigate, develop and present mitigation evidence; and

4.  The Confrontation Clause was violated by the introduction of a "911" emergency call.

Pet. 27–135, ECF No. 17.  As fully briefed in the Director's answer, Gardner has failed to show that the Court of Criminal Appeals unreasonably adjudicated these claims or that he is otherwise entitled to habeas corpus relief under the Antiterrorism and Effective Death Penalty Act (AEDPA). The Court should deny Gardner's requested relief and deny the petition with prejudice.

## STATEMENT OF THE CASE

A jury convicted Gardner of capital murder for killing his estranged wife, Tammy Gardner, during the course of committing a burglary or in

retaliation for her status as a prospective witness.  2 CR (219-81121-06) 608.[1]
After a separate punishment hearing the jury answered the submitted
special issues in such a way that Gardner was sentenced to death.  2 CR
(219-81121-06) 618–19.  The Court of Criminal Appeals, on direct appeal,
affirmed the judgment of conviction, *Gardner v. State*, 306 S.W.3d 274 (Tex.
Crim. App. 2009), and the Supreme Court of the United States denied
Gardner's petition for a writ of certiorari from direct appeal, *Gardner v.
Texas*, 131 S. Ct. 103 (2010).

With direct appeal still pending Allen filed an application for state
habeas relief.  1 SHCR 3–216.[2]  The habeas trial court entered written
findings, and recommended that relief be denied.  2 SHCR 383–401.  The
Court of Criminal Appeals adopted a majority of the habeas trial court's
recommended findings, and denied relief.  *Ex parte Gardner*, No. WR-74030-
01, 2010 WL 3583072, at *1 (Tex. Crim. App. Sept. 15, 2010).

Gardner now seeks federal relief by filing a petition for a writ of habeas
corpus.  Pet. 20–135.  The Director submits the following answer in response.

---

[1]   "CR" refers to the documents and pleadings filed in the state convicting court,
or clerk's record.  The clerk's record in this case totals six volumes; however,
Gardner was re-indicted twice so instead of six sequential volumes there are three
two-volume sets differentiated only by the trial court cause number.  The references
are preceded by the volume number and followed by the trial court cause number
and page number where necessary.

[2]   "SHCR" refers to the documents and pleadings filed in the state habeas court,
or state habeas clerk's record.  The references are preceded by volume number and
followed by page numbers where necessary.

# STATEMENT OF FACTS

## I.   Guilt-Innocence Facts.

The Court of Criminal Appeals accurately summarized the evidence presented at Gardner's trial:

[Gardner] and Tammy Gardner had a relatively short, but violent, marriage. Before Tammy married [Gardner] in 1999, she was very outgoing and happy. After that marriage, she lost weight, became introverted, and lost her sparkle. [Gardner] dominated, threatened, and physically abused her. His name was tattooed on her inner thigh.

Jacquie West, Tammy's best friend, testified that the one time she visited Tammy's home after the marriage, she and Tammy's daughter, Jessie, were sitting in the living room when [Gardner] came in, pushed Tammy onto the bed, sat on her, choked her with his hand, and then put a gun to her head. [Gardner] said that if Jacquie didn't leave, he would kill Tammy. Jacquie left and never returned. Shortly thereafter, Tammy sent Jessie to live with her natural father for her safety.

Both Jacquie and Jessie saw injuries on Tammy's face on various occasions. Tammy told Jessie that one time [Garnder] shoved her into a bookcase, then hit her and gave her a black eye. Jacquie said that Tammy once had a large bruise running diagonally across her face. When confronted, Tammy matter-of-factly admitted that [Gardner] had hit her in the face with a hammer. Both had seen [Gardner] "stalking" Tammy at different times.

Tammy told them that "she wasn't getting out of there alive," meaning that she would not get out of her marriage alive. Candace Akins, her boss at the Action Company, a wholesale horse-equipment company, said that Tammy was constantly fearful, nervous, and in extreme financial difficulties. Tammy said that "she wanted out of the relationship," but she was afraid to leave, and she told Candace many times, "I can't leave, he will kill me."

Tammy eventually went to a neurologist complaining of vision loss, headaches, sleeplessness, anxiety, and depression. She told the doctor's wife—who was assisting her husband and who had her own family counseling practice—that she was too embarrassed to tell the doctor that her migraines were caused by physical injuries from her husband. She said that [Gardner] had pulled her hair and hit her both with his fists and with a gun. She was very frightened of him and kept crying, "The only way I'm going to get out of this relationship is by being dead." She explained that [Gardner] had threatened to kill her and her children if she left him.

Finally, in December 2004, Tammy borrowed money from her company to file for divorce. On Christmas day she told [Gardner] to move out, so his parents came and took him and his belongings back to Mississippi. She "perked up" after she filed for divorce, and she began to see more of Jacquie and her daughter Jessie. At work, Tammy marked her calendar for February 7, 2005, the day her divorce would become final, and she would go over to the calendar and say, "You're almost there. You're almost there."

But she also told Jacquie, Jessie, and Candace that she didn't think she would get to that day because [Gardner] would kill her first. Jessie testified that [Gardner] kept calling and leaving phone and text messages: "Are you going through with the divorce or not?" When Jacquie and Tammy had lunch together at Applebee's on January 20th, Tammy's cell phone started ringing as soon as they got there. It rang constantly, making Tammy upset and scared. She told Jacquie, "He's going to kill me" before the divorce becomes final.

On Sunday, January 23rd, Tammy was driving Jessie home after church when [Gardner] kept text messaging about the upcoming divorce and asking "YES OR NO?" Jessie read the text messages to her mother, who became frantic, but Tammy did not reply to [Gardner's] question. The messages stopped about 5 p.m. Jessie stayed at her father's home that night.

Tammy called David Young, her company's vice-president, early that evening and asked him if she could come talk to him.

She arrived around 7:00 p.m. and stayed about three hours, seeking his help in "disappearing" so that no one could track her. Mr. Young was concerned about Tammy's safety, but he felt more comfortable when she called him after she returned home about 11 p.m.  According to the phone records, they talked until 11:13 p.m.

At 11:58 p.m., Erin Whitfield, the 911 dispatcher for the Collin County Sheriff's Office, received a 911 call from a woman who identified herself as "Tammy," gave her address, and said she needed an ambulance.  Her speech was very slurred and hard to hear, but she said that her husband had either slapped or shot her (Ms. Whitfield wasn't sure until she replayed the tape that the word was "shot").  The woman said that she couldn't hear the dispatcher because her ears were still ringing from gunshots and that her head hurt and "there was blood everywhere."  When Ms. Whitfield asked if the person who shot her was still there, the woman said, "No, he left in a white pickup truck with Mississippi plates."  She said his name was Steven Gardner.  The dispatcher had to yell and repeat herself because the woman sounded like she was choking and vomiting.  Then the line disconnected.

Ms. Whitfield dispatched police and paramedics, but it took the police about 25 minutes to arrive because, at first, they went to the wrong address, 3191 FM 2862 instead of 9191 FM 2862.  As Deputy Armstrong drove there, he saw a white truck sitting in a ditch by a creek about two or three miles from Tammy's home, but it was only later that he learned that they were looking for a white truck.  He was the first to arrive at Tammy's home.  He knocked on the doors, but there was no answer, and he could not get in through the windows.  He had to kick in the front door.  He saw a light on in the bedroom, and, when he entered, he saw Tammy on the bed with a trail of blood leading into the bathroom.  She was trying to sit up, but she was bleeding badly from her head and seemed to be in shock.

By the time the paramedics arrived, Tammy was spitting up a lot of blood and mumbling incomprehensibly.  She was wearing a red robe.  One of the paramedics, Stephanie Taylor, cut the bottom part of the robe off because she couldn't properly assess Tammy's condition while she was dressed.  Tammy was

flown by helicopter to Parkland Hospital, but she went into a coma, and her family took her off life support two days later. Tammy died from a single gunshot to her head. The bullet had hit her in the front right temple, traveled downward through her brain, and exited below her left ear. Apparently, Tammy had been sitting up against a pillow in bed, and the exiting bullet went through the pillow and out the bedroom window. The bullet was never recovered.

Investigating police found Tammy's house keys—keys that Jessie said her mother always kept in her purse—in a tool chest in the back of her truck parked in the driveway. Nothing else appeared to have been taken from the house. There was no sign of forced entry.

Meanwhile, [Gardner] had borrowed his brother-in-law's white Ford F–150 pickup truck that Sunday afternoon, saying that he was going to visit relatives in nearby Hattiesburg. However, [Gardner's] credit card was used twice that day at a convenience store in Marshall, Texas, which is on the way from Mississippi to Collin County. He apparently bought gas for $28.00 and then made another purchase for $3.86. The backing and store price tag for a pair of Brahma work gloves—an item that the Marshall convenience store sold for $1.49—were later found in the white F–150 pickup. [Gardner's] fingerprint was found in that pickup as were fibers that were similar in all respects to red fibers taken from Tammy's robe.

In the early hours of Monday, Collin County Det. Cundiff found [Gardner's] father's telephone number and called him in Mississippi. Det. Cundiff obtained [Gardner's] cell phone number and called him at 5:15 a.m. [Gardner] hung up on him.

[Gardner] returned to his brother-in-law's home driving the white F–150 pickup at about 8:30 a.m. His sister, Elaine Holifield, had already been told that Tammy had had "an accident." She confronted [Gardner] and asked, "What happened?" He didn't say anything; he just started crying. She asked if Tammy was okay, and [Gardner] said, "Yes." Elaine told him that he had to turn himself in to the police, and he said, "Okay." He showered, changed clothes, shaved, and went first to

his parents' home and then to the sheriff's office. Elaine then went to check for her husband's .44 Magnum that he kept under his mattress. It was there, with five live rounds and one spent round. [Gardner's] brother-in-law testified that he never left spent shells in his gun; he always reloaded it.

When [Gardner] turned himself in to the sheriff's office in Mississippi, officers there called Det. Cundiff in Collin County, who said that he did not have a warrant out for [Gardner's] arrest. But he asked to speak to [Gardner] on the phone, and [Gardner] agreed. Det. Cundiff explained that he knew that [Gardner] had been in Texas and he wanted to find out what happened to Tammy. [Gardner] said, "I don't have an answer for that one." When Det. Cundiff explained that Tammy had been shot in the head, [Gardner] replied, "Okay." Then Det. Cundiff said that Tammy was still alive, and [Gardner] said that she could tell what had occurred "if she wants, that'll be fine." [Gardner] then went home but was later arrested and brought back to Collin County for trial.

*Gardner*, 306 S.W.3d at 281–84 (footnotes omitted).

## II.   State's Punishment Evidence.

Gardner had been married five times, and all of his marriages, save for the first, ended poorly, and often with violence. Gardner married his first wife, Rita, in Hawaii, and they eventually separated without apparent incident. 23 RR 48.[3] Gardner thereafter married Rhoda, and he lived with her in Laurel, Mississippi. 22 RR 28–30; 23 RR 49. Their relationship ended when Gardner waited for Rhoda in hiding, called out to her, and then shot

---

[3]   "RR" refers to the transcribed statement of facts at trial, or reporter's record. "SX" and "DX" refer to the exhibits proffered by the State and Gardner, respectively, at trial, and found in volumes twenty-four through twenty-seven of the reporter's record. The references are preceded by volume number and followed by page or exhibit numbers where necessary.

her when she turned around.  22 RR 77.  Gardner shot Rhoda again as she lay on the ground, and stood over her until she urinated on herself to confirm that she had died.  22 RR 77–78.

Rhoda, however, survived three gunshot wounds—one to her face, one to her breast, and one to the right side of her torso—but was rendered a paraplegic.  22 RR 16–17.  She was also pregnant at the time of the shooting but had a miscarriage approximately seven weeks after being shot.  22 RR 17–18.  Following the miscarriage a decision was made to conduct a dilation and curettage procedure; Rhoda, though, died during the procedure.  22 RR 19–20.  Gardner was convicted of aggravated assault for shooting Rhoda, and sentenced to eight years' imprisonment.  22 RR 33; SX 77.

While imprisoned Gardner started communicating with Margaret Westmoreland, and eventually became romantically involved with her.  22 RR 33–34.  After Gardner was released on parole he married Westmoreland, and moved in with her and her two children—six-year-old Tim and thirteen-year-old Becky.  22 RR 34–35.  Westmoreland stated that their dating relationship was "great," but after marriage Gardner acted like "he owned" her.  22 RR 36.  Gardner dictated what Westmoreland could wear, eroded her self-esteem, and ominously watched her while she was at work.  22 RR 36, 38–39.  Gardner also threatened Westmoreland and her family, including threats of skinning Westmoreland's children while alive and snapping

Westmoreland's neck.  22 RR 37.  Westmoreland thought that Gardner would eventually kill her, but did not immediately leave him because she did not believe it was safe for her or her family to do so.  22 RR 38, 40.

Gardner was also sexually inappropriate with Becky during his relationship with Westmoreland, including propositioning Becky "to have sex with the devil" so "that he could give [her] powers."  22 RR 68–69.  He also belittled Becky, and "proud[ly]" described the killing of Rhoda to Becky, showing no remorse.  22 RR 67, 78.  Gardner and Westmoreland's relationship ended when one evening, Gardner, without provocation, struck Becky in the head with such force that she required seventy-eight stitches, and an overnight stay in a hospital.  22 RR 43–47, 71–73; SX 69.  Gardner denied responsibility for the attack.  22 RR 45–46, 74.

Westmoreland ceased living with Gardner after Becky's assault; however, Gardner abducted Westmoreland at knifepoint at her place of employment.  22 RR 50–52.  Gardner forced Westmoreland to drive to various locales, eventually engaging in a high-speed chase with the police.  22 RR 50–53.  Westmoreland finally succumbed to the fear that either Gardner was going to kill her, or that she would die in a car wreck, so she pulled over.  22 RR 52.  Gardner was then arrested, his parole revoked, and he returned to prison.  22 RR 53.  Despite his imprisonment Gardner still contacted Westmoreland threatening to "hunt [her] down" if she left him.  22 RR 54.

10

Although Westmoreland had divorced Gardner long before trial she frequently moved and regularly changed her phone number because she continued to fear Gardner.  22 RR 55–56.

Gardner then married Sandra, and had a son, Nicholas.  23 RR 52–53. That marriage ended in June 1999.  SX 72.  In mid-August 2001, Sandra applied for a temporary protective order, alleging family violence.  SX 72.  A two-year protective order was granted in late-August 2001.  SX 72.  Before the issuance of the protective order Sandra would bring Nicholas to visit Gardner but was "frantic" around him, and would not talk to Gardner nor stay long at the drop-off site.  22 RR 128.

Gardner's final marriage was to Tammy, and he abused her and then killed her with a single gunshot to the head.  Gardner also sexually assaulted Tammy's daughter, Jessie, beginning when she was nine.   22 RR 124. Gardner kissed Jessie on the mouth, had Jessie touch his "private area" underneath his clothing, and he touched Jessie's "private area" underneath her clothing.  22 RR 125–26.  Shortly before Jessie left Tammy's home and moved in with her father Gardner "tried to take [Jessie's] pants off and rape" her.  22 RR 127.

Gardner was also spotted by police masturbating in his vehicle at the Irving Mall during Christmastime in 1992 while women and children were in

the area.  22 RR 93–95.  When Gardner was pulled over the police discovered two illegal knives and a wooden club in his vehicle.  22 RR 102–03.

Finally, while in the Army, Gardner was punished for disobeying a superior non-commissioned officer, and leaving his post without authority. SX 74.   An Army psychiatrist noted that Gardner had an "inadequate, immature, [and] sociopathic personality," and that Gardner was considered "ineligible for [re]enlistment" when he was discharged.  SX 74.

## III.   Gardner's Punishment Evidence.

A co-worker of Gardner's described him as a "very diligent employee," who was responsible, and "a bit of a peacemaker."  23 RR 7–8.  The co-worker was a "born-again Christian" who had talked with Gardner post-arrest, and he noted that Gardner had studied "the Word . . . in diligence," and "had become a believer much earlier in life."  23 RR 9–10.  He opined that Gardner had "Christ in his heart."  23 RR 10.  Another co-worker stated that Gardner was "very professional, [and] very courteous," and displayed no hostility at work.  23 RR 16–18.  One of Tammy's ex-husbands described her as having a "weakness for men," and that she could be manipulative. 23 RR 21–23.

Elaine, Gardner's sister, testified that Gardner was her "baby brother," and that she was his only living sibling as their oldest sister, Charlene, had died at the age of six, while Gardner was two years old. 23 RR 25–26.  After the death of Charlene life became "pretty stressful," emotionally and

financially, in the Gardner household.  23 RR 26.  Gardner's father was a "Baptist preacher," and the family moved often because Gardner's father would be forced to resign.  23 RR 26–27.  Gardner's father made Elaine and Gardner get up early each morning, listen to Bible passages, and pray.  23 RR 27–29.  If the children refused to participate they would be "whip[ped]."  23 RR 30.

Elaine also described their parents' marriage as unhappy, and that she and Gardner would frequently observe violence between their parents.  23 RR 30–34.  Gardner's father had a violent temper, and he would "whip" Elaine and Gardner at least once a week, for no reason, with Gardner receiving the brunt of the "whippings."  23 RR 30–32, 37–38.  Elaine recalled one incident where their father was preaching but then suddenly got up from his chair and took Gardner outside of the meeting hall, and beat Gardner so loudly that the congregation could hear it.  23 RR 35–36.  Despite the rampant abuse Elaine explained that "two lives were led, the one in front of the public, and then the one behind closed doors," and that the authorities were never called because "[y]ou didn't do that."  23 RR 39, 44.

Elaine also stated that Gardner, while in the Army, told his father that he "better not lay another hand on mom again."  23 RR 38–39.  Further, Elaine pleaded, while crying, to spare Gardner's life because "[h]e's all I've got," and that Gardner's elderly parents loved Gardner.  23 RR 42, 58–59.

13

Finally, Gardner received multiple commendations while in the Army including the "National Defense Service Medal," and the "Good Conduct Medal." SX 74.

## ANSWER

Gardner's petition is subject to AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA "imposes a highly deferential standard of review for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam) (quoting *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam)). This review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398–99 (2011).

Under 28 U.S.C. § 2254(d), as amended by AEDPA, a federal court may not grant habeas relief unless the state court adjudication (1) "was contrary to federal law then clearly established in the holdings of" the Supreme Court; or (2) "involved an unreasonable application of" clearly established Supreme Court precedent; or (3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (internal quotation marks omitted) (quoting 28 U.S.C. § 2254(d)(1)–(2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (*Terry Williams*)).

14

A state court decision is contrary to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent, yet reaches an opposite result. *Terry Williams*, 529 U.S. at 405–06.   A state court unreasonably applies Supreme Court precedent if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case.   *Id.* at 407–09.   To determine whether a state court has made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 131 S. Ct. at 786.

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision.  *Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion").   Further, "evaluating whether a rule application was unreasonable requires

considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664.

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning.  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc).  Indeed, state courts are presumed to "know and follow the law."  *Visciotti*, 537 U.S. at 24.  And, even where the state court fails to cite applicable Supreme Court precedent or is unaware of such precedent, AEDPA nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]."  *Early v. Packer*, 537 U.S. 3, 8 (2002).

Additionally, if the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard.  *Williams*, 529 U.S. at 381.  A federal court must be wary of circumstances where it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand" because such a process suggests that the proposed rule is not clearly established.  *Alvarado*, 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the inmate carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, "[t]he presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Finally, an evidentiary hearing is precluded on claims adjudicated on the merits by the state court. *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011). In certain other situations, an evidentiary hearing is unwarranted because the inmate has not diligently developed the state court record. *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (*Michael Williams*). If diligence is not in issue, then an inmate may not obtain a hearing unless (1) an inmate's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) an inmate establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). Assuming no procedural barriers, it is appropriate to deny an evidentiary hearing if sufficient facts exist to make an informed decision on the merits. *Schriro v. Landrigan*, 550 U.S. 465, 474–75 (2007).

## I.     Preliminary Legal Issues Relevant To All Claims For Relief.

Gardner, before delving into his claims for relief, alleges that the state court's fact-finding process was constitutionally deficient, Pet. 20–22, that the credibility findings made by the state court are irrelevant, Pet. 22, that the findings of fact predicated on counsel's affidavit are unreliable because counsel were acting under a conflict of interest, Pet. 22–23, and that due process was violated when the state court struck the juror affidavits that Gardner proffered as evidence, Pet. 23–26.  Gardner also integrates these arguments into each claim when addressing the merits.  *E.g.*, Pet. 33 (no presumption of correctness for factfindings), 52 (juror affidavits should be considered by this Court), 54 (AEDPA does not apply because there was no live hearing).  His contentions hold no merit.[4]

### A.     The state court's findings of fact are entitled to a presumption of correctness regardless of whether a live hearing was held in state court or not.

Gardner, essentially, argues that a "full and fair" hearing in state court is necessary before this Court presumes that the state court's findings of fact are correct under 28 U.S.C. § 2254(e)(1).  *See* Pet. 20–22.  According to Gardner, in order for a hearing to be "full and fair" there must be a live

---

[4]  In order to avoid repeating the same argument many times over the Director addresses Gardner's arguments at the outset and simply refers to and re-incorporates his responses when Gardner reasserts these arguments in each claim for relief.

hearing with discovery. *See* Pet. 21. To support his argument Gardner points to *Panetti v. Quarterman*, 551 U.S. 930 (2007) and *Wiley v. Epps*, 625 F.3d 199 (5th Cir. 2010). Pet. 20–22.

The statute imposing a presumption of correctness, 28 U.S.C. 2254(e)(1), does not refer to a hearing in state court as a precondition for its application, and Gardner cites no case law on point to support such a broad proposition. *See* Pet. 21. Indeed, the law in this circuit runs counter. *Valdez*, 274 F.3d at 951 ("[W]e hold that a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review.").[5] This is by itself a sufficient reason to discard Gardner's argument.

But further, Gardner distorts the holdings in *Panetti* and similar cases to support his assertion that a live evidentiary hearing is a prerequisite to presuming a state court fact-finding correct. *Panetti* itself is founded on *Ford*

---

[5]   The rule that Gardner suggests is also counter to case law in a number of other circuits. *See Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) ("AEDPA does not make deference to state court fact-finding dependent on the adequacy of the procedures followed by the state court."); *Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007) ("As Professors Fallon, Meltzer, and Shapiro have noted, these changes suggest that 'the presumption of correctness now applies across the board.'"); *Lambert v. Blackwell*, 387 F.3d 210, 238 (3d Cir. 2004) ("[T]he habeas statute no longer explicitly conditions federal deference to state court factual findings on whether the state court held a hearing."); *Mendiola v. Schomig*, 224 F.3d 589, 592–93 (7th Cir. 2000) ("[I]f the state court's finding is supported by the record, even though not by a 'hearing on the merits of [the] factual issue,' then it is presumed to be correct.").

*v. Wainwright*, 477 US. 399, 410 (1986), and *Ford* simply confirmed that a death-sentenced inmate had a constitutional right to competence at the time of execution.  *See Panetti*, 551 U.S. at 949 ("Justice Powell's opinion [in *Ford*] constitutes 'clearly established' law for purposes of § 2254.").   In the competence-to-be-executed context an inmate, after making a "substantial threshold showing of insanity," is "afforded by *procedural due process* . . . a 'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U.S. at 949 (emphasis added).[6]  In other words, an inmate challenging his competency to be executed has a *constitutional* right to certain procedures should he make a requisite showing in state court that he is categorically exempt from the death penalty.

Predicated on *Panetti*, and in the context of a claim of mental retardation, the Fifth Circuit has found a constitutional basis in the procedures afforded an inmate if they make a prima facie showing of mental retardation in state court:

> Even though *Atkins*[ *v. Virginia*, 536 U.S. 304 (2002)] did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme Court's and lower court's

---

[6]   Assuming that the difference between a claim of categorical prohibition from the death penalty and all other claims does not distinguish *Panetti*, the actions of the state court in that case make it inapposite.  Despite making a substantial threshold showing of incompetence the state court did not provide Panetti with his own expert, failed to transcribe the proceedings, based its decision solely on court-appointed experts, and denied Panetti a hearing despite entitlement to one under Texas law.  *Panetti*, 551 U.S. at 948–52.  Gardner has not alleged similar faults in his state habeas process so *Panetti* has no application to this case.

> *due process* jurisprudence.  The lesson we draw from *Panetti* is
> that, where a petitioner has made a prima facie showing of
> retardation as Rivera did, the state court's failure to provide him
> with the opportunity to develop his claim deprives the state
> court's decision of the deference normally due.

*Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007) (emphasis added).

The Fifth Circuit has clarified that the rule in *Rivera* "stems from the fact

that *Atkins* created and protects a significant substantive liberty interest, a

liberty interest that entitles the petitioner to a set of core *procedural due*

*process* protections."  *Blue v. Thaler*, 665 F.3d 647, 657 (5th Cir. 2011)

(emphasis added) (footnote omitted).  *Wiley*, a case involving a claim of

mental retardation, simply followed the holding in *Rivera*.  *See Wiley*, 625

F.3d at 207 ("The teachings of *Panetti* and *Rivera* inform our conclusion in

Wiley's case.").[7]  Like *Panetti*, this line of cases supports the proposition that

---

[7]   Even if the difference between a claim of categorical exemption from
execution and all other claims is not enough to distinguish *Wiley*, the procedural
posture of that case in state court makes it inapplicable.  Mississippi case law had
created a specific right to an evidentiary hearing if an inmate made a prima facie
case of mental retardation.  *Wiley*, 625 F.3d at 206–07 (citing *Chase v. State*, 873 So.
2d 1013, 1028–29 (Miss. 2004)).  Despite complying with the state-law requirements
Wiley was denied such a hearing by the Mississippi Supreme Court.  *Id*. at 208.
The Fifth Circuit compared Wiley's evidence of mental retardation to other cases
where evidentiary hearings were granted, and labeled Wiley's case "an anomaly."
*Id*. at 209–10.  Because Wiley's case was an outlier—most mental retardation cases
with evidence similar to Wiley's were remanded to the trial court for further factual
development—"[t]he state court applied an unexpectedly more stringent process to
Wiley without notice, contrary to its announced procedure in numerous cases."  *Id*.
at 211.  Gardner has provided no analysis to suggest that his case was handled
improperly under Texas law, and *Wiley* is therefore inapposite.

inmates with death sentence impunity have a *constitutional* right to specific fact-finding procedures should a requisite showing be made in state court.

In contrast, Gardner presented only claims of ineffective assistance to the state habeas court; these are not allegations of absolute immunity from the death penalty possibly triggering additional procedural due process protections.   While Gardner certainly enjoyed the right to constitutionally effective counsel at trial he did not enjoy a constitutional right to a collateral process, *see Pennsylvania v. Finley,* 481 U.S. 551, 556–57 (1987), or the additional rights afforded inmates with significant evidence of categorical exemption from the death penalty.  Stated differently, Gardner is simply not entitled to the additional protections sometimes afforded to inmates who have substantial evidence that they are unconditionally exempted from execution; AEDPA's presumption of correctness, 28 U.S.C. § 2254(e)(1), therefore applies.  *See Hines v. Thaler*, 456 F. App'x 357, 360–64 (5th Cir. 2011) (distinguishing *Panetti*, *Wiley* and *Rivera* and upholding AEDPA deference despite no live hearing in state court).

In any event the paper hearing in state court, presided over by the same judge who sat at trial, is a full and fair hearing.  *See, e.g., Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000) ("We have repeatedly found that a paper hearing is sufficient to afford a petitioner a full and fair hearing on the factual issues underlying his claims, especially where as here, the trial court

and the state habeas court were one and the same."). For this reason, too, the factfindings of the state habeas court should be presumed correct.

## B. Credibility findings have relevance in the ineffective assistance of counsel context.

Gardner "objects" to certain findings of fact made by the state habeas court regarding counsel's experience, credibility, and the court's recollection of the events at trial. Pet. 22 (citing 2 SHCR 385–86 (Findings 11–16)). In Gardner's view "[a]n attorney, who is 'forthright and credible,' may nonetheless be ineffective." Pet. 22 (citation omitted).

A claim alleging ineffectiveness of counsel requires some factual inquiry as "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and *fact*." *Strickland v. Washington*, 466 U.S. 668, 698 (1984) (emphasis added). Facts pertinent to such a claim can include whether counsel made "strategic choices . . . after thorough investigation of law and facts relevant to plausible options," which sometimes requires "inquiry into counsel's conversations with the defendant." *Id.* at 691. In short, *Strickland*—the standard governing Gardner's claims—makes clear that ineffective assistance claims are fact-based inquiries usually bottomed on counsel's explanation of his or her acts or omissions, at least as far as the performance inquiry is concerned. *See id.* And any time an explanation is given before a fact-finder credibility is unquestionably

23

relevant.  *Cf.* Fed. R. Evid. 607 ("Any party, including the party that called the witness, may attack the witness's credibility.").  It should be no surprise then that the state court made a determination regarding the credibility of Gardner's former attorneys.

Because *Strickland* requires some factfinding, and because such investigation often requires an explanation from counsel, credibility is undoubtedly an issue for the reviewing court.  *See, e.g., Burdick v. Quarterman*, 504 F.3d 545, 548 (5th Cir. 2007) (presuming as true a credibility finding in favor of an attorney's explanation in affidavit form).  Indeed, a court may find that counsel's explanation lacks credibility, *e.g., Richards v. Quarterman*, 578 F. Supp. 2d 849, 856 (N.D. Tex. 2008), *aff'd Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009), presumably something that Gardner would not complain about.  Ultimately, Gardner takes issue with the fact that the credibility choice did not go in his favor; this, however, does not make the credibility finding "irrelevant."  As such, Gardner's "objections" to the state court's credibility fact-findings carry no weight, and those findings should be considered by this Court in addressing the state court's decision.

### C.   Counsel did not labor under a conflict of interest when they provided an affidavit to the state habeas court.

Gardner again "objects" to any finding by the state habeas court that relied upon counsel's affidavit.  Pet. 22–23.  He does so because he believes that a finding of ineffectiveness creates a conflict of interest for any attorney who admits deficiency as they will be removed from the capital appointment list under Article 26.052 of the Texas Code of Criminal Procedure.  Pet. 23.

First, an attorney's admission of deficiency is not a legal finding of ineffectiveness.   An attorney's belief that they erred is a subjective determination; *Strickland*, however, requires that counsel's actions be reviewed under "an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688; *see Richter*, 131 S. Ct. at 790 ("*Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").  Accordingly, an attorney's admission of deficient representation does not require a finding of deficiency under *Strickland*, nor automatic removal from the capital appointment list.

Second, even if an attorney admits to having erred this does not mandate a finding of prejudice which is necessary for a determination of ineffectiveness.  *Strickland*, 466 U.S. at 692 ("[A]ny deficiencies in counsel's performance must be prejudicial in order to constitute ineffective assistance.").  Indeed, it is expected that an attorney, during the course of a

trial, will at some point err, but only those errors which substantially affect the outcome of trial implicate a constitutional violation. *Richter*, 131 S. Ct. at 791 ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."). Again, admitting an error does not require a finding of prejudice or removal from the capital appointment list.

Third, Article 26.052 does not permanently remove an attorney from the capital appointment list after a finding of ineffectiveness. An attorney may be appointed in a capital case despite a prior finding of ineffectiveness if "the local selection committee determines . . . that the conduct underlying the finding no longer accurately reflects the attorney's ability to provide effective representation." Tex. Code Crim. Proc. art. 26.052(d)(1)(C). Even if removal from the capital appointment list is incentive to fabricate strategy it is mitigated by the fact that removal is not permanent.

Fourth, it appears that Gardner's former counsel would have little to lose by a finding of ineffectiveness. Lead counsel had been practicing criminal law for thirty-five years and had participated in eight capital murder trials; second chair counsel had been practicing criminal law for six and one-half years and had not participated in any capital murder trials. 2 SHCR 337–38. To suggest that capital murder appointments are a boon to

counsel's business is a stretch, and it further strains credulity to believe that counsel would lie to maintain an already infrequent practice which is on the decline. *See generally* Press Release, Texas Defender Service, Executions and New Death Sentences Continue to Decline in Texas (Dec. 15, 2011), *available at* http://www.texasdefender.org/images/stories/Press/2011-year-end.pdf.

Fifth, and most importantly, Article 26.052 does not create a conflict of interest. Counsel's representation of Gardner ended when appellate counsel was appointed, 2 CR (219-81121-06) 632, so this is not a situation where counsel are actively representing opposing interests. Tex. Disciplinary R. Prof'l Conduct 1.06(b)(1). To the extent that counsel's own interests are impacted by potential removal from the capital appointment list, a conflict arises from such a scenario only when such personal interests "have [an] adverse effect on representation"—*active representation*. Tex. Disciplinary R. Prof'l Conduct 1.06(b)(2) & cmt. 5. Because counsel no longer represent Gardner or owe any duty to him, save for a duty of confidentiality which Gardner has waived by challenging counsel's representation, no conflict arises in this case. At best, Gardner identifies a potential motive to conceal error in order to gain continued appointments in capital cases, an "incentive" which may never materialize. This speculative source of income is unrelated to present representation—it ended long ago—or to the prior representation

27

of Gardner—a book deal negotiated between counsel and Gardner prior to trial, for example—and it is not a conflict of interest.

Gardner, in any event, made his allegation of a supposed conflict of interest (or motive to lie) to the state habeas court, 1 SHCR 79–80, and the court nonetheless found counsel to be credible, 2 SHCR 385 (Finding 16).   In other words, the state habeas court considered and rejected Gardner's challenge to counsel's credibility.   This discrete fact-finding is entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1), and Gardner has not proffered clear and convincing evidence—nothing but a weak argument, not evidence, of conflicted interests—to undermine it.   Accordingly, this Court should have no moment of pause in considering the explanations proffered by counsel to the state habeas court.

### D.   Gardner was not denied due process when the state court found juror affidavits to be inadmissible.

Gardner submitted affidavits of five jurors, 1 SHCR 95–107, in an attempt to expose the jury's deliberations and show the effect of the "new" evidence that counsel should have supposedly presented at trial, *see, e.g.*, 1 SHCR 29.   The state habeas court found, pursuant to Rule 606(b) of the Texas Rules of Evidence, that such affidavits were inadmissible and did "not consider them for any purpose."   2 SHCR 385 (Findings 8–10).   Gardner complains that the state court interpreted state law incorrectly, Pet. 24, and

28

that the state court relied on the juror affidavits despite explicitly saying otherwise, resulting in a judicial inconsistency and violating due process, Pet. 24. Gardner then requests that this Court consider the affidavits in reviewing the reasonableness of the state court's decision regardless of the state court's treatment of the juror affidavits. Pet. 24–26.

The state court interpreted state law in striking the juror affidavits, 2 SHCR 385 (Finding 9), and this Court may not disturb that finding because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011) ("A federal court lacks authority to rule that a state court incorrectly interpreted its own law. When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law."). Accordingly, Gardner's argument that the state court erred in its interpretation of state law is simply not cognizable in this proceeding.

Next, Gardner errs in his assertion that the state habeas court acted inconsistently by striking the juror affidavits on the one hand, while considering them on the other. Gardner suggests that Findings 53,[8] 58,[9] 59,[10]

---

[8] As discussed in the Court's findings on Ground One, the abandonment rage theory had numerous weaknesses and counsel did not believe it would

81[11] and 82,[12] show that the state habeas court considered the juror affidavits

after supposedly striking them.   Pet. 24.   Close inspection of these findings

---

be a successful defense based on their experience with local juries' distrust of "novel" defensive theories.  Counsel's reasons for not pursuing such a defense were reasonable.
2 SHCR 391 (Finding 53).

[9]   In the punishment phase, presentation of the abandonment rage theory would not have affected the jury's decision on future dangerousness.  Rather, it would have reinforced the jury's conclusion that Applicant was a future danger because it showed he was highly controlling and would be a danger in any future relationship where he did not feel in control.  *See* Applicant's Exhibit C.
2 SHCR 392 (Finding 58).

[10]   The abandonment rage theory would not have affected the jury's decision on mitigation because it was internally contradictory:
   a. Applicant claims he only hurt women who tried to leave him, but he shot Rhoda because she would not file for divorce.  *See* Applicant's Exhibit D.2 at 16.
   b. Applicant's violence against Margaret and Sandra was unconnected to any attempt to leave him.  *See* Applicant's Exhibits D.2, D.5 at 3.
   c. Applicant began being violent with Tammy shortly after they married, long before she attempted to leave him.  19 RR 190–95, 214, 231–33, 235, 254, 280, 285–86; 20 RR 152.
   d. Applicant's violence and sexual abuse against his stepchildren was unconnected to any abandonment.  22 RR 43, 69, 71–72, 77, 124–27.
   e. Applicant often had "anger episodes" where he was suddenly, irrationally angry.  *See* Applicant's Exhibits D.5 at 6; D.6 at 1; D.7 at 1.
2 SHCR 392 (Finding 59).

[11]   Other evidence developed by Applicant on habeas established that he was obsessed with sex, had sex with his friends' wives, frequented nightclubs where he had sex on stage, lived with a drag queen known as China Blue, and was a homosexual prostitute [].   See Applicant's Exhibit D.2.  As recognized by counsel, the jury would not likely have found this evidence mitigating.  *See* Affidavit of Counsel at 7.
2 SHCR 397 (Finding 81) (portion of finding rejected by the Court of Criminal Appeals omitted).

reveals that the juror affidavits were not considered or even cited by the state habeas court past the act of striking them.

Findings 53 and 81 mention that *counsel* did not think that Collin County jurors would be receptive to "novel" defensive theories or sexual behavior related to "alternate lifestyles" as mitigating evidence.  2 SHCR 391 (Finding 53), 397 (Finding 81).  Clearly, Findings 53 and 81 are based on *counsel's belief* of what hypothetical Collin County jurors would have been willing to accept in the context of preparing for trial.  It is apparent that in Findings 53 and 81 the state habeas court was considering *counsel's affidavit*, not the juror affidavits.

Findings 58, 59 and 82 are determinations that certain evidence— abandonment rage theory—"would not have affected the jury's decision."  2 SHCR 392 (Findings 58 & 59), 397–98 (Finding 82).  Such findings are, in truth, mixed law-fact conclusions finding no *Strickland* prejudice.  Again, these findings focus on "a decisionmaker . . . reasonably, conscientiously, and impartially," *Strickland*, 466 U.S. at 695, weighing the evidence presented at trial versus Gardner's state habeas evidence.  This type of analysis is what

---

[12] Applicant's overall evidence on habeas portrays him as frequently and unpredictably violent, sexually deviant, and willing to exaggerate mental problems for his own benefit, as well as someone who systematically alienated those who supported him.  Had additional evidence been presented at trial, it would not have persuaded the jury to conclude Applicant was not a future danger or that mitigating circumstances existed to grant a life sentence.
2 SHCR 397–98 (Finding 82).

*Strickland* demands, and there is nothing in such findings indicating that the state habeas court considered the juror affidavits.  Stated differently, the word "jury" simply does equate with "juror affidavits."  Accordingly, because the state habeas court did not strike the juror affidavits and then consider them there is no inconsistency to form the basis of Gardner's alleged due process violation.[13]

Despite the decision by the state court to strike the juror affidavits Gardner nonetheless asks this Court to consider them in finding the state court's decision unreasonable.  Pet. 24–26.  Because these affidavits are not part of the considered record—while part of the physical record they are not part of the state court's adjudicative record—this Court may not consider them in deciding the reasonableness of the state court's decision.  *Pinholster*, 131 S. Ct. at 1398–99.  Further, and independent of AEDPA, this Court may not consider the juror affidavits because Rule 606(b) of the Federal Rules of Evidence independently precludes consideration as well.  *See Adams v. Thaler*, 421 F. App'x 322, 328 n.2 (5th Cir. 2011) (finding that an affidavit

---

[13] To the extent that Gardner complains that the act of striking the juror affidavits violated his constitutional rights, as opposed to the inconsistent treatment of striking then considering the juror affidavits, case law is clearly against him. *See Tanner v. United States*, 483 U.S. 107, 116–27 (1987) (upholding Rule 606(b) of the Federal Rules of Evidence against a Sixth Amendment fair-jury claim); *Maldonado v. Mo. Pacific Ry. Co.*, 798 F.2d 764, 770 (5th Cir. 1986) (finding no due process violation through the application of Rule 606(b) of the Federal Rules of Evidence); *Salazar v. Dretke*, 419 F.3d 384, 399–405 (5th Cir. 2005) (rejecting claim that striking juror affidavit violated due process).

regarding how a juror "would have" reacted considering new evidence was not admissible).  Finally, this Court cannot consider the juror affidavits because *Strickland* requires an objective determination regarding prejudice; this is not achieved through "proof" of what actual jurors would have done given the "new" evidence.  *Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.").  In sum, the juror affidavits are either inadmissible or irrelevant for this Court's analysis of the state court decision.

Regardless, the reason Gardner requests consideration of the juror affidavits despite the state habeas court's decision to strike them is of little value.  Gardner claims that counsel's belief that abandonment rage theory was a novel defense unlikely to be considered by conservative Collin County jurors was wrong because the jurors, in their affidavits, said that they would have considered it.  Pet. 24–25.

First, each juror that Gardner points to couched their consideration language in vague terms.  For example, one juror stated that the evidence "*may* have affected my sentencing deliberations," 1 SHCR 103 (emphasis added), while another stated that the evidence "would have [been] seriously *considered*." 1 SHCR 104 (emphasis added).  None of the affidavits state with specificity that abandonment rage would have been considered, or that it

would have caused any of the jurors to change their mind.  Simply because the jurors would have considered abandonment rage had it been presented at trial—as any juror would have been required to do—does not transform the theory from "novel" to "scientifically accepted."  In other words, jurors must consider all of the evidence admitted before them, whether it is novel or well-researched.

Second, it is evident that counsel were not concerned with whether jurors would have just considered abandonment rage theory, but whether such a defense was an "effective" theory that the jury would have "respond[ed]" to.  2 SHCR 339.  Narrowing possible strategies to cater to the local population is a permissible consideration for an attorney.  *See Strickland*, 466 U.S. at 695 ("[a]lthough ['the idiosyncrasies of the particular decisionmaker'] may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry . . .").  Even if counsel were wrong about these particular jurors Gardner has not shown that counsel's perception of Collin County jurors as a whole was wrong.  Because the juror affidavits in no way undermine counsel's reasonable actions prior to trial it does not provide clear and convincing evidence undermining specific fact-findings by the state habeas court, show the unreasonableness of that court's decision, or provide a basis for an evidentiary hearing.

34

## II.    The State Court's Decision That Counsel Were Not Ineffective For Failing To Advance The Abandonment Rage Theory At The Guilt-Innocence Phase Of Trial Is Not Objectively Unreasonable (Claim One).

Gardner complains that counsel were ineffective for failing to present abandonment rage to negate the retaliation manner and means of capital murder.  Pet. 27, 34–55.  Under Gardner's theory he committed the murder because "of abandonment rage predicated on attachment disorder" and not because his soon-to-be ex-wife Tammy was going to be a witness in the divorce proceeding.  Pet. 40.  Boiled down, he argues that "he abused or killed his spouses, not because of their status as prospective witnesses who would testify against him . . . but because they were leaving him."  Pet. 42. Gardner's argument is entirely founded on a theory that counsel could have proved Garnder's subjective intent behind the killing through psychological evidence.  He does not show deficiency or prejudice, or that the state court's decision to deny relief on this point was contrary to or an unreasonable application of Supreme Court precedent.

The familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective assistance of counsel claims.   To prove ineffectiveness, an inmate must establish that counsel's actions were deficient and that such deficiency prejudiced the defense.  *Id*. at 687.  To establish deficient performance an inmate must show that "counsel's

representation fell below an objective standard of reasonableness." *Id*. at 688. A "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance applies.  *Id*. at 689. An inmate's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

Concerning prejudice an inmate must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693.  Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at  687.   In determining whether an inmate has shown prejudice, a reviewing court must "consider *all* the relevant evidence that the jury would have had before it if [the inmate] had pursued a different path— not just the . . . evidence [the inmate] could have presented, but also the . . . evidence that almost certainly would have come in with it."  *Wong v. Belmontes*, 130 S. Ct. 383, 386 (2009).

"Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010).  "Even under de novo review, the

standard for judging counsel's representation is a most deferential one." *Richter*, 131 S. Ct. at 789.   And, under AEDPA, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009).   As such, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult.   The standards created by *Strickland* and [AEDPA] are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788 (citations omitted).[14]

In preparing for trial counsel employed a variety of expert assistance: an investigator (Randi Ray), a mitigation specialist (Shelly Schade), a consulting mental health expert (Dr. Kristi Compton), a testifying mental health expert (Dr. Kate Allen), and a risk assessment expert (Dr. Gilda Kessner).[15] 1 SHCR 112, 204; 2 SHCR 338–39, 342, 345.   Despite this plethora of talent no investigator or expert raised the issue of abandonment

---

[14]  Gardner argues that AEDPA deference does not apply because the state habeas court did not provide him with a live hearing. Pet. 54–55. As the Director explained above, *see supra* Section I(A), the lack of a live hearing does not eliminate AEDPA deference, Gardner's case citations are inapposite, and the "paper hearing" that Gardner received was full and fair.

[15]  There is some discrepancy in the record regarding whether Dr. Kessner was retained to testify solely about risk assessment, or whether she was also retained to testify in terms of mitigation. *Compare* 1 SHCR 204, *with* 2 SHCR 338.   That issue was decided when the state habeas court found that Dr. Kessner was retained "regarding the future danger special issue." 2 SHCR 387 (Finding 23).

rage as possibly explaining Gardner's murderous actions.  2 SHCR 338.  As such, counsel did not consider the defensive theory in preparation for trial.  2 SHCR 338.

The state habeas court found that neither Dr. Kessner nor any of Gardner's other multiple experts informed counsel about abandonment rage. 2 SHCR 387 (Findings 23 & 24).  Accordingly, the state habeas court found that counsel were not deficient.  2 SHCH 387 (Finding 24).[16]  This is not a finding that applies Supreme Court precedent unreasonably.

Indeed, case law is consistent in that counsel is not deficient when, after retaining pertinent experts and providing them with the relevant

---

[16]  Gardner attempts to undermine the reasonableness of this finding because counsel's mitigation investigation was not adequate, Pet. 34–37, a claim fully addressed later.  *See infra* Section IV.  First, the American Bar Association guideline that Gardner relies upon to support the interrelatedness between a mitigation investigation and preparation for the guilt-innocence phase, Pet. 35–36, was adopted well after Gardner's trial and, therefore, cannot support the deficiency prong of *Strickland*.  *See Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009) (per curiam) ("Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines . . . was error.").  Second, Dr. Kessner's supposed complaint to counsel that the mitigation investigation was lacking—arguably presented to show that counsel was on notice to delve deeper into Gardner's history—is non-specific, Pet. 35, and it does not explain how the additional witnesses discovered during the state habeas proceeding were critical to the diagnosis of abandonment rage.  Stated another way, Gardner has not made clear what evidence was needed but not found at the time of trial of such critical importance that the diagnosis of abandonment rage was missed by Gardner's multiple mental health experts.  Lastly, the fact that the Court of Criminal Appeals did not adopt a finding of fact recommended by the state habeas trial court does not mean that the opposite is true, and Gardner certainly has pointed to no precedent establishing his converse argument.  *See infra* Section IV. In fact, the rejected finding relied upon by Gardner relates to another claim.  Pet. 35 (citing Finding 67).  At bottom, none of these arguments does anything to diminish the reasonableness of the state court's decision.

background material, such experts do not discover the underlying mental health issue that should have supposedly been presented at trial. *See Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) ("Trial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating trial strategy."); *McClain v. Hall*, 552 F.3d 1245, 1252 (11th Cir. 2008) ("McClain's counsel reasonably relied on Dr. Maish's opinion that McClain suffered from 'Antisocial Personality Disorder' but did not suffer from a frontal lobe disorder or from any 'significant emotional disorder.'"); *Sims v. Brown*, 425 F.3d 560, 585–86 (9th Cir. 2005) ("[A]ttorneys are entitled to rely on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information from an expert would defeat the whole aim of having experts participate in the investigation."); *Dowthitt v. Johnson*, 230 F.3d 733, 747–48 (5th Cir. 2000) (counsel may rely upon their retained experts and need "not canvass[] the field to find a more favorable defense expert"); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense."). The fact that none of Gardner's experts identified abandonment rage as a possible defense before trial ends the matter at performance, and the state court's decision is reasonable on this point.

But, counsel stated that even if they had known about abandonment rage, they would not have presented the defense at Gardner's trial during the guilt-innocence phase.  2 SHCR 339.  First, they believed that raising an abandonment rage defense at the guilt-innocence phase would have opened the door to a host of bad acts committed by Gardner and, second, they did not believe that Collin County jurors would have "respond[ed] to [this] 'novel' defensive theor[y]."[17]  2 SHCR 339.  The state habeas court accepted these explanations, 2 SHCR 387 (Findings 22 & 25), and further found that, as a matter of state law, Gardner's "prior history of violence" would have been admissible at the guilt-innocence phase if abandonment rage had been offered as a defense, and that such evidence would have been "highly prejudicial."  2 SHCR 387 (Findings 26 & 27).  Accordingly, the state habeas court found that "[c]ounsel's decision to pursue a fact-based rather than psychological defense and limit the State's rebuttal evidence was a reasoned strategic choice."  2 SHCR 387 (Finding 28).  The state court's alternative holding on deficiency is patently reasonable.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466

---

[17] Gardner asks this Court to consider the juror affidavits in an attempt to prove that counsel were wrong for considering abandonment rage as a novel theory. Pet. 52.  As explained above, *see supra* Section I(D), the state court permissibly struck the juror affidavits, this Court may not consider them for a variety of reasons, and the juror affidavits do not prove the point that Gardner is trying to make.

U.S. at 690.   Presenting or withholding certain evidence is clearly within counsel's reasoned, strategic discretion.  *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 185–86 (1986) (counsel reasonably withheld most of the defendant's available mitigation evidence).   Counsel may reasonably consider the atmosphere of the convicting county's population in formulating a strategy, *see, e.g., Strickland*, 466 U.S. at 695 ("[a]lthough ['the idiosyncrasies of the particular decisionmaker'] may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry . . ."), and counsel may reasonably choose to avoid certain avenues of evidence in an attempt to limit the State's rebuttal, *see, e.g., id*. at 699 ("Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history . . . would not come in.").   That is what counsel explained in this case—they would not have presented a "novel" psychological defense in a historically conservative county, and they would not have allowed the State to introduce punishment evidence at the guilt-innocence phase of trial.[18]  2 SHCR 339.   There is nothing unreasonable about the state court's decision on this matter.

---

[18]   Gardner faults counsel's explanation that they would not have used abandonment rage theory at the guilt-innocence phase because "[t]he extra offenses concerning domestic abuse and violence were going to come into evidence regardless."   Pet. 51.   This ignores *when* such evidence becomes admissible and

Moreover, the state habeas court noted that neither Dr. Kessner nor Garnder's state habeas mitigation specialist, Toni Knox, believed that abandonment rage theory was applicable to the guilt-innocence phase, 2 SHCR 388 (Findings 30 & 31), and that, even if it had been presented, it would have provided only "psychological context" but not a legal justification for Tammy's murder, 2 SHCR 388 (Finding 32). As such, the state habeas court found that it was reasonable for counsel not to have advanced a legally inapplicable defense. 2 SHCR 38 (Finding 33).

The state habeas court additionally found that abandonment rage was not a good fit, factually, for Gardner. The court noted that Gardner had a "history of random violence unconnected to any abandonment," 2 SHCR 388 (Finding 34),[19] and that the State's evidence showed that abandonment was not the impetus behind Tammy's murder; rather, it was the divorce

---

relevant—at the guilt-innocence versus punishment phase of trial—and that counsel's effectiveness is not judged by a "nothing to lose" standard. *Mirzayance*, 556 U.S. at 122 ("This Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating *Strickland* claims."). Clearly, the reason why extraneous offenses are inadmissible at the guilt-innocence phase is to prevent a jury from finding a defendant guilty simply because of his poor character in other instances. *Cf.* Tex. R. Evid. 608(b). Counsel are not ineffective in insuring that Gardner's guilt was determined solely on relevant, non-character, and admissible evidence.

[19] For example, Gardner shot Rhoda because she would not divorce him and called him a "faggot"; Gardner had "anger episodes" for no apparent reason; and Gardner became violent with Westmoreland and Becky soon after they married. 2 SHCR 388 (Finding 34).

proceeding in which Tammy was a prospective witness, 2 SHCR 389 (Finding 35).[20]    Consequently, the state habeas court found that counsel were not unreasonable for declining to proffer a defense which was not well-supported by the evidence.  2 SHCR 389 (Finding 36).

The state habeas court also noted that while abandonment rage theory may be applicable to the retaliation manner and means, it had no bearing on the burglary manner and means.  2 SHCR 389 (Finding 37).  Stated another way, regardless of whether Gardner killed because of Tammy's abandonment or prospective status as a witness, he still did not have effective consent to enter Tammy's home on the evening of her death—burglary.  Because abandonment rage did not have any effect on the burglary manner and means the state habeas court found that counsel were not unreasonable in failing to have advanced a defensive theory that did not address all alternative means of proving capital murder.  2 SHCR 389 (Finding 38).

These three further findings of non-deficiency—failing to advance a legally inapplicable defensive theory, failing to advance an unsupported defensive theory, and failing to advance a less than comprehensive defensive theory—are all reasonable findings by the state habeas court.  *See*

---

[20]    Indeed, Gardner did not react in anger when Tammy informed Gardner that she was seeking a divorce and that he had to move out of their house; Tammy only became upset and fearful after she filed for divorce; Tammy predicted that the divorce would never occur because Gardner would kill her; and Gardner repeatedly asked whether Tammy was "going through with the divorce or not?"  2 SHCR 389 (Finding 35).

*Mirzayance*, 556 U.S. at 127 ("The law does not require counsel to raise every available nonfrivolous defense. . . . Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether."); *Haines v. Risley*, 412 F.3d 285, 289 (1st Cir. 2005) ("to couple a weak argument with a stronger one may detract from the latter").

In any event, the state habeas court found that Gardner was not prejudiced by the failure to raise abandonment rage during the guilt-innocence phase. 2 SHCR 390 (Findings 41 & 42). This finding is directly intertwined with some of the findings above—that abandonment rage did not legally negate retaliation, 2 SHCR 388 (Finding 32); that abandonment rage did not fit well with Gardner's "history of random violence unconnected to any abandonment," 2 SHCR 388 (Finding 34); that the State's evidence "showed that the impending divorce was the impetus for Tammy's murder," not abandonment, 2 SHCR 389 (Finding 35); and that abandonment rage did not negate the burglary manner and means, 2 SHCR 389 (Finding 37). These findings are well-supported and clearly reasonable determinations by the state habeas court.

As pertinent to this case retaliation occurs when a person "intentionally or knowingly harms or threatens to harm another by an unlawful act . . . in retaliation for or on account of the service or status of another as a . . .

44

prospective witness."[21]  Tex. Penal Code § 36.06(a)(1)(A); *accord* 1 CR (219-81121-06) 6 (final re-indictment).  Here, Gardner clearly intended to or knowingly harmed Tammy by an unlawful act—he shot her in the head with a .44 magnum pistol.  Gardner does not take issue with that element of retaliation.  Gardner does, however, challenge the *reason* for harming Tammy—he now claims that he shot her because she abandoned him, while the State alleged that Gardner killed Tammy because she was divorcing him, an act which necessarily included Tammy's participation as a witness against Gardner in order to finalize the divorce.

The State proved that Tammy had filed for divorce, SX 39, and that she had to testify under oath in order to complete the divorce, 20 RR 99–100.  The State also proffered evidence that it was not the termination of the relationship that angered Gardner but the act of divorce itself.  For example, Gardner was not upset or angry when Tammy ended the relationship, 19 RR 266, but he became agitated and made Tammy fearful only *after* she filed the divorce petition, 19 RR 206.  To this, Gardner seems to argue that he could

---

[21]  Gardner cites *Giles v. California*, 554 U.S. 353 (2008), in an attempt to show that the State's evidence did not support retaliation.  Pet. 41.  *Giles* addressed whether "the theory of forfeiture by wrongdoing . . . is a founding-era exception to the confrontation right."  *Giles*, 554 U.S. at 358.  *Giles* simply has no application in this case as to either the limits of a state's authority to define a particular offense, or whether there was sufficient evidence introduced to prove such offense.  To the extent that Gardner cites *Giles* in an attempt to show that Texas has violated the Constitution through its definition of retaliation he has failed to raise such a claim in state court, and it is therefore unexhausted.

have committed retaliation only if he intended to prevent Tammy from testifying, Pet. 41, but he is wrong under Texas law as one may commit retaliation "on account of *the service or status* of another as a . . . prospective witness." Tex. Penal Code 36.06(a)(1)(A) (emphasis added). Retaliation can occur even where it is not the defendant's primary objective to stop the witness from testifying. The State proved that Tammy's status as a prospective witness was part and parcel of the divorce, and provided sufficient evidence for the jury to believe that the divorce was the impetus of the killing, not abandonment. Given the evidence at trial it is unlikely that the jury would have been swayed by abandonment rage as the impetus for the killing instead of Tammy's status as a prospective witness.

Moreover, the evidence proffered by Gardner during the state habeas hearing indicated that Gardner was prone to violence for reasons other than abandonment. For example, he killed Rhoda because she would not divorce him, 1 SHCR 159, he had random "anger episodes," 1 SHCR 195, and was violent with Westmoreland, 1 SHCR 191. Gardner's own evidence indicates that he was violent because a former wife *would not* leave him, and was violent in situations not connected to real or perceived abandonment. Given that Gardner's own evidence is inconsistent with abandonment rage theory it is improbable that the jury would have accepted such explanation.

46

Finally, abandonment rage theory does not negate the burglary manner and means.  A person commits burglary "if, without the effective consent of the owner, the person . . . enters a building or habitation and commits or attempts to commit a felony, theft, or an assault."  Tex. Penal Code § 30.02(a)(3); *accord* 1 CR (219-81121-06) 6 (final re-indictment).  There is no doubt that Gardner entered Tammy's home with the intent to murder her— he borrowed his brother-in-law's pickup truck under false pretenses, stole a .44 magnum pistol, and drove straight to Tammy's house from Mississippi with both; this was not an attempt at a happy reunion.

Further, the Court of Criminal Appeals observed that there was "ample circumstantial evidence that Tammy did not consent to [Gardner's] middle-of-the-night entry."  *Gardner*, 306 S.W.3d at 287.  The following evidence supported the theory that Gardner did not have effective consent to enter Tammy's home:

- Jacquie West, Candace Akins, and Tammy's daughter, Jessie, all testified that Tammy was terrified of [Gardner] and believed that he would kill her.

- Tammy had repeatedly told them that she would never get out of her marriage to [Gardner] alive, that he would kill her first.

- Jessie testified that, on the afternoon of Tammy's death, [Gardner] kept sending her text messages, asking about whether she planned to go through with the divorce, and, when Tammy did not respond to those messages, his messages became shorter and bigger until they culminated with

47

repeated texts: "YES OR NO?" Tammy was frantic as she drove down the road with Jessie.

- Immediately before her murder, Tammy had spent three hours visiting with the vice-president of her company seeking his assistance to help her "disappear" so that no one could track her down.

- [Gardner] had kept a second set of keys to Tammy's house when he left at Christmas after giving one set to Tammy's son, John.

- The physical condition of the bedroom leads to a reasonable inference that Tammy was surprised by the intruder and shot as she was sitting up in bed, propped up by pillows.

*Gardner*, 306 S.W.3d at 287.  The Court of Criminal Appeals summarized the inferences that could have been reasonably drawn by the jury given the evidence before them:

> The jury could infer from this evidence that Tammy would not, and did not, give [Gardner] consent to enter her home after 11 p.m. on January 23, 2005. Viewing the totality of the evidence, the jury could reasonably infer that [Gardner] drove to Tammy's isolated rural home, used his extra key to open the front door, walked down to the bedroom to confront Tammy sitting up in bed, shot her through the right temple, took the house keys from her purse hanging on the bedpost, locked the front door as he left, put Tammy's keys into the tool box in Tammy's truck, stopped at a ditch two to three miles down the road (perhaps to throw his extra set of keys into the ditch), and then drove back to Mississippi. Tammy, meanwhile, was still conscious enough to put on her red robe, which was hanging on the bedpost, look outside to see [Gardner] departing in the white Ford truck with Mississippi plates, and then call 911 to summon an ambulance.

*Id.* at 287–88 (footnote omitted).  Although Gardner states that abandonment rage theory somehow negates the burglary manner and means, Pet. 50

48

("[e]vidence of abandonment rage in guilt/innocence would have refuted burglary"), he does not follow up this conclusory statement with briefing.

In any event, it is clear that abandonment rage theory does not undermine the burglary manner and means. Indeed, even if Gardner was uncontrollably furious at his failed relationship—this rage, in fact, is the reason why Tammy would not let Gardner into the home after they separated and further supports a lack of effective consent—he still did not have effective consent to enter Tammy's home and then shoot her while she lay in bed. Those facts are enough to prove capital murder in this case, and entirely uninfluenced by Gardner's abandonment rage defense. Accordingly, there is no reasonable probability of a different result at the guilt-innocence phase of trial had abandonment rage been advanced as a defense, and the state habeas court's decision to deny relief on this point is not objectively unreasonable.

## III. The State Court's Decision That Counsel Were Not Ineffective For Failing To Advance A Consistent and Effective Theory Throughout Both Phases of Trial Was Reasonable (Claim Two).

Gardner faults counsel for advancing a defense that was not consistent between the guilt-innocence and punishment phases of trial, and which was ultimately a losing strategy. Pet. 63–87. Essentially, Gardner bemoans counsel's performance because they did not advance abandonment rage in both phases of trial, a defensive theory that he believes is consistent and

winning.   Pet. 68–71.   And because counsel did not adopt this defensive theory Gardner claims that prejudice is either presumed, Pet. 72, or is present based on the facts in this case, Pet. 72–87.   Gardner, however, cannot show deficiency or prejudice, as it is not presumed, and does not show that the state court's decision was contrary to Supreme Court precedent or an unreasonable application thereof.[22]

Counsel explained, in their affidavit to the state habeas court, that they adopted two strategies—one for the guilt-innocence phase and one for the punishment phase.   2 SHCR 339.   Counsel averred that, in the guilt-innocence phase, they attempted to negate the two manner and means of capital murder—burglary and retaliation.   2 SHCR 339–40.   As to burglary, counsel focused on showing that there was no forced entry into Tammy's home, namely, "that [Gardner] entered the residence by invitation and nothing else."   2 SHCR 340.   As to retaliation, counsel pointed out that Gardner had not contested the divorce, and that the divorce could have been completed without Gardner's participation, specifically, "if [Gardner] did commit this act it was not in retaliation for the pending divorce."   2 SHCR 340.

---

[22] Gardner reasserts that the state court decision is not entitled to AEDPA deference because there was no live evidentiary hearing.   Pet. 86–87.   As explained beforehand, *see supra* Section I(A), AEDPA deference still applies despite no live hearing, Gardner's cases on this point are inapplicable, and the hearing by affidavit was full and fair.

In the punishment phase counsel had a two-pronged strategy—first, counsel attempted "to humanize" Gardner and, second, counsel focused on the State's burden of proving future dangerousness in prison beyond a reasonable doubt.  2 SHCR 340–41.  As to the first prong counsel explained that the mitigation specialist "discovered little or nothing that was deemed useful for trial," that Gardner's father chose not to attend Gardner's trial, and that Gardner's mother was too "emotionally unstable" to testify.  2 SHCR 340–41.

As to the second prong counsel relied on the fact that the State, during voir dire, emphasized that they had the burden on proving future dangerousness beyond a reasonable doubt, and "that future dangerousness could be measured in terms of the society that existed in prison."  2 SHCR 341.  Counsel noted that the State, at trial, put on no evidence concerning Gardner's likelihood of future danger while incarcerated, and that, had they presented evidence showing that Gardner had a low likelihood of future violence in prison, "the State would call at least one expert to rebut our testimony giving the jury an out."  2 SHCR 341.  Recognizing that the State did not present evidence concerning Gardner's future dangerousness in prison, counsel consulted with John Niland[23] of the Texas Defender Service

---

[23] "John Niland" is currently listed as the "Trial Project Director" for the Texas Defender Service.  Tex. Defender Serv., Staff, http://www.texasdefender.org/staff/ (last visited June 14, 2012).  Mr. Niland's capital litigation history appears impeccable to the degree that a yearly award is named after him for contributions to

and Bill Schultz, a local attorney, regarding the decision to rest without presenting evidence of Gardner's low probability of violence in prison, "and both agreed that it seemed sound." 2 SHCR 341–42.

Predicated on these explanations the state habeas court found that counsel purposefully chose different strategies during both phases of trial, 2 SHCR 390 (Finding 45), where counsel focused on negating the manner and means of capital murder at guilt-innocence, 2 SHCR 390 (Finding 46), and, at punishment, humanized Gardner and relied on the State's burden to prove future dangerousness beyond a reasonable doubt, 2 SHCR 390 (Finding 48).[24] The court determined that both tacks were reasoned strategies, 2 SHCR 390 (Findings 47 & 49), and that, although different, were not inconsistent with each other, 2 SHCR 390–91 (Finding 50). While acknowledging that counsel should seek a single theory of a case the court found that, in this case, it was reasonable to have multiple theories. 2 SHCR 391 (Findings 52, 53 & 54).

The state habeas court also found that prejudice was not presumed because counsel "subjected the prosecution's evidence to meaningful

capital defense. *Id.* And Mr. Niland was available to counsel as several references are made to him during voir dire. *See, e.g.,* 6 RR 43–50 (Mr. Niland arguing on Gardner's behalf).

[24] Gardner repeatedly attacks these findings based on attorney guidelines that were adopted after trial regarding the interconnectedness of guilt-innocence and punishment preparation. Pet. 58 n.11, 60, 85. As explained earlier, *see supra* Note 16, guidelines enacted after the challenged conduct occurred cannot be used to assess counsel's effectiveness.

adversarial testing," 2 SHCR 391 (Findings 55 & 56), and that presentation of abandonment rage would not have affected the jury's decision on guilt or innocence, 2 SHCR 392 (Finding 57), or punishment, 2 SHCR 392 (Findings 58, 59, 60 & 61).  This is largely because abandonment rage did not legally excuse the killings, 2 SHCR 388 (Findings 32, 35 & 37), is not supported or is inconsistent with the evidence proffered by Gardner, 2 SHCR 388 (Finding 34), 392 (Finding 59), and would have been double-edged, 2 SHCR 392 (Findings 58 & 60).  The decision of the state court is objectively reasonable.

At the outset, counsel did not present abandonment rage as a "consistent" defense throughout trial because their myriad of retained investigators and experts did not inform them of such a defense.  2 SHCR 387 (Findings 23 & 24).  Federal law is in accord with the state court's decision that counsel are not deficient in failing to present a psychological defense if their experts do not raise the issue.  *See Couch*, 632 F.3d at 246; *McClain*, 552 F.3d at 1252; *Sims*, 425 F.3d at 585–86; *Dowthitt*, 230 F.3d at 747–48; *Hendricks*, 70 F.3d at 1038.  Accordingly, the state court's decision was reasonable on grounds of non-deficient performance alone.

Irrespective of the lack of notice concerning abandonment rage as a defense, counsel had a strategy for the guilt-innocence phase that was reasonable—they focused on negating the burglary and retaliation manner and means.  2 SHCR 340.  This was a difficult case in that Gardner

undoubtedly killed Tammy—Tammy, while dying from a gunshot wound was able to tell an emergency dispatcher that Gardner had shot her, and she was able to accurately identify the vehicle he was driving, which was corroborated by Gardner's sister, brother-in-law, credit card statements, fingerprints, and microscopic fiber analysis.   In light of the overwhelming evidence that Gardner killed Tammy, a reasonable attorney could have decided that the most prudent defensive course would be to limit Gardner's exposure to a death sentence by holding the State to its burden of proving the manner and means which enhanced the crime to capital murder.[25]  *See Richter*, 131 S. Ct. at 790 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates.").  While Gardner suggests that counsel should have presented a different defense—abandonment rage—mere disagreement with counsel's chosen path does not show deficiency.  *See Strickland*, 466 U.S. at 689 ("Even the best criminal defense attorneys would

---

[25]  Gardner's abandonment rage theory is an attempt to negate the retaliation manner and means too, lowering Gardner's criminal exposure to the non-capital offense of murder.  Pet. 58 ("[T]he defense could have shown that the killing of Tammy Gardner was the result of abandonment rage and trauma which[,] at best, was a non-capital offense resulting in a term of years, instead of a sentence of death.").   This exposes the fundamental flaw in Gardner's allegation of ineffectiveness—he argues that counsel's path in negating the manner and means of capital murder was wrong but only because they did not pursue his specific, desired plan.  Stated another way, Gardner agrees that the only defense in this case was to seek the lesser included offense of murder, *see* Pet. 58, he just would have preferred a different course to achieve such goal.   Simple disagreement with counsel's strategy—and in this case it is not total disagreement—does not prove deficiency.

not defend a particular client in the same way."). The state court's decision is objectively reasonable on this point.

And counsel had a strategy for punishment too—they tried to humanize Gardner by calling co-workers—one who was also a lay minister—and Gardner's sister who also testified about physical and emotional abuse inflicted by Gardner's parents, and pleaded for Gardner's life.   Counsel additionally hired investigators and experts to conduct a mitigation investigation but "had discovered little or nothing that was deemed useful."[26] 2 SHCR 340–41.  And it was not for want of trying.  Counsel explained before closing arguments at the punishment phase commenced:

> We did check Mr. Gardner's prior childhood accidents and injuries on our mitigation [investigation].  There didn't seem to be anything other than what Elaine Holifield [Gardner's sister] testified to.  There was no serious illnesses at any time.  There was physical abuse to [Gardner] and Elaine.  We have testimony to that.  There was no sexual abuse of any type.

---

[26] In the next two claims Gardner asserts that the mitigation investigation was deficient.  Pet. 88–128.  It, for reasons fully explained later, was not.  *See infra* Section IV.  Indeed, the only additional evidence produced during the state habeas proceeding comes from Gardner's former brother-, sister- and nephew-in-law, a former military acquaintance, and former church member, all of whom, except the church member, have poor things to say about Gardner.  *See, e.g.,* 1 SHCR 190 (Gardner stole brother-in-law's gun and shot his then-current wife Rhoda), 191 (Gardner treated his wife Margaret like "property"), 195 (Gardner had "anger episodes"), 198 (Gardner threatened to kill a teenager), 213 (Gardner had sex with married women).   And the church member's recollection would have merely corroborated a single instance where Gardner was, most likely, physically disciplined by his father at a church.  The mitigation investigation, as explained below, *see infra* Section IV, was thorough and even if it was not, there is no reasonable probability of a different result.

The—the immediate family was checked as to the size of the immediate family, which was four—plus grandchildren. We checked with—as far as the relationship and attitudes toward the member that was drug—we checked whether or not there was drug or alcohol abuse by Mr. Gardner or any members of the family. There was no[t]—we checked whether there was any mental health treatment that would aid in mitigation in this case and—and also to the cohesiveness of the family. We've done that through all our experts. The family standard of living and living conditions.

There were no available school records for Mr. Gardner. They were all too old and could not be captured. We checked as far as the social relationships with members of, basically, the opposite sex, marriage, divorces, et cetera; and that's all come into evidence. And any—all awards or honors or special accomplishments. That can be shown by his Army records. And any and all traumatic experiences, anything at all, especially proud moments. Memberships in relig—religious, social, educational and charitable organizations. And as far as his best and worst side memories.

Those are all items that our experts and myself have checked and determined what to put on in this case.

23 RR 77–78. It appears, in fact, that Gardner did not even want a mitigation case presented as little as three days before the punishment phase of trial began. *See* 23 RR 76 ("It was our understanding at that point the defense team had consulted with their client and that he was of the opinion that he did not want to put on a mitigation case."). It also appears that counsel would have liked to have put on Gardner's father and mother but they were not available due to their own choosing. 2 SHCR 341; *see* 23 RR 54 (Gardner's sister testified that she would not let Gardner's parents attend

trial).   Counsel cannot present what does not exist and the state court's decision on this point is objectively reasonable.   *See Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009) ("We must be particularly wary of arguments that essentially come down to a matter of degrees.   Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing." (quoting *Dowthitt*, 230 F.3d at 743)).

Further, counsel made a strategic decision to rest their punishment case without presenting a risk assessment expert as the State, in voir dire, had assumed the burden of proving future dangerousness beyond a reasonable doubt, including future danger within a prison society, but put on no evidence regarding Gardner's probability of violence while incarcerated.  2 SHCR 341–42; *see, e.g.*, 6 RR 14–17 (State accepting burden of proving future dangerousness including in "prison society").   Indeed, counsel informed the trial court that they purposefully chose to omit calling a risk assessment expert as a matter of strategy, and that Gardner concurred in their judgment. 23 RR 74–75.   And, had counsel attempted to put on risk assessment evidence, the State was prepared to put on their own expert in rebuttal.  2 SHCR 341.   In fact, the State called A.P. Merillat, a well-known TDCJ

expert,[27] to rebut the implication that Gardner was a good prisoner as counsel tried to demonstrate by introducing Gardner's jail records.   23 RR 61–64.   In order to prevent Merillat's testimony counsel withdrew the jail records as an exhibit.   23 RR 64–65.   If the mere implication that Gardner was well-behaved in prison was enough to trigger the State's rebuttal, an expert's risk assessment testimony would have surely sparked further action by the State; at bottom, this was no idle threat.   Counsel may reasonably formulate a strategy based on holding the State to its burden of proof, *see Richter*, 131 S. Ct. at 790, and counsel may also reasonably withhold evidence it suspects will evoke a strong response from the State, *see Strickland*, 466 U.S. at 699.   Accordingly, the state court's decision to deny relief on this point was reasonable.

Nor was the state court's finding that counsel was not deficient for failing to advance a single theory throughout trial an unreasonable determination of Supreme Court precedent.   It is hard to imagine, in fact, that any attorney would have advanced abandonment rage simply because it would have been "consistent" throughout both phases of Gardner's trial.   Such an attorney would have: (1) conceded that Gardner killed Tammy as a

---

[27] "A.P. Merillat" has testified in numerous capital murder prosecutions on behalf of the State.   *See, e.g., Devoe v. State*, 354 S.W.3d 457, 475 (Tex. Crim. App. 2011); *Gobert v. State*, No. AP-76345, 2011 WL 5881601, at *5 (Tex. Crim. App. Nov. 23, 2011); *Sparks v. State*, No. AP-76099, 2010 WL 4132769, at *22 (Tex. Crim. App. Oct. 20, 2010).

predicate to advancing the defense; (2) hoped that abandonment rage negated the retaliation manner and means despite considerable contrary evidence that the divorce, and not the split, triggered the killing; (3) conceded the burglary manner and means because abandonment rage strengthens the notion that Gardner entered Tammy's home with the intent to kill her, and without her effective consent; (4) hoped that the jury viewed abandonment rage as mitigating evidence although it proves that Gardner will be perpetually ill-tempered and destructive; and (5) conceded future danger as the condition only makes Gardner more likely to explode in a violent rage.[28] While certain guidelines may suggest that a consistent defensive theory is a best practice, Pet. 64, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions" they may make, *Strickland*, 466 U.S. at 688–89.   In this case and on these facts an attorney is hardly deficient for avoiding the pitfalls attached to abandonment rage

---

[28] Gardner again argues that this Court should consider the juror affidavits that the state habeas court struck as inadmissible. Pet. 61–63, 83–84. As explained above, *see supra* Section I(D), the state court's action was permissible, this Court may not consider the juror affidavits for myriad reasons, and the juror affidavits do not support the contention that Gardner suggests.

merely to achieve "consistency."[29]  As such, the state habeas court did not act

unreasonably on this issue.

Regardless of counsel's performance, the state court's decision on

prejudice is wholly reasonable.  First, it was reasonable for the state court to

reject presumed prejudice as this case is not like those where counsel failed to

challenge any aspect of the State's case.  Prejudice is presumed,

> in only a very narrow spectrum of cases where the circumstances
> leading to counsel's ineffectiveness are so egregious that the
> defendant was in effect denied any meaningful assistance at all.
> The Supreme Court recently has emphasized that for [*United
> States v.*] *Cronic*[, 466 U.S. 648 (1984)] to apply, the attorneys
> failure must be *complete*.  For purposes of distinguishing between
> the rule of *Strickland* and that of *Cronic*, the Court held that a
> case does not come under *Cronic* merely because counsel failed to
> oppose the prosecution . . . at specific points in the trial.  It is not
> enough for the defendant to show mere shoddy representation or
> to prove the existence of errors, omissions, or strategic blunders

---

[29] It is also a stretch to consider counsel's chosen strategies as "inconsistent."  If Gardner suggests that any capital defendant who challenges the State's evidence at the guilt-innocence phase but then asks for mercy or provides mitigating evidence at the punishment phase is inconsistent, then almost all capital murder defendants have been exposed to an "inconsistent" defense.  As the state habeas court noted it is not inconsistent to hold the State to its burden of proof at guilt-innocence and then seek mercy and provide explanation at punishment.  2 SHCR 390–91 (Finding 50).  Gardner's requirement of consistency seems to imply that capital murder defendants should either plead guilty or, in the alternative, raise a mental health defense at guilt-innocence so that the punishment case accords with the guilt-innocence theory that the *defendant killed the victim*, although compelled by mental health issues.  This is obviously problematic unless one assumes that all capital murder defendants are guilty or have mental health issues negating specific intent, and it "interfere[s] with the constitutionally protected independence of counsel and restrict[s] the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689.  Counsel's effectiveness is not predicated on subscribing to the belief that only two types of defenses are permissible in a capital murder case.

> by counsel.   [B]ad lawyering, regardless of how bad, does not
> support the per se presumption of prejudice.

*Johnson v. Cockrell*, 301 F.3d 234, 239 (5th Cir. 2002) (footnotes omitted) (citations omitted) (internal quotation marks omitted).   An alleged insufficient investigation leading to a bad strategic choice—Gardner's present claim—is not a *Cronic*-type situation and the state court's refusal to apply per se prejudice was not unreasonable.

Second, as to guilt-innocence, presentation of abandonment rage would not have affected the jury's decision.  As explained above, the presentation of abandonment rage would not have altered the outcome of trial concerning Gardner's guilt.  *See supra* Section II.  In sum, the evidence at trial showed that the divorce triggered Gardner's murderous behavior, not the dissolution of his relationship with Tammy; Gardner's own state habeas evidence contradicted the argument that his uncontrollable rage emanates from abandonment; and abandonment rage theory does nothing to detract from the burglary manner and means but, rather, it strengthens the State's case on that point.  *See supra* Section II.  As also explained above, the decision of the state court is entirely reasonable on this matter.  *See supra* Section II.

Further, there is no reasonable probability that the jury's decision would have been different as to punishment.  Abandonment rage is not well-supported by Gardner's state habeas evidence or the evidence at trial:

Gardner killed his former wife Rhoda because she would not leave him—the opposite of abandonment, 1 SHCR 159; Gardner became violent with Westmoreland shortly after they married, 1 SHCR 191; Gardner became violent with Tammy soon after their marriage, 19 RR 190–95, 214, 231–33, 235, 254, 280, 285–86; 20 RR 152; Gardner was violent with his stepchildren—individuals he was not in consensual romantic relationships with, 22 RR 43, 69, 71–72, 77, 124–27; and Gardner had "anger episodes" untethered to abandonment, 1 SHCR 195.  The jury would have likely not given much thought to a defensive theory so tenuously supported, or outright contradicted, by the evidence.

Moreover, abandonment rage—or, really, any defense with the word "rage" in it—simply reinforces that Gardner is a future danger, and it lessens his mitigation as it shows a violent nature.  The failure to present a mental health issue, especially one so poorly supported by the evidence, does not amount to prejudice as it does more harm than good.  *See, e.g., Dowthitt*, 230 F.3d at 745 ("[T]rial counsel's actions in not discovering and presenting the records to the jury to bring out indications of mental illness do not create a 'probability sufficient to undermine confidence in the outcome.'" (quoting *Strickland*, 466 U.S. at 694)); *cf. Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (mental health issues can support a future dangerousness case more than provide a case of mitigation).  Accordingly, the state habeas court's denial of

relief on prejudice does not amount to an unreasonable application of Supreme Court precedent.

## IV. The State Court's Decision That Counsel Were Not Ineffective For Failing To Develop And Present Mitigating Evidence Was Not Unreasonable (Claims Three And Four).

In two grounds for relief[30] Gardner claims that counsel were ineffective because they did not perform an adequate mitigation investigation—ground three—and then present the mitigating evidence that should have been discovered—ground four—at the punishment phase of trial.  Pet. 88–128.[31] Gardner asserts that the investigation was inept, Pet. 105, that the information gathered by counsel was not appropriately arranged, Pet. 105, and that these deficiencies infected all of counsel's strategic decisions, Pet. 106–07.  Had the mitigation investigation been conducted properly counsel would have discovered and presented evidence explaining Gardner's killing of Rhoda, Pet. 107–11, corroborating the abuse Gardner suffered at the hands of his father, Pet. 111, and justifying Gardner's actions through the rage

---

[30] Although Gardner lists these issues separately—claims three and four—he briefs them as a single claim.  Pet. 88–128.  The Director, therefore, offers a single response to the consolidated claim.

[31] At one point Gardner states that "[n]o mitigation was presented by the defense team."  Pet. 91.  That statement is patently incorrect as counsel presented the testimony of two co-workers who stated that Gardner was a good worker who got along with customers; a lay minister who testified that Gardner had "Christ in his heart;" and his sister who testified about the emotional and physical abuse suffered by her and Gardner growing up, and who pled for mercy.  Indeed, Gardner acknowledges that this evidence was presented by counsel at trial, Pet. 90, so it is somewhat unclear where the "[n]o mitigation" statement finds its footing.

abandonment theory, Pet. 111–13.  This additional evidence, Gardner claims, would have led to different result.   Pet. 114–28.  The state court's decision to deny relief was neither contrary to or an unreasonable application of Supreme Court precedent.

## A.   The state-court record and the state court's decision to deny relief.

Gardner's counsel explained their investigation to the state habeas court by affidavit.   Lead counsel started a fact investigation upon appointment, which the investigator and mitigation specialist took over after funds were provided by the trial court.  2 SHCR 342.  Second chair counsel, the investigator and the mitigation specialist thereafter traveled to Mississippi—Gardner's long-time home and where most of his family and friends lived—to develop mitigation witnesses derived from "family contacts, interviews with [Gardner] and interviews with childhood friends."  2 SHCR 342.  These three individuals also spent considerable time with Gardner's parents attempting to probe allegations of childhood abuse, but the parents denied inflicting such treatment and insisted that Gardner was a "normal kid" with few friends.  2 SHCR 342–43.  Their refusal or inability to cooperate "led to very little of importance being developed through the time spent with them."  2 SHCR 343.

Counsel were candid in their assessment of the mitigation investigation, including taking issue with their mitigation specialist who they acknowledged was "overly close" with Gardner's family, and was paranoid about discovery so she therefore refused to put her investigation on paper. 2 SHCR 342–43. That said, counsel never stated that they did not receive the results of the mitigation specialist's investigation (presumably through oral reports) but even if they did not, counsel stated that most of the information developed in Gardner's state habeas proceeding was of little value, and not new to them.

Counsel knew that Gardner had participated in "the gay and transgender community" but they weren't able to develop any witnesses through their investigator. 2 SHCR 343. And if they had been able to locate Don Ware, also known as China Blue—a male transvestite working as a "drag queen" in Dallas nightclubs who Gardner had a sexual relationship with, 1 SHCR 170–71—they would not have introduced such evidence because it "would have hurt, more than helped, Mr. Gardner" given the conservative attitudes of Collin County jurors. 2 SHCR 343.

Counsel also would not have called William "Billy" Stone, Gardner's Army friend while they were stationed in Hawaii. 2 SHCR 343–44. This is because Stone characterized Gardner as a womanizer whose "constant focus

on sex would not have [had] a positive effect on any jury and especially a Collin County jury." 2 SHCR 344.[32]

Counsel also addressed the supposed failure to present mitigating evidence.[33] They explained that the available evidence "could cause more harm than good." 2 SHCR 344. Counsel elaborated that "the fact of the matter th[ere] wasn't much available given the life style [Gardner] had lived including his past homosexual relationships, his past history of violence in many if not all of [his] relationships and the limited testimony from his family." 2 SHCR 344–45. While Gardner's sister "spoke of the unbearable

---

[32] Counsel confused Stone, Gardner's Army friend, with Don Reeves, Gardner's former brother-in-law, as one in the same. 2 SHCR 343–44. In fact, Gardner became Don Reeves's brother-in-law, not Stone's, when Gardner married Westmoreland. 1 SHCR 191. Nonetheless, counsel clearly referenced Don Reeves, but misidentified him in the affidavit, by mentioning that Gardner went "back to prison after hitting [Westmoreland's] daughter as part of a parole violation." 2 SHCR 344. Accordingly, counsel clearly meant that they would not have called Don Reeves, "nor his wife," Sylvia Reeves, because their testimony would not "have benefitted Mr. Gardner in a trial in Collin County, Texas." 2 SHCR 344.

[33] Counsel also addressed the alleged failure to present risk assessment evidence, which was a separate claim that Gardner raised in state court but not in his present proceeding. 1 SHCR 73–76. Counsel explained that they did not present a risk assessment expert because the State, in voir dire, had accepted the burden of proving future danger beyond a reasonable doubt in prison but put on no evidence of Gardner's likelihood of violence while incarcerated. 2 SHCR 344. Because counsel felt like the State erred by failing to put on such evidence they did not call their risk assessment expert to avoid the State's rebuttal with Merillat. 2 SHCR 344. They explained that "by limiting what the State put on we were [e]ffectively attacking the 'reasonable doubt' standard they had to meet regarding future dangerousness." 2 SHCR 344; *accord* 2 SHCR 345 ("[W]e felt like [the trial court] would let that testimony of the State in . . . even though we believe[d] the evidence from their Huntsville prison statistics expert may have been inadmissible, we felt as a matter of trial strategy we didn't want to risk allowing such testimony [by] opening the door a[nd] putting Steve at greater risk.").

abuse" inflicted by Gardner's parents, they "would not, or refused to, admit to any abusive behavior on their part." 2 SHCR 345.

Further, counsel retained a mental health expert "to examine and address . . . abandonment issues concerning [Gardner]." 2 SHCR 345. The mental health expert did not testify because "at the conclusion of watching some of the [State's] testimony[—]specifically when the step-daughter[34] stated [Gardner] had been very abusive to her—she decided she didn't want to testify because of [a] lack of information and felt that he was psychotic." 2 SHCR 345.

Counsel concluded that they had consulted with their two testifying experts "before letting them know of our decision not to present their testimony." 2 SHCR 346. Further, counsel consulted with John Niland, *see supra* Note 23, an attorney with the Texas Defender Service, and a local attorney, Bill Schultz, regarding their mitigation strategy and "both concluded that our decision was a sound trial strategy." 2 SHCR 346.

The state habeas court found that "[c]ounsel thoroughly investigated and prepared for [Gardner's] trial, including traveling to Mississippi to interview witnesses and hiring a mitigation [specialist], a private

---

[34] It is unclear which step-daughter counsel were referring to in their affidavit. This is because Gardner abused his then-step-daughter Becky when he was married to Westmoreland, and his then-present step-daughter Jessie while married to Tammy. Either way, Dr. Allen's point remains the same—evidence concerning violence unattached to Gardner's romantic relationships made her believe that Gardner was psychotic.

investigator, and two mental health experts."[35]   2 SHCR 393 (Finding 64).

The court also found that counsel investigated Gardner's "childhood, medical and family history, prior drug and alcohol abuse, education, military service and other personal history," and that such investigation was in line with the recommended practices of various courts.[36] 2 SHCR 393 (Findings 65 & 66).

The state habeas court also noted that counsel discovered a host of evidence not favorable to Gardner including: (1) Gardner's prior deviant sexual relationships; (2) a history of violence in prior relationships; (3) and a mental health expert's opinion that Gardner was psychotic.  2 SHCR 393–94 (Finding 68).  The court further declared that counsel discovered much of the same evidence presented by Gardner during the state habeas proceeding, and that counsel did not have to prepare such information in a "timeline" format to render effective assistance.  2 SHCR 394 (Findings 69 & 70).  The court concluded that counsel's performance was not deficient.   2 SHCR 394 (Finding 72).

---

[35] In reality, counsel retained three mental health experts: (1) Dr. Kristi Compton, a consulting mental health expert; (2) Dr. Kate Allen, a testifying mental health expert; and Dr. Gilda Kessner, a psychologist retained as a risk assessment expert. 1 SHCR 112, 204; 2 SHCR 338–39, 342, 345.

[36] Gardner repeatedly argues that these findings are unreasonable based on attorney guidelines taking effect after Gardner's trial.  Pet. 96, 98, 103, 126.  As formerly explained, *see supra* Note 16, this is impermissible as it grades counsel's performance on a standard of reasonableness developed after the challenged conduct occurred.

In addition, the state habeas court held that Gardner had not proven prejudice.  2 SHCR 395 (Finding 74).  The court found that the affidavits of Sylvia, Donald and Randy Reeves "did not provide credible, helpful testimony."  2 SHCR 395 (Finding 75 & 76).  The court noted that, in fact, the Reeves' affidavits provided multiple instances of information unfavorable to Gardner, such as: (1) contradicting Gardner's explanations concerning the murder of Rhoda; (2) highlighting the similarities between the murders of Tammy and Rhoda; (3) proving that Gardner manipulated "those around him;" (4) showing that Gardner was "frequently and irrationally angry;" and (5) bringing attention to the fact that none of the Reeveses had anything to do with Gardner after he assaulted Becky nearly twenty years earlier.  2 SHCR 395–96 (Finding 76).

Concerning the affidavit of Louise Lillis, a former congregant of Gardner's father's church, the state habeas court found that it "was not compelling and would not have affected the result of the proceeding."  2 SHCR 396 (Findings 77 & 78).  This was because: (1) Lillis only heard, but did not see, a single instance of corporal punishment; (2) Lillis's testimony "would not have significantly corroborated or strengthened" Gardner's sister's testimony of childhood abuse at trial; and (3) Lillis would have been cross-examined with information that Gardner had a good relationship with his parents.  2 SHCR 396–97 (Finding 78).

The state habeas court also determined that Gardner's testifying mental health expert, Dr. Allen, "refused to testify after hearing the testimony of other witnesses and believed that [Gardner] was psychotic." 2 SHCR 397 (Finding 79).[37]   And the court decided that Dr. Kessner's testimony regarding abandonment rage: (1) would not have been persuasive given the multiple inconsistencies found in the evidence supposedly supporting such diagnosis; (2) would have brought attention to the fact that Gardner "was consistently violent and incapable of ever forming normal, non-violent relationships;" and (3) would have been of little persuasive force given Gardner's history of feigning mental health symptoms.  2 SHCR 397 (Finding 80).  And the court found that the remaining evidence proffered by Gardner—ostensible sex addiction—was not mitigating, and that, considering all of the "new" evidence offered by Gardner, the jury's decision on the special issues would not have been affected.  2 SHCR 397–98 (Findings 81 & 82).  The decision of the state habeas court is clearly a reasonable application of Supreme Court precedent.

---

[37] Every reference that Gardner makes to this finding of fact omits its most compelling aspect—that Gardner's testifying mental health expert found *that he was psychotic. Compare* Pet. 92, 95, *with* 2 SHCR 345.

## B.   Counsel's mitigation investigation was not deficient, and the state court's decision on this point is reasonable.

An ineffective assistance claim alleging a deficient mitigation investigation is governed by *Strickland*.  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  That standard is laid out in detail above, *see supra* Section II, but, generally, it demands that an inmate prove deficient performance— representation falling below an objective standard of reasonableness—and prejudice—a reasonable probability that the proceeding would have been different but for counsel's errors.  *Wiggins*, 539 U.S. at 521.

In the context of mitigation investigations, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  The inmate, in a postconviction proceeding, must present what background evidence should have been discovered but for counsel's deficient investigation, and prove that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigation circumstances did not warrant death."  *Id*. at 695.

It is clear that counsel performed adequately in their investigation and presentation of mitigating evidence.  Counsel utilized an investigator, a mitigation specialist, a consulting mental health expert, a testifying mental health expert, and a risk assessment expert.  1 SHCR 112, 204; 2 SHCR 338–

39, 342, 345.   And counsel disclosed the lengths of their mitigation investigation to the trial court, notably before any allegations of ineffectiveness arose:

> We did check Mr. Gardner's prior childhood accidents and injuries on our mitigation [investigation].   There didn't seem to be anything other than what Elaine Holifield [Gardner's sister] testified to.   There was no serious illnesses at any time.   There was physical abuse to [Gardner] and Elaine.   We have testimony to that.   There was no sexual abuse of any type.
>
> The—the immediate family was checked as to the size of the immediate family, which was four—plus grandchildren.   We checked with—as far as the relationship and attitudes toward the member that was drug—we checked whether or not there was drug or alcohol abuse by Mr. Gardner or any members of the family.   There was no[t]—we checked whether there was any mental health treatment that would aid in mitigation in this case and—and also to the cohesiveness of the family.   We've done that through all our experts.   The family standard of living and living conditions.
>
> There were no available school records for Mr. Gardner. They were all too old and could not be captured.   We checked as far as the social relationships with members of, basically, the opposite sex, marriage, divorces, et cetera; and that's all come into evidence.   And any—all awards or honors or special accomplishments.   That can be shown by his Army records.   And any and all traumatic experiences, anything at all, especially proud moments.   Memberships in relig—religious, social, educational and charitable organizations.   And as far as his best and worst side memories.
>
> Those are all items that our experts and myself have checked and determined what to put on in this case.

23 RR 77–78.   This thorough investigation is confirmed through Gardner's own state habeas evidence.   Dr. Kessner, for example, explained in her

affidavit to the state habeas court that she had reviewed: (1) "the interviews" that she conducted of Gardner, and members of his family, in preparation for trial, 1 SHCR 111; (2) the voluntary statements of individuals who testified for and against Gardner at trial, 1 SHCR 111; (3) the "Collin County Jail Medical Records," 1 SHCR 112; (4) the "State of Mississippi, Department of Corrections" records, 1 SHCR 112; (5) the "Psychological Records from Kristi Compton, Ph.D., case consultant," 1 SHCR 112; and (6) the "Case Notes from Kate Allen, Ph.D. expert witness," 1 SHCR 112.[38]   Plainly, all of these documents were generated during the investigation of Gardner's background, and in preparation of a mitigation case.

Further, the mitigation specialist hired by Gardner during his state habeas proceeding, Toni Knox, admitted that "*much* of the social history information that I used to compile the current psychosocial history *was*

---

[38]  Dr. Kessner provided a second affidavit explaining her pre-trial preparation on behalf of Gardner.  1 SHCR 208.  She stated that she "conducted several interviews with Mr. Gardner, reviewed documents supplied to me by the attorneys and had limited interviews with family members."  1 SHCR 208.  This included: (1) "Forrest County General Hospital" records; (2) "First National Bank of Marin" records; (3) Collin County Sheriff[']s Office" records; (4) "Southwestern Institute of Forensic Sciences at Dallas" records; (5) "Orchid Cellmark" records; (6) "Parkland Health and Hospital" records; (7) "Texas Department of Public Safety" records; (8) "Irving Police Department" records; (8) "Jones County Sheriff Department" records; (9) "Mississippi Crime Lab" records; (10) "Hinds County Coroner" records; (11) "University Hospital, Jackson MS" records; (12) "Mississippi State Penitentiary" records; (13) "Employment Records" for two businesses; (14) "Military Personnel Records;" (15) "Letters and Notes" from Tammy, "Justin White," Gardner, "Lori Osborn," and "Raquel E.B.;" (16) and "Voluntary Statements" from a number of individuals who testified for and against Gardner.  1 SHCR 208–09.

*obtained from previous notes and interviews by the private investigator, consulting psychologist, and mitigation specialist.*"   1 SHCR 125 (emphasis added) (footnote omitted).   Moreover, Knox admitted that "someone . . . in the initial mitigation investigation" prepared a psychosocial history "but the dates were vague and the time line did not document what records the information was taken from."[39]   1 SHCR 125.   And, Knox stated that "a considerable amount of information concerning [Gardner's] social history [was obtained] through interviews and writings to the mitigation specialist" but was lacking because the mitigation specialist did not conduct a "diverse investigation and interviews of corroborating witnesses."   1 SHCR 125–26.

Undoubtedly, counsel made a reasonable investigation into Gardner's background which, in turn, makes the state habeas court's denial of relief on this point reasonable.   As nicely put by Knox, "*much of the social history*

_____

[39] Knox listed the documents reviewed in compiling Gardner's psychosocial history for the state habeas court.   1 SHCR 176.   Most of these documents were obviously generated during the pre-trial investigation of Gardner's background, and include: (1) "[f]ive boxes" of counsel's trial file, including "interviews, research, invoices, handwritten notes, meeting notes, copies of records obtained, e-mails;" (2) the records of the investigator, including "copies of records, interviews, database researches for witnesses, meeting notes, invoices, miscellaneous trial notes, e-mails;" (3) the records of the mitigation specialist, including "[m]itigation notes, interview notes, timeline, genogram, records, invoices, correspondence with attorneys, . . . Gardner letters, [Gardner's] writings on social history, drawings done by . . . Gardner, [l]etters [Gardner] wrote in jail to Tammy, [and] e-mails;" (4) Dr. Kessner's records, including "interviews, research notes, slides that were to be presented concerning future dangerousness, e-mails, invoices;" (5) Gardner's military records; (6) Gardner's Collin County jail records; (7) Gardner's Mississippi prison records; (8) Gardner's employment records; (9) various law enforcement records concerning Gardner; and (10) medical records of Rhoda.   1 SHCR 176.

information" that Gardner presented to the state habeas court came from counsel's investigation into Gardner's background.  1 SHCR 125 (emphasis added).  To do this counsel employed numerous investigators and experts in accord with then-prevailing guidelines.  American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, 31 Hofstra L. Rev. 913, 952 (2003) (guideline 4.1) (the defense team should consist include at least two attorneys, an investigator, and a mitigation specialist).  Counsel also repeatedly talked with Gardner and multiple witnesses, and uncased a plethora of archived documents to discover Gardner's life history.  This is also in agreement with then-applicable attorney-practice norms.  *Id.* at 1015, 1022–27 (guideline 10.7 & commentary) (the defense team should explore medical history, family and social history, educational history, military service, employment, and prior incarcerations); *see also Wiggins*, 539 U.S. at 524. As a result of that investigation counsel called several witnesses during the punishment phase to testify on Gardner's behalf including a couple of co-workers (employment and spiritual beliefs), Gardner's sister (family and social history), and introduced records of his time in the Army (military service).  Clearly, counsel's investigation was well-within the then-prevailing standards of practice, and it is even more readily apparent when the results

of counsel's investigation are compared with the scant "new" evidence that Gardner provided to the state habeas court.

Gardner turned up only five "new" witnesses during the state habeas proceeding, and all have minimal mitigating (or any) import.   The first, Sylvia   Reeves,   was   Gardner's   sister-in-law   after   Gardner   married Westmoreland, his third wife.  1 SHCR 191.  Sylvia discussed how she first met Gardner, and how her family came to enjoy Gardner's company.  1 SHCR 189.  She stated that Gardner married Rhoda when he was twenty-six and Rhoda was seventeen, and asserted that Rhoda played emotional "games" with Gardner by continuing to contact her ex-husband after marrying Gardner.  1 SHCR 189–90.  Sylvia also related that Gardner stole the weapon that he shot Rhoda with from Sylvia's husband, and that Gardner had made a full confession to her where he expressed remorse.  1 SHCR 190.  Sylvia additionally thought that codeine-based cough syrup "*might* have contributed to [Gardner's] state of mind" when he shot Rhoda.  1 SHCR 190 (emphasis added).

Further, Sylvia explained that Gardner eventually married her sister, Westmoreland, but "seemed to get increasingly unstable and treated [Westmoreland] like she was property."  1 SHCR 191.   After hitting Westmoreland's daughter Becky in the head, Sylvia "did not want anymore to do with [Gardner.]"  1 SHCR 191.  Sylvia also mentioned that Gardner had

"impulse control and anger problems," and reacted violently on a number of occasions.  1 SHCR 191–92.

The second affidavit was provided by Sylvia's husband, Donald Reeves. 1 SHCR 195.  He stated that Gardner "seemed like a nice guy," but "had these anger episodes" that he termed "flash-overs" or "spasms."  1 SHCR 195. Donald also expounded that Rhoda was "manipulative" and still in contact with her ex-husband despite marrying Gardner.  1 SHCR 195.  He further averred that Gardner expressed remorse over shooting Rhoda.  1 SHCR 195.

The third affidavit came from the son of Sylvia and Donald, Randy Reeves. 1 SHCR 198.  Randy explained that he initially liked Gardner, but became "nervous" around Gardner because Gardner was "extremely jealous" of Rhoda, and had threatened to kill Randy for flirting with Rhoda.  1 SHCR 198–99.  Randy also mentioned that he had heard that Gardner did not treat Randy's grandmother well, and that Gardner hit Becky in the head.  1 SHCR 199–200.

The fourth undiscovered witness was Louise Lillis, a former congregant of Gardner's father's church.  1 SHCR 202.  Lillis stated that Gardner "was a likeable boy" whose father was "very strict."  1 SHCR 202.  She recalled an incident at church where she heard what sounded like "a particularly harsh whipping" of Gardner by his father.

The fifth, and final, affidavit was provided by William "Billy" Stone, a friend of Gardner's while he was stationed in Hawaii on active duty with the Army.  1 SHCR 213.  Stone recounted that Gardner "was popular with the women," and that "he was constantly pursuing women and was totally focused on sex."  1 SHCR 213.  Stone explained that Gardner had sex with single and married women, including the wife of a "good friend[]."  1 SHCR 213.

At bottom, Gardner suggests that counsel should have presented: (1) three witnesses (the Reeves) who were initially fond of Gardner until he became violent towards his then-wife Rhoda—eventually shooting her—and thereafter married into the family and became violent with multiple relatives—Sylvia's sister, Westmoreland, and Westmoreland's daughter, Becky; (2) a witness who could have "corroborated" a session of corporal punishment inflicted on Gardner by his father on a single occasion, and only aurally (Lillis); and (3) a former friend who described Gardner as obsessed with sex regardless of the consequences (Stone).  Such weak mitigating evidence would not have turned the tide in Gardner's favor despite Gardner's present protestations.  Pet. 109–13, 114–126.

Gardner also fails to explain how this minimal amount of additional background evidence made abandonment rage so readily apparent to Gardner's state habeas expert, Dr. Kessner.  Indeed, it seems implausible

that the Reeves' explanation that Gardner killed Rhoda and treated Westmoreland like property tipped the scales—this information came out in the State's punishment case—nor does a single corroborating witness to Gardner's abuse at the hands of his father make such claims that much more believable.  In short, the state habeas mitigation investigation turned up so little "new" evidence of Gardner's background that it cannot be seriously contended that the pre-trial investigation was deficient.

Moreover, counsel cannot be labeled deficient for choosing not to present a mental health expert, Dr. Allen, who determined that Gardner "was psychotic."[40]  2 SHCR 345.  This is a reasonable, strategic decision.  *See, e.g., Dowthitt*, 230 F.3d at 747 ("[C]ounsel's decision not to put a witness on the stand who himself is not entirely favorable toward Dowthitt, and

---

[40] Gardner harps, repeatedly, on counsel's explanation that Dr. Allen did not testify, in part, "because of a lack of information." *E.g.,* Pet. 95 (citing 2 SHCR 345). Gardner's selective quotation omits the fact that Dr. Allen thought Gardner was psychotic, 2 SHCR 345, but also takes counsel's explanation out of context. Counsel explained that Dr. Allen, after hearing one of Gardner's step-daughter's testify that Gardner repeatedly abused her, did not think that she should testify "because of a lack of information."  2 SHCR 345.  In context, "lack of information" most likely indicates that Dr. Allen thought that the information with which she had been provided before trial was less than truthful; otherwise, her change of heart during trial would make no sense.  Stated another way, if Dr. Allen truly believed that she had not been provided with adequate information before trial she surely would not have agreed to testify which Dr. Kessner makes clear was not the case.  1 SHCR 210 ("Dr. Allen . . . was expecting to testify.").  While counsel's explanation was less than artful it is apparent from its context that Dr. Allen did not testify because of a "lack of [truthful] information" from and about Gardner, and because Gardner was psychotic.  *See* 2 SHCR 345.

79

furthermore, who would have to respond with more damaging information during the State's cross-examination, is not objectively unreasonable.").

Additionally, counsel cannot be faulted for failing to corroborate Gardner's claims of abuse at his parents' hands.  Gardner's sister, Elaine, testified that the abuse was hidden to the outside world, 23 RR 39 ("I don't know if I can make y'all understand the way it was in our house.  It was like two lives were led, the one in front of the public, and then the one behind closed doors."), and Gardner's parents consistently denied the abuse when asked, 2 SHCR 345.  This does not render counsel's performance deficient.[41] *See, e.g., Dowthitt*, 230 F.3d at 749 ("[C]ounsel's actions here would be characterized as reasonable trial strategy because they attempted to investigate Dowthitt's background and were thwarted by uncooperative potential witnesses."); *cf. Mirzayance*, 556 U.S. at 125 ("Competence does not

---

[41] Gardner argues that counsel "impermissibly shift blame to" Gardner's parents by discussing their lack of cooperation.  Pet. 98–99.  He states counsel's explanation is "unsupportable in the law" under *Rompilla v. Beard*, 545 U.S. 374 (2005).  Pet. 99.  While active obstruction of an investigation by the defendant and the defendant's family cannot obviate the need "to conduct *some* sort of mitigation investigation," *Porter v. McCollum*, 130 S. Ct. 447, 453 (2009), counsel did not simply stop at Gardner's family.  Unlike the attorneys in *Rompilla*, who did not even review the "readily available" court documents regarding prior convictions, *Rompilla*, 545 U.S. at 387–84, counsel obtained a cache of historical records, *see supra* Notes 38 & 39, interviewed many potential witnesses, and obtained expert assistance, *see supra* Section IV.  As Gardner's sister, Elaine, explained at trial Gardner's parents were really the only individuals who could corroborate Gardner's childhood abuse as it was kept secret from outsiders.  23 RR 39.  Counsel asked Gardner's parents to admit the abuse but they denied it—this is simply different in degree and kind to the attorneys' actions in *Rompilla*.

require an attorney to browbeat a reluctant witness into testifying, especially when the facts suggest that no amount of persuasion would have succeeded."). Similarly, although counsel knew of Gardner's participation in the "gay and transgender community," they could not develop any viable witnesses in that community through their investigator. This, again, does not make the investigation deficient. *See, e.g., Dowthitt*, 230 F.3d at 749. Accordingly, the state court's decision that counsel were not deficient is objectively reasonable.

The state court's alternative holding on deficiency is also reasonable. Counsel explained that had they been able to locate "China Blue," they would not have presented such testimony given the conservative attitudes of Collin County jurors. Counsel may reasonably take into account the prevailing beliefs of a particular locale in choosing to introduce certain evidence, *see Strickland*, 466 U.S. at 695, and Gardner has not challenged counsel's assertion that Collin County is a conservative county where "alternate lifestyles" may not be warmly received as mitigating evidence.[42] The same is

---

[42] There is little doubt that some individuals do not view homosexuality favorably, whether rightly or wrongly. *E.g., Lawrence v. Texas*, 539 U.S. 558, 571 (2003) ("It must be acknowledged, of course, that the Court in *Bowers* [*v. Hardwick*, 478 U.S. 186 (1986)] was making the broader point that for centuries there have been powerful voices to condemn homosexual conduct as immoral."). And although it would have been improper for the State to use Gardner's sexual orientation as an "aggravating" factor, *Neill v. Gibson*, 278 F.3d 1044, 1061 (10th Cir. 2001) (no "legitimate justification" for invoking a defendant's sexual orientation during punishment phase closing arguments), does not mean that counsel should ignore

true for Stone's proposed testimony of Gardner's sexual escapades with multiple women regardless of the woman's relationship status.  Common sense suggests that promiscuity and infidelity can be considered "aggravating" in the realm of moral culpability.  *See Bell v. Kelly*, 260 F. App'x 599, 606 (4th Cir. 2008) (affirming denial of federal habeas relief because, in part, the un-presented evidence would have "allowed the prosecution to emphasize multiple instances of Bell's infidelity"); *cf. Rompilla*, 545 U.S. at 392 (evidence that Rompilla's father bragged about cheating on his wife was mitigating).  And the Reeves' proposed testimony was similarly damaging because it would have reiterated the killing of Rhoda, the assault of Westmoreland and Becky, and undermined abandonment rage by highlighting violent behavior unattached to real or perceived abandonment.  Counsel is not ineffective for choosing to avoid such evidence.  *See, e.g., St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006) (counsel was not ineffective for avoiding evidence that would have introduced facts concerning the defendant's violent behavior).  Accordingly, the state habeas court's decision on deficiency is reasonable.

---

what can be "profound and deep convictions accepted as ethical and moral principles" against homosexuality in potential jurors, *Lawrence*, 539 U.S. at 571.

### C.   Counsel's errors, if any, did not prejudice Gardner, and the state court's decision on this point is reasonable.

Regardless of deficiency, there was no prejudice, and the state court's denial of relief on this point is undoubtedly reasonable.   The beneficial elements of Gardner's postconviction "mitigation" evidence can be summarized as: (1) the Reeves initially believed Gardner was likeable, 1 SHCR 189, 195, 198; (2) Gardner's second wife, Rhoda, played games with Gardner, 1 SHCR 189–91, 195; (3) Gardner might have been on codeine-based cough syrup when he shot Rhoda, 1 SHCR 190; (4) Gardner expressed remorse over shooting Rhoda, 1 SHCR 190, 195; (5) a single incident of corporal punishment by Gardner's father was aurally corroborated by Lillis, 1 SHCR 202; (6) Gardner was friends with Stone while both were in the Army, 1 SHCR 213–14; and (7) Gardner's violence in relationships is explained by abandonment rage, which has a biological component, 1 SHCR 112–18.   The benefits realized from this evidence are greatly outweighed by the double-edged nature of the evidence, and the State's "aggravating" evidence.

The Reeves affidavits do the following damage: (1) they reiterate that Gardner killed Rhoda, his second wife, 1 SHCR 190, 195, 199; (2) they reiterate that Gardner abused Westmoreland and Becky, 1 SHCR 191, 199–200; (3) they conflict with Gardner's abandonment rage diagnosis because they point to periods of violence unrelated to abandonment, 1 SHCR 191–92,

195, 198–99; (4) they opine that Gardner may have abused an elderly woman, 1 SHCR 199–200; and (5) they conflict with Becky's testimony that Gardner lacked remorse over the killing of Rhoda, 1 SHCR 190, 195.   Evidence exposing prior acts of violence or conflicting with evidence at trial or counsel's strategy does not prove prejudice.   *See, e.g., Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (evidence of good behavior "unlikely to have had a significant mitigating effect" because it would have exposed defendant's prior arson conviction, and arson was one of the manner and means of capital punishment alleged); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999) (evidence of an abusive upbringing not prejudicial where it would have revealed instances of violent behavior unconnected to inebriation, which contradicted the defendant's argument at trial that he was only violent when intoxicated).

Moreover, it is not hard to imagine that the "blame the victim" defense Gardner suggests by discussing Rhoda's "game playing" would have backfired.   *See, e.g., United States v. King*, 604 F.3d 125, 142 (3d Cir. 2010) (describing as "disturbing[]" a defendant's attempt to blame a two-year-old sex abuse victim).   Whatever Rhoda's faults this would not have, in the jurors' minds, justified Gardner's shooting of Rhoda, paralyzing her, and causing her to lose her unborn child before dying of medical complications

arising from her injuries, and would most likely have caused the jurors to look more harshly at Gardner's moral culpability.

And Lillis's hearing of a single incident of corporal punishment would not have made the difference. As explained by Gardner's sister, Elaine, the abuse by Gardner's father was kept in-house. 23 RR 39 ("I don't know if I can make y'all understand the way it was in our house. It was like two lives were led, the one in front of the public, and then the one behind closed doors."). If the jury was going to believe that Gardner's father had abused his children it was either going to have to believe Elaine or Gardner, had he chosen to testify, because Gardner's parents denied the abuse. Additionally, to the extent that Lillis's testimony would have corroborated Elaine's testimony of childhood abuse, it was minimal. The jury could have believed that the single instance of punishment described by Lillis was proper—not abusive—or it could have thought that an isolated incident of physical abuse was nominally probative in the scheme of Gardner's moral blameworthiness. *See Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997) (no prejudice where the testimony "was duplicative of testimony given" at trial). Further, Lillis could have been cross-examined, as Elaine was at trial, regarding Gardner's letters to his parents where he thanked them for being "great parents" who made "life a lot easier for me." 23 RR 56–57. Gardner's recognition that his parent's raised him with his best interests in mind minimizes any notions of abuse, and it

would have minimized the cumulative, and trivially corroborative aspect of Lillis's testimony.

And it is not unreasonable to conclude that Stone's proposed testimony of Gardner's sexual history while in the military, or the proposed testimony of Gardner's sexual history with China Blue,[43] would not have affected the jury's decision. The evidence of Gardner's promiscuity with married women, including women whose husbands were friends with Gardner, would have lessened his plea for mercy, *see Bell*, 260 F. App'x at 606; *cf. Rompilla*, 545 U.S. at 392, and evidence of "alternate lifestyles" including homosexual behavior[44] could have backfired, *see Lawrence*, 539 U.S. at 571. This does not prove prejudice.

Finally, abandonment rage does not establish prejudice had it been presented. As discussed numerous times, *see supra* Sections II & III, Gardner's own evidence undermines the argument that his violent behavior

---

[43] It should be noted that China Blue did not provide an affidavit, "and did not want further contact" with Gardner's state habeas mitigation specialist. 1 SHCR 137. It is hard to imagine that had counsel contacted China Blue that the result would have been any different.

[44] Even if homosexuality is not to be treated as "aggravating" evidence, Gardner has not explained why evidence of one's sexuality has inherently mitigating value. Gardner has not claimed that he was abused on account of his sexuality, nor does he suggest that any psychic distress caused by confusion over his sexuality played any great role in his crime or development as a person. Indeed, Dr. Kessner described Gardner's sexual history as *an effect* of "a damaged and insecure sense of self," not *a cause* of issues relating to moral blameworthiness. In short, while one's sexual orientation may not be aggravating (in the academic sense) it is also not mitigating.

is linked with abandonment because there are many instances where Gardner behaved violently without real or perceived abandonment.  This contradiction does not prove prejudice.  *Kitchens*, 190 F.3d at 703.  In addition, Gardner's abandonment rage would merely have provided further evidence that Gardner could not control his emotions in a non-violent way leading to the inevitable conclusion that he posed a future danger.  This, again, does not prove prejudice.  *See Gray v. Epps*, 616 F.3d 436, 449 (5th Cir. 2010) (evidence that defendant was "markedly antisocial" and "disturbed" was "double-edged" and no prejudice resulted from its exclusion).  Finally, the diagnosis of abandonment rage would have been significantly undermined by Gardner's own statements that he feigned mental health issues to secure his release from the military.  1 SHCR 153.  This, too, does not prove prejudice. *See Shuler v. Ozmint*, 209 F. App'x 224, 231–32 (4th Cir. 2006) (no prejudice where counsel did not introduce a suicide attempt that would have opened the door to evidence that defendant had malingered on previous psychological examinations).

When the undiscovered "mitigating" evidence listed above is compared to the "aggravating" evidence presented at trial, *Strickland*, 466 U.S. at 695– 96, it is beyond doubt that the state court's decision was reasonable.  Gardner shot and paralyzed Rhoda, which eventually resulted in the loss of an unborn child, and Rhoda's life.   22 RR 16–20, 77–78.  Rhoda's death was all the more

tragic given the immense agony she must have gone through during the seven weeks following the shooting but before her death, filled with repeated surgeries and the knowledge that she would never walk again.

While incarcerated for Rhoda's shooting Gardner conned another woman into a relationship, Westmoreland, and then became physically abusive and controlling.  22 RR 33–39.  Gardner threatened the lives of Westmoreland and her family, 22 RR 37, and was sexually inappropriate with Westmoreland's daughter, Becky.  22 RR 68–69.  He also belittled Becky, and "proud[ly]" described the killing of Rhoda to Becky showing no remorse.  22 RR 67, 78.  The relationship with Westmoreland ostensibly ended when Gardner struck Becky in the head causing a severe injury, 22 RR 43–47, 71–73; SX 69, nevertheless, Gardner abducted Westmoreland by knifepoint from her work which ended in a high-speed chase with the police, 22 RR 50–53.  After returning to prison Gardner continued to threaten Westmorland, and she stayed fearful of him despite attempts to hide her location.  22 RR 54–56.

Gardner's fourth marriage ended in 1999, SX 72, but in 2001 his ex-wife Sandra applied for a temporary protective order and alleged family violence.  SX 72.  The protective order was granted for a period of two years. SX 72.  And Sandra clearly was afraid of Gardner because she was "frantic"

when she brought her son to Gardner's home for visitation, would not talk to Gardner, and hurriedly left Gardner's presence.  22 RR 128.

Gardner's fifth marriage resulted in years of abuse to Tammy, and ended with a single gunshot to Tammy's head.  Again, this killing was particularly gruesome given that Tammy was conscious for at least twenty minutes following the shooting, and most likely lived that short time with the knowledge that she would soon die.  Gardner also sexually assaulted Tammy's daughter, Jessie, beginning when she was nine, and tried to have intercourse with her although he was unsuccessful.  22 RR 124–27.

Further, Gardner was arrested at a mall masturbating in his vehicle while women and children were in the area, 22 RR 93–95, and had illegal weapons in the vehicle.  22 RR 102–03.  And finally, Gardner was punished multiple times while in the Army, and a psychiatrist noted that Gardner had an "inadequate, immature, [and] sociopathic personality."  SX 74.  The horrendous violence and sexual aggressiveness that Gardner wreaked on those closest to him would have outweighed Gardner's state habeas evidence, all of which was of weak import, and most of it being double-edged.  At

bottom, the state court's decision on prejudice—that none was found on the record before the court—was reasonable.[45]

### D. Gardner's discrete attacks on the state-court decision do not undermine the reasonableness of that court's conclusion.

Despite the apparent reasonableness of the state court's decision, Gardner proffers multiple reasons why it is not. Gardner first suggests that the Court of Criminal Appeals found that the mitigation investigation was impaired because it rejected a proposed finding by the state habeas trial court. Pet. 94. The finding rejected by the Court of Criminal Appeals, finding sixty-seven, reads, "Counsel believed that their mitigation expert, Shelli Schade, was 'overly close' with [Gardner] and his family, but they did not believe that their investigation was impaired." 2 SHCR 393 (Finding 67). In rejecting finding sixty-seven, *Ex parte Gardner*, 2010 WL 3683072, at *1, Gardner tries to impute an implicit finding in the court's action—that the Court of Criminal Appeals actually believed, but did not explicitly hold, that counsel's investigation was impeded by the mitigation specialist and, therefore, deficient. Pet. 94 ("The TCCA's September 15, 2010 order implicitly ruled that the mitigation investigation *was* impaired."). There are several problems with Gardner's argument.

---

[45] Gardner again suggests that the state court's decision is not entitled to AEDPA deference because there was no live hearing. Pet. 128. As addressed previously, *see supra* Section I(A), this is incorrect.

First, Gardner provides this Court with no authority that the rejection of a proposed finding by the Court of Criminal Appeals gives rise to an implicit, contrary finding.  Second, the absence of a finding on whether the mitigation specialist impaired the mitigation investigation—no finding exists because the Court of Criminal Appeals rejected it—does not make the opposite true; Gardner's argument is a logical fallacy.  *See Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1257 (11th Cir. 2007) (describing the logical fallacy of "argumentum ad ignorantiam" as "the mistake that is committed whenever it is argued that a proposition is true simply on the basis that it has not been proved false").  Third, the Court of Criminal Appeals clearly did not intend its rejection of finding sixty-seven to be the final word on whether there was an impaired mitigation investigation because an earlier finding, finding sixty-four, states that "[c]ounsel thoroughly investigated and prepared for [Gardner's] trial."  2 SHCR 393 (Finding 64).  Finally, the most logical reason why the Court of Criminal Appeals rejected finding sixty-seven is because counsel never expressed a belief, one way or the other, about whether the mitigation specialist's "overly close" relationship with Gardner and his family affected the mitigation investigation; finding sixty-seven, however, ascribed such a belief to counsel. Finding sixty-seven was most likely rejected because a portion of the finding concerned counsel's belief—a belief they never espoused—which was simply

not "supported by the record." *Ex parte Van Alstyne*, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007) (describing the legal standard utilized by the Court of Criminal Appeals in its capacity as the "ultimate fact finder").

Simply put, the Court of Criminal Appeals' rejection of finding sixty-seven means nothing more than the fact that the Court of Criminal Appeals rejected finding sixty-seven, nothing more and nothing less. Accordingly, Gardner's argument that the Court of Criminal Appeals implicitly found that the mitigation investigation was impaired, and the arguments he stacks upon this premise, Pet. 95, means nothing.

Gardner, second, argues that counsel should have kept digging in their mitigation investigation because they were put on notice by their experts, Dr. Allen and Dr. Kessner, that the investigation was inadequate. Pet. 95–96, 107–09. As to Dr. Allen, Gardner focuses on counsel's state habeas affidavit to prove his point. Pet. 95. Counsel, in the affidavit, explained that Dr. Allen, after hearing the testimony of the State's witnesses, did not testify "because of [a] lack of information." Pet. 95 (citing 2 SHCR 345). And, as to Dr. Kessner, Gardner points to Dr. Kessner's state habeas affidavit where she stated that she informed counsel "that there were important corroborating witnesses who were not being located and interviewed for mitigation." Pet. 96 (citing 1 SHCR 209). These arguments fail for several reasons.

92

First, Gardner wrenches the "lack of information" statement out of context, as explained earlier. *See supra* Note 40. Briefly, Dr. Allen determined that she should not testify because, after hearing the abuse perpetrated by Gardner on one of his step-daughters, she determined that she lacked *truthful* information. *See supra* Note 40. At best, this put counsel on notice that Gardner was not forthright, not that there was more information to be uncovered regarding his past. Second, Dr. Kessner's statement that "there were important corroborating witnesses who were not being located" assumes that such witnesses exist. The only "corroborative" witness identified was Lillis, who heard a single instance of corporal punishment.[46] This is hardly a game changer. Third, Dr. Kessner's statement regarding uncorroborated aspects of Gardner's background was vague, and could hardly be thought of to put counsel on notice that they had missed certain avenues of investigation. Indeed, that Dr. Kessner was only referring to corroborative witnesses suggests that counsel had uncovered the important substantive evidence regarding Gardner's background. These

---

[46] Gardner also points to his state habeas mitigation specialist's assessment of the pre-trial investigation to suggest that it was inadequate. Pet. 97. Specifically, "[t]here was not a thorough mitigation investigation as there were quite a few friends and family that were not contacted to corroborate [Gardner's] investigation." Pet. 97 (quoting 1 SHCR 137). Again, the only "corroborative" witness was Lillis, and her testimony was minimally probative as discussed above. *See supra* Section IV. And to the extent that these "friends and family" refer to the Reeves and Stone, that testimony was not helpful either, as mentioned earlier. *See supra* Section IV. Ultimately, the state habeas mitigation specialist's assessment means little.

vague statements were hardly notice of additional, undiscovered background evidence, and they do not undermine the reasonableness of the state court's decision.[47]

Thirdly, Gardner argues that counsel's ineffectiveness is proven through the juror affidavits. Pet. 105–06, 124–26. As explained above, *see*

---

[47] Gardner tries to expand review of the state court's decision by attaching documents to his petition that were never reviewed by the state habeas court. Pet. 97–98; Pet. Ex. 1, ECF No. 17-1 (mitigation specialist's billing invoices), Pet. Ex. 2, ECF No. 17-2 (counsel's billing invoices). This is impermissible as federal habeas review looks only to the record before the state court. *Pinholster*, 131 S. Ct. at 1398. Even if *Pinholster* did not stand in the way Section 2254(e)(2) does. *Holland v. Jackson*, 542 U.S. 649, 653 (2004) ("Those same restrictions [in § 2254(e)(2) apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an evidentiary hearing."). This is because, with diligence, state habeas counsel—present counsel— could have provided these records to the state habeas court. *See Michael Williams*, 529 U.S. at 432. Indeed, these records appear to have been easily obtained by present counsel, and present counsel, acting as state habeas counsel, had plenty of time between appointment and filing to obtain these records. Pet. Ex. 2 at 45 ("date of appointment" listed as "12-29-06"). Accordingly, this Court cannot consider the billing invoices of the mitigation specialist or counsel.

Assuming that these records could be considered they do not support a deficient investigation. First, the records are incomplete. The earliest billing invoice is from March 1, 2006, where the mitigation specialist bills for eighteen hours of work; however, there is also a note stating "Total Hours to date: 169.75." Pet. Ex. at 1. Gardner makes no attempt to account for approximately four typical work-weeks of investigation, and pays no attention to the other entries regarding communication with possible witnesses. *See, e.g.,* Pet. Ex. A at 5 ("correspondence with family"). Second, Gardner fails to provide this Court with any basis to conclude that a certain amount of hours are necessary to render an investigation sufficient. The fact that little else turned up during the state habeas proceeding is more probative on this point than a simple hourly cutoff. Third, the billing invoices are general and, obviously, do not detail the entirety of the mitigation specialist's work. This is most likely purposeful. *See* Tex. Comm. on Prof'l Ethics, Op. 559, 68 Tex. B.J. 1034 (2005) (explaining that appointed counsel should provide billing invoices that are general unless a client's consent is obtained or a court order compels more). Ultimately, the billing invoices mean little, either because they cannot be considered or have little probative value.

*supra* Section I(D), this Court may not consider such affidavits as a matter of federal habeas law, *Strickland*, and federal evidentiary law.  In any event, whether a juror was shocked at the lack of mitigation evidence produced at trial has little bearing on whether counsel was actually ineffective.  Lay opinion simply has no import on whether counsel reasonably acted in presenting or not presenting certain evidence.

The fourth argument made by Gardner is that the psychosocial history compiled by the mitigation specialist was not detailed enough so any decision made by counsel regarding mitigation was not fully informed and, therefore, ineffective.  Pet. 106, 113.  As Gardner's state habeas mitigation specialist[48] admitted a timeline was "prepared by someone" although "the dates were vague and the time line did not document what records the information was obtained from."  1 SHCR 125.  Instead, "there were various handwritten notes from interviews with [Gardner], typed interview notes, [Gardner's] own

---

[48]  Knox's affidavit also opines regarding the effectiveness of counsel's mitigation specialist—a legal conclusion.  *E.g.,* 1 SHCR 131 (citing a host of Supreme Court cases).  Knox is essentially an impermissible "*Strickland* expert."  *See Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) ("[T]he reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof.  Accordingly, it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable.  The question is not one to be decided by plebiscite, by affidavits, by deposition, or by live testimony.  It is a question of law to be decided by the state courts, by the district court, and by this Court, each in its own turn.").  Moreover, in judging the mitigation specialist's reasonableness Knox utilizes guidelines that were enacted well after trial.  *E.g.,* 1 SHCR 123 (citing guidelines from 2008).  This, again, cannot be the guideline for reasonableness at the time of Gardner's trial.  *See supra* Note 16.

writings, and e-mails with [Gardner's] sister," 1 SHCR 124, plus the extensive cache of records compiled by counsel. *See supra* Notes 38 & 39. Essentially, Gardner is suggesting that unless a mitigation specialist compiles the information gleaned from the investigation in a particular format then counsel is ineffective—for example, the mitigation specialist can only use Microsoft Word to compile the timeline and is ineffective for using Corel Word Perfect. The argument is utterly specious.

Whether counsel is constitutionally effective is not so nitpicky. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case."). Here, counsel had the raw information and it was compiled in a timeline format. What was not discovered—the Reeves, Lillis, and Stone—would not have affected the outcome of the proceeding, as discussed above. *See supra* Section IV. More importantly, the Supreme Court has never suggested that a detailed timeline is necessary to render effective assistance, and that ends the argument.

Ultimately, none of the arguments that Gardner proffers undermines the state court's decision to deny relief. Counsel investigated Gardner's background competently, and Gardner did not produce sufficient evidence, either quantity or quality, in the state habeas court to prove prejudice. Accordingly, the state court's decision on this point is reasonable, and relief should be denied.

## V. Gardner Did Not Fairly Present His Confrontation Clause Claim, It Is Procedurally Barred By An Adequate And Independent State Law Ground, It Should Be Judicially Estopped, And It Is Without Merit.

Gardner claims that the introduction of evidence regarding the 911 call placed by Tammy on the eve of her death violated the Confrontation Clause. Pet. 129–36.   This is because, according to Gardner, the 911 call was not a dying declaration as Tammy did not subjectively know that her death was imminent, Pet. 131–34, and because portions of the call were testimonial in nature, Pet. 134–35.

### A. Gardner's Confrontation Clause claim is unexhausted and procedurally defaulted because further attempts to exhaust would be fruitless.

An inmate must exhaust available state remedies or federal habeas relief must be withheld.   28 U.S.C. § 2254(b).   To exhaust, inmates must first seek redress in state court.   *Heck v. Humphrey*, 512 U.S. 477, 480 (1994). This means that an inmate must provide a state court "a fair opportunity" to review the claim, that is, the inmate must present the issue in a procedural context which insures that the state court will review the claim solely on the merits.   *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

Practically, exhaustion is met "when the substance of the federal habeas claim has been fairly presented to the highest state court."   *Parr v. Quarterman*, 472 F.3d 245, 252 (5th Cir. 2006) (quoting *Smith v. Dretke*, 522

97

F.3d 269, 275 (5th Cir. 2005)).  The Court of Criminal Appeals is the highest court in Texas for criminal matters.  *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985).  The determination of "whether a[n inmate] exhausted his claim in state court is a case- and fact-specific inquiry."  *Moore v. Quarterman*, 533 F.3d 338, 341 (5th Cir. 2008) (en banc).

On direct review Gardner complained that the 911 call was inadmissible hearsay without exception.  Appellant's Brief at 42–43, *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009) (No. AP-75,582).  Gardner also addressed a possible Confrontation Clause violation but predicated the argument with a concession: "Appellant agrees, therefore, that if the statement made to [the 911 operator] by the caller satisfied Texas's requirements for a dying declaration, neither the Confrontation Clause nor *Crawford* [*v. Washington*, 541 U.S. 36 (2004)] or *Davis* [*v. Washington*, 547 U.S. 813 (2006)] would bar its admission."  Appellant's Brief at 43–45, *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009) (No. AP-75,582). The Court of Criminal Appeals, after finding that the 911 call met Texas's dying declaration hearsay exception, accepted Gardner's concession and declined to address the constitutional issue.  *Gardner*, 306 S.W.3d at 289 n.20.

As such, the Court of Criminal Appeals did not reach the merits of Gardner's Confrontation Clause claim, *but only because of Gardner's*

*intentional action*—he conceded the constitutional issue in lieu of a state law claim involving the same facts.  Put another way, the Court of Criminal Appeals simply had to address state law—the admissibility of the 911 call under Texas evidence law—because Gardner conceded the constitutional issue.  Fair presentation requires more and, consequently, Gardner has failed to exhaust this claim.

The Supreme Court has addressed several scenarios where an inmate's litigation tactics do not suffice to fairly present an issue.  For example, merely placing the same facts before both the state and federal courts does not suffice to fairly present a claim.  *See Anderson v. Harless*, 459 U.S. 4, 7–8 (1982); *Picard v. Connor*, 404 U.S. 270, 277 (1971).  In *Picard* an inmate complained about the validity of his indictment in state court but did not challenge the indictment on equal protection grounds.  *Picard*, 404 U.S. at 273.  The state court, not surprisingly, did not address the Equal Protection Clause in finding that the indictment was valid because it only "dealt with the arguments [the inmate] offered."  *Id*. at 277.  The state court could therefore not be faulted "for failing also to consider sua sponte" the equal protection claim, which was not fairly presented.  *Id*.

As another example, simply giving a state court an opportunity to reach a claim's merits does not fairly present a claim.  *Castille*, 489 U.S. 351.  The inmate in *Castille* filed a petition with Pennsylvania's highest court

seeking further review where he raised, for the first time ever, two claims that were later advanced in his federal habeas petition. *Id.* at 347–48. Such review, however, was only afforded by the Pennsylvania court if "there are special and important reasons therefor." *Id.* at 351. The Supreme Court found that the manner in which this inmate presented his claims did not "constitute 'fair presentation.'" *Id.*

Texas law is clear that a conceded issue need not be addressed by an appellate court. *E.g., Alameda v. State*, 235 S.W.3d 218, 223 (Tex. Crim. App. 2007) ("Appellant concedes that if the audiotape were admissible, his complaint regarding the admissibility of the transcript of the recorded conversations would be moot. Therefore, because the audiotape was properly admitted, the transcript was also admissible, and we do not need to address Appellant's second ground for review."); *In re Estate of Vackar*, 345 S.W.3d 588, 592–93 (Tex. App.—San Antonio 2011) ("Based on Betty's concession that the trial court's judgment is not supported by the jury's finding of undue influence, we need not address Maggie's issues regarding undue influence."); *In re SWEPI L.P.*, 103 S.W.3d 578 582 n.2 (Tex. App.—San Antonio 2003) ("Shell also challenged the trial court's order denying Shell's motion for continuance. We need not address this issue as all parties now concede the matter is moot."). Texas's rule is hardly unique. *See E.E.O.C. v. CRST Van Expedited, Inc.*, 670 F.3d 897, 918 (8th Cir. 2012) ("In light of this concession,

we need not address Starke's appeal of the district court's decision to judicially estop Starke from pursuing her intervener claims against CRST."); *United States v. Agofsky*, 458 F.3d 369, 375 (5th Cir. 2006) ("Agofsky asserts additional claims solely to preserve them for further review.  Inasmuch as Agofsky concedes that these claims are foreclosed by precedent binding on this Court, we do not address them."); *Brent v. Dominguez*, 234 F. App'x 528, 529 (9th Cir. 2007) ("We do not address the merits of the district court's dismissal of Brent's APA claims because, in his reply brief, Brent conceded that the dismissal of those claims was proper.").  Accordingly, by conceding the Confrontation Clause claim conditioned on state law admissibility Gardner permitted the state court to avoid adjudicating the claim's constitutional merits.

Gardner's action of conceding the constitutional issue predicated on state law admissibility is a hybrid of *Picard* and *Castille*.  Gardner placed the same facts before the state court and this Court, but *Picard* teaches that this is not enough, and Gardner placed the same legal argument before the state court and this Court, but *Castille* teaches that this is not enough either. Rather, Gardner was required to present his Confrontation Clause claim in a manner that required adjudication by the Court of Criminal Appeals— opportunity is not enough.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) ("Section 2254(c) requires only that state prisoners give state courts a

*fair* opportunity to *act* on their claims.") (second emphasis added).   By concerning the constitutional issue he did not provide the Court of Criminal Appeals a fair opportunity to act on the claim.[49]   Indeed, raising a claim on appeal but thereafter shortly conceding the correctness of the lower court's decision is like raising no issue at all—if an appellate court is not required to address issues sua sponte, *Picard*, 404 U.S. at 277, they are surely not required to address conceded claims.   Accordingly, Gardner did not fairly present the claim and it is therefore unexhausted.

Should Gardner, however, file another state application in an attempt to exhaust this claim, it would be dismissed as abusive since he was required to include all available grounds for relief in his first application save certain, narrow exceptions that Gardner does not meet.[50]   *Nobles v. Johnson*, 127 F.3d

---

[49] This is not a case where the state court simply ignored a properly presented claim that was ripe for adjudication. *See Smith v. Digmon*, 434 U.S. 332, 333 (1978) (per curiam) ("It is too obvious to merit extended discussion that whether the exhaustion requirement of 28 U.S.C. § 2254(b) has been satisfied cannot turn upon whether a state appellate chooses to ignore in its opinion a federal constitutional claim."). The Court of Criminal Appeals acknowledged Gardner's Confrontation Clause claim but did not address it because Gardner conceded the issue. *Gardner*, 306 S.W.3d at 289 n. 20.

[50] There are three enumerated exceptions to Texas's abuse-of-the-writ bar, Tex. Code Crim. Proc. art. 11.071 § 5(a)(1)–(3), and Gardner undoubtedly could not meet any of them. First, Gardner could not show factual and legal unavailability because the facts underlying his Confrontation Clause claim were available at the time of trial, and the law was sufficiently developed by the time of his direct appeal to raise the claim—both were therefore clearly available before he filed his state habeas application. *Id.* at §5(a)(1). Second, Gardner could not meet the actual innocence exception as there is strong evidence—including his estranged wife's dying

409, 423 (5th Cir. 1997).  It is well-settled that abuse of the writ constitutes an adequate and independent state law ground that bars federal habeas review.  *Id.*; *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).  It is also well-settled that the Court of Criminal Appeals applies its abuse-of-the-writ rules regularly and strictly.  *See Fearance*, 56 F.3d at 642.  And, where an inmate's failure to exhaust precludes further state review, such unexhausted claims are procedurally defaulted in federal court.  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Nobles*, 127 F.3d at 423; *Emery v. Johnson*, 139 F.3d 191, 196 (5th Cir. 1997); *Fearance*, 56 F.3d at 642.  Consequently, Gardner's Confrontation Clause claim is procedurally defaulted.

### B.  Gardner's Confrontation Clause claim is barred from federal review by an adequate and independent state law ground.

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 130 S. Ct. 612, 614 (2009) (quoting *Coleman*, 501 U.S. at 729).  Foreclosure of federal review "applies whether the state law ground is

---

declaration—that he is guilty of capital murder.  *Id.* at § 5(a)(2).  Third, he could not show actual innocence of the death penalty because he is not categorically exempt from execution.  *Id.* at § 5(a)(3); *see Rocha v. Thaler*, 619 F.3d 387, 405 (5th Cir. 2010) (Texas's actual-innocence-of-the-death-penalty exception requires categorical exemption from the death penalty such as mental retardation or commission of the crime before the age of eighteen).  As such, Gardner cannot seriously contend that he could overcome Texas's abuse-of-the-writ bar.

substantive or procedural." *Coleman*, 501 U.S. at 729.  When an inmate fails to properly raise a claim in state court he "has deprived the state courts of an opportunity to address those claims in the first instance."   *Id*. at 732. Accordingly, preventing review of claims decided on state law procedural grounds "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Id*.

A state-law procedural bar is adequate to preclude federal consideration of a claim if it is "'firmly established and regularly followed.'" *Lee v. Kemna*, 534 U.S. 362, 885 (2002) (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)).  The discretionary nature of such a bar does not make it any less "adequate" for a "discretionary rule can be 'firmly established' and 'regularly followed' even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Beard*, 130 S. Ct. at 618.   And those situations where a state-law ground is found inadequate are but a "small category of cases." *Kemna*, 534 U.S. at 381.

Decisions by state courts "are independent of federal law [when] they do not depend upon a federal constitutional ruling on the merits."  *Stewart v. Smith*, 536 U.S. 856, 860 (2002).  In the context of federal habeas, there is no presumption of federal law consideration unless it is first determined that the state court decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law." *Coleman*, 501 U.S. at 735.  Where there is

no "clear indication that a state court rested its decision on federal law, a federal court's task will not be difficult." *Id.* at 739–40.

When a claim has been procedurally defaulted in state court, federal review is only allowed when a petitioner has shown cause and prejudice, or shown that a fundamental miscarriage of justice will occur but for review of the claim. *Coleman*, 501 U.S. at 749–50. A petitioner can invoke the miscarriage-of-justice exception only if he can show that he is actually, as opposed to legally, innocent of the crime or of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992). Actual innocence of the death penalty looks to eligibility for a sentence of death, not the jury's discretion in imposing such punishment. *Id.* at 346–47.

Gardner's confrontation claim was adjudicated on an adequate and independent state law ground—the Court of Criminal Appeals accepted the concession of a party. *Gardner*, 306 S.W.3d at 289 n.20. The acceptance of a party's concession does not implicate federal law so such action is independent of it. Texas courts have accepted concessions long before Gardner's appeal so the practice is firmly established. *E.g., Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 721 n.1 (Tex. App.—Houston [1st Dist.] 2005). And, as explained above, Texas courts often deny claims based on a concession so it is a practice that is regularly followed. *E.g., Alameda*, 235 S.W.3d at 223; *In re Estate of Vackar*, 345 S.W.3d at 592–93; *In re*

*SWEPI L.P.*, 103 S.W.3d at 582 n.2.  As such, the denial of a claim based on a concession is an adequate and independent state-law ground precluding federal review.  And because Gardner has not shown cause and prejudice or a miscarriage of justice despite his burden to do so,[51] the Confrontation Clause claim is procedurally defaulted as a result.

---

[51] Most likely, if Gardner were to argue cause and prejudice, he would claim that appellate counsel was ineffective for conceding the Confrontation Clause claim on direct appeal, and that state habeas counsel was ineffective for failing to raise the ineffective-assistance-on-appeal claim under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).  *Martinez* is inapplicable, however.  First, *Martinez* is limited to ineffective assistance at trial claims.  *Id.* at 1315 ("This opinion qualifies *Coleman* by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a *claim of ineffective assistance at trial*.") (emphasis added).  Second, Martinez applies only where a state chooses to purposefully wall off direct appeal from ineffective assistance at trial claims.  *Id.* at 1320 ("Where, *under state law*, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . .") (emphasis added).  Texas law does not so limit direct appeal.  *See Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011) ("[A]n appellate court may address and dispose of the [ineffective assistance] claim on direct appeal."); *accord Adams v. Thaler*, Nos. 12-70010, 12-40436, 12-70011, 2012 WL 1415094, at *3 n.4 (5th Cir. Apr. 25, 2012) (recognizing that Texas law allows ineffective-assistance-at-trial claims to be raised on direct appeal).  Third, Texas law also permits defendants to develop claims of ineffective assistance at trial during a motion for new trial proceeding.  *Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993) ("[W]e hold that ineffective assistance of counsel may be raised in a motion for new trial.").  This allows defendants thirty days to develop the claim before filing the motion, Tex. R. App. P. 21.4(a), and up to forty-five additional days before a ruling is required, Tex. R. App. P. 21.6, 21.8.  Thus, to the extent that dicta in *Martinez* suggesting that thirty days is not enough time to develop a claim of ineffective assistance, *Martinez*, 132 S. Ct. at 1318, it is not applicable in Texas.

Assuming that *Martinez* does apply, state habeas counsel—present counsel— was clearly effective in not raising an ineffective-assistance-on-appeal claim.  As explained below, *see infra* Section V(D), there is no merit to Gardner's Confrontation Clause claim so appellate counsel was not ineffective in conceding such claim.  *See Smith v. Murray*, 477 U.S. 527, 535–36 (1986) (choosing not to raise weak claims but, instead, focusing on claims more likely to succeed is the definition of effective appellate practice).  As such, state habeas counsel—present counsel—

### C.   Gardner is judicially estopped from taking a position contrary to the one he took on direct appeal.

On direct appeal Gardner conceded the Confrontation Clause issue contingent on a finding that the 911 call was a dying declaration.  Appellant's Brief at 43–45, *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009) (No. AP-75,582).  The Court of Criminal Appeals accepted the concession after it found that the 911 call met Texas's dying declaration exception, and did not decide the constitutional issue.  *Gardner*, 306 S.W.3d at 289 n.20.  Gardner's about-face should be judicially estopped.

> [W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.  This rule, known as judicial estoppels, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (alteration in original) (citations omitted) (internal quotation marks omitted).  This doctrine protects "the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *Id*. at 749–50

---

was not ineffective for failing to raise such a claim.  *See id*.  And Gardner cannot show his actual innocence of either the crime or the death penalty constituting a miscarriage of justice.  *See supra* Note 50.  He, accordingly, cannot escape the procedural default in this case.

(citations omitted) (internal quotation marks omitted).   Several principles guide application of judicial estoppel: (1) "a party's later position must be clearly inconsistent with its earlier position," (2) "whether the party has succeeded in persuading a court to accept that party's earlier position," and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51.  All of those are met in this case.

Clearly, Gardner is taking inconsistent positions—he admitted the constitutionality of the 911 call on direct appeal, Appellant's Brief at 43–45, *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009) (No. AP-75,582), and now he argues that it is unconstitutional, Pet. 129–35.   Second, he persuaded the Court of Criminal Appeals to accept his concession so the court did not decide the claim's merits.  *Gardner*, 306 S.W.3d at 289 n.20; *see New Hampshire v. Maine*, 532 U.S. at 752 ("succeeding" simply meant that the Supreme Court accepted the consent decree proposed by the parties).   Third, Gardner is seeking an unfair advantage—he could have determined the constitutionality of his claim almost three years ago, and allowed the state courts to correct the error, if any.  *See Coleman*, 501 U.S. at 732 (exhaustion requirement exists to provide state courts with the first opportunity to correct error).   Instead, he seeks to unravel his conviction several steps down the line, and after being provided an appropriate forum to litigate his claim.  *See*

*Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("[D]irect appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception."), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997).   And, importantly, he has not alleged that appellate counsel was ineffective by conceding the issue on direct appeal.[52]   Accordingly, this Court should deny Gardner the right to raise his current claim, inconsistent with his earlier assertion which was accepted by the Court of Criminal Appeals, for the purpose of seeking an unfair advantage.

### D.   The introduction of the 911 call did not violate the Confrontation Clause.

At trial Erin Whitfield, a 911 dispatcher, testified regarding a call she received at 11:58 p.m. on January 23, 2005.  19 RR 22–23.  The woman on the line identified herself as "Tammy," and said she needed an ambulance because her husband "had either slapped or shot her."[53]   19 RR 24–25. Tammy later stated that the person who had shot her left in a "white Ford

---

[52]  The Director does not suggest that judicial estoppel would have prevented Gardner from raising an inconsistent position during his state habeas proceeding, namely, that appellate counsel was ineffective for conceding the constitutionality of the 911 call.  Had Gardner raised and exhausted such a claim judicial estoppel would be inapplicable, at least as far as the ineffective assistance of appellate counsel claim would be concerned.

[53]  After the call ended Whitfield listened to the temporary recording of the call and confirmed that Tammy had said that her husband shot, not slapped, her.  19 RR 30–31.  The confusion arose because *Whitfield* had difficulty understanding Tammy's slurred speech, 19 RR 25, not because Tammy was confused about what had just happened to her.

pickup truck with Mississippi plates," and that her husband's name was "Steven Gardner." 19 RR 26–27. The call ended after about twenty minutes when it sounded like Tammy was choking and vomiting. 19 RR 28. The State also introduced an audio recording containing a small portion of the twenty-minute 911 call.[54] SX 1; 19 RR 32–34.

Gardner now claims that the state court got it wrong when it found the 911 call to be a dying declaration because: (1) it is a retrospective finding of fact; (2) "[n]o one can read the mind of another, or intuit a subjective belief;" (3) no evidence at trial suggested that Tammy subjectively felt that her death was imminent; and (4) the evidence at trial contradicts a belief that Tammy thought she was about to die. Pet. 131–33. Gardner further claims that the 911 call was testimonial because Tammy's statements were made "in response to questioning by the dispatcher [and] were not necessary to address an on-going emergency." Pet. 134–35.

Although Gardner attempts to challenge the correctness of the state court's finding that the 911 call was a dying declaration, he cannot do so in this forum—matters of state law, including the admissibility of evidence under a state's evidence rules, are for a state's courts to decide. *Corcoran*, 131 S. Ct. at 16; *Charles*, 629 F.3d at 500–01; *see Walker v. Harry*, No. 10-

---

[54] The 911 call was not recorded in its entirety because there was a malfunction in the recording equipment. 19 RR 32.

2063, 2012 WL 447479, at *1 (6th Cir. Feb. 13, 2012) (in raising a Confrontation Clause claim inmate could not challenge state law ruling that a statement was a dying declaration).  The determination that the 911 call constituted a dying declaration under the Texas Rules of Evidence is simply not an issue this Court may decide.

In any event, Gardner's challenge to the Court of Criminal Appeals' is, at bottom, a complaint that they considered objective evidence to determine whether Tammy subjectively believed that she was about to die.  *See* Pet. 131–33.  As the Court of Criminal Appeals noted, proof that a declarant believed that death was imminent is not limited to the words of the declarant.  *Gardner*, 306 S.W.3d at 289–91.  Instead, it can include the "declarant's conduct and the nature of his wounds."  *Id.* at 290. Consideration of such evidence to establish a belief of imminent death is proper and in accord with Supreme Court precedent.

In *Mattox v. United States*, 146 U.S. 140, 151 (1892), the Supreme Court interpreted the then-common law federal dying declaration hearsay exception as allowing proof of imminent death to come from what the declarant uttered, "the nature and extent of the wounds inflicted," and the conduct of the declarant.  *See, e.g., United States v. Shields*, 497 F.3d 789, 793 8th Cir. 2007) ("A declarant's serious injuries can support an inference that he believed death was imminent.").  While the "findings" of the Court of

Criminal Appeals may have been "retrospective," inferential and based on circumstantial evidence,[55] this practice is clearly permissible under Supreme Court precedent.[56] *See Mattox*, 146 U.S. at 151; *Shields*, 497 F.3d at 793.

Accordingly, the Court of Criminal Appeals noted that a substantial amount of evidence suggested that Tammy knew that her death was imminent:

(1) The single bullet entered her right temple, went through her brain, and exited below her left ear.  This was a mortal wound;

(2) Ms. Whitfield testified that Tammy's voice was very slurred and hard to understand;

(3) Tammy kept repeating that her head hurt and that she could not hear very well 'because her ears were ringing from the gunshots';

---

[55] Any review by an appellate court will be necessarily be retrospective of what occurred at trial, which itself is retrospective of what occurred at an earlier date.  And, any determination about a declarant's, or a defendant's, state of mind will be based on inference from circumstantial evidence absent a truthful confession. This does not mean that a court or a jury cannot draw reasonable, logical conclusions from background facts in order to make certain findings—this is the grist of the fact-finding mill—and Gardner has not provided any legal authority to suggest that such commonplace fact-finding renders a state court's decision unreasonable.  *See* Pet 133.

[56] The fact that Tammy tried to speak and walk after emergency personnel arrived at her home, Pet. 133, does not negate the evidence that she believed her death was imminent.  Instead, it confuses an attempt (and possibly hope) to save one's life with the recognition that one's life is ending.  Stated another way, evidence that a person has tried to extend their life after suffering mortal wounds does not negate the realization that death is not far off.  For example, had Tammy consented to emergency surgery this would not have nullified the objective fact that surgery had little chance of success.

(4) She said that her husband had shot her, there was blood everywhere, and she needed an ambulance;

(5) Before the phone disconnected, Ms. Whitfield heard what sounded like Tammy choking and vomiting;

(6) When the first deputy arrived, he found Tammy on the blood-soaked bed, trying to sit up; she appeared to be in shock and was bleeding badly from both the back and top right of her head;

(7) There was a trail of blood leading into the bathroom, around the toilet, and in the trash can;

(8) When the paramedics finally arrived, Tammy was 'spitting up a lot of blood' and mumbling incomprehensibly;

(9) She was in a vegetative state and died at the hospital two days later.

*Gardner*, 306 S.W.3d at 291–92.  The Court of Criminal Appeals decision—to the extent that a decision of state evidence law can be reviewed for reasonableness in a federal habeas corpus proceeding—in finding that the 911 call was a dying declaration was reasonable.  *See, e.g. Mattox*, 146 U.S. at 152 (a dying declaration was properly admitted into evidence because the statement was elicited within "a few hours" of the injury, "[t]he wounds were three in number, and one of them of great severity," and the declarant was told, by a physician, that his chance of survival was slim).  Because the 911

call was a dying declaration, it did not violate the Confrontation Clause as Gardner conceded on direct appeal.[57]

Regardless, the Confrontation Clause was not violated in this case because the 911 call was not testimonial.  In *Davis v. Washington*, 547 U.S. 813, 817–18 (2006), the Supreme Court considered whether the 911 call made in that case was testimonial.   The caller in *Davis* stated that she was involved in a domestic dispute, named her attacker, and then said her attacker fled.   *Id*.   The Court found that the 911 call was not testimonial because (1) the caller described events that were presently occurring; (2) the call was a plea for help; (3) the questions that the dispatcher asked were for the purpose of resolving an emergency; and (4) the setting was not formal "or even . . . safe."  *Id*. at 827–28.

The facts in Gardner's case are almost identical.   Tammy called 911, provided her name and address, and said "she needed an ambulance" because she had just been shot by her husband.   19 RR 24–25.   Tammy then provided a physical description of her residence, informed Whitfield that her attacker had just fled "in a white Ford pickup truck with Mississippi plates" when

---

[57] To the extent that this Court finds that Gardner's Confrontation Clause claim was adjudicated on the merits, the decision is clearly reasonable. *See Walker*, 2012 WL 447479, at *2 (state court's decision that a dying declaration did not violate Confrontation Clause was not an unreasonable application of clearly established federal law because, in part, the Supreme Court had noted, but not decided, that dying declarations were likely an exception to the ban on out-of-court testimonial statements); *Martin v. Fanies*, 365 F. App'x 736, 739 (8th Cir. 2010) (same).

asked if the shooter was still at the premises, and stated that her husband's name was "Steven Gardner."  19 RR 26–27.

Gardner argues that Tammy's identification of him and her description of his vehicle are testimonial because the emergency had ended when he fled. Pet. 134.  *Davis* makes clear that a dispatcher's "effort to establish the identity of the assailant" is not testimonial because it aids "the dispatched officers [to] know whether they would be encountering a violent felon." *Davis*, 547 U.S. at 827.  Here, Whitfield was doing the same thing—she needed to know the assailant's name to determine whether Gardner was "a violent felon," and needed the vehicle make to determine whether Gardner was still at Tammy's residence to insure the safety of first responders.  There is no reasonable, objective reading of the 911 call to suggest that Whitfield was questioning Tammy to determine past events for purposes of providing proof at a future trial; instead, she was meeting a then-present crisis.  The 911 call was therefore not testimonial, and did not violate the Confrontation Clause.[58]  *See id.* at 828.  Because Gardner's right to confrontation was not violated, either because dying declarations are an exception to the introduction of out-of-court testimonial statements or because the 911 call was not testimonial, relief should be denied.

---

[58]  Should this Court determine that Gardner's Confrontation Clause claim was adjudicated on the merits, it is clearly a reasonable application of Supreme Court precedent given the closeness in fit between Gardner's case and *Davis*.

Assuming that a Confrontation Clause violation occurred, the error was harmless. *See Fratta v. Quarterman*, 536 F.3d 485, 507–08 (5th Cir. 2008) ("Confrontation Clause violations are subject to harmless error analysis."). Harmless error inquiry of a Confrontation Clause violation can include "whether the testimony was *cumulative*, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (emphasis added).

To the extent that Gardner argues that his name, as uttered by Tammy, was testimonial, Pet. 134, the error is undoubtedly harmless. Before Whitfield was aware that the emergency had abated—and assuming that abatement is the only test appropriate for distinguishing between testimonial and non-testimonial statements[59]—Tammy had already informed Whitfield "that her husband had . . . shot her." 19 RR 25. Gardner's marriage status—

---

[59] This assumption is, in fact, incorrect. *Davis* did not define the "outer bounds of [an] 'ongoing emergency.'" *Michigan v. Bryant*, 131 S. Ct. 1143, 1158 (2011). Indeed, *Bryant* suggests that if Tammy had told the police who arrived at her home the information she relayed to Whitfield, it would have been non-testimonial because it would have been in response to an ongoing emergency to the public. This is because the police: (1) did not know the "potential scope of the dispute," *id.* at 1163–64, meaning the general public could have been exposed to harm; (2) a gun was used, *id.* at 1164, thereby lengthening the possibility of danger; and (3) did not know where the shooter was located, *id.* at 1164, negating that the danger had abated because he or she could have returned to the scene. If the responding officers could have elicited the information from Tammy contained in the 911 call, then surely the 911 call itself is not testimonial.

that he was Tammy's husband at the time of the shooting—was proven with other admissible evidence such as the divorce petition.  SX 39.  There can be no harm in Tammy's statement that her husband's name was "Steven Gardner" when the most inculpating aspect of the statement was "that her *husband* had . . . shot her," 19 RR 25 (emphasis added), a clearly non-testimonial statement.  In short, Gardner's name was cumulative of other evidence establishing that he was indeed Tammy's husband.

Further, to the extent that Gardner argues that the description of the vehicle was testimonial, Pet. 134, that, too, was clearly harmless.  The first law enforcement officer to arrive at Tammy's house, Deputy William Armstrong, spotted a white pickup truck on the way to scene.  19 RR 42–43. Gardner's brother-in-law, David Holifield, testified that he had a white Ford F-150 pickup truck that Gardner borrowed on the morning of Tammy's shooting, 20 RR 20–22, and returned the next day, 20 RR 32, 37.  Upon returning the pickup truck his sister asked him whether Tammy was "okay, and he said yes," implying that he had recently seen Tammy and knew her status.  20 RR 38–39.

In addition, Gardner's fingerprints were found inside the pickup truck, 19 RR 124–25, along with fibers that were consistent in diameter, color and chemical composition with those from Tammy's housecoat, 20 RR 86–91. Gardner's credit card was also used at a Marshall, Texas convenience store

117

on the day of Tammy's shooting, 19 RR 273; SX 44, and the cardboard backing of a pair of work gloves, SX 50, sold at the same convenience store, 19 RR 272, was found in the pickup truck as well, 20 RR 56–57.  And, most importantly, Tammy stated, in the midst of dying, "that her husband had . . . shot her." 19 RR 25.

The evidence of a white pickup truck bearing Mississippi license plates is merely corroborative that Gardner shot Tammy, the most important evidence being that Tammy identified Gardner as the shooter shortly before slipping into unconsciousness.   But there was also significant additional evidence that Gardner had used a white pickup truck to travel from Mississippi to Collin County, Texas, including his relatives' testimony, credit card statements, and fiber analysis.   Even if Tammy's statement that Gardner had fled in a white pickup truck with Mississippi license plates was inadmissible it was harmless considering that the statement was simply corroborative and relatively unimportant in the host of evidence against Gardner.  As such, relief should be denied.

## CONCLUSION

Because Gardner's claims have no merit the Director respectfully requests that Gardner's petition for writ of habeas corpus be denied with prejudice, that no certificate of appealability issue, and that further factual development be denied to the extent that Gardner requests such relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

 /s/ Matthew Ottoway
*MATTHEW OTTOWAY
Assistant Attorney General
State Bar No. 24047707

*Counsel of Record

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1400
Fax: (512) 320-8132

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do herby certify that on June 14, 2012, I electronically filed the forgoing pleading with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following counsel of record, who consented in writing to accept the Notice as service of this document by electronic means:

Lydia M.V. Brandt
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas 75085

/s/ Matthew Ottoway
MATTHEW OTTOWAY
Assistant Attorney General