UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| **JOHN STEVEN GARDNER, Jr.,**<br>    Petitioner,<br><br>*v.*<br><br>**WILLIAM STEPHENS,**<br>    Director, TDCJ. | 1:10-cv-610 |

**SUPPLEMENTAL SIXTH AMENDMENT CLAIM PRESENTED PURSUANT TO THE AUTHORITY OF *SPEER/MENDOZA***

COMES NOW, Seth Kretzer, Court-Appointed supplemental counsel for Petitioner Gardner, and presents a supplemental Ineffective Assistance of Counsel claim pursuant to the authority of *Mendoza v. Stephens*, 783 F.3d 203 (5th Cir. 2015), and *Speer v. Stephens*, 781 F.3d 784, 787 (5th Cir. Mar. 30, 2015).

**INTRODUCTION**

On August 13, 2015, this Court granted Gardner's motion for supplemental counsel. (Doc. No. 74). After review of the complete casefile, Counsel presents the following additional argument: "Mr. Gardner was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel when his trial lawyers failed to get the work product of their recalcitrant mitigation specialist, Shelli Schade."

1

*Deficient Performance By Trial Counsel*

With regards to *Strickland*'s first prong (deficient performance), both the trial lawyers and their expert, Dr. Kessner, stated in their affidavits that Ms. Schade had developed "an overly close" relationship with Gardner's family, especially his sister, Elaine. Standing alone, this vaporous social relationship would not have any legal significance. But the trial counsels also testified that, "Shelli Schade refused to share notes from her mitigation investigation and refused to summarize her findings in a report to the attorneys." This is significant because Dr. Kessner testified in her affidavit that she was "concerned that there were important corroborating witnesses who were not being located and interviewed for mitigation" and "Ms. Schade did not provide me with notes from any interviews she conducted."

In sum, trial counsel proceeded with an expert (Dr. Kessner) who they knew to have been provided far less than the complete data set available. Moreover, Dr. Kessner had voiced concern about this exact issue. Although Dr. Kessner was not ultimately called to testify at trial, the decision to call her (or not) was necessarily affected by the truncated information made available to her but which the trial lawyers could have easily made complete by getting the files Ms. Scade refused to provide.

**Martinez/Trevino:** *Deficient Performance By State Habeas Counsel*

With regards to ineffective assistance of state habeas counsel as cause-and-prejudice for the default, it is most salient that Gardner's state writ presented five discreet IAC contentions about the trial lawyers. Much of the information presented in the preceding paragraph was presented in Claims 3 (IAC for failure to adequately *investigate* and *develop* mitigating evidence) and 4 (IAC because trial counsel failed to adequately *present* crucial mitigating evidence) (emphasis in original). Gardner submits that his state habeas lawyer's performance

was nevertheless deficient because Claims 3 and 4 (while in and of themselves correct) self-imposed a higher hurdle than Gardner needed to clear.

Specifically, the issue was not the failure to adequately investigate (a pure *Wiggins* situation), because that investigation had been done. Rather, the issue was the failure to obtain work product from Ms. Schade created as part of that investigation. In the initial federal writ, Ms. Brandt comes close to making a similar point when she wrote, "trial counsel's performance was constitutionally ineffective because they failed to closely supervise and monitor the work of Ms. Schade, for whose work they were responsible." (Doc. No. 17, p. 106). "The mitigation investigation was woefully inadequate." *Id*. at p. 108. "The decisions of trial counsel are owed no deference because they were made after less than complete investigation." *Id*. at 121.

Yet, none of these statements is completely accurate, because by their own admission the trial lawyers ***did*** supervise and monitor Ms. Sshade's work; this parameter is anchored in their testimonies that they knew Ms. Schade had not disclosed certain information. To the contrary, the constitutional ineffectiveness redounds to the fact that the trial lawyers did not use tools at their disposal to pry this information from Ms. Schade's hands. In other words, the mitigating evidence was in the possession of the defense team, it just did not make it to the hands of the trial lawyers (where it would have been distributed to experts like Dr. Kessner) because of their professionally unreasonable decision not to countermand Ms. Schade's misconduct.

I. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

    A. LEGAL STANDARDS FOR A *MARTINEZ/TREVINO* CLAIM

The Fifth Circuit has recently clarified the legal standards for the ineffectiveness of state habeas to predicate cause-and-prejudice for procedural default of an IAC claim on the part of trial counsel:

3

> In *Martinez v. Ryan*, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272 (2012), the Supreme Court concluded that ineffective assistance by a state habeas attorney may amount to cause where state procedural law requires that an ineffective assistance of trial counsel claim be raised in an initial state habeas application. The Supreme Court extended *Martinez* in *Trevino v. Thaler*, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013), to cases in Texas, where state law—on its face—permits an ineffective assistance of trial counsel claim to be raised on direct appeal, but in effect makes it virtually impossible to do so. To meet *Martinez's* "cause" exception, the applicant must show that the representation provided by his state habeas counsel fell below the standards established in *Strickland* and that his underlying ineffective assistance of trial counsel claim "is a substantial one, which is to say ... that the claim has some merit." *Martinez*, 132 S.Ct. at 1318.

*Allen v. Stephens*, 805 F.3d 617, 626 (5th Cir. 2015).

### B. Numerous Observations of Ms. Schade's Non-Disclosure of Work Product Materials

#### 1. Trial Lawyer's Joint Affidavit

Gardner submits that the ineffectiveness of his trial lawyers is established by the joint affidavit they filed in response to his state writ:

> Shelli Schade refused to share notes from her mitigation investigation and refused to summarize her findings in a report to the attorneys. She was overly concerned with what could be discoverable by the State and despite the attorneys' reassurance that it would not be discoverable, she refused to put together a report of any form for use by the investigator and the trial team.

Exhibit "A", p. 7.

> Both attorneys agree with Dr. Gilda Kessner's assessment of Shelli Schade's work that she 'developed an overly close relationship with the defendant and his family members, specifically his sister Elaine, and took on the role of counselor to them rather than a mitigation investigator.

*Id*. at p. 6.

#### 2. Dr. Kessner's Affidavit

As indicated above, the trial lawyers' affidavit quoted from Dr. Kessner's affidavit. The critical language is found in Paragraph 10:

> I also had telephone conferences and in person conferences with the defense attorneys and various members of the defense team. I voiced my concern that there were important corroborating witnesses who were not being located and interviewed for mitigation. Ms. Shelli Schade the social worker hired by the attorneys for the mitigation investigation indicated that people in small towns would not be willing to reveal information and therefore corroborating information could not be obtained from them. The meeting with the defense team and Ms. Holifield proved to be difficult. Ms. Holifield kept looking to Ms. Schade before she would answer questions, at one point she became very tearful, and asked if she could just speak with Ms. Schade. I instructed Ms. Holifield that she was going to have to answer my questions without coaching by Ms. Schade. She stated that she was concerned if she spoke with anyone but Ms. Schade that the information could come out at trial. Ms. Schade appeared to have developed an overly close relationship with the defendant and his family members, such that she seemed to take on the role of counselor to them instead of mitigation investigator. Ms. Schade did not provide me with notes from any interviews she conducted. It was my impression that she did not provide summary notes to the attorneys either.

Exhibit "B", p. 3-4.

      **3.     Ms. Schade's Affidavit**

Ms. Schade's affidavit did not address the non-disclosure of work product, but it is striking that there was personal animosity between Ms. Schade and the trial lawyers:

> Prior to Dr. Kessner and Dr. Allen's testimony during the punishment phase of the trial, Mr. Gardner's attorney, Bob Hulkrantz, stated that it was a trial team strategy not to put on consulted or testifying experts. This was a false statement as the entire defense team including Randi Ray, Dr. Kristi Compton and myself were not consulted and were not involved in the decision not to present this testimony. It was a decision made by Bob Hulkrantz and Bennie House in the hallway of the courthouse and not the entire defense team. As a matter of fact, Randi, Dr. Compton, and myself were very surprised when Mr. Hulkrantz made this statement in court considering both experts were in attendance in the courtroom that day prepared to testify in the punishment hearing.

Exhibit "C", p. 1.

     **C.    Argument and Analysis: Deficient Performance Is Established By The Reality That Schade's Notes of Interviews Qualified As Unalloyed Attorney Fact Work Product**

         **1.     Ms. Scahde's Notes Belonged to Gardner, Not Herself Anymore Than They Did the Trial Lawyers**

5

Gardner's baseline proposition is the simple fact that work product (both fact and opinion) belongs to the client. The Texas State Bar rules provide that a lawyer must "promptly pay or deliver to the client as requested by a client, the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive." DR 9–102(B)(4).

> Both the Texas Bar and the Houston Court of Civil Appeals have held that this rule applies to documents in an attorney's files. *See Hebisen v. Texas*, 615 S.W.2d 866, 868 (Tex.Civ.App.—Houston 1981, no writ); Professional Ethics Committee, State Bar of Texas, Ethics Op. 395 (1980), reprinted at ABA/BNA Lawyer's Manual on Professional Conduct: Ethics Opinions 1980–1984 801:8301 (1984).

*Resolution Trust Corp. v. H——, P.C.,* 128 F.R.D. 647, 648-50 (N.D. Tex. 1989) (Sanders, J.).

> The information contained in the attorney's files belongs to the client. Such information includes material provided by the client; all correspondence; all pleadings, motions, other material filed in discovery, including depositions (and) all documents which have evidentiary value. "Papers and property" also includes photographs.

Meegan B. Nelson, Note, *When Clients Become "Ex-Clients": The Duties Owed After Discharge*, 26 J. LEGAL PROF. 233, 237 (2002) (quotations omitted).

Gardner's second argument rests in the simple reality that privilege extends to statements made to investigators for a lawyer. "Ingram also seems to argue that the communication was not privileged because it was made to an ***investigator*** rather than an attorney. ***The investigator was an agent for Ingram's attorney***, however, so it is as if the communication was to the attorney himself." *United States v. McPartlin*, 595 F.2d 1321, 1337 (7th Cir. 1979) (emphasis added).

Ms. Schade's affidavit states that she is a "Licensed Master Social Worker", but it is unclear if there is a proper license and less formalized certification to qualify as a "Mitigation Specialist." For purposes of privilege, however, this is a distinction with no difference: "[t]he fact that he is not a licensed professional is not outcome determinative. The standard is whether

6

the third-party agent is supervised directly by an attorney and whether the communications were intended to remain confidential." *Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 72 (S.D.N.Y. 2010); "Notes of a prosecuting attorney ***or members of his or her staff*** ordinarily are considered nondiscoverable work product because they are prepared in anticipation of litigation." 23 Am. Jur. 2d Depositions and Discovery § 278 (emphasis added).

In sum, there is no doubt that trial lawyers retain supervisory authority over a mitigation specialist appointed by a criminal state trial judge for that exact purpose. Applying these legal principles to the facts presented in Gardener's case, it necessarily follows that any statements gathered by Ms. Schade were every bit as protected under work-product privilege doctrine as they would have been if Mr. Hulkrantz or Mr. House had taken these statements themselves.

### 2. It Was Professionally Unreasonable For The Trial Team Not to Demand Ms. Schade's Documents

Gardner is not asking this Court to make a determination as to whether or not Ms. Schade's stated concern that if she disclosed her notes to the trial team that the State would be able to discover them was right or wrong. Assume for sake of argument that Ms. Schade was correct and the state could have filed a motion to force the defense lawyers to produce these documents; this hardly means that the state judge would have granted such a motion. Moreover, how would the state know (unless Ms. Schade went and told them) that such documents existed in the first place? Whatever the answer to these varied hypothetical questions, the point is that these are risks for the trial lawyers to consider, not a social worker.

By contrast, Gardner is asking this Court to determine that it was professionally unreasonable for the trial lawyers to lay supine while Ms. Schade shirked her job duties. First, it is a given that the trial lawyers ordered her to produce these documents to them; their affidavit is

clear, "despite the attorneys' reassurance that it would not be discoverable, she refused to put together a report of any form for use by the investigator and the trial team." Second, if Ms. Schade continued to refuse to produce these documents, the trial lawyers should have requested an *ex parte* hearing with the presiding judge. It is hard to see a situation in which a trial judge would permit an expert to refuse to hand over documents she had been paid with public funds to create.

Furthermore, on the subject of compensation, Gardner's opening writ filed in this Court argued that "the billing records of Ms. Schade, the trial mitigation specialist, was inadequate." Doc. No. 17, p. 105. For present purposes, the point is simply that Ms. Schade was in fact paid for her services. But before a court will pay a voucher for expert services, the trial lawyer must sign an affirmation that services have been rendered. If Ms. Schade insisted that she would not hand over the documents, the trial lawyer's simplest response would have been to decline to submit a signed voucher.

Gardner adduces the following line of cases in support of his contention of deficient performance: *Goodman v. Bertrand*, 467 F.3d 1022, 1029 (7th Cir. 2006) (holding that trial counsel was ineffective for failing to call witness who counsel knew could present evidence that client was not the person who committed the crime, and stating that such could not be considered a tactical decision.); *Mathews v. Abramajtys*, 319 F.3d 780 (6th Cir. 2003) (upholding district court's grant of writ of habeas corpus, focusing on trial counsels failure to present potential alibi witness); *Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001) (holding that trial counsel's decision not to call two important fact witnesses could not be seen as plausible strategic decision making or adequate pretrial investigation where counsel knew they would provide useful non-cumulative trial testimony).

Synthesizing these cases, Gardner submits that the question becomes, 'What strategic or tactical reason did the trial lawyers have for neglecting to make Ms. Schade produce her file after she refused to do so in response to their request for same because this non-lawyer/social worker self-proclaimed a false legal premise that she would thereby trigger a reciprocal discovery obligation?' Since the answer is "there was no such strategic or tactical reason", Gardner has carried his burden on the first prong of *Strickland*.

D.    *Strickland*'s Second Prong: Prejudice Analysis

Dr. Kessler's affidavit was clear:

> I believe I had scant information for the development of a coherent mitigation theme due to the absence of detailed and corroborated information about Mr. Gardner's background. There was an abundance of information from Mr. Gardner but without corroborating witnesses my ability to present mitigation information to the jury was necessarily very limited.

Exhibit "B" p. 4; ¶12.

Why was Dr. Kessler's information limited? Because the trial lawyers took no effort to pry it from Ms. Schade's file.

Denying a § 3599(f) funding request in the context of a *Martinez/Trevino* claim, the Fifth Circuit recently held that investigation into what family member witnesses would have said had they been called **_supported_** a finding of prejudice under the second prong of *Strickland*, but denied relief because the trial lawyers were found not to have performed deficiently because they had not had prior indication that these witnesses would not voluntarily attend:

> Allen seeks to investigate the testimony his family members would have given if they had been subpoenaed. **This testimony might possibly lend support to Allen's prejudice argument,…**

*Allen v. Stephens*, 805 F.3d 617, 638 (5th Cir. 2015) (emphasis added).

9

Gardner submits that *Allen* gives succor to Gardner's prejudice argument for very similar reasons as it did on the facts presented in that case. The core issue in *Allen* trained on the fact that a social worker (Bettina Wright) testified about abuse family members afflicted on Allen, but without corroborating testimony from the absent family members, the jury was left to wonder if Allen had told this social worker the truth. Indeed, the jury sent out three jury notes specifically inquiring about whether or not Wright had actually spoken to family members. The Court held that, "Allen makes a ***plausible argument*** that further corroborating testimony could have been dispositive, pointing out that multiple jury notes during the sentencing phase deliberation indicate that the jury was not only interested in, but also divided on, the reliability of Wright's testimony and the possible statements of Allen's family members upon which Wright had relied." *Id*. at 637, n.4 (emphasis added).

By contrast, in Gardner's case, the issue is not what uncalled witnesses would have said, but rather whether or not the trial outcome was affected by the trial lawyers' decision not to take simple and costless (but necessary) steps to get documents they knew they needed and had actually asked for from their mitigation specialist. Gardner submits that the answer is necessarily "yes" because had this data been handed over to the trial lawyers, they would have passed it on to (potentially) testifying experts who would have then used it to inform and buttress their opinions. More fully informed opinions would have necessarily affected the trial lawyers' decision on whether or not to call experts like Dr. Kessner.

### E. Conclusion

*Martinez* requires that the underlying IATC "claim has some merit." *Martinez*, 132 S.Ct. at 1318. Gardner respectfully submits that he has shown far more than a mere shadow of "some merit."

There is no professional justification for the trial lawyers to have signed a voucher for an expert who refused to turn over the work she was being paid to produce. Gardner was prejudiced because Dr. Kessner's analysis, and corresponding potential testimony, was necessarily circumscribed by the limited data furnished to her. The *deus ex machina* is that this data was sitting in Ms. Schade's briefcase and it was the sole fault of trial counsel that it did not make it onto Dr. Kessner's desk.

## II. *Martinez/Trevino* IAC As Cause For Procedural Default

Having established that trial counsel performed deficiently and Gardner was harmed in the *Strickland* framework, the next issue becomes whether or not Gardner's situation qualifies for the *Martinez/Trevino* mechanism to excuse the default. For methodological convenience, Gardner will address the familiar *Strickland* elements in reverse order.

### 1. Harm/Prejudice Analysis

Had the failure of trial counsel to get the documents at issue from Ms. Schade's files been properly presented to the state habeas court, there is simply no way the FFCL would have reached the same conclusions. For example, Paragraph 64 concludes:

> Counsel thoroughly investigated and prepared for Applicant's trial, including traveling to Mississippi to interview witnesses and hiring a mitigation expert, a private investigator, and two mental health experts to assist with the case.

FFCL; p. 11.

There can be no doubt that the term "hiring a mitigation expert" does not stand without some qualification, as Ms. Schade clearly had acrimony with trial counsel and (more impactful) refused to give her file over when it was requested. This difference is also demonstrated in Paragraph 67: "Counsel believed that their mitigation expert, Shelli Schade, was 'over close'

with Applicant and his family, but they did not believe that their investigation was impaired." *Id.* at p. 11. We know this is untrue, since the trial lawyers specifically testified, "despite the attorneys' reassurance that it would not be discoverable, she refused to put together a report of any form for use by the investigator and the trial team." In other words, the "impairment" is a given since the trial lawyers did not have access to information Ms. Schade would not release from her control.

      Paragraph 32 concludes:

Dr. Kessner's theory adds psychological context to but does not contradict the State's theory that Applicant felt he had lost control of the relationship and killed Tammy to present her from finalizing the divorce.

      The crux of Gardner's *Martinez/Trevino* claim is that a vicious feedback loop was put in motion when the trial lawyers neglected to get documents they had requested and were entitled to. What the habeas judge called "context" would necessarily have been developed into something more had the complete file been provided to Dr. Kessner for her to analyze and incorporate into her potential testimony.

      **2.**      **Deficient Performance of State Habeas Counsel**

      To be sure, there is substantial overlap between Garden's *Martinez/Trevino* claim and the nucleus of IATC claims presented both in state habeas and in the opening writ. The problem is that state habeas counsel presented a pure *Wiggins* claim that reduced to the argument 'trial counsel should have investigated further.' At that level of abstraction, relief was denied because trial counsels were afforded a wide latitude of professional judgment. But when the issue becomes failure to pry documents from a court-appointed expert who would not be paid until those trial lawyers signed the expert's voucher, that latitude narrows considerably.

### III. CONCLUSION

Trial counsel did not need another trip back to Mississippi to gather evidence in order to be *Wiggins*-compliant. What was needed was a simple impetus for Ms. Schade to give over the documents she had been paid to create. It would not have taken much effort for this to happen; refusal to sign off on her voucher would likely have done the trick, but if that did not work a simple *ex parte* motion to the judge would surely have done so. Trial counsel cannot hide behind the mitigation specialist's (a non-lawyer) erroneous but self-proclaimed legal conclusion that disclosure would have made her files subject to discovery by the prosecution. Gardner satisfied both *Strickland* elements at the level of both his trial lawyers and his state habeas lawyer.

    Respectfully submitted,

    /s/ Seth Kretzer

    Seth Kretzer

    LAW OFFICES OF SETH KRETZER
    440 Louisiana St.; Suite 200
    Houston, Texas 77002
    [Tel.] (713) 775-3050

    seth@kretzerfirm.com

    COURT-APPOINTED ATTORNEY FOR
    PETITIONER GARDNER

### CERTIFICATE OF SERVICE

I certify foregoing brief was served on all counsel of record through the ECF system on December 14, 2015.

I also certify that I mailed a paper copy to Mr. Gardner at the Polunsky Unit.

_____
Seth H. Kretzer