IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JOHN STEVEN GARDNER | § | |
| | § | CIVIL ACTION No. 1:10-CV-610 |
| v. | § | |
| | § | JUDGE RON CLARK |
| DIRECTOR, TDCJ-CID | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER OF DISMISSAL</u>

Petitioner John Steven Gardner, an inmate confined on death row in the Texas prison

system, filed the above-styled and numbered Petition for a Writ of Habeas Corpus pursuant to 28

U.S.C. § 2254. Mr. Gardner is challenging his capital murder conviction and death sentence

imposed by the 219th District Court of Collin County, Texas, in Cause Number 219-81121-06,

*The State of Texas vs. Gardner.* The Court finds that the Petition should be denied.[1]

## I. PROCEDURAL HISTORY OF THE CASE

On November 14, 2006, Mr. Gardner was convicted and sentenced to death for the

murder of his estranged wife, Tammy Gardner, in the course of committing or attempting to

commit burglary or retaliation for her status as a prospective witness. 2 CR (219-81121-06) 608.

The offense took place on January 23, 2005. The Texas Court of Criminal Appeals affirmed the

conviction and death sentence. *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009). On

---

[1] "CR" refers to the documents and pleadings filed in the State convicting court, or clerk's record. The clerk's record in this case totals six volumes; however, Mr. Gardner was re-indicted twice, so instead of six sequential volumes, there are three two-volume sets differentiated only by the trial court cause number. The references are preceded by the volume number and followed by the trial court cause number and page number where necessary.

"RR" refers to the reporter's record of the transcribed testimony during the trial, preceded by the volume number and followed by the page number.

"SCHR" refers to the State habeas clerk's record, preceded by the volume number and followed by the page number.

On the disc containing these documents, the CR and RR are in a file labeled AP 75,582. The SHCR is in a file labeled WR 74,030.

October 4, 2010, the United States Supreme Court denied the  petition for writ of certiorari.  *See*

*Gardner v. Texas*, 562 U.S. 850, 131 S. Ct. 103 (2010).

    While the direct appeal was pending, Mr. Gardner filed an application for a writ of habeas

corpus in State court.  1 SHCR 3–216.  The trial court entered written findings and  recommended

that relief be denied.  2 SHCR 383–401.  The T e x a s  Court of Criminal Appeals adopted a

majority of the habeas trial court's recommended findings and denied relief.  *Ex parte Gardner*,

No. WR-74030-01, 2010 WL 3583072, at *1 (Tex. Crim. App. Sept. 15, 2010) (unpublished). On

September 15, 2010, the Texas Court of Criminal Appeals denied relief based on the trial court's

findings and conclusion and on its own review of the record, and included the following statement

with its denial:

> [The court] agree[s] with the trial judge's recommendation and adopt the trial judge's
> findings and  conclusions, except for findings paragraphs 67, 85, and 86. In
> addition, we do not adopt the phrase, "at China Blue's direction," in findings
> paragraph 81. We also observe that the word, "first," in findings paragraph 94(c)
> should be changed to the word, "second." Based upon the trial court's findings
> and conclusions and our own review of the record, relief is denied.

*Gardner*, 2010 WL 3583072, at *1.

    Mr. Gardner began the present proceedings on September 29, 2010.  He filed his original

petition for writ of habeas corpus on September 7, 2011.  (Dkt. # 17).  The Director responded (Dkt.

# 27), and Mr. Gardner replied (Dkt. # 32).

    Subsequently, the United States Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012) held

that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause

for a prisoner's procedural default of a claim of ineffective assistance of trial."  566 U.S. at 8.  Later

that year, the Fifth Circuit held that *Martinez* did not apply to habeas cases in Texas.  *Ibarra v.*

*Thaler*, 687 F.3d 222, 227 (5th Cir. 2012).  In 2013, the United States Supreme Court released its

decision in *Trevino v. Thaler*, in which it held that in Texas, a death row inmate can raise an

ineffective assistance of counsel ("IATC") claim for the first time in a federal habeas petition because Texas courts make it "virtually impossible" to present an IATC claim on direct review. *Trevino v. Thaler*, 569 U.S. 413, 133 S. Ct. 1911, 1915 (2013) (quoting *Robinson v. State*, 16 S.W.3d 808, 811 (Tex. Crim. App. 2000)).

Mr. Gardner then moved for "Additional, Conflict-Free Counsel," on the basis of *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).  (Dkt. # 49). The court granted the motion and appointed additional counsel to address whether Mr. Gardner could establish cause and prejudice for any procedurally defaulted ineffective assistance of trial (IATC) claims.  (Dkt. # 74).  That counsel filed a supplemental IATC claim.   (Dkt. # 78).  The Director filed a response (Dkt. # 79), and Mr. Gardner, through his additional-but-independent counsel, replied (Dkt. # 82).  Mr. Gardner's habeas counsel also filed a response.  (Dkt. # 84).

## II.  FACTUAL BACKGROUND OF THE CASE

The Texas Court of Criminal Appeals summarized the factual background of the case as follows:

> [Mr. Gardner] and Tammy Gardner had a relatively short, but violent, marriage. Before Tammy married [Mr. Gardner] in 1999, she was very outgoing and happy. After that marriage, she lost weight, became introverted, and lost her sparkle. [Mr. Gardner] dominated, threatened, and physically abused her.  His name was tattooed on her inner thigh.
>
> Jacquie West, Tammy's best friend, testified that the one time she visited Tammy's home after the marriage, she and Tammy's daughter, Jessie, were sitting in the living room when [Mr. Gardner] came in, pushed Tammy onto the bed, sat on her, choked her with his hand, and then put a gun to her head. [Mr. Gardner] said that if Jacquie didn't leave, he would kill Tammy. Jacquie left and never returned.  Shortly thereafter, Tammy sent Jessie to live with her natural father for her safety.
>
> Both Jacquie and Jessie saw injuries on Tammy's face on various occasions. Tammy told Jessie that one time [Mr. Gardner] shoved her into a bookcase, then hit her and gave her a black eye.  Jacquie said that Tammy once had a large bruise running diagonally across her face.   When confronted, Tammy matter-of-factly admitted that [Mr. Gardner] had hit her in the face with a hammer.  Both had seen [Mr. Gardner] "stalking" Tammy at different times.  Tammy told them that "she wasn't getting out of there alive," meaning that she would not get out of her marriage alive. Candace Akins, her boss at the Action Company, a wholesale horse-equipment

company, said that Tammy was constantly fearful, nervous, and in extreme financial difficulties. Tammy said that "she wanted out of the relationship," but she was afraid to leave, and she told Candace many times, "I can't leave, he will kill me."

Tammy eventually went to a neurologist complaining of vision loss, headaches, sleeplessness, anxiety, and depression. She told the doctor's wife—who was assisting her husband and who had her own family counseling practice—that she was too embarrassed to tell the doctor that her migraines were caused by physical injuries from her husband. She said that [Mr. Gardner] had pulled her hair and hit her both with his fists and with a gun. She was very frightened of him and kept crying, "The only way I'm going to get out of this relationship is by being dead." She explained that [Gardner] had threatened to kill her and her children if she left him.

Finally, in December 2004, Tammy borrowed money from her company to file for divorce. On Christmas day she told [Mr. Gardner] to move out, so his parents came and took him and his belongings back to Mississippi. She "perked up" after she filed for divorce, and she began to see more of Jacquie and her daughter Jessie. At work, Tammy marked her calendar for February 7, 2005, the day her divorce would become final, and she would go over to the calendar and say, "You're almost there. You're almost there."

But she also told Jacquie, Jessie, and Candace that she didn't think she would get to that day because [Mr. Gardner] would kill her first. Jessie testified that [Mr. Gardner] kept calling and leaving phone and text messages: "Are you going through with the divorce or not?" When Jacquie and Tammy had lunch together at Applebee's on January 20th, Tammy's cell phone started ringing as soon as they got there. It rang constantly, making Tammy upset and scared. She told Jacquie, "He's going to kill me" before the divorce becomes final.

On Sunday, January 23rd, Tammy was driving Jessie home after church when [Mr. Gardner] kept text messaging about the upcoming divorce and asking "YES OR NO?" Jessie read the text messages to her mother, who became frantic, but Tammy did not reply to [Mr. Gardner's] question. The messages stopped about 5 p.m. Jessie stayed at her father's home that night.

Tammy called David Young, her company's vice-president, early that evening and asked him if she could come talk to him. She arrived around 7:00 p.m. and stayed about three hours, seeking his help in "disappearing" so that no one could track her. Mr. Young was concerned about Tammy's safety, but he felt more comfortable when she called him after she returned home about 11 p.m. According to the phone records, they talked until 11:13 p.m.

At 11:58 p.m., Erin Whitfield, the 911 dispatcher for the Collin County Sheriff's Office, received a 911 call from a woman who identified herself as "Tammy," gave her address, and said she needed an ambulance. Her speech was very slurred and hard to hear, but she said that her husband had either slapped or shot her (Ms. Whitfield wasn't sure until she replayed the tape that the word was "shot"). The woman said that she couldn't hear the dispatcher because her ears were still ringing from gunshots and that her head hurt and "there was blood everywhere." When Ms. Whitfield asked if the person who shot her was still there, the woman said, "No, he left in a white pickup truck with Mississippi plates." She said his name was Steven Gardner. The dispatcher had to yell and repeat herself because the woman sounded like she was choking and vomiting. Then the line disconnected.

Ms. Whitfield dispatched police and paramedics, but it took the police about 25 minutes to arrive because, at first, they went to the wrong address, 3191 FM 2862

4

instead of 9191 FM 2862.  As Deputy Armstrong drove there, he saw a white truck sitting in a ditch by a creek about two or three miles from Tammy's home, but it was only later that he learned that they were looking for a white truck.  He was the first to arrive at Tammy's home.  He knocked on the doors, but there was no answer, and he could not get in through the windows.  He had to kick in the front door.  He saw a light on in the bedroom, and, when he entered, he saw Tammy on the bed with a trail of blood leading into the bathroom.  She was trying to sit up, but she was bleeding badly from her head and seemed to be in shock.

By the time the paramedics arrived, Tammy was spitting up a lot of blood and mumbling incomprehensibly.  She was wearing a red robe.  One of the paramedics, Stephanie Taylor, cut the bottom part of the robe off because she couldn't properly assess Tammy's condition while she was dressed.  Tammy was flown by helicopter to Parkland Hospital, but she went into a coma, and her family took her off life support two days later.  Tammy died from a single gunshot to her head.  The bullet had hit her in the front right temple, traveled downward through her brain, and exited below her left ear.  Apparently, Tammy had been sitting up against a pillow in bed, and the exiting bullet went through the pillow and out the bedroom window.  The bullet was never recovered.

Investigating police found Tammy's house keys—keys that Jessie said her mother always kept in her purse—in a tool chest in the back of her truck parked in the driveway.  Nothing else appeared to have been taken from the house.  There was no sign of forced entry.

Meanwhile, [Mr. Gardner] had borrowed his brother-in-law's white Ford F–150 pickup truck that Sunday afternoon, saying that he was going to visit relatives in nearby Hattiesburg.  However, [Mr. Gardner's] credit card was used twice that day at a convenience store in Marshall, Texas, which is on the way from Mississippi to Collin County.  He apparently bought gas for $28.00 and then made another purchase for $3.86.  The backing and store price tag for a pair of Brahma work gloves—an item that the Marshall convenience store sold for $1.49—were later found in the white F–150 pickup.  [Mr. Gardner's] fingerprint was found in that pickup as were fibers that were similar in all respects to red fibers taken from Tammy's robe.

In the early hours of Monday, Collin County Det. Cundiff found [Mr. Gardner's] father's telephone number and called him in Mississippi.  Det. Cundiff obtained [Mr. Gardner's] cell phone number and called him at 5:15 a.m.  [Mr. Gardner] hung up on him.  [Mr. Gardner] returned to his brother-in-law's home driving the white F–150 pickup at about 8:30 a.m.  His sister, Elaine Holifield, had already been told that Tammy had "an accident."  She confronted [Mr. Gardner] and asked, "What happened?"  He didn't say anything; he just started crying.  She asked if Tammy was okay, and [Mr. Gardner] said, "Yes."  Elaine told him that he had to turn himself in to the police, and he said, "Okay."  He showered, changed clothes, shaved, and went first to his parents' home and then to the sheriff's office.  Elaine then went to check for her husband's .44 Magnum that he kept under his mattress.  It was there, with five live rounds and one spent round.  [Mr. Gardner's] brother-in-law testified that he never left spent shells in his gun; he always reloaded it.

When [Mr. Gardner] turned himself in to the sheriff's office in Mississippi, officers there called Det. Cundiff in Collin County, who said that he did not have a warrant out for [Mr. Gardner's] arrest.  But he asked to speak to [Mr. Gardner] on the phone, and [Mr. Gardner] agreed.  Det. Cundiff explained that he knew that [Mr. Gardner] had been in Texas and he wanted to find out what happened to Tammy.  [Mr.

Gardner] said, "I don't have an answer for that one."  When Det. Cundiff explained that Tammy had been shot in the head, [Mr. Gardner] replied, "Okay."  Then Det. Cundiff said that Tammy was still alive, and [Mr. Gardner] said that she could tell what had occurred "if she wants, that'll be fine."  [Mr. Gardner] then went home but was later arrested and brought back to Collin County for trial.

*Gardner*, 306 S.W.3d at 281–84.

At the punishment phase of the trial, the State introduced evidence of Mr. Gardner's violent past.  Mr. Gardner had been married five times, and all of his marriages, with the exception of the first marriage, were marked with violence and depravity.  Mr. Gardner married his first wife, Rita, in Hawaii, and they eventually separated without apparent incident.  23 RR 48.

Mr. Gardner thereafter married Rhoda, and they resided in Laurel, Mississippi.  22 RR 28–30; 23 RR 49.  Their relationship ended when Mr. Gardner waited for Rhoda in hiding, called out to her, and then shot her when she turned around.  22 RR 77.  Mr. Gardner shot Rhoda again as she lay on the ground, and stood over her until she urinated on herself, believing that this confirmed that she had died.  22 RR 77–78.  But, Rhoda survived the three gunshot wounds but was rendered a paraplegic.  22 RR 16–17.  She was pregnant at the time of the shooting and had a miscarriage approximately seven weeks after being shot.  22 RR 17–18.  Rhoda underwent a surgical procedure after she miscarried; she died during the operation.  22 RR 19–20.  Mr. Gardner was convicted of aggravated assault for shooting Rhoda and was sentenced to eight years' imprisonment.  22 RR 33; SX 77.

While imprisoned for his criminal activity against Rhoda, Mr. Gardner began corresponding with Margaret Westmoreland.   They became romantically involved.  22 RR 33–34.  When Mr. Gardner was released on parole, he married and moved in with Westmoreland.  Her two children from her previous marriage, six-year-old Tim and thirteen year-old Becky, lived with them.  22 RR 34–35.  Westmoreland testified that their dating relationship was "great," but after marriage, Mr. Gardner acted like "he owned" her.  22 RR 36.  Mr. Gardner dictated what Westmoreland could

wear, eroded her self-esteem, and ominously watched her while she was at work.  22 RR 36, 38–39.   Mr. Gardner also threatened Westmoreland and her family, including threats of "skinning" Westmoreland's children alive, while Westmoreland watched, and breaking Westmoreland's neck.  22 RR 37.  Westmoreland thought that Mr. Gardner would eventually kill her, but she did not immediately leave him because she did not believe it was safe to do so.  22 RR 38, 40.

Testimony revealed that Mr. Gardner was also sexually and emotionally abusive to Becky during his relationship with Westmoreland.  22 RR 67, 78.  Mr. Gardner's and Westmoreland's relationship ended when Mr. Gardner violently assaulted Becky.  The teenaged girl required seventy-eight stitches in her head to repair the damage that Mr. Gardner inflicted.  Becky had to spend the night in the hospital after the assault.  22 RR 43–47, 71–73; SX 69.

After the assault on Becky, Westmoreland ended her relationship with Mr. Gardner.  Mr. Gardner then abducted Westmoreland at knifepoint at her place of employment.  22 RR 50–52.  Mr. Gardner forced Westmoreland to drive to various locales, eventually engaging in a high-speed chase with the police.  22 RR 50– 53.  Westmoreland finally pulled over.  22 RR 52.  Mr. Gardner was then arrested.  His parole was revoked, and he was sent back to prison.  22 RR 53.  Despite his imprisonment, Mr. Gardner still contacted Westmoreland, threatening to "hunt [her] down" if she left him.  22 RR 54.

Mr. Gardner then married a woman named Sandra, and the couple had a son, Nicholas.  23 RR 52–53.  That marriage ended in June 1999.  SX 72.  In mid-August 2001, Sandra applied for a temporary protective order, alleging family violence.  SX 72.  A two-year protective order was granted in late-August 2001.  SX 72.

Mr. Gardner's final marriage was to Tammy, the homicide victim in the present case.  Mr. Gardner was abusive to her during their marriage, and Tammy sought a divorce.  Before the

divorce was finalized, Mr. Gardner shot and killed her.  Mr. Gardner also sexually assaulted Tammy's daughter, Jessie, beginning when she was nine.  22 RR 124–127.

Testimony regarding other incidents of criminal activity was also introduced during the sentencing hearing.  For instance, Mr. Gardner was also spotted by police masturbating in his vehicle at the Irving Mall during Christmastime in 1992, while women and children were in the area.  22 RR 93–95.  When police apprehended him, Mr. Gardner possessed two illegal knives and a wooden club in his vehicle.  22 RR 102–03.  Finally, while in the Army, Mr. Gardner was punished for disobeying a superior non-commissioned officer and for leaving his post without authority.  SX 74.  An Army psychiatrist noted that Mr. Gardner had an "inadequate, immature, [and] sociopathic personality" and that Mr. Gardner was considered "ineligible for [re]enlistment" when he was discharged.  SX 74.

In his defense at punishment, Mr. Gardner called a former coworker to testify that he was responsible, diligent, and religious.  23 RR 8–9.  Another former coworker testified that Mr. Gardner was professional and courteous at work.  23 RR 17.  Although Mr. Gardner had trouble in the military, he did receive multiple commendations while in the Army, including the "National Defense Service Medal" and the "Good Conduct Medal."  SX 74.

Finally, Mr. Gardner's sister Elaine testified that their father had a violent temper and was abusive to their mother and Mr. Gardner.  23 RR 30–32.  Mr. Gardner's father beat the children frequently.  Mr. Gardner received the brunt of the beatings.  23 RR 30–32, 37–38.  Elaine recalled one incident where their father was preaching at a church but then suddenly got up from his chair, took Mr. Gardner outside of the meeting hall, and beat Mr. Gardner so loudly that the congregation could hear it.  23 RR 35–36.  Despite the abuse, Elaine explained that "two lives were led, the one in front of the public, and then the one behind closed doors," and that the

authorities were never called because "[y]ou didn't do that." 23 RR 39, 44. Elaine also pleaded

with the jury to spare her brother's life. 23 RR 42, 58–59.

Elaine also acknowledged that Mr. Gardner had a good relationship with his parents at the

time of trial. 23 RR 53. In fact, Mr. Gardner wrote his parents a letter, while in jail pending trial,

thanking them for being great parents and for making his life easier. 23 RR 55, SX 79.

The jury found Mr. Gardner to be a future danger and concluded that there were not

sufficient mitigating circumstances to warrant a life sentence. CR 616–17, 23 RR 121.

Accordingly, the trial court sentenced Mr. Gardner to death. CR 618, 23 RR 124.

### III.  GROUNDS FOR RELIEF

Mr. Gardner presented the following grounds for relief in his petition:

1. Trial counsel were ineffective during the guilt-innocence phase of trial because they did not present an "abandonment rage" defense to negate an essential element of capital murder—retaliation for status as a prospective witness.

2. Trial counsel were ineffective because they presented multiple, inconsistent, and implausible theories in both the guilt-innocence and punishment phases of trial, due to their failure to timely investigate and develop crucial information.

3. Trial counsel were ineffective because they failed to adequately investigate and *develop* crucial mitigating evidence and failed to *present* that crucial mitigating evidence.[2]

4. The trial court erred in admitting Tammy's 911 call into evidence because the admission violated Mr. Gardner's Sixth Amendment right to confrontation.

(Dkt. # 19, at pp. 27–135).  Mr. Gardner presented the following ground for relief in his

Supplemental IATC Petition:

5. State habeas counsel should have raised the following claim in State court:  Trial counsel were ineffective for failing "to get the work product of their recalcitrant mitigation

---

[2] In Mr. Gardner's Petition, Mr. Gardner's counsel presented trial counsel's failure to adequately *develop* and to adequately *present* as crucial mitigating evidence as two separate grounds for relief. (Dkt. # 17 at p. 96).  Mr. Gardner's counsel then analyzed these two separate grounds together in Mr. Gardner's Petition.  For simplicity, the court considers these two grounds as one ground for relief.

specialist, Shelli Schade."

(Dkt. # 78, at p. 1).

## IV.  LEGAL STANDARD

The petition was filed in 2011; thus, review is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  Under the AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "By its terms § 2254 bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  T h e  AEDPA "imposes a highly deferential standard for evaluating state court rulings, and demands that state court decisions be given the benefit of the doubt."  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotations omitted).  With respect to the first provision, "[a] state court's decision is 'contrary to' clearly established federal law if (1) the state court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts."  *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (*en banc*); *see also Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003).

"[R]eview under § 2254(d)(1) is limited to the record that was before the State court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  As

10

such, "evidence later introduced in federal court is irrelevant." *Id.* at 184. "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011), *cert. denied*, 133 S. Ct. 105 (2012).  With respect to § 2254(d)(2), a Texas court's factual findings are presumed to be sound unless a petitioner "rebuts the presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). " The standard is demanding but not insatiable . . . deference does not by definition preclude relief." *Id.*

The Supreme Court stated that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (quoting *Richter*, 562 U.S. at 101).   The Supreme Court has explained that the AEDPA "modified a federal  habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that State court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).  Federal habeas corpus relief is not available just because a State court decision may have been incorrect; a petitioner must show that a State  court decision  was unreasonable. *Id.* at 1850.

The role of federal courts in reviewing habeas corpus petitions by prisoners in state  custody is exceedingly narrow.  A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993).   Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).   In the course of reviewing state proceedings, a federal court does "not sit as a super state supreme court to review error under state law." *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983).

# V.  ANALYSIS

**A.  Mr. Gardner's running objections are meritless.**

Mr. Gardner states several objections to the State court's Findings of Fact.  Mr. Gardner incorporates these objections into each claim for relief in his Petition.  (Dkt. # 17, at pp. 28–34).  For the following reasons, these objections are meritless.

### 1.  The State court's findings of fact are entitled to a presumption of correctness, regardless of whether a live hearing was held in State court.

Mr. Gardner argues that a "full and fair" hearing in State court is necessary before this Court can presume that the State court's findings of fact are correct under 28 U.S.C. § 2254(e)(1).  (Dkt. # 17, at pp. 20–22).  Mr. Gardner contends that for a hearing to be "full and fair," there must be a live hearing with discovery.  (Dkt. # 17, at p. 21).  He points to *Panetti v. Quarterman*, 551 U.S. 930 (2007) and *Wiley v. Epps*, 625 F.3d 199 (5th Cir. 2010).  (Dkt. # 17, at pp. 20–22).  28 U.S.C. 2254(e)(1) does not refer to a hearing in state court as a precondition for its application, and Mr. Gardner offers no case law on point to support such a broad proposition (Dkt. # 17, at p. 21).

The Fifth Circuit has stated otherwise.  *See Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir. 2001) ("[W]e hold that a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to State habeas court findings of fact nor to applying § 2254(d)'s standards of review.").  Other circuits share this view.  *See Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) ("AEDPA does not make deference to state court fact-finding dependent on the adequacy of the procedures followed by the state court."); *Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007) ("As Professors Fallon, Meltzer, and Shapiro have noted, these changes suggest that 'the presumption of correctness now applies across the board.'") (quoting R. Fallon et al., *Hart & Wechsler's The Federal Courts and the Federal System* 1355 (5th ed. 2003)); *Lambert v. Blackwell*, 387 F.3d 210, 238 (3d Cir. 2004) ("The habeas statute no longer explicitly conditions federal deference to state court factual findings on whether the state court held a hearing."); *Mendiola v. Schomig*, 224 F.3d 589, 592–93 (7th Cir. 2000)

("[I]f the state court's finding is supported by the record, even though not by a hearing on the merits of [the] factual issue, then it is presumed to be correct.") (internal quotations omitted).

Mr. Gardner relies on the holdings in *Panetti* and similar cases to support his assertion that a live evidentiary hearing is a prerequisite to presuming that a state court fact-finding is correct. *Panetti* itself is founded on *Ford v. Wainwright*, 477 U.S. 399, 409–10 (1986), and *Ford* simply confirmed that a death-sentenced inmate had a constitutional right to competence at the time of execution. *See Panetti*, 551 U.S. at 949 ("Justice Powell's opinion in *Ford* constitutes 'clearly established' law for purposes of § 2254."). An inmate challenging his competency to be executed has a constitutional right to certain procedures, should he make a requisite showing in state court that he is categorically exempt from the death penalty. In the context of a claim of mental retardation, the Fifth Circuit has found a constitutional basis in the procedures afforded an inmate if they make a prima facie showing of mental retardation in state court. *See Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007).

Mr. Gardner presented only claims of ineffective assistance to the State habeas court; these are not allegations of absolute immunity from the death penalty possibly triggering additional procedural due process protections. Mr. Gardner is not entitled to the additional protections sometimes afforded to inmates who present substantial evidence that they are unconditionally exempted from execution. 28 U.S.C. § 2254(e)(1) therefore applies to his case. *See Hines v. Thaler*, 456 F. App'x 357, 360–64 (5th Cir. 2011) (distinguishing *Panetti*, *Wiley*, and *Rivera*, and upholding AEDPA deference despite no live hearing in state court).

A decision based on a review of the complete record by the same judge who sat at trial, is a full and fair hearing. *See*, *e.g.*, *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000) ("We have repeatedly found that a paper hearing is sufficient to afford a petitioner a full and fair hearing on the factual issues underlying his claims, especially where as here, the trial court and the state

habeas court were one and  the same.").  This court concludes that the fact-findings of the State

habeas court will  be presumed to be correct.

### 2. *The Court of Criminal Appeals credibility findings are relevant to an ineffective assistance of counsel claim.*

Mr. Gardner objects to certain findings of fact made by the State habeas court regarding

counsel's experience, credibility, and the court's recollection of the events at trial.  (Dkt. # 16,

at  p. 22); *see also*  2 SHCR 385–86 (Findings 11–16).  Mr. Gardner argues that the findings of

credibility  do not impact  the query of effectiveness.   (Dkt. # 16, at p. 22).  A claim alleging

ineffectiveness of counsel requires some factual inquiry as "both the performance and prejudice

components of the ineffectiveness inquiry are mixed  questions of law and fact."  *Strickland  v.*

*Washington*, 466 U.S. 668, 698 (1984).  Facts pertinent to such a claim can include whether counsel

made "strategic choices . . . after thorough  investigation of law and facts relevant to plausible

options," which sometimes requires "inquiry into counsel's conversations with the defendant."

*Id*. at 690–91.   Ineffective  assistance of counsel claims are fact-based inquiries typically premised

on counsel's explanation of his or her acts  or omissions, at least as far as the performance inquiry

is concerned.  *Id*.  Any time an explanation  is given before a fact-finder, credibility is relevant.

*Cf*. Fed. R. Evid. 607 ("Any party, including the  party that called the witness, may attack the

witness's credibility.").   Mr. Gardner's disagreement with  a credibility finding does not render it

irrelevant.   Mr. Gardner's "objections" to the state  court's credibility fact-findings carry no

weight, and those findings will be considered by this court in addressing the State court's decision.

### 3. *Submission of an affidavit by counsel to the State habeas court did not create a conflict of interest.*

Mr. Gardner objects to any finding by the State habeas court that relied upon the

affidavit of counsel.  (Dkt. # 16, at p. 22–23).  He argues that a finding of ineffectiveness creates

a conflict of interest for an attorney who admits deficiency because he will be removed from the capital appointment list under a rticle 26.052 of the Texas Code of Criminal Procedure. (Dkt. # 16, at p. 23).

Mr. Gardner's objection is overruled for several reasons. First, an attorney's admission of deficiency is not a legal finding of ineffectiveness. An attorney's belief that he erred is a subjective determination; *Strickland* requires that an attorney's actions be reviewed under "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also Richter*, 562 U.S. at 110. Accordingly, an attorney's admission of deficient representation does not require a finding of deficiency under *Strickland*, nor automatic removal from the capital appointment list.

Further, an admission that an attorney erred does not mandate a finding of prejudice. Prejudice is necessary for a determination of ineffectiveness. *Strickland*, 466 U.S. at 692. Although it is not uncommon for an attorney to make an error during the course of a trial, only those errors which substantially affect the outcome of trial implicate a constitutional violation. *Richter*, 562 U.S. at 110 ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."). Admitting an error does not require a finding of prejudice or removal from the capital appointment list.

Article 26.052 does not create a conflict of interest. Representation of Mr. Gardner by trial counsel ended when appellate counsel was appointed. 2 CR (219-81121-06) 632. This is not a situation where counsel are actively representing opposing interests. *See* Tex. Disciplinary R. Prof'l Conduct 1.06(b)(1). To the extent that counsel's own interests are impacted by potential removal from the capital appointment list, a conflict arises from such a scenario only

when such personal interests "have [an] adverse effect on representation"—active representation. Tex. Disciplinary R. Prof'l Conduct 1.06(b)(2) & cmt. 5.  Because trial counsel no longer represented Mr. Gardner or owed any duty to him, save a duty of confidentiality, which Mr. Gardner waived by challenging their representation, no conflict arose in this case.

Mr. Gardner presented his allegation of an alleged conflict of interest to the State habeas court.  1 SHCR 79–81.  The State habeas court considered and rejected this challenge, finding trial counsel to be credible. 2 SHCR 386 (Finding 16). This discrete fact-finding is entitled to a presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1). Mr. Gardner has not proffered clear and convincing evidence to counter this finding.  Accordingly, this court will consider the explanations proffered by counsel to the State habeas court.

### 4. *Mr. Gardner was not denied due process when the State Court found the juror affidavits to be inadmissible.*

Mr. Gardner submitted affidavits of five jurors.  1 SHCR 95–107.  This was an attempt to expose the jury's deliberations and to show the effect of the new evidence that counsel should have supposedly presented at trial.  *See* 1 SHCR 29.  The State habeas court found, pursuant to Rule 606(b) of the Texas Rules of Evidence, that such affidavits were inadmissible and did "not consider them for any purpose." 2 SHCR 385 (Findings 8–10). Mr. Gardner complains that the State court interpreted state law incorrectly and that the State court relied on the juror affidavits despite explicitly saying otherwise, resulting in a judicial inconsistency and violating due process. (Dkt. # 16, at p. 24).  Mr. Gardner then requests that this court consider the affidavits in reviewing the reasonableness of the State court's decision regardless of the State court's treatment of the juror affidavits.  (Dkt. # 16, at pp. 24–26).

The State court interpreted state law in striking the juror affidavits.  2 SHCR 385 (Finding 9).  This court may not disturb that finding because "[i]t is not the province of a federal habeas

court to reexamine state-court determinations on state-law questions." *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *see also Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011) ("A federal court lacks authority to rule that a state court incorrectly interpreted its own law.  When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law.").  Accordingly, Mr. Gardner's argument that the State court erred in its interpretation of state law is not cognizable.

Despite the decision by the State court to strike the juror affidavits, Mr. Gardner nonetheless asks this court to consider them in finding the State court's decision unreasonable. (Dkt. # 16, at pp.  24–26).   Because these affidavits are not part of the considered, adjudicative record, this court will not consider them in deciding the reasonableness of the state court's decision. *Pinholster*, 563 U.S. at 180-181.   Further, and independent of the AEDPA, this court may not consider the juror affidavits because Rule 606(b) of the Federal Rules of Evidence independently precludes their consideration as well.   *See Adams v. Thaler*, 421 F. App'x 322, 328 n.2 (5th Cir. 2011) (an affidavit stating how a juror "would have" reacted to new evidence was not admissible).

Striking the juror affidavits, does not a present a constitutional issue for Mr. Gardner. *See Tanner v. United States*, 483 U.S. 107, 116–27 (1987) (upholding Rule 606(b) of the Federal Rules of Evidence against a Sixth Amendment fair-jury claim); *Salazar v. Dretke*, 419 F.3d 384, 399–405 (5th Cir. 2005) (rejecting claim that striking juror affidavit violated due process).

Finally, this court cannot consider the juror affidavits because *Strickland*  requires an objective determination regarding prejudice; this determination is not achieved through speculation of what actual jurors might have done if they had considered the new evidence. *Strickland*, 466 U.S. at 695 ("The assessment  of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously,  and impartially applying the standards that govern the decision.").

The juror affidavits are inadmissible and irrelevant for this court's analysis of the State court decision. The court will not consider them.

**B.      Mr. Gardner was afforded constitutionally effective assistance of counsel (Claims One and Two).**

Mr. Gardner presents several claims regarding ineffective assistance of counsel. The court finds these claims meritless.

> ***1.       The State Court's decision that counsel were not ineffective for failing to advance the abandonment rage theory at the guilt-innocence phase of trial is not objectively unreasonable (Claim One).***

Mr. Gardner complains that counsel were ineffective for failing to present a theory of abandonment rage to negate the retaliation manner and means of capital murder.  (Dkt. # 16, at pp. 27, 34–55).  Under Mr. Gardner's theory, the murder was committed because "of abandonment rage predicated on attachment disorder" and not because Mrs. Gardner was going to be a witness in the divorce proceeding.  (Dkt. # 16, at p. 34).  Mr. Gardner argues that "he abused or killed his spouses, not because of their status as prospective witnesses who would testify against him . . . but because they were leaving him."  (Dkt. # 16, at p. 42).

Mr. Gardner's argument is based on a speculative conjecture that counsel could have  proved Mr. Gardner's subjective intent behind the killing through psychological evidence.  He does not show deficiency or prejudice, or that the State court's decision to deny relief on this point was contrary to, or an unreasonable application of, Supreme Court precedent.

*Strickland v. Washington,* 466 U.S. 668 (1984), governs ineffective assistance of counsel claims.  To prove ineffectiveness, an inmate must establish that counsel's actions were deficient and that such deficiency prejudiced the defense.  *Id*. at 687, 2064.  To establish deficient performance an inmate must show that "counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688.  A "strong presumption" that counsel's representation was within

the "wide range" of reasonable professional assistance applies. *Id*. at 689.  An inmate's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

Concerning prejudice, an inmate must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.  "It is not enough . . . to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693.  Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.  In determining whether an inmate has shown prejudice, a reviewing court must "consider *all* the relevant evidence that the jury would have had before it if [the inmate] had pursued a different path— not just the . . . evidence [the inmate] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105.  Under the AEDPA, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  As such, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult.  The standards created by *Strickland* and [AEDPA] are both 'highly deferential,' . . . when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105.

In preparing for trial, counsel employed several experts: an investigator (Randi Ray), a mitigation specialist (Shelly Schade), a consulting mental health expert (Dr. Kristi Compton), a testifying mental health expert (Dr. Kate Allen), and a risk assessment expert (Dr. Gilda Kessner). 1  SHCR 112, 204; 2 SHCR 338–39, 342, 345.  No investigator or expert raised the issue of abandonment rage as possibly explaining Mr. Gardner's murderous actions.  2 SHCR 338.  Not surprisingly, counsel did not consider that defensive theory in preparation for trial.  2 SHCR 338.

The State habeas court found that neither Dr. Kessner nor any of Mr. Gardner's other multiple experts informed counsel about abandonment rage.  2 SHCR 387 (Findings 23 & 24). Accordingly, the State habeas court found that counsel were not deficient.  2 SHCR 387 (Finding 24).   This is not a finding that unreasonably applies Supreme Court precedent.  Case law is consistent in that counsel is not deficient when, after retaining pertinent experts and providing them with the relevant background material, such experts do not discover the underlying mental health issue that should have supposedly been presented at trial.  *See Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) ("Trial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating a trial strategy."); *McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008) ("McClain's counsel reasonably relied on Dr. Maish's opinion that McClain suffered from 'Antisocial Personality Disorder' but did not suffer from a frontal lobe disorder or from any 'significant emotional disorder.'"); *Sims v. Brown*, 425 F.3d 560, 585–86 (9th Cir. 2005) ("[A]ttorneys are entitled to rely on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information from an expert would defeat the whole aim of having experts participate in the investigation.") (internal quotations and citations omitted); *Dowthitt v. Johnson*, 230 F.3d 733, 747–48 (5th Cir. 2000) (stating that counsel may rely upon their retained experts and need "not canvass[] the field to find a more favorable

defense expert."); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense.").   None of Mr. Gardner's experts identified abandonment rage as a possible defense before trial, which indicates that the State court's decision is reasonable regarding this issue.

Counsel stated that even if they had known about abandonment rage, they would not have presented the defense at Mr. Gardner's trial during the guilt-innocence phase. 2 SHCR 339. First, they believed that raising an abandonment rage defense at the guilt-innocence phase would have opened the door to a host of bad acts committed by Mr. Gardner. 2 SHCR 339. Further, they did not believe that Collin County jurors would have responded to this defensive theory. 2 SHCR 339. The State habeas court accepted these explanations. 2 SHCR 387 (Findings 22 & 25). The State habeas court further found that as a matter of state law, Mr. Gardner's prior history of violence would have been admissible at the guilt-innocence phase if abandonment rage had been offered as a defense and that such evidence would have been highly prejudicial. 2 SHCR 387 (Findings 26 & 27). Accordingly, the State habeas court found that "[c]ounsel's decision to pursue a fact-based rather than psychological defense and limit the State's rebuttal evidence was a reasoned strategic choice. . ." 2 SHCR 387 (Finding 28). The State court's alternative holding on deficiency is reasonable.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Presenting or withholding certain evidence is clearly within counsel's reasoned, strategic discretion. *See*, *e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 185–86 (1986) (counsel reasonably withheld most of the defendant's available mitigation evidence). Counsel may reasonably consider the atmosphere of

the convicting county's population in formulating a strategy.  *See*, *e.g.*, *Strickland*, 466 U.S. at 695.

That is what Mr. Gardner's counsel explained in this case—they would not have presented a

"novel" psychological defense in a historically conservative county, and they would not have

allowed the State to introduce punishment evidence at the guilt-innocence phase of trial.  2 SHCR

339.  The State court's decision on this matter was not unreasonable.

The State habeas court noted that neither Dr. Kessner nor Mr. Gardner's State habeas

mitigation specialist, Toni Knox, believed that abandonment rage theory was applicable to the

guilt-innocence phase (2 SHCR 388 (Findings 30 & 31)) and that even if it had been presented,

it would have provided only "psychological context" but not a legal justification for Mrs.

Gardner's murder (2 SHCR 388 (Finding 32)).  This supports that court's finding that it was

reasonable for counsel not to have advanced a legally inapplicable defense.  2 SHCR 38 (Finding

33).  The State habeas court additionally found that abandonment rage was not an appropriate

defense for Mr. Gardner.  The court noted that Mr. Gardner had a history of random violence

unconnected to any abandonment.  2 SHCR 388 (Finding 34).  The court also found that the

State's evidence showed that abandonment was not the impetus behind Mrs. Gardner's murder;

rather, it was the divorce proceeding in which Mrs. Gardner was a prospective witness.  2

SHCR 389 (Finding 35).  Consequently, the State habeas court found that "[c]ounsel were not

unreasonable for declining to present a defensive theory that not supported by the evidence."  2

SHCR 389 (Finding 36).

The State habeas court also noted that while abandonment rage theory may be applicable

to the retaliation manner and means, it had no bearing on the burglary manner and means.  2

SHCR 389 (Finding 37).  Regardless of whether Mr. Gardner killed Tammy because of her

abandonment or her status as a prospective witness, he still did not have effective consent to

enter her home on the evening of her death. Because abandonment rage did not have any effect on the burglary manner and means, the State habeas court found that counsel were not unreasonable in failing to have advanced a defensive theory that did not address all alternative means of proving capital murder. 2 SHCR 389 (Finding 38).

These three further findings of non-deficiency—failing to advance a legally inapplicable defensive theory, failing to advance an unsupported defensive theory, and failing to advance a less than comprehensive defensive theory—are all reasonable findings by the State habeas court. *See Mirzayance*, 556 U.S. at 127 ("The law does not require counsel to raise every available nonfrivolous defense. . . . Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether."); *Haines v. Risley*, 412 F.3d 285, 289 (1st Cir. 2005) ("[T]o couple a weak argument with a stronger one may detract from the latter . . . .").

The State habeas court found that Mr. Gardner was not prejudiced by the failure to raise abandonment rage during the guilt/innocence phase. 2 SHCR 390 (Findings 41 & 42). This finding is directly intertwined with some of the findings above—that abandonment rage did not legally negate retaliation (2 SHCR 388 (Finding 32)), that abandonment rage did not fit well with Mr. Gardner's "history of random violence unconnected to any abandonment" (2 SHCR 388 (Finding 34)); that the State's evidence "showed that the impending divorce was the impetus for Tammy's murder," not abandonment (2 SHCR 389 (Finding 35)), and that abandonment rage did not negate the burglary manner and means (2 SHCR 389 (Finding 37)). These findings are reasonable determinations by the State habeas court.

Retaliation occurs when a person "intentionally or knowingly harms or threatens to harm another by an unlawful act . . . in retaliation for or on account of the service or status of

another as a . . . prospective witness." Tex. Penal Code § 36.06(a)(1)(A); *accord* 1 CR (219-81121-06) 6 (final re- indictment).  Mr. Gardner intended to harm, or knowingly harmed, Tammy by an unlawful act—he shot  her.  Mr. Gardner does not take issue with that element of retaliation. Mr. Gardner does, however, challenge the reason for harming Tammy. He now claims that he shot her because she abandoned him, while the State alleged that Mr. Gardner killed Tammy because  she  was  divorcing him, an act that necessarily included her participation as a witness against Mr. Gardner in order to finalize the divorce.

The State proved that Mrs. Gardner had filed for divorce (SX 39) and that she had to testify under oath in order to complete the divorce (20 RR 99–100). The State also proffered evidence that it  was not the termination of the relationship that angered Mr. Gardner but the act of divorce itself.  For example, Mr. Gardner became agitated after Tammy filed the divorce petition. 19 RR 206–10.  Mr. Gardner seems to argue that  he could have committed retaliation only if he intended to prevent Tammy from testifying.  (Dkt. # 16, at p. 41).  However, retaliation can occur even where it is  not the defendant's primary objective to stop the witness from testifying.  The State proved that Tammy, as a prospective witness, was part of the divorce and provided sufficient evidence for the  jury  to  believe  that  the  divorce  was  the  impetus  of  the  killing,  not abandonment.  Given the  evidence at trial, it is unlikely that the jury would have been swayed by abandonment rage as the impetus for the killing instead of Tammy's status as a prospective witness.

The evidence proffered by Mr. Gardner during the State habeas hearing indicated that  Mr. Gardner was prone to violence for reasons other than abandonment.  For example, Mr. Gardner killed Rhoda  because she would not divorce him.  *See* 1 SHCR 159.  Mr. Gardner had random "anger episodes."  *See* 1 SHCR 195.  He was violent with his ex-wife Westmoreland. *See* 1 SHCR 191.

Mr. Gardner's own evidence indicates that he was violent because a former wife would not leave him, and was violent in situations not connected to real or perceived abandonment.  Considering Mr. Gardner's own evidence is inconsistent with abandonment rage theory, it is improbable that the jury would have accepted such explanation.

Finally, abandonment rage theory does not negate the burglary manner and means.  A person commits burglary "if, without the effective consent of the owner, the person . . . enters a building or habitation and commits or attempts to commit a felony, theft, or an assault." Tex. Penal Code § 30.02(a)(3); *accord* 1 CR (219-81121-06) 6 (final re-indictment).  There is no doubt that Mr. Gardner entered Mrs. Gardner's home with the intent to murder her—he borrowed his brother-in-law's pickup truck under false pretenses, stole a .44 magnum pistol, and drove straight to Mrs. Gardner's house from Mississippi.

Further, the Court of Criminal Appeals observed that there was "ample circumstantial evidence that Tammy did not consent to [Mr. Gardner's] middle-of-the- night entry . . . ." *Gardner*, 306 S.W.3d at 287.  The following evidence supported the theory that Mr. Gardner did not have effective consent to enter Mrs. Gardner's home:

- Jacquie West, Candace Akins, and Tammy's daughter, Jessie, testified that Tammy was terrified of [Mr. Gardner] and believed that he would kill her.

- Tammy had repeatedly told them that she would never get out of her marriage to [Mr. Gardner] alive, that he would kill her first.

- Jessie testified that, on the afternoon of Tammy's death, [Mr. Gardner] kept sending her text messages, asking about whether she planned to go through with the divorce, and, when Tammy did not respond to those messages, his messages became shorter and bigger until they culminated with repeated texts: "YES OR NO?"  Tammy was frantic as she drove down the road with Jessie.

- Immediately before her murder, Tammy had spent three hours visiting with the vice-president of her company seeking his assistance to help her "disappear" so that no one could track her down.

25

- [Mr. Gardner] had kept a second set of keys to Tammy's house when he left at Christmas after giving one set to Tammy's son, John.

- The physical condition of the bedroom leads to a reasonable inference that Tammy was surprised by the intruder and shot as she was sitting up in bed, propped up by pillows.

*Gardner*, 306 S.W.3d at 287.

The Court of Criminal Appeals summarized the inferences that could have been reasonably drawn by the jury given the evidence before them:

> The jury could infer from this evidence that Tammy would not, and did not, give [Mr. Gardner] consent to enter her home after 11 p.m. on January 23, 2005. Viewing the totality of the evidence, the jury could reasonably infer that [Mr. Gardner] drove to Tammy's isolated rural home, used his extra key to open the front door, walked down to the bedroom to confront Tammy sitting up in bed, shot her through the right temple, took the house keys from her purse hanging on the bedpost, locked the front door as he left, put Tammy's keys into the tool box in Tammy's truck, stopped at a ditch two to three miles down the road (perhaps to throw his extra set of keys into the ditch), and then drove back to Mississippi. Tammy, meanwhile, was still conscious enough to put on her red robe, which was hanging on the bedpost, look outside to see [Mr. Gardner] departing in the white Ford truck with Mississippi plates, and then call 911 to summon an ambulance.

*Id.* at 287–88.

Mr. Gardner states that abandonment rage theory negates the burglary manner and means by proposing that evidence of "abandonment rage in guilt/innocence would have refuted burglary." (Dkt. # 16, at p. 50). Mr. Gardner does not provide support for this statement.

Further, recent case law further demonstrates the reasonableness of the State court's decision. In *Rayford v. Stephens*, 622 F. App'x 315 (5th Cir. 2015), Rayford claimed that the two murders he committed stemmed from "abandonment rage" and that his attorneys should have presented this defensive theory at trial. 662 F. App'x at 320. The State habeas court rejected the claim noting that abandonment rage "would only show a motive for the murders [and] would not negate *mens rea* or otherwise excuse the killings . . . [and] would not be mitigating." *Id.* at

322, 336.  The Fifth Circuit upheld the denial of  federal habeas relief finding that the State court decision was objectively reasonable.  *Id*. at 336–37.

In affirming the denial of relief, the Fifth Circuit recognized that the abandonment rage theory  would present negative information.  *Id*. at 337.  The court noted that "while the theory would offer a *reason* for Rayford's violent rage, it would simultaneously undercut his argument on  the  future  dangerousness  issue."  *Id*.  Thus,  trial  counsel  was  not  deficient  because  "'a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged  in  nature  is  objectively  reasonable,  and  therefore  does  not  amount  to  deficient performance.'"  *Id.* (quoting *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999)).  Like the situation in *Rayford*, Mr. Gardner failed to prove trial counsel's deficiency in failing to investigate abandonment rage or that any harm came of  the omission.  Trial counsel were not deficient in failing to make the defense of "abandonment rage"  a consistent theme between both phases of trial.

Mr. Gardner cannot obtain habeas relief as to his abandonment-rage claims.  *See Rayford*, 622 F. App'x at 336–37.  Abandonment rage theory does not undermine the burglary manner and means.    Even if Mr. Gardner was uncontrollably furious at his failed relationship, he did not have effective  consent to enter Tammy's home and then shoot her while she lay in bed.  Those facts are sufficient to  sustain capital murder in this case and are not impacted  by Mr. Gardner's abandonment rage defense.    Accordingly, there is no reasonable probability of a different result at the guilt-innocence phase of trial  had abandonment rage been advanced as a defense.  The State habeas court's decision to deny relief  on this point is not objectively unreasonable.

**2.     *The State court's rejection of the theory that counsel were ineffective for failing to advance a consistent and effective theory throughout both phases of trial was reasonable (Claim Two).***

Mr. Gardner contends that counsel advanced a defense that was not consistent between the guilt-innocence and punishment phases of trial and that the inconsistent defense was ultimately a losing strategy.   (Dkt. # 16, at pp. 63–87).    Essentially, Mr. Gardner criticizes counsel's performance because they did not advance the abandonment rage defense in both phases of trial. (Dkt. # 16, at pp. 68–71).  Mr. Gardner claims that prejudice is either presumed (Dkt. # 16, at p. 72) or is present based on the facts in this case (Dkt. # 16, at pp. 72–87) because counsel did not advance this theory.   Mr. Gardner, however, cannot show deficiency or prejudice, as it is not presumed, and Mr. Gardner does not show that the State court's decision was contrary to Supreme Court precedent or an unreasonable application thereof.

Counsel explained in their affidavit to the State habeas court that they adopted two strategies—one for the guilt-innocence phase and one for the punishment phase.  2 SHCR 339. Counsel averred that in the guilt-innocence phase, they attempted to negate the two manner and means of capital murder—burglary and retaliation.  2 SHCR 339–40.  As to burglary, counsel focused on showing that there was no forced entry into Mrs. Gardner's home, namely "that [Mr. Gardner] entered the residence by invitation and nothing else."  2 SHCR 340.  To negate retaliation, counsel pointed out that Mr. Gardner had not contested the divorce and that the divorce could have been completed without Mr. Gardner's participation.  2 SHCR 340.

Mr. Gardner reasserts that the State court decision is not entitled to AEDPA deference because there was no live evidentiary hearing.  (Dkt. # 16, at pp. 86–87).   AEDPA deference applies despite the fact that the court ruled on the papers instead of conducting a live hearing. *Carter v. Johnson*, 131 F.3d 452, 460 n.13 (5th Cir. 1997) (collecting cases); *see also Hudson v.*

*Quarterman*, 273 F. App'x 331, 335 (5th Cir. 2008) (citing *Carter v. Johnson* with approval).

The State habeas judge, who also presided over Mr. Gardner's trial, was able to evaluate Mr. Gardner's State habeas claims, including whether the affidavits sufficiently showed that counsel should have discovered and offered the specified mitigating evidence, informed by the court's knowledge of the trial proceedings and defense counsel's performance at trial. The lack of a live hearing in State court thus does not defeat the presumption of deference in this case. *See Valdez,* 274 F.3d at 951.

In the punishment phase, counsel had a two-pronged strategy. First, counsel attempted to humanize Mr. Gardner, and second, counsel focused on the State's burden of proving future dangerousness in prison beyond a reasonable doubt. 2 SHCR 340–41. As to the first prong, counsel explained that the mitigation expert "discovered little or nothing that was deemed useful for trial," that Mr. Gardner's father chose not to attend Mr. Gardner's trial, and that Mr. Gardner's mother was too "emotionally unstable" to testify. 2 SHCR 340–41. As to the second prong, counsel relied on the fact that the State, during voir dire, emphasized that they had the burden on proving future dangerousness beyond a reasonable doubt, and "that future dangerousness could be measured in terms of the society that existed in prison." 2 SHCR 341.

Counsel noted that the State, at trial, put on no evidence concerning Mr. Gardner's likelihood of future danger while incarcerated. But, if they had presented evidence showing that Mr. Gardner had a low likelihood of future violence in prison, "the State would call at least one expert to rebut our testimony giving the jury an out." 2 SHCR 341. Recognizing that the State did not present evidence concerning Mr. Gardner's future dangerousness in prison, counsel consulted with John Niland of the Texas Defender Service and Bill Schultz, a local attorney, regarding the decision to rest without presenting evidence of Mr. Gardner's low probability of

violence in prison, "and both agreed that it seemed sound."  2 SHCR 341–42.

The State habeas court found that counsel purposefully chose different strategies during both phases of trial (2 SHCR 390 (Finding 45)). Counsel focused on negating the manner and means of capital murder at guilt-innocence (2 SHCR 390 (Finding 46))  At punishment, they humanized Mr. Gardner and relied on the argument that the State failed to meet its burden to prove future dangerousness beyond a reasonable doubt (2 SHCR 390 (Finding 48)). The court determined that these were reasoned strategies. 2 SHCR 390 (Findings 47 & 49). Although they were different, they were not inconsistent with each other. 2 SHCR 390–91 (Finding 50). While acknowledging that counsel should seek a single theory of a case, the court found that in this case, it was reasonable to have multiple theories.  2 SHCR 391 (Findings 52, 53 & 54).

The State habeas court also found that prejudice was not presumed because counsel "subjected the prosecution's evidence to meaningful adversarial testing" (2 SHCR 391 (Findings 55 & 56)), and that presentation of abandonment rage would not have affected the jury's decision on guilt or innocence (2 SHCR 392 (Finding 57)), or punishment (2 SHCR 392 (Findings 58, 59, 60 & 61)). This is largely because abandonment rage did not legally excuse the killings (2 SHCR 388 (Findings 32, 35 & 37)), is not supported or is inconsistent with the evidence proffered by Mr. Gardner (2 SHCR 388 (Finding 34), 392 (Finding 59)) and would have been double-edged (2 SHCR 392 (Findings 58 & 60)). The decision of the State court is objectively reasonable.

The Director points out that counsel did not present abandonment rage as a consistent defense throughout trial because the investigators and experts did not inform them of such a defense. 2 SHCR 387 (Findings 23 & 24). Federal law is in accord with the State court's decision that counsel are not deficient in failing to present a psychological defense if their experts do not

raise the issue. *See Couch*,  632 F.3d at 246; *McClain*, 552 F.3d at 1252; *Sims*, 425 F.3d at 585–86;

*Dowthitt*, 230 F.3d at 747–48;  *Hendricks*, 70 F.3d at 1038. Accordingly, the State court's decision

was reasonable on grounds of non-deficient performance  alone.

  Counsel's strategy for the guilt-innocence phase was reasonable. They focused on negating

the burglary and retaliation manner and means. 2 SHCR 340. The defense options in this case

were  limited. There was compelling evidence that Mr. Gardner killed Mrs. Gardner. In her last

few minutes  of consciousness, Mrs. Gardner  identified  Mr. Gardner as her assailant. She

further  accurately  described the vehicle he was driving. This evidence was corroborated by Mr.

Gardner's sister, brother-in-law,  credit  card  statements, fingerprints,  and  microscopic  fiber

analysis.  In  light  of  the  overwhelming  evidence  that  Mr. Gardner  killed  Mrs. Gardner,  a

reasonable attorney  could have  decided that the most prudent defensive course would be to limit

Mr. Gardner's exposure to a death  sentence by holding the State to its burden of proving the manner

and means which enhanced the crime  to capital murder. *Richter*, 562 U.S. at 109, 131 S. Ct. at 790

("To support a defense argument that the  prosecution has not proved its case it sometimes is better

to try to cast pervasive suspicion of doubt  than to strive to prove a certainty that exonerates.").

  Disagreement with counsel's strategy does not show deficiency. *See Strickland*, 466 U.S.

at  689, 104 S. Ct. at 2065 ("Even the best criminal defense attorneys would not defend a particular

client  in the same way."). The State court's decision is objectively reasonable on this point.

  Counsel's strategy for punishment  was an attempt  to humanize Mr. Gardner by calling

Mr. Gardner's sister, who testified about physical and emotional abuse inflicted by Mr. Gardner's

parents,  and  pleaded  for  Mr. Gardner's  life, and by calling Mr. Gardner's co-workers. Counsel

additionally  hired  investigators  and  experts  to  conduct  a  mitigation  investigation  but "had

discovered little or nothing that was deemed useful." 2 SHCR 340–41.

Counsel explained that:

> We did check Mr. Gardner's prior childhood accidents and injuries on our mitigation [investigation]. There didn't seem to be anything other than what Elaine Holifield [Mr. Gardner's sister] testified to. There was [sic] no serious illnesses at any time. There was physical abuse to [Mr. Gardner] and Elaine. We have testimony to that. There was no sexual abuse of any type.

> The—the immediate family was checked as to the size of the immediate family, which was four—plus grandchildren. We checked with—as far as the relationship and attitudes toward the member that was drug—we checked whether or not there was drug or alcohol abuse by Mr. Gardner or any members of the family. There was no—we checked whether there was any mental health treatment that would aid in mitigation in this case and—and also to the cohesiveness of the family. We've done that through all our experts. The family standard of living and living conditions.

> There were no available school records for Mr. Gardner. They were all too old and could not be captured. We checked as far as the social relationships with members of, basically, the opposite sex, marriage, divorces, et cetera; and that's all come into evidence. And any—all awards or honors or special accomplishments. That can be shown by his Army records. And any and all traumatic experiences, anything at all, especially proud moments. Memberships in relig—religious, social, educational and charitable organizations. And as far as his best and worst side memories.

> Those are all items that our experts and myself have checked and determined what to put on in this case.

23 RR 77–78.

Three days before the start of the punishment phase of trial Mr. Gardner told his attorneys that he did not want a mitigation case presented. *See* 23 RR 76. Counsel sought to have Mr. Gardner's father and mother testify on his behalf, but they c h o s e  t o  b e  u n available. 2 SHCR 341; *see* 23 RR 54 (Mr. Gardner's sister testifying that she would not let Mr. Gardner's parents attend trial). Counsel cannot present what does not exist, and the State court's decision on this point is objectively reasonable. *See Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009) ("We must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.") (quoting *Dowthitt*, 230 F.3d at 743).

Counsel made a strategic decision to rest their punishment case without presenting a risk assessment expert. As early as the voire dire jurors knew that the State had assumed the burden of proving future dangerousness beyond a reasonable doubt, including future danger within a prison society. But the State put on no evidence regarding Mr. Gardner's probability of violence while incarcerated. 2 SHCR 341–42; *see*, *e.g.*, 6 RR 14–17 (State accepting burden of proving future dangerousness including in "prison society"). Counsel informed the trial court that they purposefully chose to omit calling a risk assessment expert as a matter of strategy and that Mr. Gardner concurred in their judgment. 23 RR 74–75.  Had counsel attempted to put on risk assessment evidence, the State was prepared to put on their own expert in rebuttal. 2 SHCR 341.

Counsel tried to demonstrate that Mr. Gardner was a good inmate by introducing his jail records.  The State responded by calling A.P. Merillat, a well-known TDCJ expert, to rebut the implication that Mr. Gardner was a good prisoner. 23 RR 61–64. In order to prevent Merillat's testimony, counsel withdrew the jail records as an exhibit. 23 RR 64–65. If the mere implication that Mr. Gardner was well-behaved in prison was enough to trigger the State's rebuttal, an expert's risk assessment testimony would have triggered further action by the State. Counsel may reasonably formulate a strategy based on holding the State to its burden of proof. *See Richter*, 562 U.S. at 109, 131 S. Ct. at 790. Counsel may also reasonably withhold evidence it suspects will evoke a strong response from the State. *See Strickland*, 466 U.S. at 699, 104 S. Ct. 2070-71. Accordingly, the State court's decision to deny relief on this point was reasonable.

The State court's finding that failing to present the theory of "rage abandonment" throughout trial counsel was not deficient not an unreasonable determination of Supreme Court precedent. Presenting the rage abandonment theory means that an attorney would have (1) conceded that Mr. Gardner killed Mrs. Gardner as a predicate to advancing the defense; (2) hoped that

abandonment rage negated the retaliation manner and means despite considerable contrary evidence that the divorce, and not the split,  triggered the killing; (3) conceded manner and means of the burglary because abandonment rage  strengthens the idea that Mr. Gardner entered Mrs. Gardner's home with the intent to kill her and without her effective consent; (4) hoped that the jury viewed abandonment rage as mitigating evidence  although it demonstrates Mr. Gardner's violent tendencies; and (5) conceded future danger, as the condition only makes Mr. Gardner more likely to explode in a violent rage.

An attorney is hardly deficient for avoiding the pitfalls attached to the theory of abandonment rage. Mr. Gardner argues that this court should consider the juror affidavits that the State habeas court struck as inadmissible. Pet. at pp. 61–63, 83–84.  For the reasons set out above in section A(4) this court may not consider the juror affidavits.  And even if the affidavits were to be considered, it  cannot be said that they demonstrate Mr. Gardner's contention that trial counsel were wrong in believing conservative Collin County jurors were not likely to accept an abandonment rage theory. Pet. at pp. 24–25.

Each juror that Mr. Gardner points to couched their consideration language in vague terms. For example, one juror stated that the evidence "may have affected my sentencing deliberations" (1 SHCR  103), while another stated that she "would have seriously considered" the evidence (1 SHCR  104).  None of the affidavits state with specificity that abandonment rage would have been considered or that  such evidence would have caused any of the jurors to change their mind. Simply because the jurors would have  considered abandonment rage had it been presented at trial—as any juror would have been required  to do—does not transform the theory from "novel" to "scientifically accepted." In other words, jurors  must consider all of the evidence admitted before them, whether it is novel or well-researched.

34

Counsel were not concerned with whether jurors would have just considered abandonment rage theory, but whether such a defense was an effective theory to which the jury would have responded. 2 SHCR 339. Tailoring strategies for a local population is a permissible consideration for an attorney. *See Strickland*, 466 U.S. at 695, 104 S. Ct. 2068. Even if Mr. Gardner's trial counsel were wrong about these particular jurors, Mr. Gardner has not shown that trial counsel's perception of the Collin County venire pool was wrong. Even if the the juror affidavits could be considered, they do not undermine counsel's reasonable actions prior to trial. They do not provide clear and convincing evidence undermining specific fact-findings by the State habeas court, show the unreasonableness of that court's decision, or provide a basis for an evidentiary hearing.

As such, the State habeas court did not act unreasonably on this issue. It was reasonable for the State court to reject presumed prejudice, as this case is not like those where counsel failed to challenge any aspect of the State's case. Prejudice is presumed

> in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was <u>in effect denied any meaningful assistance at all</u>. The Supreme Court recently has emphasized that for [*United States v. Cronic*, 466 U.S. 648 (1984)] to apply, the attorney's failure must be complete. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, the Court held that a case does not come under *Cronic* merely because counsel failed to oppose the prosecution . . . at specific points in the trial. It is not enough for the defendant to show mere shoddy representation or to prove the existence of errors, omissions, or strategic blunders by counsel. Bad lawyering, regardless of how bad, does not support the per se presumption of prejudice.

*Johnson v. Cockrell*, 301 F.3d 234, 238 (5th Cir. 2002)(internal citations and quotations omitted)(emphasis added). The present case does not present a *Cronic*- type situation and the State court's refusal to apply *per se* prejudice was not unreasonable.

As to guilt-innocence, presentation of abandonment rage would not have affected the jury's decision. The presentation of abandonment rage would not have altered the outcome of trial concerning Mr. Gardner's guilt. The evidence at trial showed that the divorce triggered Mr.

Gardner's homicidal behavior. Mr. Gardner's own State habeas evidence contradicted the argument that his uncontrollable rage emanates from abandonment; and abandonment rage theory does nothing to detract from the burglary manner and means. Rather, it strengthens the State's case on that point. The decision of the State court is reasonable on this matter.

Further, there is no reasonable probability that the jury's decision would have been different as to punishment. It cannot be said that abandonment rage is supported by Mr. Gardner's State habeas evidence or the evidence at trial. Mr. Gardner killed his former wife Rhoda because she would not leave him—the opposite of abandonment. *See* 1 SHCR 159. Mr. Gardner became violent with Westmoreland shortly after they married. *See* 1 SHCR 191. Mr. Gardner became violent with Mrs. Gardner soon after their marriage. *See* 19 RR 192–96, 214, 232–35, 285–86; 20 RR 152. Mr. Gardner was violent with his stepchildren. *See* 22 RR 43, 69, 71–72, 77, 124–27. Mr. Gardner experienced "anger episodes" not related to abandonment. 1 SHCR 195. Such a defense theory would have been unlikely to sway any jury.

The theory of "abandonment rage" would have supported the State's case on future dangerousness, and weakened the mitigation case, as it demonstrates the capacity for violence. The failure to present a mental health issue, especially one so poorly supported by the evidence, does not amount to prejudice, where it will likely do more harm than good. *See, e.g.*, *Dowthitt*, 230 F.3d at 745 ("[T]rial counsel's actions in not discovering and presenting the records to the jury to bring out indications of mental illness do not create a 'probability sufficient to undermine confidence in the outcome.'"). *Cf. Atkins v. Virginia,* 536 U.S. 304, 321, 122 S. Ct. 2242, 2252 (2002) (noting that mental health issues can support a future dangerousness case more than provide a case of mitigation). The State habeas court's denial of relief on the claim of prejudice does not amount to an unreasonable application of Supreme Court precedent.

36

C.      **The State court's decision that counsel were not ineffective for failing to develop and present mitigating evidence was not unreasonable (Claims Three and Four).**

Mr. Gardner claims that counsel were ineffective because they did not perform an adequate mitigation investigation—ground three—and then present the mitigating evidence that should have been discovered—ground four—at the punishment phase of trial. Pet. at pp. 88–128.[3] Mr. Gardner asserts that the investigation was inept. *See* Pet. at p. 105. He further contends that the information gathered by counsel was not appropriately arranged. *See* Pet. at p. 105. Mr. Gardner contends that these deficiencies had an impact on many of counsel's strategic decisions. *See* Pet. at pp. 106–07. Mr. Gardner argues that if the mitigation investigation had been conducted properly, counsel would have discovered and presented evidence explaining Mr. Gardner's murder of Rhoda. *See* Pet. at pp. 107–11. He further argues that a proper investigation would have corroborated the abuse Mr. Gardner suffered at the hands of his father. *See* Pet. at p. 111. He claims that a thorough investigation could have provided justification for Mr. Gardner's actions through the rage abandonment theory. *See* Pet. at pp. 111–13. Mr. Gardner claims such an investigation would have led to different result. *See* Pet. at pp. 114–28. This court finds that the State court's decision to deny relief, was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

1.      *The State court record and the State court's decision to deny relief*

Mr. Gardner's counsel explained their investigation to the State habeas court by affidavit. Lead counsel started a fact investigation upon appointment, which the investigator and mitigation specialist took over. 2 SHCR 342. Second chair counsel, the investigator, and the mitigation

---

[3] Mr. Gardner lists claims three and four separately but briefs them as a single claim. Pet. at pp. 88–128. Therefore, these claims are consolidated for discussion and disposition.

specialist thereafter traveled to Mississippi—Mr. Gardner's long-time home and where most of his family and friends lived—to develop mitigation witnesses derived from "family contacts, interviews with [Mr. Gardner] and interviews with childhood friends." 2 SHCR 342. These three individuals also spent considerable time with Mr. Gardner's parents, attempting to probe allegations of childhood abuse, but the parents denied inflicting such treatment and insisted that Mr. Gardner was a "normal kid." 2 SHCR 342–43. Their refusal or inability to cooperate "led to very little of importance being developed through the time spent with them." 2 SHCR 343.

Counsel were candid in their assessment of the mitigation investigation, including taking issue with their mitigation specialist who they acknowledged was "overly close" with Mr. Gardner's family, and was paranoid about discovery, so she therefore refused to put her investigation on paper. 2 SHCR 342–43. Counsel never stated, however, that they did not receive the results of the mitigation specialist's investigation (presumably through oral reports). But even if they did not, counsel stated that most of the information developed in Mr. Gardner's State habeas proceeding was of little value and not new to them. 2 SHCR 343.

Counsel knew that Mr. Gardner had participated in the gay and transgender community, but they weren't able to develop any witnesses through their investigator. 2 SHCR 343. Mr. Gardner allegedly had a relationship with a male transvestite working as a drag queen in Dallas nightclubs. They were not able to locate this individual, who went by the name "China Blue." 1 SHCR 170–71. Counsel further stated they would not have introduced such evidence because it "would have hurt, more than helped, Mr. Gardner" given the conservative attitudes of Collin County jurors. 2 SHCR 343.

Counsel also would not have called William "Billy" Stone, Mr. Gardner's Army friend, while they were stationed in Hawaii. 2 SHCR 343–44. Stone characterized Mr. Gardner as a

womanizer whose "constant focus on sex would not have [had] a positive effect on any jury and especially a Collin County jury." 2 SHCR 344.

Counsel also addressed the supposed failure to present mitigating evidence.  They explained that  the available evidence "could cause more harm than good." 2 SHCR 344. Counsel elaborated there "wasn't much [evidence] available given the life style [Mr. Gardner] had lived including  his past homosexual relationships, his past history of violence in many if not all of [his] relationships and the limited testimony from his family." 2 SHCR 344–45. While Mr. Gardner's sister "spoke of the  unbearable abuse" inflicted by Mr. Gardner's parents, his parents "would not, or refused to, admit to any abusive behavior on their part." 2 SHCR 345.

Counsel retained a mental health expert "to examine and address . . . abandonment issues concerning [Mr. Gardner]." 2 SHCR 345. The mental health expert did not testify because "at the  conclusion of watching some of the [State's] testimony[,]specifically when the step-daughter stated [Mr. Gardner] had been very abusive to her—she decided she didn't want to testify because of [sic] lack of information and felt that he was psychotic." 2 SHCR 345.

Counsel concluded that they had consulted with their two testifying experts "before letting them know of [the] decision not to present their testimony." 2 SHCR 346. Further, counsel consulted with John Niland, an attorney with the Texas Defender Service, and a local attorney, Bill Schultz, regarding their mitigation strategy and "both concluded that [the] decision was a sound trial strategy." 2 SHCR 346.

The State habeas court found that "[c]ounsel thoroughly investigated and prepared for [Mr. Gardner's] trial, including traveling to Mississippi to interview witnesses and hiring a mitigation  [specialist], a private investigator, and two mental health experts." 2 SHCR 393 (Finding 64).

The court also found that counsel investigated Mr. Gardner's "childhood, medical and family history, prior drug and alcohol abuse, education, military service and other personal history" and that such investigation was in line with the recommended practices of various courts. 2 SHCR 393 (Findings 65 & 66).

The State habeas court also noted that counsel discovered a host of evidence not favorable to Mr. Gardner including: (1) Mr. Gardner's prior deviant sexual relationships; (2) a history of violence in prior relationships; (3) and a mental health expert's opinion that Mr. Gardner was psychotic. 2 SHCR 393–94 (Finding 68). The court further declared that counsel discovered much of the same evidence presented by Mr. Gardner during the state habeas proceeding and that counsel did not have to prepare such information in a "timeline" format. 2 SHCR 394 (Findings 69 & 70). The court concluded that counsel's performance was not deficient. 2 SHCR 394 (Finding 72).

In addition, the State habeas court held that Mr. Gardner had not proven prejudice. 2 SHCR 395 (Finding 74). The court found that the affidavits of Sylvia, Donald, and Randy Reeves "did not provide credible, helpful testimony." 2 SHCR 395 (Finding 75 & 76). The court noted that in fact, the Reeves' affidavits provided multiple instances of information unfavorable to Mr. Gardner, such as: (1) contradicting Mr. Gardner's explanations concerning the murder of Rhoda; (2) highlighting the similarities between the murders of Mrs. Gardner and Rhoda; (3) proving that Mr. Gardner " manipulate[d] those around him;" (4) showing that Mr. Gardner was "frequently and irrationally angry"; and (5) bringing attention to the fact that none of the Reeveses had anything to do with Mr. Gardner after he assaulted Becky nearly twenty years earlier. 2 SHCR 395–96 (Finding 76).

Concerning the affidavit of Louise Lillis, a former congregant of Mr. Gardner's father's church, the state habeas court found that it "was not compelling and would not have affected the result of the proceeding." 2 SHCR 396 (Findings 77 & 78). This was because: (1) Lillis only heard, but did not see, a single instance of corporal punishment; (2) "Lillis's testimony would not have significantly corroborated or strengthened" Mr. Gardner's sister's testimony of childhood abuse at trial; and (3) Lillis would have been cross-examined with information that Mr. Gardner had a good relationship with his parents. 2 SHCR 396–97 (Finding 78).

The State habeas court also determined that Mr. Gardner's testifying mental health expert, Dr. Allen, "refused to testify after hearing the testimony of other witnesses and believed that [Mr. Gardner] was psychotic." 2 SHCR 397 (Finding 79). The court decided that Dr. Kessner's testimony regarding abandonment rage: (1) would not have been persuasive given the multiple inconsistencies found in the evidence supposedly supporting such diagnosis; (2) would have brought attention to the fact that Mr. Gardner "was consistently violent and incapable of ever forming normal, nonviolent relationships"; and (3) would have been of little persuasive force given Mr. Gardner's history of feigning mental health symptoms. 2 SHCR 397 (Finding 80). The court found that the remaining evidence proffered by Mr. Gardner—ostensible sex addiction—was not mitigating, and that, considering all of the new evidence offered by Mr. Gardner, the jury's decision on the special issues would not have been affected. 2 SHCR 397–98 (Findings 81 & 82).

## 2. *Counsel's mitigation investigation was not deficient, and the State Court's decision on this point is reasonable.*

An ineffective assistance claim alleging a deficient mitigation investigation is governed by *Strickland. Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003). The standard requires that the litigant prove deficient performance—representation falling below an objective

41

standard of reasonableness—and prejudice—a reasonable probability that the proceeding would have been different but for counsel's errors. *Id*. In the context of mitigation investigations, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. The inmate, in a postconviction proceeding, must present what background evidence should have been discovered but for counsel's deficient investigation and prove that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigation circumstances did not warrant death." *Id*. at 695, 2069.

Counsel performed adequately in their investigation and presentation of mitigating evidence. Counsel utilized an investigator, a mitigation specialist, a consulting mental health expert, a testifying mental health expert, and a risk assessment expert. 1 SHCR 112, 204; 2 SHCR 338–39, 342, 345. Among other areas, Counsel investigated the following: Mr. Garner's prior childhood accidents and injuries, whether Mr. Gardner was physically abused, whether Mr. Gardner was sexually abused, whether Mr. Gardner or any member of his family had abused drugs or alcohol, whether any mental health treatment would have aided mitigation in the case, the cohesiveness of Mr. Gardner's family, the family's standard of living and living conditions, Mr. Gardner's school records, Mr. Gardner's social relationships with members of the opposite sex, any awards, honors, or special accomplishments Mr. Gardner received, any and all traumatic experiences Mr. Gardner experienced, Mr. Gardner's memberships in religious, social, educational, and charitable organizations, and Mr. Gardner's best and worst memories. *See* 23 RR 77–78. Counsel disclosed the lengths of their mitigation investigation to the trial court, notably before any allegations of ineffectiveness arose.

Mr. Gardner's own state habeas evidence confirms this investigation. Dr. Kessner explained in her affidavit to the State habeas court that she had reviewed: (1) "the interviews" that she conducted of Mr. Gardner and members of his family in preparation for trial (1 SHCR 111); (2) the voluntary statements of individuals who testified for and against Mr. Gardner at trial (1 SHCR 111); (3) the "Collin County Jail Medical Records" (1 SHCR 112); (4) the "State of Mississippi, Department of Corrections" records (1 SHCR 112); (5) the "Psychological Records from Kristi Compton, Ph.D., case consultant" (1 SHCR 112); and (6) the "Affidavit and Case Notes from Kate Allen, Ph.D. expert witness" (1 SHCR 112). These documents were generated during the investigation of Mr. Gardner's background, and in preparation of a mitigation case.

Mitigation specialist Toni Knox admitted that "much of the social history information that I used to compile the current psychosocial history was obtained from previous notes and interviews by the private investigator, consulting psychologist, and mitigation specialist." 1 SHCR 125 (footnote omitted). Knox also admitted that "someone . . . in the initial mitigation investigation" prepared a psychosocial history "but the dates were vague and the time line did not document what records the information was taken from." 1 SHCR 125. Knox stated that "a considerable amount of information concerning [Mr. Gardner's] social history [was obtained] through interviews and writings to the mitigation specialist" but was lacking because the mitigation specialist did not conduct a "diverse investigation and interviews of corroborating witnesses." 1 SHCR 125–26.

Counsel made a reasonable investigation into Mr. Gardner's background, which in turn, makes the State habeas court's denial of relief on this point reasonable. Knox stated that "much of the social history information" that Mr. Gardner presented to the State habeas court came from counsel's investigation into Mr. Gardner's background. 1 SHCR 125. Counsel employed an

investigator, a mitigation specialist, and mental healthy experts in accord with then-prevailing guidelines. American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Revised Edition, 31 HOFSTRA L. REV. 913, 952 (2003) (guideline 4.1) (stating that the defense team should consist include at least two attorneys, an investigator, and a mitigation specialist). Counsel also repeatedly talked with Mr. Gardner and multiple witnesses and reviewed documents to discover Mr. Gardner's life history. This is also in agreement with then-applicable attorney-practice norms. *Id.* at 1015, 1022–27 (guideline 10.7 & commentary) (the defense team should explore medical history, family and social history, educational history, military service, employment, and prior incarcerations); *see* also *Wiggins*, 539 U.S. at 524, 123 S. Ct. at 2537.

As a result of that investigation, counsel called several witnesses during the punishment phase to testify on Mr. Gardner's behalf, including coworkers (employment and spiritual beliefs) and Mr. Gardner's sister (family and social history), and introduced records of his time in the Army (military service). The court finds that counsel's investigation was well within the then-prevailing standards of practice, and it is even more readily apparent when the results of counsel's investigation are compared with the evidence that Mr. Gardner provided to the State habeas court.

Mr. Gardner turned up five new witnesses during the State habeas proceeding, and all have minimal mitigating impact. The first, Sylvia Reeves, was Mr. Gardner's sister-in-law after Mr. Gardner married Westmoreland, his third wife. 1 SHCR 191. Sylvia discussed how she first met Mr. Gardner, and how her family came to enjoy Mr. Gardner's company. 1 SHCR 189. She stated that Mr. Gardner married Rhoda when he was twenty-six and Rhoda was seventeen, and asserted that Rhoda played emotional "games" with Mr. Gardner by continuing to contact her ex-husband after marrying Mr. Gardner. 1 SHCR 189–90. Sylvia also related that Mr. Gardner stole the

weapon that he shot Rhoda with from Sylvia's husband and that Mr. Gardner had made a full confession to her where he expressed remorse. 1 SHCR 190. Sylvia additionally thought that codeine-based "cough syrup might have contributed to [Mr. Gardner's] state of mind" when he shot Rhoda. 1 SHCR 190.

Further, Sylvia explained that Mr. Gardner eventually married her sister, Westmoreland, but "seemed to get increasingly unstable and treated [Westmoreland] like she was property." 1 SHCR 191. After hitting Westmoreland's daughter Becky in the head, Sylvia "did not want anymore to do with [Mr. Gardner.]" 1 SHCR 191. Sylvia also mentioned that Mr. Gardner had "impulse control and anger problems" and that he reacted violently on a number of occasions. 1 SHCR 191–92.

The second affidavit was provided by Sylvia's husband, Donald Reeves. 1 SHCR 195. He stated that Mr. Gardner "seemed like a nice guy," but "had these anger episodes" that he termed "flash- overs" or "spasms." 1 SHCR 195. Donald also expounded that Rhoda was "manipulative" and still in contact with her ex-husband despite marrying Mr. Gardner. 1 SHCR 195. He further averred that Mr. Gardner expressed remorse over shooting Rhoda. 1 SHCR 195. The third affidavit came from the son of Sylvia and Donald, Randy Reeves. 1 SHCR 198. Randy explained that he initially liked Mr. Gardner, but became "nervous" around Mr. Gardner because Mr. Gardner was "extremely jealous" of Rhoda, and had threatened to kill Randy for flirting with Rhoda. 1 SHCR 198–99. Randy also mentioned that he had heard that Mr. Gardner did not treat Randy's grandmother well and that Mr. Gardner hit Becky, Westmoreland's daughter, in the head. 1 SHCR 199–200.

The fourth undiscovered witness was Louise Lillis, a former congregant of Mr. Gardner's father's church. 1 SHCR 202. Lillis stated that Mr. Gardner "was a likeable boy" whose father

was "very strict." 1 SHCR 202. She recalled an incident at church where she heard what sounded like "a particularly harsh whipping" of Mr. Gardner by his father. 1 SHCR 202.

The final affidavit was provided by William "Billy" Stone, a friend of Mr. Gardner's while he was stationed in Hawaii on active duty with the Army. 1 SHCR 213. Stone recounted that Mr. Gardner "was popular with the women," and that "he was constantly pursuing women and was totally focused on sex." 1 SHCR 213. Stone explained that Mr. Gardner had sex with single and married women, including the wife of a good friend. 1 SHCR 213.

Mr. Gardner suggests that counsel should have presented: (1) three witnesses (the Reeves) who were initially fond of Mr. Gardner until he became violent towards his then-wife Rhoda—eventually shooting her—and thereafter married into the family and became violent with multiple relatives—Sylvia's sister, Westmoreland, and Westmoreland's daughter, Becky; (2) a witness (Lillis) who could have "corroborated" a session of corporal punishment inflicted on Mr. Gardner by his father on a single occasion, and (3) a former friend (Stone) who described Mr. Gardner as obsessed with sex regardless of the consequences. Pet. at pp. 109–13, 114–126. It is disingenuous to argue that this type of evidence would have been favorably received by any jury, much less create a mitigating impact on punishment.

Mr. Gardner also fails to explain how this additional background evidence made abandonment rage appealing to Mr. Gardner's State habeas expert, Dr. Kessner. The State habeas mitigation investigation found so little "new" evidence of Mr. Gardner's background that it indicates the pre-trial investigation was thorough.

It cannot be said that counsel was deficient for choosing not to present a mental health expert, Dr. Allen, who determined that Mr. Gardner "was psychotic." 2 SHCR 345. This is a reasonable, strategic decision. *See*, *e.g.*, *Dowthitt*, 230 F.3d at 747 ("[C]ounsel's decision not to

put a witness on the stand who himself is not entirely favorable . . . is not objectively unreasonable.").

Counsel cannot be faulted for failing to corroborate Mr. Gardner's claims of abuse at his parents' hands. Mr. Gardner's sister, Elaine, testified that the abuse was hidden to the outside world. 23 RR 39 ("I don't know if I can make y'all understand the way it was in our house. It was like two lives were led, the one in front of the public, and then the one behind closed doors.") Mr. Gardner's parents consistently denied the abuse when asked. 2 SHCR 345. This does not render counsel's performance deficient. *See*, *e.g.*, *Dowthitt*, 230 F.3d at 749 ("[C]ounsel's actions here would be characterized as reasonable trial strategy because they attempted to investigate [the petitioner's] background and were thwarted by uncooperative potential witnesses."); *cf. Mirzayance*, 556 U.S. at 125, 129 S. Ct. at 1421 ("Competence does not require an attorney to browbeat a reluctant witness into testifying, especially when the facts suggest that no amount of persuasion would have succeeded."). Counsel also discovered Mr. Gardner's participation in the gay and transgender community, but they could not develop any viable witnesses in that community through their investigator. This does not make the investigation deficient. *See*, *e.g.*, *Dowthitt*, 230 F.3d at 749. Accordingly, the State court's decision that counsel were not deficient is objectively reasonable.

The State court's alternative holding on deficiency is also reasonable. Counsel explained that had they been able to locate "China Blue," they would not have presented testimony about Mr. Gardner's sexual proclivities given the conservative attitudes of Collin County jurors. Counsel may reasonably take into account the prevailing beliefs of a particular locale in choosing to introduce certain evidence. *See Strickland*, 466 U.S. at 695, 104 S. Ct. at 2068. Mr. Gardner has not challenged counsel's assertion that Collin County is a conservative county where

evidence of "alternate lifestyles" is not effective as mitigating evidence.

The same is true for Stone's proposed testimony of Mr. Gardner's sexual escapades with multiple women regardless of the woman's relationship status. Promiscuity and infidelity can be considered "aggravating" in the realm of moral culpability. *See Bell v. Kelly*, 260 F. App'x 599, 606 (4th Cir. 2008) (affirming denial of federal habeas relief because, in part, the unpresented evidence would have "allowed the prosecution to emphasize multiple instances of [the petitioner's] infidelity"); *cf. Rompilla*, 545 U.S. at 392, 125 S. Ct. 2468 (evidence that Rompilla's father bragged about cheating on his wife was mitigating). The Reeves' proposed testimony was similarly damaging because it would have reiterated the killing of Rhoda and the assaults of Westmoreland and Becky, and would have undermined abandonment rage by highlighting violent behavior unattached to real or perceived abandonment. Counsel is not ineffective for choosing to avoid such evidence. Accordingly, the State habeas court's decision on deficiency is reasonable.

### 3. *Counsel's errors, if any, did not prejudice Mr. Gardner, and the State Court's decision on this point is reasonable.*

Even if counsel's performance was somehow deemed deficient, Mr. Gardner does not establish prejudice. The State court's denial of relief on this point is undoubtedly reasonable. The beneficial elements of Mr. Gardner's postconviction "mitigation" evidence can be summarized as: (1) the Reeves initially believed Mr. Gardner was likeable (1 SHCR 189, 195, 198); (2) Mr. Gardner's second wife, Rhoda, played "games" with Mr. Gardner (1 SHCR 189–91, 195); (3) Mr. Gardner might have been on codeine based cough syrup when he shot Rhoda (1 SHCR 190); (4) Mr. Gardner expressed remorse over shooting Rhoda (1 SHCR 190, 195); (5) a single incident of corporal punishment by Mr. Gardner's father was corroborated by Lillis (1 SHCR 202); (6) Mr. Gardner was friends with Stone while both were in the Army (1 SHCR 213–14); and (7)

Mr. Gardner's violence in relationships is explained by abandonment rage, which has a biological component (1 SHCR 112–18). The benefits realized from this evidence are greatly outweighed by the double edged nature of the evidence, and the State's "aggravating" evidence.

The Reeves' affidavits provide the following damaging information: (1) they reiterate that Mr. Gardner killed Rhoda, his second wife (1 SHCR 190, 195, 199); (2) they reiterate that Mr. Gardner abused Westmoreland and her daughter (1 SHCR 191, 199–200); (3) they conflict with Mr. Gardner's abandonment rage diagnosis because they point to periods of violence unrelated to abandonment (1 SHCR 191–92, 195, 198–99); (4) they opine that Mr. Gardner may have abused an elderly woman (1 SHCR 199–200); and (5) they conflict with Becky's testimony that Mr. Gardner lacked remorse over the killing of Rhoda (1 SHCR 190, 195). Evidence exposing prior acts of violence or conflicting with evidence at trial or counsel's strategy does not prove prejudice. *See*, *e.g.*, *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (evidence of good behavior "unlikely to have had a significant mitigating effect" because it would have exposed defendant's prior arson conviction, and arson was one of the manner and means of capital punishment alleged); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999) (evidence of an abusive upbringing not prejudicial where it would have revealed instances of violent behavior unconnected to inebriation, which contradicted the defendant's argument at trial that he was only violent when intoxicated).

Further, it is likely that a defense of blaming the victim by discussing Rhoda's "game playing" would have backfired. *See United States v. King*, 604 F.3d 125, 142 (3d Cir. 2010) (describing as disturbing a defendant's attempt to blame a two-year-old sex abuse victim). It is extremely unlikely that evidence regarding Rhoda's faults would have justified Mr. Gardner's actions towards her, including shooting Rhoda, paralyzing her, and causing her to lose her unborn

child before dying of medical complications arising from her injuries. This evidence would have more likely repulsed the jurors and caused them to look more harshly at Mr. Gardner's moral culpability.

Lillis's hearing of a single incident of corporal punishment would not have made a difference in the case. As explained by Mr. Gardner's sister, Elaine, the abuse by Mr. Gardner's father was kept in-house. 23 RR 39 ("I don't know if I can make y'all understand the way it was in our house. It was like two lives were led, the one in front of the public, and then the one behind closed doors."). To the extent that Lillis's testimony would have corroborated Elaine's testimony of childhood abuse, it was minimal. The jury could have believed that the single instance of punishment described by Lillis was proper—not abusive—or it could have thought that an isolated incident of physical abuse was nominally probative in the scheme of Mr. Gardner's moral blameworthiness. *See Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997) (no prejudice where the testimony "was duplicative of testimony given" at trial). Further, Lillis could have been cross-examined, as Elaine was at trial, regarding Mr. Gardner's letters to his parents where he thanked them for being "great parents" who made "life a lot easier for me." 23 RR 56. Mr. Gardner's recognition that his parents raised him with his best interests in mind minimizes any notions of abuse, and it would have minimized the cumulative and trivially corroborative aspect of Lillis's testimony.

It is not unreasonable to conclude that Stone's proposed testimony of Mr. Gardner's sexual history while in the military, or the proposed testimony of Mr. Gardner's deviant sexual history, would not have affected the jury's decision. The evidence of Mr. Gardner's promiscuity with married women, including women whose husbands were friends with Mr. Gardner, would have lessened his plea for mercy and evidence of "alternate lifestyles," including promiscuous behavior,

could have backfired. *See Bell*, 260 F. App'x at 606; *cf. Rompilla*, 545 U.S. at 392, 125 S. Ct. 246. Mr. Gardner cannot prove prejudice.

If the theory of abandonment rage had been presented, it would not have established prejudice. Mr. Gardner's own evidence undermines the argument that his violent behavior is linked with abandonment. The record is replete with examples of Mr. Gardner committing violent acts without real or perceived abandonment. This contradiction does not prove prejudice. *Kitchens*, 190 F.3d at 703. In addition, Mr. Gardner's abandonment rage would merely have provided further evidence that Mr. Gardner could not control his emotions in a non-violent way, leading to the inevitable conclusion that he posed a future danger. Therefore, no prejudice is shown. *See Gray v. Epps*, 616 F.3d 436, 448 (5th Cir. 2010). Finally, the diagnosis of abandonment rage would have been significantly undermined by Mr. Gardner's own statements that he feigned mental health issues to secure his release from the military. 1 SHCR 153. This also does not prove prejudice. *See Shuler v. Ozmint*, 209 F. App'x 224, 231–32 (4th Cir. 2006) (no prejudice where counsel did not introduce a suicide attempt that would have opened the door to evidence that defendant had malingered on previous psychological examinations).

When the undiscovered "mitigating" evidence listed above is compared to the "aggravating" evidence presented at trial, it is beyond doubt that the state court's decision was reasonable. *See Strickland*, 466 U.S. at 695–96. Mr. Gardner shot and paralyzed Rhoda, which eventually resulted in the loss of an unborn child and Rhoda's life. 22 RR 16–20, 77–78. While incarcerated for Rhoda's shooting, Mr. Gardner began a relationship with a married woman, Westmoreland, and then became physically abusive and controlling. 22 RR 33–39. Mr. Gardner threatened the lives of Westmoreland and her family. *See* 22 RR 37. Mr. Gardner emotionally and sexually abused Westmoreland's daughter, Becky. *See* 22 RR 67–70. The relationship with

Westmoreland ostensibly ended when Mr. Gardner physically assaulted Becky. *See* 22 RR 43–49, 71–73; SX 69.

Mr. Gardner's fourth marriage ended in 1999, but in 2001, his ex-wife Sandra applied for a temporary protective order and alleged family violence. SX 72. The protective order was granted for a period of two years. SX 72. Sandra feared Mr. Gardner and was "frantic" when she brought her son to Mr. Gardner's home for visitation. 22 RR 128.

Mr. Gardner murdered his fifth wife after years of abuse against her and her daughter. 22 RR 124–27. Further, Mr. Gardner was arrested at a mall masturbating in his vehicle while women and children were in the area. 22 RR 93–95. He was discovered with illegal weapons in the vehicle. 22 RR 103. Finally, Mr. Gardner was punished multiple times while in the Army, and a psychiatrist noted that Mr. Gardner had an "inadequate, immature, [and] sociopathic personality." SX 74. This evidence outweighed Mr. Gardner's State habeas evidence. The State court's decision that no prejudice was found on the record before the court was reasonable.

### 4. That the Court of Criminal Appeals rejected finding sixty-seven does not mean that the Court of Criminal Appeals found that the mitigation investigation was impaired.

Mr. Gardner argues that the Court of Criminal Appeals found that the mitigation investigation was impaired because it rejected a proposed finding by the State habeas trial court. Pet. at p. 94. The finding rejected by the Court of Criminal Appeals, finding sixty-seven, reads, "Counsel believed that their mitigation expert, Shelli Schade, was 'overly close' with [Gardner] and his family, but they did not believe that their investigation was impaired." 2 SHCR 393 (Finding 67).

In rejecting finding sixty-seven, Mr. Gardner tries to impute an implicit finding in the court's action. Mr. Gardner suggests that the Court of Criminal Appeals actually believed,

but did not explicitly hold, that counsel's investigation was impeded by the mitigation specialist and, therefore, deficient. Pet. a t p . 94 ("The TCCA's September 15, 2010 order implicitly ruled that the mitigation investigation was impaired."); *see Ex parte Gardner*, 2010 WL 3583072, at *1.

 This argument is faulty. First, Mr. Gardner provides this court with no authority that the rejection of a proposed finding by the Court of Criminal Appeals gives rise to an implicit, contrary finding. Second, the absence of a finding on whether the mitigation specialist impaired the mitigation investigation does not necessarily make the opposite true. Mr. Gardner's argument is a logical fallacy. *See Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1257 (11th Cir. 2007) (describing the logical fallacy of "argumentum ad ignorantiam" as "the mistake that is committed whenever it is argued that a proposition is true simply on the basis that it has not been proved false…."). Third, the Court of Criminal Appeals could not have intended for its rejection of finding sixty-seven to be the final word on whether there was an impaired mitigation investigation because an earlier finding, finding sixty-four, states that "[c]ounsel thoroughly investigated and prepared for [Mr. Gardner's] trial." 2 SHCR 393 (Finding 64). It is more likely that the Court of Criminal Appeals rejected finding sixty-seven because counsel never expressed a belief about whether the mitigation specialist's relationship with Mr. Gardner and his family affected the mitigation investigation. Finding sixty-seven improperly imputed such a belief to counsel. This belief was not supported by the record. *Ex parte Van Alstyne*, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007) (describing the legal standard utilized by the Court of Criminal Appeals in its capacity as the "ultimate fact finder").

 The Court of Criminal Appeals' rejection of finding sixty-seven means nothing more than the fact that the Court of Criminal Appeals rejected finding sixty-seven. Accordingly, Mr.

Gardner's  argument that the Court of Criminal Appeals implicitly found that the mitigation investigation was  impaired, and the arguments based upon this premise are meritless.

Mr. Gardner further argues that counsel were ineffective due to their mitigation investigation.  Mr. Gardner contends that experts Drs. Allen and Kessner informed counsel that the investigation was  inadequate. Pet. at pp. 95–96, 107–09.  Mr. Gardner references  counsel's State habeas affidavit to prove his  point regarding Dr. Allen. Pet. at p. 95. Counsel, in the affidavit, explained that Dr. Allen, after hearing the testimony of the State's witnesses, did not testify "because of [a] lack of information." Pet. at p.  95; *see also*  2 SHCR 345.   Mr. Gardner points to Dr. Kessner's State habeas affidavit where she stated that she  informed counsel "that there were important corroborating witnesses who were not being located and  interviewed for mitigation." Pet. at p. 96; *see also* 1 SHCR 209. This court rejects those arguments.   First, the "lack of information" statement is taken out of context.  Dr. Allen determined that she should not testify because after hearing the abuse perpetrated by Mr. Gardner on one of his  step-daughters, she determined that she lacked truthful information. This possibly put counsel on notice that  Mr. Gardner was not truthful, but it does not indicate that there was more information to be uncovered regarding his past. Second, Dr. Kessner's statement that "there were important corroborating witnesses  who  were  not  being  located"  assumes  that  such  witnesses  exist.  The  only "corroborative" witness identified was Lillis, who provided evidence of a single instance of corporal punishment.

Dr. Kessner's statement regarding uncorroborated aspects of Mr. Gardner's background was too vague to serve as a notice to counsel that they had missed certain avenues of investigation. Dr. Kessner's references to corroborative witnesses suggests that counsel had uncovered the important  substantive evidence regarding Mr. Gardner's background. These vague statements were

hardly notice  of additional, undiscovered background evidence. They do not undermine the reasonableness of the state court's decision.

Third, Mr. Gardner argues that counsel's ineffectiveness is proven through the juror affidavits. Pet. at pp. 105–06, 124–26. This Court may not consider such affidavits as a matter of federal habeas law. And even if it did, a statement the hypothetical effect of a theory when the juror has not been provided with the full scope of the evidence and the State's likely rebuttal evidence and argument does not have an impact on this court's inquiry into constitutional effectiveness.

Mr. Gardner tries to expand review of the State court's decision by attaching documents to his petition that were never reviewed by the State habeas court. Pet. at pp. 97–98; Pet. Ex. 1 (mitigation specialist's billing invoices); Pet. Ex. 2 (counsel's billing invoices). This is impermissible, as federal habeas review looks only to the record before the state court. *Pinholster*, 563 U.S. at 181, 131 S. Ct. at 1398. Section 2254(e)(2) also precludes federal habeas review of such documents. *See Holland v. Jackson*, 542 U.S. 649, 653, 124 S. Ct. 2736, 2738 (2004) ("Those same restrictions [in § 2254(e)(2)] apply *a fortiori* when a prisoner seeks relief based on new evidence without an evidentiary hearing."). These records could have been submitted to the State habeas court. *See Williams*, 529 U.S. at 432–33, 120 S. Ct. at 1488. Accordingly, this court cannot consider the billing invoices of the mitigation specialist or counsel.[4]

---

[4] The records themselves do not support a deficient investigation.  First, the records are incomplete. The earliest billing invoice is from March 1, 2006, where the mitigation specialist  bills for eighteen hours of work; however, there is also a note stating "Total Hours to date: 169.75." Pet. Ex. 1 at p. 1. Mr. Gardner makes no attempt to account for approximately four typical  work-weeks of investigation, and pays no attention to the other entries regarding communication with possible witnesses. *See*, *e.g.*, Pet. Ex. 1 at p. 4 ("correspondence with family"). Second, Mr. Gardner fails to provide this Court with any basis to conclude that a certain amount of hours are necessary to render an investigation sufficient. The fact that little else turned up during the State habeas proceeding is more probative on this point than a simple  hourly cutoff. Third, the billing

Mr. Gardner also argues that the psychosocial history compiled by the mitigation specialist was not detailed enough so any decision made by counsel regarding mitigation was not fully informed and, therefore, ineffective. Pet. at pp. 106, 113. As Mr. Gardner's State habeas mitigation specialist admitted, a timeline was "prepared by someone" although "the dates were vague and the time line did not document what records the information was obtained from." 1 SHCR 125. Instead, "there were various handwritten notes from interviews with [Mr. Gardner], typed interview notes, [Mr. Gardner's] own writings, and e-mails with [Mr. Gardner's] sister" (1 SHCR 124), plus the extensive cache of records compiled by counsel. Mr. Gardner argues that unless a mitigation specialist compiles the information from the investigation in a particular format, counsel is ineffective. This argument is meritless. The query of constitutional assistance of counsel does not delve into such minutiae. *See Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Counsel had the raw information, and counsel compiled the information in a timeline format. The information later provided by Lillis, Stone, and the Reeves would not have affected the outcome of the proceeding.

The arguments proffered by Mr. Gardner do not undermine the State court's decision to deny relief. Counsel investigated Mr. Gardner's background competently, and Mr. Gardner did not produce sufficient evidence in the State habeas court to prove prejudice. Accordingly, the State court's decision on this point is reasonable. This claim is denied.

---

invoices are general and obviously do not detail the entirety of the mitigation specialist's work. This is most likely purposeful. *See* Tex. Comm. on Prof'l Ethics, Op. 559, 68 Tex. B.J. 1034 (2005) (explaining that appointed counsel should provide billing invoices that are general unless a client's consent is obtained or a court order compels more). Ultimately, the billing invoices mean little, either because they cannot be considered, or because they have little probative value.

**D.      The admission of Tammy's 911 call did not violate the Confrontation Clause (Claim Five).  Additionally, this claim was not fairly presented, is procedurally barred by an adequate and independent state law ground, and should be judicially estopped.**

Mr. Gardner claims that the introduction of evidence regarding the 911 call placed by Mrs.  Gardner on the eve of her death violated the Confrontation Clause. Pet. at pp. 129–30. Mr. Gardner contends that the 911 call was not a dying declaration. Mr. Gardner argues that the phone call does not meet the requirements of a dying declaration because Mrs. Gardner did not subjectively know that her death  was imminent and because portions of the call were testimonial in nature.

### 1.      The admission of the 911 call did not violate the Confrontation Clause.

At trial, Erin Whitfield, a 911 dispatcher, testified regarding a call she received at 11:58 p.m.  on January 23, 2005. 19 RR 22–23. The woman on the line identified herself as "Tammy," and said  she needed an ambulance because her husband "had either slapped or shot her." 19 RR 24–25. As the  conversation continued, Mrs. Gardner stated that the person who had shot her left in a "white Ford pickup truck with Mississippi plates," and that her husband's name was Steven Gardner.  19  RR  26–27. The call lasted  about twenty minutes. 19 RR 28. As the call ended, the dispatcher testified she heard Mrs.  Gardner choking and vomiting. 19 RR 28. The State also introduced an audio recording containing a  small portion of the twenty-minute 911 call. SX 1; 19 RR 32–34.

Mr. Gardner argues that the State court committed reversible error when it found the 911 call  qualified as  a dying declaration because: (1) it is a retrospective finding of fact; (2) "[n]o one can read  the mind of another, or intuit a subjective belief"; (3) no evidence at trial suggested that Mrs. Gardner  subjectively felt that her death was imminent; and (4) the evidence at trial contradicts a belief that Mrs. Gardner thought she was about to die. Pet. at pp. 132–33. Mr. Gardner further claims that the 911 call was  testimonial because Mrs. Gardner's statements were made "in response

to questioning by the dispatcher [and] were not necessary to address an on-going emergency." Pet. at p. 134.

Mr. Gardner cannot challenge the correctness of the State court's finding that the 911 call was a dying declaration in federal court. Matters of state law, including the admissibility of evidence under a state's evidence rules, are for a state's courts to decide. *Walker v. Harry*, 462 F. App'x. 543, 545 (6th Cir. 2012) (in raising a Confrontation Clause claim, inmate could not challenge state law ruling that a statement was a dying declaration). Mr. Gardner's challenge to the Court of Criminal Appeals is a complaint that they considered objective evidence to determine whether Mrs. Gardner subjectively believed that she was about to die. *See* Pet. at pp. 131–33. As the Court of Criminal Appeals noted, proof that a declarant believed that death was imminent is not limited to the words of the declarant. *Gardner*, 306 S.W.3d at 289–91.  Instead, it can include the "declarant's conduct and the nature of his wounds." *Id*. at 290. Consideration of such evidence to establish a belief of imminent death is proper and in accord with Supreme Court precedent.

In *Mattox v. United States*, 146 U.S. 140, 151, 13 S. Ct. 50, 53–54 (1892), the Supreme Court interpreted the then-common law federal dying declaration hearsay exception as allowing proof of imminent death to come from what the declarant uttered, "the nature and extent of the wounds inflicted," and the conduct of the declarant. *See United States v. Shields*, 497 F.3d 789, 793 (8th Cir. 2007) ("A declarant's serious injuries can support an inference that he believed death was imminent."). While the "findings" of the Court of Criminal Appeals may have been "retrospective," inferential and based on circumstantial evidence, this practice is permissible under Supreme Court precedent.

Accordingly, the Court of Criminal Appeals found that a substantial amount of evidence suggested that Mrs. Gardner knew that her death was imminent:

(1)     The single bullet entered her right temple, went through her brain, and exited below her left ear.  This was a mortal wound;

(2)     Ms. Whitfield testified that [Mrs. Gardner's] voice was very slurred and hard to understand;

(3)     [Mrs. Gardner] kept repeating that her head hurt and that she could not hear very well 'because her ears were ringing from the gunshots';

(4)     She said that her husband had shot her, there was blood everywhere, and she needed an ambulance;

(5)     Before the phone disconnected, Ms. Whitfield heard what sounded like [Mrs. Gardner] choking and vomiting;

(6)     When the first deputy arrived, he found [Mrs. Gardner] on the blood-soaked bed, trying to sit up; she appeared to be in shock and was bleeding badly from both the back and top right of head;

(7)     There was a trail of blood leading into the bathroom, around the toilet, and in the trash can;

(8)     When the paramedics finally arrived, Mrs. Gardner was 'spitting up a lot of blood' and mumbling incomprehensibly;

(9)     She was in a vegetative state and died at the hospital two days later.

*Gardner*, 306 S.W.3d at 291–92.

The decision by the Court of Criminal Appeals in finding that the 911 call was a dying declaration was reasonable. *See, e.g.*, *Mattox*, 146 U.S. at 152; 13 S. Ct. at 54 (a dying declaration was properly admitted into evidence because the statement was elicited within "a few hours" of the injury, "the wounds were three in number, and one of them of great severity," and the declarant was told, by a physician, that his chance of survival was slim). Because the 911 call constituted a dying declaration, it did not violate the Confrontation Clause.

Further, the Confrontation Clause was not violated in this case because the 911 call was not testimonial. In *Davis v. Washington*, 547 U.S. 813, 817–18, 126 S. Ct. 2266, 2271 (2006), the Supreme Court considered whether the 911 call made in that case was testimonial. The caller in

*Davis* stated  that she was involved in a domestic dispute, named her attacker, and then said her attacker fled. *Id*. The court found that the 911 call was not testimonial because (1) the caller described events that were presently occurring; (2) the call was a plea for help; (3) the questions that the dispatcher asked were for the purpose of resolving an emergency; and (4) the setting was "not tranquil or even . . . safe." *Id*. at 827–28, 2276–77.

The facts in Mr. Gardner's case are similar. Mrs. Gardner called 911, provided her name and  address, and said "she needed an ambulance" because she had just been shot by her husband. 19 RR  24–25. Mrs. Gardner then provided a physical description of her residence, informed Whitfield that her attacker had just fled "in a white Ford pickup truck with Mississippi plates" when asked if  the shooter was still at the premises, and stated that her husband's name was Steven Gardner. 19 RR  26–27.

Mr. Gardner argues that Mrs. Gardner's identification of him and her description of his vehicle are testimonial because the emergency being reported was no longer "on going." Pet. at p. 134. According to *Davis*, a dispatcher's "effort to establish the identity of the assailant" is not testimonial because it aids "the  dispatched officers [in knowing] whether they would be encountering a violent felon." *Davis*, 547 U.S. at 827, 126 S. Ct. at 2276. In this case, the dispatcher was doing the same thing. She needed to know  the  assailant's  name  to determine whether Mr. Gardner was "a violent felon," and she needed the vehicle description to determine whether Mr. Gardner was still at Mrs. Gardner's residence to ensure  the safety of first responders.

There is no reasonable, objective reading of the 911 call transcript that suggests that the dispatcher was questioning Mrs. Gardner to determine past events for purposes of providing proof at a future trial;  instead, she was responding to a crisis. The 911 call was therefore not testimonial,

and its admission did not violate Mr. Gardner's constitutional right to confrontation was not violated. Dying declarations are an exception to the introduction of out-of-court testimonial statements. Further, the 911 call was not testimonial. Relief is not warranted.

Assuming that a Confrontation Clause violation occurred, the error was harmless. "Confrontation Clause violations are subject to harmless error analysis." *Fratta v. Quarterman*, 536 F.3d 485, 507–08 (5th Cir. 2008). Harmless error inquiry of a Confrontation Clause violation can include "whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986).

Although Mr. Gardner argues that his name was testimonial, any error is harmless. Before the dispatcher was aware that the emergency had subsided, Mrs. Gardner had already informed the dispatcher "that her husband had . . . shot her." 19 RR 25. Mr. Gardner's marriage status—that he was Mrs. Gardner's husband at the time of the shooting—was proven with other admissible evidence such as the divorce petition. SX 39. There can be no harm in Mrs. Gardner's statement that her husband's name was "Steven Gardner" when the most inculpating aspect of the statement was "that her husband had . . . shot her." 19 RR 25. Mr. Gardner's identity was cumulative of other evidence establishing that he was Mrs. Gardner's husband.

Mr. Gardner also argues that the description of the vehicle was testimonial. *See* Pet. at p. 134. Any error h e r e was also harmless. When Deputy William Armstrong arrived at Mrs. Gardner's house, he observed a white pickup truck. 19 RR 42–43. Mr. Gardner's brother-in-law, David Holifield, testified that he had a white Ford F-150 pickup truck that Gardner borrowed on the morning of Mrs. Gardner's shooting (20 RR 20–22) and returned the next day (20 RR 32)

37.  When Mr. Gardner returned the vehicle, his sister asked him whether Mrs. Gardner was okay. 20 RR 38. Mr. Gardner responded " yes," implying that he had recently seen Mrs. Gardner and knew her status. 20 RR 38. In addition, Mr. Gardner's fingerprints were found inside the pickup truck (19 RR 124–25) along with fibers that were consistent in diameter, color, and chemical composition with those from Mrs. Gardner's housecoat (20 RR 86–91).  Mr. Gardner's credit card was also used at a Marshall, Texas convenience store on the day of Mrs.  Gardner's shooting (19 RR 273; SX 44) and the cardboard backing of a pair of work gloves (SX 50) sold at the same convenience store (19 RR 272) was found in the pickup truck as well (20 RR 56–57).

The evidence of a white pickup truck bearing Mississippi license plates is corroborative that Mr. Gardner shot Mrs. Gardner. Mrs. Gardner identified Mr. Gardner as the shooter shortly before slipping into unconsciousness. There was also significant additional evidence that Mr. Gardner had used a white pickup truck to travel from Mississippi to Collin County, Texas, including his relatives' testimony, credit card statements, and fiber analysis. Even if Mrs. Gardner's statement that Mr. Gardner had fled in a white pickup truck with Mississippi license plates was inadmissible, it was harmless considering that the statement was simply corroborative and relatively unimportant in the host of evidence against Mr. Gardner. This claim does not rise to the level of reversible error.

### 2.      Alternatively, Mr. Gardner's Confrontation Clause claim is unexhausted and procedurally defaulted because further attempts to exhaust would be fruitless.

An inmate must exhaust available state remedies or federal habeas relief must be withheld. 28 U.S.C. § 2254(b). To exhaust, inmates must first seek redress in state court. *Heck v. Humphrey*, 512 U.S. 477, 480, 114 S. Ct. 2364, 2369 (1994). This means that an inmate must provide a state court "a fair" opportunity to review the claim, that is, the inmate must present the issue in a procedural context,  which insures that the state court will review the claim solely on the merits.

*Castille v. Peoples*, 489 U.S. 346, 351, 109 S. Ct. 1056, 1060 (1989). Practically, exhaustion is met "when the substance of the federal habeas claim has been fairly presented to the highest state court." *Parr v. Quarterman*, 472 F.3d 245, 252 (5th Cir. 2006) (citing *Smith v. Dretke*, 522 F.3d 269, 275 (5th Cir. 2001)). The Court of Criminal Appeals is the highest court in Texas for criminal matters. *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985). "Determining whether a petitioner exhausted his claim in state court is a case- and fact-specific inquiry." *Moore v. Quarterman*, 533 F.3d 338, 341 (5th Cir. 2008) (en banc).

On direct review, Mr. Gardner complained that the 911 call was inadmissible hearsay to which no exception applied. Appellant's Brief at pp. 42–43, *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009) (No. AP-75,582). Mr. Gardner also addressed a possible Confrontation Clause violation but predicated the argument with a concession: "Appellant agrees, therefore, that if the statement made to [the 911 operator] by the caller satisfied Texas's requirements for a dying declaration, neither the Confrontation Clause nor *Crawford* or *Davis* would bar its admission." Appellant's Brief at p. 44, *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009).

The Court of Criminal Appeals, after finding that the 911 call met Texas's dying declaration hearsay exception, accepted Mr. Gardner's concession and declined to address the constitutional issue. *Gardner*, 306 S.W.3d at 288 n.20. As such, the Court of Criminal Appeals did not reach the merits of Mr. Gardner's Confrontation Clause claim. The Court of Criminal Appeals was required to address state law—the admissibility of the 911 call under Texas evidence law— because Mr. Gardner conceded the constitutional issue. Fair presentation requires more and consequently, Mr. Gardner has failed to exhaust this claim.

The Supreme Court has addressed several scenarios where an inmate's litigation tactics do not suffice to fairly present an issue. For example, merely placing the same facts before both the

state and federal courts does not suffice to fairly present a claim. *See Anderson v. Harless*, 459 U.S. 4, 7–8, 103 S. Ct. 276, 278 (1982); *Picard v. Connor*, 404 U.S. 270, 277–78, 92 S. Ct. 509, 513 (1971). In *Picard*, an inmate complained about the validity of his indictment in state court but did not challenge the indictment on equal protection grounds. *Picard*, 404 U.S. at 277, 92 S. Ct. at 513. The state court, not surprisingly, did not address the Equal Protection Clause in finding that the indictment was valid because it only "dealt with the arguments [the petitioner] offered." *Id*. The state court could therefore not be faulted "for failing also to consider sua sponte" the equal protection claim, which was not fairly presented. *Id*. As another example, simply giving a state court an opportunity to reach a claim's merits does not fairly present a claim. *Castille*, 489 U.S. at 351, 109 S. Ct. at 1060. The inmate in *Castille* filed a petition with Pennsylvania's highest court seeking further review where he raised, for the first time ever, two claims that were later advanced in his federal habeas petition. *Id*. at 347–48, 1058. Such review, however, was only afforded by the Pennsylvania court if "there are special and important reasons therefor." *Id*. at 351, 1060. The Supreme Court found that the manner in which this inmate presented his claims did not "constitute 'fair presentation.'" *Id*.

Under established Texas law, an appellate court is not required to address a conceded issue. *See Alameda v. State*, 235 S.W.3d 218, 223 (Tex. Crim. App. 2007) ("Appellant concedes that if the audiotape were admissible, his complaint regarding the admissibility of the transcript of the recorded conversations would be moot. Therefore, because the audiotape was properly admitted, the transcript was also admissible, and we do not need to address Appellant's second ground for review."); *In re Estate of Vackar*, 345 S.W.3d 588, 592–93 (Tex. App.—San Antonio 2011, pet. denied) ("Based on Betty's concession that the trial court's judgment is not supported by the jury's finding of undue influence, we need not address Maggie's issues regarding

undue influence.").

Texas's rule is hardly unique. *Brent v. Dominguez*, 234 F. App'x 528, 529 (9th Cir.  2007) ("We do not address the merits of the district court's dismissal of Brent's APA claims because,  in his reply brief, Brent conceded that the dismissal of those claims was proper."); *United States v. Agofsky*, 458 F.3d 369, 374, n.4 (5th Cir. 2006) ("Agofsky asserts additional claims solely to preserve  them for further review. Inasmuch as Agofsky concedes that these claims are foreclosed by precedent binding on this Court, we do not address them.").

By conceding the Confrontation Clause claim conditioned on state law admissibility, Mr. Gardner permitted the state court to avoid adjudicating the claim's constitutional merits.  Mr. Gardner's action of conceding the constitutional issue predicated on state law admissibility  is a hybrid of *Picard* and *Castille*. Mr. Gardner placed the same facts before the State court and this court. According to *Picard*, this is insufficient. Mr. Gardner placed the same legal argument before the  State court and this Court. According to *Castille*, this is also insufficient. Mr. Gardner was required to  present his Confrontation Clause claim in a manner that required adjudication by the Court of Criminal  Appeals—opportunity is not enough. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S. Ct. 1732  (1999) ("Section 2254(c) requires only that state prisoners give state courts a fair opportunity to act  on their claims.")

By conceding the constitutional issue, Mr. Gardner did not provide the Court of Criminal Appeals a  fair  opportunity  to  act  on  the  claim.  Raising  a  claim  on  appeal  but  thereafter shortly  conceding the correctness of the lower court's decision is akin to  raising no issue at all. Accordingly,  this claim is unexhausted.

If Mr. Gardner files another state application in an attempt to exhaust this claim, it would be  dismissed as abusive since he was required to  include all  available  grounds  for  relief  in

his first application save certain, narrow exceptions that Mr. Gardner does not meet. *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997). It is well-settled that abuse of the writ constitutes an adequate and independent state law ground that bars federal habeas review. *Id.; Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995). It is also well-settled that the Court of Criminal Appeals applies its abuse-of-the-writ rules regularly and strictly. *See Fearance*, 56 F.3d at 642. Where an inmate's failure to exhaust precludes further state review, such unexhausted claims are procedurally defaulted in federal court. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1, 111 S. Ct. 2546, 2557 (1991). Consequently, Mr. Gardner's Confrontation Clause claim is procedurally defaulted.

### 3. Mr. Gardner's Confrontation Clause claim is barred from federal review by an adequate and independent State law ground.

A federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 558 U.S. 53, 55, 130 S. Ct. 612, 614 (2009). Foreclosure of federal review "applies whether the state law ground is substantive or procedural." *Coleman*, 501 U.S. at 729, 111 S. Ct. at 2553–54 When an inmate fails to properly raise a claim in state court he "has deprived the state courts of an opportunity to address those claims in the first instance." *Id*. at 732, 2555.

Accordingly, preventing review of claims decided on state law procedural grounds "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Id*. A state-law procedural bar is adequate to preclude federal consideration of a claim if it is "'firmly established and regularly followed.'" *Lee v. Kemna*, 534 U.S. 362, 376, 122 S. Ct. 877, 885 (2002). The discretionary nature of such a bar does not make it any less "adequate" for a "discretionary rule can be 'firmly established' and 'regularly followed' even if the appropriate

exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard*, 558 U.S. at 60-61, 130 S. Ct. at 618. Those situations where a state law ground is found inadequate are but a "small category of cases." *Kemna*, 534 U.S. at 381, 122 S. Ct. at 888. Decisions by State courts "are independent of federal law [when] they do not depend upon a federal constitutional ruling on the merits." *Stewart v. Smith*, 536 U.S. 856, 860, 122 S. Ct. 2578, 2581 (2002). In the context of federal habeas, there is no presumption of federal law consideration unless it is first determined that the state court decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law." *Coleman*, 501 U.S. at 735, 111 S. Ct. at 2557 (internal citations and quotations omitted). Where there is no "clear indication that a state court rested its decision on federal law, a federal court's task will not be difficult." *Id*. at 739–40, 2559.

When a claim has been procedurally defaulted in state court, federal review is only allowed when a petitioner has shown cause and prejudice, or shown that a fundamental miscarriage of justice will occur but for review of the claim. *Id*. at 749–50, 111 S. Ct. at 2564. A petitioner can invoke the miscarriage-of-justice exception only if he can show that he is actually, as opposed to legally, innocent of the crime or of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 339–40, 112 S. Ct. 2514, 2519 (1992). Actual innocence of the death penalty looks to eligibility for a sentence of death, not the jury's discretion in imposing such punishment. *Id*. at 346–47, 2522–2523.

Mr. Gardner's confrontation claim was adjudicated on an adequate and independent state law ground—the Court of Criminal Appeals accepted the concession of a party. *Gardner*, 306 S.W.3d at 288 n.20. The acceptance of a party's concession does not implicate federal law, so such action is independent of it. Texas courts have long accepted concessions. *See Trigeant*

*Holdings, Ltd. v. Jones*,  183 S.W.3d 717, 721 n.1 (Tex. App.—Houston [1ˢᵗ Dist.] 2005, pet.

denied). Texas courts often deny claims based on a concession, so it is a practice that is regularly

followed. *E.g.*, *Alameda*, 235 S.W.3d at 223; *In re  Estate of Vackar*, 345 S.W.3d at 592–93. As

such, the denial of a claim based on a concession is an adequate and independent state-law ground

precluding federal review.  Mr. Gardner has not shown cause and prejudice or a miscarriage of

justice despite his burden to do so.  Therefore,  the  Confrontation Clause claim is procedurally

defaulted as a result.

### 4.     *Alternatively, Mr. Gardner is judicially estopped from taking a position contrary to the one he took on direct appeal.*

Mr.  Gardner conceded that the Confrontation Clause issue is contingent on a finding that the

911 call was a dying declaration. Appellant's Brief at p. 44, *Gardner v. State*, 306 S.W.3d 274

(Tex. Crim. App. 2009) (No. AP-75,582). The Court of Criminal Appeals accepted the concession

after it found that the 911 call met Texas's dying declaration exception and did not decide the

constitutional issue. *Gardner*, 306 S.W.3d at 289 n.20.  Mr. Gardner's new argument is  judicially

estopped.

> Where a party assumes a  certain  position  in  a  legal  proceeding, and  succeeds
> in maintaining that position, he may not thereafter, simply because his interests
> have changed, assume a contrary position, especially if it be to the prejudice of
> the party who has acquiesced in the position formerly taken by him. This rule,
> known as judicial estoppel, generally prevents a party from prevailing in one phase
> of a case on an argument and then relying on a contradictory argument to prevail
> in another phase.

*New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814 (2001). This doctrine protects

"the integrity of the  judicial process by prohibiting parties from deliberately changing positions

according to the exigencies of the moment." *Id*. at 749–50, 1814 (internal citations omitted).

Several principles guide application of judicial estoppel: (1) "a party's later position must

be  clearly  inconsistent  with  its  earlier  position,"  (2)  "whether  the  party  has  succeeded  in

persuading a court to accept that party's earlier position," and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51, 1815.

These requirements are met in this case. Mr. Gardner is taking inconsistent positions—he admitted the constitutionality of the 911 call on direct appeal. *See* Appellant's Brief at p. 44, *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009). Mr. Gardner now argues that it is unconstitutional. Pet. at pp. 129–35. Second, he persuaded the Court of Criminal Appeals to accept his concession, so the court did not decide the claim's merits. *Gardner*, 306 S.W.3d at 289 n.20. Third, Gardner is seeking an unfair advantage—he could have determined the constitutionality of his claim on direct appeal and could have allowed the state courts to correct the error, if any. *See Coleman*, 501 U.S. at 732, 111 S. Ct. 2555 (exhaustion requirement exists to provide state courts with the first opportunity to correct error). Instead, he seeks to unravel his conviction several steps down the line, and after declining to use an appropriate forum to litigate his claim. *See Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S. Ct. 3383, 3391-3392 (1983) ("Direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception."), overruled on other grounds by *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059 (1997). Mr. Gardner has not alleged that appellate counsel was ineffective by conceding the issue on direct appeal. Accordingly, Gardner has forfeited the right to raise his current claim.

**E.     Mr. Gardner's Supplemental IATC claim is meritless (Claim Six).**

During the pendency of this case, opinions in *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012), and *Trevino v. Thaler*, 569 U.S. 413, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013) were issued by the Supreme Court. This court appointed independent counsel to

brief any supplemental claims to determine whether Mr. Gardner had any claims procedurally defaulted such that analysis under *Martinez* and *Trevino* is proper.

In supplemental briefing provided by independent counsel, Mr. Gardner alleges that State habeas counsel should have raised the following claim in State court—trial counsel were ineffective for failing "to get the work product of their recalcitrant mitigation specialist, Shelli Schade." Suppl. Pet. a t p . 1. Mr. Gardner argues that the mitigation specialist "refused to share notes from her mitigation investigation and refused to summarize her findings in a report to the attorneys" because "[s]he was overly concerned with what could be discoverable by the State." *Id*. at p. 4. Mr. Gardner argues that trial counsel were deficient because they did not demand that Schade turn over her notes, which belonged to Mr. Gardner as a matter of agency law. *Id*. at pp. 5–9.

## 1. Mr. Gardner's claim was presented and adjudicated in State Court, making *Martinez/Trevino* inapplicable.

*Martinez/Trevino* provides no relief for Mr. Gardner because the legal and factual bases of the supplemental IATC claim were before the State court, and the claim was adjudicated on the merits. To exhaust remedies, a petitioner "must 'fairly present' his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004); *see* also *Duncan v. Henry*, 513 U.S. 364, 365–66, 115 S. Ct. 887, 888 (1995) (per curiam). State habeas counsel, in State habeas claims three and four, identified the correct federal precedent—*Strickland v. Washington*. 1 SHCR 43–44, 62–63. Accordingly, the legal framework of the supplemental IATC claim was before the state court. *See Baldwin*, 541 U.S. at 32, 124 S. Ct. at 1351 ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim . . . by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds . . . .").

The facts supporting the  supplemental IATC claim were also before the State court, including (1) trial counsel must conduct, or cause to be conducted, a thorough mitigation investigation (1 SHCR 44–45, 63–64); (2) the defense team members are required "to provide counsel with documentary evidence of the investigation" (1 SHCR 45, 64); (3) despite the document-provision obligation on  defense team members, trial counsel "bears ultimate responsibility for the performance of the defense  team" (1 SHCR 45, 64); (4) trial counsel performed deficiently because Schade conducted an  inadequate mitigation investigation, including the failure to contact corroborating witnesses and to compile and *document* "a complete psycho-social history" (1 SHCR 46–49); (5) because  of these inadequacies, "when experts were retained, *the trial attorneys failed to provide the experts with a documented social history*" (1 SHCR 49); (6) specifically, Dr. Kessner stated that she was concerned about insufficient corroboration of information and that "Schade did not provide with notes  from any interviews she conducted," which limited her "ability to present mitigation information" about Gardner (1 SHCR 50–51); (7) after State habeas counsel's mitigation specialist Toni Knox conducted an adequate mitigation investigation "friends and a church member . . . provided  corroborating information to some of [Mr. Gardner's] history" (1 SHCR 51); and (8) with this "crucial" corroborating information, Dr. Kessner could have developed "a unified theme of abandonment rage and trauma" that would have "supported a verdict other than death" (1 SHCR  52–61, 67–72).

The factual allegations in State court mirror those in the supplemental IATC claim. *Compare*  Suppl. Pet. at pp. 4–12,  *with* 1 SHCR 44–72. Mr. Gardner essentially concedes that  his supplemental IATC claim was before the State court. Suppl. Pet. at p. 2 ("Much of the information presented in the preceding  paragraph was presented in Claims 3 . . . and 4" in State court); Supp.

Pet. at p. 12 ("To be sure, there is substantial overlap between Gardner's *Martinez/Trevino* claim and the nucleus of IATC claims presented both in state habeas and in the opening writ.").

Mr. Gardner's numerous citations to the State court record in support of the supplemental IATC claim prove that it was presented in State court. *See, e.g., id.* at p. 4 (citing the trial attorneys' affidavit before the State habeas court and citing Dr. Kessner's State habeas affidavit). Thus, the record indicates that both the law and the facts of the supplemental IATC claim were raised in Mr. Gardner's State habeas application.

Since the legal and factual bases were presented to the state court, this court must inquire as to whether the supplemental IATC claim was adjudicated on the merits. There is a legal presumption that the query was adjudicated. *See Johnson v. Williams*, 568 U.S. 289, 301, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits."); *Harrington v. Richter*, 562 U.S. 86, 99, 131 S. Ct. 770, 784-785 (2011).

Mr. Gardner points to State court findings addressing the supplemental IATC claim. *See* Suppl. Pet. at pp. 11–12 (citing Findings 32, 64, and 67 of the State habeas trial court's findings, although the State Court did not adopt Finding 67). The relevant findings are: (1) that the trial attorneys hired Schade (Finding 64), (2) that despite some uncooperativeness on Schade's part, the trial attorneys did not feel it impeded the overall mitigation investigation (Finding 67), and (3) that there was no prejudice from Dr. Kessner's revised opinion after a full investigation had been completed by the State habeas mitigation specialist (Finding 32). *Id.* The fact that there are State court findings on which Mr. Gardner relies indicates that state court adjudication of this claim occurred.

Accordingly, as a matter of presumption and of fact, the supplemental IATC claim was adjudicated on the merits in State court. Consequently, because there is State court adjudication of the supplemental IATC claim, *Martinez/Trevino* does not apply to this case. *See Escamilla v. Stephens*, 749 F.3d 380, 394 (5th Cir. 2014) ("We conclude that *Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted.").

**2.**  **Alternatively, assuming no State court presentment, Mr. Gardner fails to prove a substantial IATC claim or the ineffectiveness of State habeas counsel.**

To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [Mr. Gardner] must show that:

> (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claims have some merit," and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application.

*Chanthakoummane v. Stephens*, 816 F.3d 62, 72 (5th Cir. 2016) (citing *Preyor v. Stephens*, 537 F. App'x 412, 412 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014). "The petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Chanthakoummane*, 816 F.3d at 72 (quoting *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013, *cert. denied* 134 S. Ct. 1786 (2014)).

a.  The supplemental IATC claim does not meet the standard of *Strickland*.

Under *Strickland*, to prove ineffectiveness, an inmate must establish both that the attorney's actions were deficient and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687, 2064. A failure to prove either results in denial of the claim. *Id*. at 687, 2064. To establish deficient performance, an inmate must show that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688, 2064.

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance; that is, the [petitioner] must overcome the resumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689, 2065 (internal citations and quotations omitted). Concerning prejudice, an inmate must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 2068.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105, 131 S. Ct. at 788.

> b. State habeas counsel's failure to present the supplemental IATC claim was not ineffective.

Assuming that the supplemental IATC claim was not presented in state court, counsel's failure to raise such a claim is not ineffective, and thus, Mr. Gardner cannot avail himself of *Martinez/Trevino*. First, because there was no merit to the supplemental claim, "habeas counsel was not ineffective in failing to raise the claim at the first state proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013); *see Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("[A state-habeas] counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective."). Mr. Gardner fails to prove either deficient performance or prejudice as to trial counsel, so state habeas counsel was not ineffective by not submitting this IATC claim in State court.

Second, counsel, including collateral-review counsel, have enormous discretion in their claim- presentation choices. Counsel may disregard "weaker arguments [and focus] on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313 (1983). Counsel "is not required to have a tactical reason—above and beyond

a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether." *Knowles v. Mirzayance*, 556 U.S. 111, 127, 129 S. Ct. 1411, 1422 (2009).

In Mr. Gardner's case, there are several reasons why State habeas counsel could have made a reasonable decision to omit the supplemental IATC claim from Mr. Gardner's State habeas application. State habeas counsel could have recognized the oral-versus-written distinction mentioned above—that the mitigation specialist, Schade, provided the defense team with the substance of her mitigation investigation, albeit orally. Unless something was actually withheld by Schade, which Mr. Gardner did not demonstrate, State habeas counsel could have recognized that relief on this minor point was unlikely and therefore not have raised it.

State habeas counsel could have also reasonably believed that the failure-to-investigate (claim three) and failure-to-present (claim four) IATC claims fully encapsulated the supplemental IATC claim. In other words, because the asserted prejudice for these two claims fully subsumed any prejudice potentially flowing from mitigation evidence allegedly withheld by Schade, there was no point in separately raising the supplemental IATC claim.

A reviewing court must affirmatively entertain the range of possible reasons that counsel may have had for proceeding as they did. *Pinholster*, 563 U.S. at 195, 131 S. Ct. at 1406. Because a reasonable attorney could have omitted the supplemental IATC claim from Mr. Gardner's State habeas application, Mr. Gardner fails to prove that State habeas counsel's actions were deficient. Further, Mr. Gardner fails to prove that the omission of the supplemental IATC claim from his State habeas application was prejudicial. He fails to prove that it is reasonably probable the State court decision would have been different had he raised the supplemental IATC claim. The allegation that Schade was less than cooperative was actually before the State habeas court, but

the court still denied relief. Simply repackaging these allegations into a separate claim does not make it more likely that relief would have been granted. Mr. Gardner fails to prove that anything was actually withheld by Schade; therefore, it cannot be said that the State court's decision would have differed had the supplemental IATC claim been before it. Mr. Gardner has failed to prove that State habeas counsel was deficient or that such deficiencies resulted in prejudice and he therefore cannot utilize *Martinez/Trevino* to reach the merits of his supplemental IATC claim.

Having addressed the ineffective assistance of trial counsel claim, and having found it without merit, the court concludes that none of the claims is "substantial" for the purposes of *Martinez*. Mr. Gardner has not demonstrated ineffective assistance of State habeas counsel. Mr. Gardner is not entitled to relief under *Martinez* or *Trevino*. In conclusion, Mr. Gardner has not shown that he is entitled to federal habeas corpus relief.

The petition for a writ of habeas corpus is denied.

## VI.    CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Mr. Gardner has not yet filed a notice of appeal, the Court may *sua sponte* address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000)("[T]he district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained

the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1603 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484, 120 S. Ct. at 1604. "When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the denial of Mr. Gardner's § 2254 petition on substantive or procedural grounds, nor could they find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034 (2003); *see* also *Slack*, 529 U.S. at 484, 120 S. Ct. at 1603. Accordingly, the Court finds that Mr. Gardner is not entitled to a certificate of appealability as to his claims.

## VII.   CONCLUSION

It is therefore **ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED WITH PREJUDICE**.  It is further

**ORDERED** that a certificate of appealability is **DENIED**.  It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this **1**  day of **March, 2018**.

_____
Ron Clark, United States District Judge